Donville James
Reg. No. 14388-424

FILED

Appearing Pro-se

Mar 10, 2008

CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
vs. )   Case No. 02-CR-278
)
DONVILLE JAMES, )
)
Petitioner. )   **08CV 1416**
)   **JUDGE ANDERSEN**
_____ )   **MAGISTRATE JUDGE SCHENKIER**

## MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY PERSON IN FEDERAL CUSTODY

1. Name and location of court which entered the sentence under attack: U.S. District Court for the Northern District of Illinois, 219 S. Dearborn, Chicago, Illinois.

2. Date of Judgment of Conviction: June 20th, 2005.

3. Length of sentence: 211 months imprisonment, no supervised released.

4. Nature of offense or offenses for which you were convicted: Knowingly attempting to possess with intent to distribute a controled substance, namely powder cocaine in excess of

-1-

five kilograms, in violation of 21 U.S.C. § 846 (Count One); Carrying and possessing a firearm during and in relation to and in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(1) (Count Two); and possessing and concealing, with intent to defraud, falsely made, forged, and counterfeit obligations of the United States, namely Federal Reserve notes, totaling $87,430, in violation of 18 U.S.C. § 472 (Count Three).

5.   What was your plea? Not Guilty.

6.   Kind of trial: Jury.

7.   Did you testify at trial? No.

8.   Did you appeal from the Judgment of Conviction: Yes.

9.   If you did appeal, answer the following:

   (a)   Name of Court: U.S. Court of Appeals for the Seventh Circuit.

   (b)   Result: Conviction affirmed.

   (c)   Date of result: June 4th, 2007.

10.   Other than a direct appeal from the Judgment of Conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal: No.

11. If your answer to #10 was "yes", give the following information:

    (a)   (1)  Name of Court: N/A
           (2)  Nature of proceeding: N/A
           (3)  Ground raised: N/A
           (4)  Did you receive an evidentiary hearing on your petition, application or motion: N/A
           (5)  Result: N/A
           (6)  Date of result: N/A

    (b)  As to any second petition, application or motion, give the same information:

           (1)  Name of Court: N/A
           (2)  Nature of proceeding: N/A
           (3)  Grounds raised: N/A
           (4)  Did you receive an evidentiary hearing on your second petition, application or motion: N/A
           (5)  Result: N/A
           (6)  Date of Result: N/A

    (c)  Did you appeal, to an appellate federal court having jurisdiction, the result of action taken on any petition, application or motion: N/A

           (1)  First petition, etc.: N/A
           (2)  Second petition, etc.: N/A

    (d)  If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not: N/A


## GROUNDS FOR RELIEF


## I.  PROCEDURAL HISTORY

Donville James (Petitioner) was charged in a three-count indictment with knowingly attempting to possess with intent to distribute a controlled substance, namely powder cocaine in excess of five kilograms, in violation of 21 U.S.C. § 846 (Count One); Carrying and possessing a firearm during and in relation

-3-

to and in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(1)(Count Two); and possessing and concealing, with intent to defraud, falsely made, forged, and counterfeited obligations of the United States, namely Federal Reserves Notes, totaling $87,430, in violation of 18 U.S.C. § 472 (Count Three).

Following a five day trial, a Jury found Petitioner guilty of all three counts in the indictment on September 10th, 2002.

On May 31st, 2005, the district court sentenced Petitioner to 151 months on Counts One and Three, to run concurrently, and 60 months on Count Two, to run consecutively to Counts One and Three. The sentencing order was entered on June 20th, 2005. On July 15th, 2005, the district court issued an amended sentencing judgment to clarify that Petitioner was to be sentenced to a total of 211 months. The Sentencing order was entered on July 22nd, 2005.

Petitioner filed a timely notice of appeal on July 14th, 2005. Petitioner's appeal was argued on October 16th, 2006 and decided June 4th, 2007.

Petitioner's conviction was affirmed by the Appellate Court on June 4th, 2007.

## II.  FACTUAL BASIS

### A.  ENTRAPMENT

The Government's criminal informant from the start of his cooperation with the Government never once told them that Petitioner was trying to purchase cocaine, neither from the

-4-

informant himself, nor from his source or anyone else. In the statement the informant gave to the prosecutors about the "cricumstances involving the investigation of Petitioner", the informant claimed that Petitioner purchased 98 pounds of marijuana and paid for it with $68,000 in counterfeit money. The informant stated that he contacted Petitioner and told him about the problem and Petitioner told him that he was not responsible for it. A few days later the informant contacted Petitioner on his cellular telephone again to discuss the problem. During that conversation, the informant stated that he argued with the Petitioner, at which time Petitioner told the informant that if the informant wanted, he could attempt to locate Petitioner and he and the informant could fight it out and they would see who killed who. After that conversation, Petitioner would not answer his phone when the informant called.

The informant told the prosecutors that as a result of the marijuana deal going bad, the Mexican Mafia drug organization held the informant responsible for the loss and began to pressure the informant for their money. Sometime in September or October (2001), Jorge and Primo (from the Mexican Mafia) called the informant to a meeting at a park where approximately six hispanic males were waiting. Jorge and Primo set a deadline for the informant to come up with the money or else he or his family would be harmed.

The informant stated that he was unable to reach Petitioner on his cellular phone and was desperate to speak with him. The informant stated that he paid one of his friends whom worked at Primco $1,000 to obtain the new telephone for Petitioner as well

-5-

as an address for Petitioner. The source then spent approximately one week going by the house at all hours of the day and night in an attempt to locate the Petitioner, without success. In addition, the source called the new number provided to him by his friend David whom worked at Primco and was able to reach Petitioner. After repeated telephone calls to Petitioner, Petitioner finally agreed to help the informant with the situation with the Mexican Mafia by providing either all or at least some of the money owed.

The informant stated that even after Petitioner had agreed to help, he still had to continue to call Petitioner and beg Petitioner to pay some amount of money, because Jorge and Primo were on his back over the debt. The informant stated that he told Petitioner that Jorge and Primo had threatened him and his family over the debt, and told Petitioner that if anything was to happen to his family, then he would do something in return to Petitioner.

The informant stated that on several occassions Petitioner "suggested" that he could provide the informant with counterfeit money that the informant could use to rip off drugs from a dealer, then the informant could sell the drugs for cash to pay off his debt.

After Petitioner made the "suggestion" to the informant, the informant stated that he approached several Chicago Police Department Officers who were friends of his sister. These officers in turn introduced the informant to a Drug Enforcment Administration (DEA) Agent who told the informant that due to his pending state narcotics case, the DEA would not be willing

-6-

to work with him. It was at that time, in November of 2001, that the informant walked into the offices of the FBI in Chicago and asked to speak with agents.

The informant stated that just prior to approaching the FBI, he spoke with a friend named Guadalupe Ovalle, whom the informant knew to be involved in selling both cocaine and marijuana. The informant asked Ovalle if he could obtain between five and seven kilograms of cocaine and entered into negotiations with both Ovalle and his supplier to conduct the deal. The informant explained that he felt that he needed to have a couple of cases lined up with people he knew were involved in drug trafficking in order to convince the FBI to work with him. See App. 0136-0144 for the entire statement the informant gave to the prosecutors about the "circumstances regarding the investigation of Petitioner".

The informant walked into FBI's office on November 26th, 2001 and asked to speak with agents. Tr. 105, 1-5.[1] Based on what the informant told the FBI they started investigating Petitioner. Tr. 204, 14-16. After almost four months of investigation, ending on February 8th, 2002, the FBI uncovered no evidence that the Petitioner was involved in illegal drug activities. The informant's primary handler, Agent Sodetz,who had all the information relevant to Petitioner's case, Tr 217, 25. 218, 1, contacted the United States Secret Service and informed them that their informant knew someone who "suggested" that he could provide their informant with counterfeit money. On the

---

[1] Tr: Trial Transcript, Page #, Line#.
App: Appendix, Page #.

same day, February 8th, 2002, the Secret Service was charged to investigate Petitioner on three matters related to counterfeiting United States Currency. Secret Service Special Agent (SSSA) Daniel Dick was assigned as the agent in charge of the investigation involving Petitioner. He was charged to investigate Petitioner for:

> Primary Case Type: Manufacturing United States Currency (735.041)
>
> Secondary Case Types: (1) Dealing in United States Currency (735.021)
>
> (2) Crimes involving use of emerging technology (848.930)

See App. 0045, primary case type and secondary case types.

The USSS investigation charged to SSSA Daniel Dick to investigate was the only investigation that was ongoing by any federal agency between February 8th, 2002 and March 25th, 2002 involving the Petitioner. SSSA Mckenna testified that the USSS investigates crimes involving counterfeiting money, and does not investigate narcotics or firearms. Tr. 779, 2-4. Agent Mckenna stated that the FBI handles narcotics and firearms violations. Tr. 279, 1-8.

FBI Agent Depodesta testified that the first time he "took part in any law enforcement activity" involving the Petitioner was on March 21st, 2002. Four days before Petitioner was arrested. Tr. 109, 12-13. The only law enforcement activity FBI Agent Depodesta could have taken part in involving the Petitioner on March 21st, 2002 were the counterfeiting matters Petitioner was being investigated for by the USSS. His own

-8-

agency found no evidence that Petitioner was involved in any illegal drug activity during their investigation of Petitioner between November 26th, 2001 and February 8th, 2002, and does not have jurisdiction in the matters Petitioner was being investigated for by the USSS.

During the USSS investigation of Petitioner on the three counterfeiting related matters, FBI Agent Depodesta, on March 21st, 2002, "instructed" the informant to "engage" Petitioner in "drug communication". At trial, the prosecutors questioned Agent Depodesta and asked him:

> "I just want to make sure I and the jury
> understands what your instruction with Mr.
> Dubon (informant) was. Was it your
> instruction to Mr. Dubon that he should
> engage in drug communication with the
> defendant or just keep in contact with the
> defendant?"

Agent Depodesta answered:

"Both." Tr. 248, 11-16

The drug communication FBI Agent Depodesta "instructed" the informant to "engage" Petitioner in was recorded by him and played by the Government at trial as the "negotiation" of Petitioner negotiating to purchase drugs from the informants source. A cursory review of the recording showed that there was no negotiation, and what really occurred was that Agent Depodesta instructed the informant to originate, create, incite,

-9-

instigate, and lure Petitioner into a drug crime. The first
thing the informant said to Petitioner on the March 21st, 2002
recorded conversation was:

> "Well, like I say, I got the guy set up....
> I mention to him between seven and ten
> (kilograms of cocaine)." App 0076, para 15.

The informant continued to tell Petitioner on the
recording:

> "um, he (the guy the informant set up) live
> by..., I don't know exactly his house, he's
> not gonna tell me exactly where it is, cause
> I could rob him myself... at Naragonsett and
> Deversey in the parking lot. We can do that
> (rob the guy) in the parking lot."
> App 0083, para 2.

The informant made it clear to the Petitioner that he
(informant) is the one who wanted to <u>rob</u> the guy he set up in
the parking lot when he told Petitioner that:

> "...I wanna do (rob the guy) this guy..."
> App 0085, last line. 0086, first line.

The informant said he wanted to arrange his plan to rob
cocaine from the guy he set up in the parking lot to:

> "Do like you (Petitioner) fuck us (the
> informant and the guy he set up) up."
> App 0086, para 9.

-10-

This meant that when the people supplying the cocaine to the informant found out that they were paid with counterfeit money, the informant would tell them that Petitioner was responsible for doing it and avoid any retaliation.

All along, this was just a scheme orchestrated by the informant, who was following the instruction of FBI Agent Depodesta. Putting the contents of the March 21st, 2002 recording in context. After the informant asked Petitioner to provide him with counterfeit money, the informant told Petitioner that he was going to use the counterfeit money and rip off cocaine from a guy the informant set up in the parking lot at Naragansett and Deversey. The informant told Petitioner that he needed Petitioner's help with the rip off because he did not know where the guy lived and he would have to rob the guy in the parking lot. Also that he could rob the guy by himself if he knew where the guy lived.

To further pull Petitioner into a drug crime, FBI Agent Depodesta instructed the informant to offer to split the cocaine with Petitioner. The informant followed FBI Agent Depodesta's instruction and told Petitioner:

> "It would be better, how we gonna split it
> (the stolen cocaine) or what?
> App 0076, last line.

To further pull Petitioner into a drug crime FBI Agent Depodesta instructed the informant to get Petitioner to agree that he would help sell the stolen cocaine. The informant followed FBI Agent Depodesta's instruction and told Petitioner:

-11-

"Alright, you (Petitioner) help <u>sell</u> them (the
stolen cocaine)." App 0079, para 10.


To further pull Petitioner into a drug crime, FBI Agent
Depodesta <u>instructed</u> the informant to offer to <u>sell</u> the stolen
cocaine to Petitioner for $10,000 per kilogram if Petitioner
would "help sell" the stolen cocaine. The informant followed FBI
Agent Depodesta's <u>instruction</u> and told Petitioner:

> "I wanna do it like I tell you, ten grand
> ($10,000), I (CI) gonna <u>sell</u> you each one
> (the stolen cocaine) ten, you make ten, I
> make ten, but I do not got much people to
> <u>sell</u> it (the stolen cocaine)."
> App 0077, para 1.


At the time FBI Agent Depodesta gave the informant the
instruction to engage Petitioner in drug communication on March
21st, 2002, the FBI did not have jurisdiction in the counterfeit
matters the USSS was investigating Petitioner for. Furthermore,
the informant was already cooperating with the FBI on other
cases unrelated to Petitioner, which made him an active
government agent. Plus, FBI Agent Depodesta never had permission
from his supervisor for the FBI to open up an new drug
investigation involving the Petitioner. The criminal informant
was an FBI controlled informant. FBI Agent Depodesta was suppose
to make the informant available to the USSS in their
investigation of Petitioner on the three counterfeiting matters
charged to them to investigate. Instead, he used the informant
to instigate a drug crime, without probable cause to do so.

-12-

**B.    PROSECUTORIAL MISCONDUCT**

### 1.    Suborning Perjury

During the informant's Grand Jury testimony, the prosecutor, Ms. Hays, asked him:

> "Allen (informant), did you meet with me yesterday and give me a statement regarding the circumstances surrounding the investigation of Donville James (Petitioner)."

In which he answered:


"Yes"

Q.    "And did you meet with me again today before you came in here?"

A.    "Yes."

Q.    "And did I give you a statement that reflected what you told me the day before?"

A.    "Yes."

Q.    "And did you read the statement carefully?"

A.    "Yes."

Q.    "And is everything in that statement true and correct and based on what you told me?"

A.    "Yes."


The informant was then asked by the prosecutor, Ms. Hays, to read her "prepared statement" before the Grand Jury as his testimony "regarding the circumstances surrounding the investigation" of Petitioner. He then preceeded to read the prosecutor's "prepared statement" to the Grand Jury in which he

-13-

testified before the Grand Jury that:

1. "On March 16th, 2001 (2002)[2/] James (Petitioner) called me and we agreed that he would purchase 1 kilo of cocaine from my source for $20,000 in counterfeit currency and he would give me $10,000 in real currency."

2. "On March 21st, 2002, we agreed that James would purcahse 10 kilos of cocaine from my source for $200,000 in counterfeit money."

3. "On March 22nd, 2002, James called me and asked whether he could buy 20 kilograms from my source."

4. "On March 24th, 2002, James and I agreed that he (Petitioner) will purchase 15 kilograms from my source."

5. "He (Petitioner) told me he would pay me $20,000 in real currency for arranging that transaction."

6. "On March 25th, 2002, James and I met in McDonald's parking lot to further discuss the conduct of this transaction." See App 0060-63 for the entire informant's Grand Jury testimony. See App 0058 for the "prosecutors prepared" statement.


SSSA Daniel Dick, who was the case agent, also testified before the Grand Jury. His testimony was identical to the prosecutor's prepared statement. He testified that:

1. The USSS was informed by the FBI that Petitioner "was planning on purchasing cocaine with counterfeit United States Currency."

2. In or about February of 2002, Petitioner "approached the FBI's confidential informant and asked him if he would arrange a deal

---

[2/]Petitioner did not know the informant in March of 2001.

where James would buy narcotics from the informant's source."

3. "James told the informant that he wanted to pay for the drugs with counterfeit currency."

4. On March 16th, 2002, James and the informant agreed that James would purchase one kilogram of powder cocaine from the informant's source for $20,000 in counterfeit currency and give the informant $10,000 in real currency.

5. "On March 21st, 2002, James wanted to buy 10 kilograms from the informant's source for $200,000 in counterfeit currency."

6. "On March 22nd, 2002, James called the informant and asked him whether his source could get James 20 kilos of cocaine."

7. "On March 24th, 2002, the informant and James agreed that James would buy 15 kilos of cocaine for $300,000 in counterfeit currency. See App 0228-0239 for the complete Grand Jury testimony of SSSA Dick.

The informant's statement of the "circumstances surrounding the investigation" of Petitioner totally contradicts everything in the prosecutor's prepared statement which was presented to the Grand Jury by the informant and SSSA Daniel Dick as to what the informant himself told the Government occurred between him and the Petitioner before the Petitioner was arrested. The only thing the informant told the Government that was relevant to the USSS getting authorization to open an investigation involving Petitioner was that on "several occasions" Petitioner "suggested" that he could provide the informant with counterfeit money. That the informant could use and rip off drugs from a dealer and the informant himself could sell the drugs for cash

-15-

to pay off his debt. He never mentioned, not once to the
Government, that the Petitioner ever asked to purchase drugs,
neither from him, nor from anyone else. The prosecutors suborned
perjury when they procurred the informant and SSSA Dick to
perjury themselves before the Grand Jury.

## 2. Suppression of Evidence

In the Governments motion responding to Defendant's "Motion
for the Government to produce the March 25th, 2002 audiotape and
tape recorder which "failed" for Examination by Defendant's Tape
Expert", the Government wrote:

> "Defendant's request to examine the tape
> recorder which failed should be denied. The
> "tape recorder" is actually a digital
> recorder which burns recorded conversations
> directly onto a CD rom. When the
> conversations are recorded on the CD rom,
> they are automatically erased from the
> digital recorder, and the CD rom itself
> becomes the evidence."

> "The audiotapes that will be provided to
> defense counsel are dubbed from the CD rom."

> "The recorder "failed" at the time of the
> March 25th transaction at issue because it
> was not turned on. The agents involved in
> the case were testing the equipment prior to
> the transaction. In testing the equipment,
> they were turning it on and off. After
> testing the equipment, they left it off by
> mistake." App 0224-25 at H.

None of the electronically gathered evidence in
Petitioner's case was recorded into the memory of any device
then automatically erased from the memory of that device. The
agents did not leave the equipment "off by mistake" on March

-16-

25th, 2002. The Government claimed that they recorded two
conversations, one on March 21st, 2002, and the other on March
24th, 2002. And that they attempted to do a third on March 25th,
2002, when they supposedly left the recorder off by mistake.
However, the Secret Service certified inventory of evidence
sheets showed that they inventoried the "original" recording in
Secret Service File (SSF) 1544.

### a) The March 25, 2002 recording

The inventory sheet showed the "original" March 25th, 2002
recorded conversation in USSS inventory as:

> "The below listed items was recovered from
> Agent Depodesta of the Federal Bureau of
> Investigation on 3/25/02 (March 25th, 2002)."
>
> "Marked for indentification: "DD 3/25/02 (SA
> Daniel Dick)."
>
> "1(one) compact disc, approximately 41
> minutes in length, comact disc is contained
> in a jewel case." App 0165.

The certified inventory of the March 25th, 2002 informant's
body wired recorded conversation was done on March 25th, 2002 by
SSSA Daniel A. Dick. The inventory of the disc was witnessed by
SSSA Michael J. Newberg on March 25th, 2002. The reviewing
supervisor for the inventory of the disc was SSSA Glenn R.
Westland. The disc was inventoried and placed into SSF 1544, and
labled with serial number 201-2002-CE-000442.

SSSA Dick also prepared a list called the "Dispostion of

Evidence, Contraband, and Personal Property" list, in which he logged the March 25, 2002 informant's body wired recorded conversation as:

> "One compact disc containing the recording of the body wire placed on the criminal informant by the Federal Bureau of Investigation on 3/25/02 (March 25, 2002), has been inventoried on SSF 1544 Serial Number 201-2002-CE-0000442." **App. 0163, para 4.**

### b) **The March 24, 2002 recording**

The March 24, 2002 "original" recorded conversation was inventoried as evidence. The certified inventory sheet showed this piece of evidence was inventoried as:

> "The below listed item was recovered from agent Depodesta of the Federal Bureau of Investigation on 3/25/02 (March 25, 2002).
>
> "Marked for identification: "DD 3/25/02 (SA Daniel Dick)."
>
> "1(one) cassette tape maxwell C45, A side labeled '3/24/02 James Donville, 603pm-613pm Cooperating Witness', B side labeled 'Case #201-735-131941-8'".

The serial number assigned was 201-2002-CE-000443.

This same piece of evidence was also logged into the Disposition of Evidence, Contraband, and Personal Property list prepared by SSSA Daniel Dick as:

> "One (1) Maxwell C45 Cassette tape containing a consentual telephone call between James Donville and the criminal informant on 3/24/02 10 minutes in length, has been inventoried on SSF 1544 serial number 201-2002-CE-000443."

The same serial number as listed in the certified inventory of evidence list.

### c) The March 21, 2002 recording

The March 21, 2002 "original" recorded conversation was inventoried into evidence. The certified inventory sheet showed this piece of evidence was inventoried as:

> "The below listed item was recovered from agent Depodesta of the Federal Bureau of Investigation on 3/21/02 (March 25, 2002)."
>
> "Marked for identification: 'DD 3/21/02'. (SA Dick)".
>
> "1(one) compact disc, white in color, labeled with 'Case #201-735-131941-S', Date 3/21/01 contained in a jewel case."

Serial number 201-2002-CE-000446.

### d) The video tape

The March 25, 2002 "original" recorded video tape was inventoried into evidence. The certified inventory sheet showed this piece of evidence was inventoried as:

> "The below listed item was produced by an FBI SA on 3/25/02 during a surveillance/arrest operation..."
>
> "Marked for identification: 'DD 3/25/02' (SA Dick)."
>
> "1(one) Maxwell mini digital video cassette in case labeled 'James reverse buy/bust 03/25/02.'"

Serial number 201-2002-CE-000454.

The certified inventory of all recorded conversations in Petitioner's case was done by SSSA Daniel Dick. The inventory of these recorded evidence was witnessed by SSSA Michael J. Newberg. The reviewing supervisor for the inventory of these "original" copies was SSSA Glenn R. Westlund. Those "original" copies were not disclosed by the Government.

-19-

## C. EDITING, ALTERATION, MANIPULATION, AND TAMPERING WITH EVIDENCE

### a) The Transcript of the March 21, 2002 conversation.

During pretrial the Government disclosed a set of transcripts of what they claimed was the transcript of the March 21, 2002 recorded conversation which was labeled as "draft" copy.

When Petitioner decided that he would go to trial, the Government then disclosed a second set of transcripts which they labeled "final" transcript. The Government edited, altered, manipulated, and tampered with the final transcript to suit their case against Petitioner.

1. On the March 21, 2002 recording the informant is clearly heard saying to Petitioner:

> "Yeah, both of them (paying for drugs with counterfeit money) are gonna do like you (Petitioner) fuck us (the informant and the guy he set up to pay counterfeit money for their drugs) up." App 0086, para 9.

The Government in the first set of transcripts labeled "draft" transcript transcripted exactly what was on the tape.

They significantly manipulated this phrase by the informant in the "final" transcript they provided to the Jury at trial. The phrase made by the informant was changed by the Government to read:

> "Yeah, but both of them are gonna do like, you, you know..." App 0107, para 3.

The phrase "like you fuck us up." is completely gone.

$-20-$

**2.** The Government also made another significant manipulation to the March 21, 2002 transcript. on the recording, the informant is clearly heard saying to Petitioner:

> "It would be better, how we gonna split it (the cocaine that he was planning to purchase with the counterfeit money), or what? <u>Cause I wanna do it like "I" (CI) tell you (Petitioner), ten grand ($10,000), I (CI) gonna "sell" you (Petitioner) each one (stolen cocaine) ten ($10,000).</u> You make ten, I make ten, but I do not got that much people to sell it. You know..." App 0076, last line 0077, para 1.

In the "final" transcript the Government manipulated the phrase so the underlined portion reads:

> "Cause I wanna do it like I tell you, you know, ten grand. I wanna tell you each one you sell, you make ten..." App 0094, lines 2-5.

On the recording and in the "draft" transcript the informant is the one offering to "sell" the cocaine that he was planning to purchase with the counterfeit money he asked Petitioner to provide him with, and not some mysterious source as the Government claimed in their case against Petitioner.

**3.** The contents after page 19 of the "final" transcript were not included in the "draft" transcript. See App 0089 and 0109-0112, compare.

**b)** The March 21, 2002 recording

The recorded disc that was disclosed to the defense matched the "draft" transcript exactly. The disclosed disc and the "draft" transcript ended exactly at the same point.

The contents after Page 19 of the "final" transcript were not on the disclosed disc. The Government played a version of the March 21, 2002 recording at trial with the additional contents recorded to it.

c) The March 24, 2002 transcript.

The Government also disclosed a set of transcripts for the recorded conversation for March 24, 2002 also labeled "draft" transcript. The transcript was fourteen pages long. The Government only disclosed the last seven pages. The page numbers for the "draft" transcript are listed in the upper right hand corner of each page. The "draft" transcript showed that the Government suppressed the first six pages and only disclosed the last seven pages. App 0114.

However, the "final" transcript that the Government gave to the Jury at trial, the Government relabeled page 7/14 of the "draft" transcript to be page 1 of the "final" transcript. App 0123, compare to App 0114.

d) The March 24, 2002 recording

The March 24, 2002 recording was manipulated by the Government. The version of the disc that was disclosed by the Government did not contain the contents of the first six pages of the "draft" transcript.

e) The March 25, 2002 recording

The certified inventory of evidence showed that this recording was 41 minutes in length. Inventoried in SSF 1544 with serial number 201-2002-CE-000442. The Disposition of Evidence, Contraband, and Personal Property list logged this recording as "the recording of the body wire placed on the criminal informant by the Federal Bureau of Investigation on SSF 1544 serial number

201-2002-CE-000442", the same Serial number as the certified
inventory of evidence.

The recording was manipulated by the Government so that the
duplicate that was disclosed would be blank. While the original
copy was stored away in SSF 1544.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

### A. Legal Authorities

Petitioner is entitled to relief under  28 U.S.C. §2255
because his confinement is "in violation of the Constitution or
laws of the United States." 28 U.S.C. §2255, moreover, as the
Supreme Court has held "[a]n Ineffective-assistance-of-counsel
claim may be brought in a collateral proceeding 'under §2255,
whether or not the Petitioner could have raised the claim on
direct appeal." Messara v. U.S.,           , (2003). 3/

The Sixth Amendment to the United States Constitution
guarantees criminal defendants the right to counsel. See
Strickland v. Washington, 466 U.S. 668 (1984). This right to
counsel includes, but not limited to, protecting a defendant's
rights to a fair trial, because counsel's skills and knowledge
are necessary to accord defendant's "ample opportunity to meet
the case of the prosecution." See Adams v. U.S., ex. rel. McConn,
317 U.S. 269, 275-76 (1942).

Because counsel plays such a critical role, the United
States Supreme Court has held that: "... the [Constitution]

3/ Petitioner adopts this Procedural proposition in all effective
assistance of counsel claims.

right  to counsel is the right to effective assistance of counsel." McMonn v. Richardson, 379 U.S. 759, n.14 (1970). Thus, if a defendant's counsel fails to render adequate effective legal assistance, a defendant's Sixth Amendment rights are violated. Cugler v. Sullivan, 446 U.S. 335, 344 (1980).

In order to prevail on a claim of ineffective assistance of counsel within the framework established by the Supreme Court, in Strickland, supra, a defendant must satisfy a two-pronged test.

A defendant must show (1) that counsel's performance fall below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's objectively unreasonable performance, the result of the proceeding would have been different, Id 446 U.S. at 688-89.

In Strickland, supra, the Court found that "Judicial scrutiny of Counsel's performance must be highly deferential" and add that a "Court must indulge a strong presumption that Counsel's conduct falls within the wide range of reasonable assistance." Id.

The Court also found that: "Strategic choice made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional Judgement support the limitations on investigation. In other words, Counsel has a duty to make a reasonable decision that makes particular investigation

unnecessary."  Strickland, Supra.

Two years after it's Strickland ruling, the Supreme Court reaffirmed that this portion of it's decision sets forth what test can be made in evaluating whether the performance of counsel was within the range of "reasonable professional assistance", or fell below an objective standard of reasoanbleness. Kimmelman v. Morrison, 477 U.S. 365, 385-87, 91 L.Ed. 305, 106 S.Ct. 2574 (1986).

There the Court noted that: "A single serious error may support a claim of ineffective assistance of counsel." Id. at 384.

The Court added that this "single serious error" could cause counsel's performance to fall "below the level of reasonable professional performance," even where "counsel's performance at trial [was] generally credible enough," and even though Counsel had made vigorous cross-examination attempts to discreit witnesses, and [an] effort to establish a different version of the fact." Id. 477 U.S. at 386.

In Kimmelman v. Morrison, Supra, the Government argued and the Court agreed, that the determining factor was whether or not Counsel's "single serious error" or "failure" was the result of, or attributable to, a trial "strategy". Id. at 384-386.

However, the Court found no "strategy was involved in that case and that counsel's performance thereby fell below the Strickland objective standard because Counsel's failure was

based "On Counsel's mistaken beliefs" as to the laws governing discovery. Id. 477 U.S. at 385.

The Court in Kimmelman v. Morrison, Supra, also found that:

> "Viewing Counsel's failure to conduct and discovery from his perspective at the time he decided to forego that stage of pretrial preparation and applying a 'heavy measure of deference' to his Judgement, we find Counsel's decision unreasonable, that is, contrary to prevailing professional norms."

> "The Justification Morrison's attorney offered for his omission betrays a startling ignorance of the law, or a weak attempt to shift blame for inadequate preparation. Respondent's lawyer neither investigated, nor made up a reasonable decision not to investigate the State's case through discovery."

Kimmelman v. Morrison, 477 U.S. at 385.

In other words, the Court determined that Counsel's omissions were professionally unreasonable and had caused Counsel's performance to fall below the objective standard as set out in Strickland, Supra. Id. at 385.

In short, according to the Court, no deference is due to Counsel's actions, or inactions, and the performance of Counsel falls below the Strickland objective standard of reasonableness if Counsel's specific acts or omissions are not demonstrably the result of actual strategic choices made between or among all plausible options "after thorough investigation of the law and facts relevant to [the] options." Strickland, Supra, at 385-87.

Where a convicted defendant is making a claim of ineffective assistance of Counsel, the defendant:

-26-

> "... must identify the acts or omissions of counsel
> that are alleged not to have been the result of
> reasonable professional judgement." Strickland,
> Supra, at 690.

Finally, the Court determined that:

> "The principle governing ineffective claims should
> apply in federal collateral proceedings as they are
> for a new trial." Strickland, Supra.

B. **Claims**

### Claim One

Petitioner's Conviction and Sentence of 211 months
imprisonment violates his Sixth Amendment rights,
because Counsel was Constitutionally ineffective
when counsel failed to object to the Government's
use of manipulated transcripts against Petitioner.

### Argument

Counsel was ineffective when Counsel failed to object to the
Government's use of manipulated transcripts against Petitioner at
trial. petitioner pointed out the Government's manipulations to
the transcripts to Counsel, but because of Counsel's incompetence
and confusion due to Counsel's lack of understanding of Petitioner's
case through discovery, counsel just simply ignored them.

Counsel's incompetence and confusion about the facts of
Petitioner's case came to light when Counsel allowed the Government
to introduce altered and manipulated transcripts to the Jury
against Petitioner. The Government introduced what they called
their "final" transcripts to the Jury which were altered and
manpulated without objections from counsel. Which is the reason
why the Jury never understood what actually took place that

-27-

caused petitioner to be arrested and charged.

In a post trial letter to counsel, Petitioner wrote,

> "accepting the new set of transcribed transcripts
> from the tapes without review prior to trial to
> compare the authenticity was another grave error."
> App 0194, at 4.

Counsel responded by stating,

> "I did not accept the final transcripts of the
> tapes without review prior to trial. I listened
> to the tapes and read the 'final' transcripts
> and found the tapes and transcripts compatible."
> App 0198, at 4.

Petitioner then wrote counsel back and requested that counsel
withdraw herself from Petitioner's case because she did not
understand the tapes and the intricacies of Petitioner's case.
See App 0200.10 - 0200.20.

Counsel showed in her response to Petitioner's letter that
she did not understand the facts of Petitioner's case, because
the "tapes and the final transcripts" were not "compatible".
See Factual Basis Section C(a)-(e). The alterations and manipulations
the Government made to the transcripts were the defining factors
for the Jury returning a guilty verdict against Petitioner.

To understand why this is the case, first, it must be
understood what Petitioner was charged with, and how the Government's
editings and manipulations relates to the guilt or innocence of
the charges.

Count-One charged Petitioner with attempting to purchase
cocaine from the informant's source by paying for the cocaine

with counterfeit United States Currency. So any evidence that would have shown that (1) the informant actually entrapped Petitioner in a drug crime by telling Petitioner that Petitioner must help him with a robbery in which the informant would pay for cocaine with the counterfeit money he asked Petitioner to provide him with, then arrange the robbery to do like it was Petitioner who "fuck" up the guy by paying for the cocaine with counterfeit money, would have been devestating to the Government's case against Petitioner. (2), that the informant was the one who himself was offering to "sell" Petitioner the stolen cocaine for $10,000 per kilogram if Petitioner would "help" him "sell them" after the robbery, would also have had a devestating effect on the Government's case against Petitioner.

On the first point, the informant clearly said to Petitioner on the March 21, 2002 recording that he was going to fix his plan to pay for cocaine with the Counterfeit money he asked Petitioner to provide him with to "do like you fuck us up." App 0086, para 9. This phrase described the entire scheme FBI agent Depodesta used through the informant to infused drugs into a USSS Counterfeit Currency investigation.

The meaning of this phrase was critical to Petitioner's guilt or innocense. When the Informant said, "Do like you (Petitioner) fuck us up." the "us" the informant is referring to is him himself. and the guy he said he would set up in the parking lot at Narogansett and Diversey in Chicago to "rob". The meaning of the phrase was

-29-

that, for the informant to avoid any retaliations from the people he was about to pay counterfeit money to for their cocaine - who know where he lived, he would simply tell them when they found out that they were paid with counterfeit money, that it was Petitioner who was responsible for giving them the counterfeit money.

This missing phrase is one of the center pieces of evidence that would have shown that Petitioner was innocent of the crimes charged. The phrase would have shown that Petitioner was not attempting to purchase drugs from the informant's source. The phrase actually showed the truth of what occured in Petitioner's case, specifically on March 21, 2002, and that was, the informant was the one who wanted to **rob** cocaine from his own source (the guy he set up in the parking lot at Naragansett and Diversey) by paying for the cocaine with the counterfeit money he asked Petitioner to provide him with. The informant would then arranged his planned robbery to appear as if it was Petitioner who "fuck" them up (responsible for the robbery). There was absolutely no "negotiation" going on for Petitioner to purchase drugs from the informant's source. Petitioner could not have been found guilty for attempting to purchase cocaine from the informant's source if Counsel would have objected to the editing and manipulation the government made to the "final" transcript and explained to the Jury what it was that they heard on the recording.

Counsel did not understand the significance of what the edited phrase meant and allowed the government to exploit the Jury by not allowing them to read the phrase for themselves. The Government relied heavily on the transcripts during trial. Reverting to them several times during trial to mislead the Jury of the actual events that took place on March 21, 2002. The difference between what's on the recording and the "draft" transcript, compared with the editing out of the phrase, "like you fuck us up" in the final transcript proved that the "tapes" and the "final" transcripts were not "compatible".

Secondly, the March 21, 2002 recording and the "draft" transcript clearly have the informant following FBI agent Depodesta's "instruction" to entrap Petitioner in a drug crime by offering to "sell" Petitioner the stolen cocaine for $10,000 per kilogram if Petitioner would "help" the informant "sell them".

The Government charged Petitioner with attempting to purchase drugs from the informant's source. It would have been impossible for the Government to have obtained a conviction against Petitioner if the Jury had read and counsel would have explained to them what was taking place when the informant said to Petitioner,

> "It would be better, how we gonna split it (stolen cocaine) or what? Cause I wanna do it like "I"(CI) tell you (Petitioner), ten grand ($10,000). "I" (CI) gonna "sell" you (Petitioner) each one (the stolen cocaine) ten. You make ten I make ten." App 0076, last line, 0077, para 1.

-31-

Here, it is the informant who is offering to "sell" Petitioner drugs, which proved that Petitioner did not have any agreement to purchase drugs from the informant's source. Plus, at the time of the informant's offer he was already an active Government informant working for the FBI, which made his solicitation for Petitioner to help him "sell" the stolen cocaine a classic case of entrapment.

In order for the Government to hide these facts from the Jury they simply manipulated the phrase in the "final" transcript so the underlined portion reads:

> "Cause I wanna do it like I tell you, you know, ten grand, I wanna tell you each one you sell, you make ten, I make ten."

The Government's play on the words "tell" and "sell" in the phrase made by the informant to Petitioner seems to be rather simply, but the meaning of the phrase changed enormously. The Government change in the phrase have the informant telling Petitioner that Petitioner could make $10,000 for each kilogram of the stolen cocaine Petitioner would help the informant to sell. However, on the recording and in the "draft" transcript, originally, the informant is the one who was offering to "sell" each kilogram of the stolen cocaine to Petitioner for $10,000 per kilogram, if Petitioner could find somebody to purchase the stolen cocaine. For Counsel not to have recognized the significance of the phrase made by the informant and the sinisterism behind the Government manipulating the phrase to mean something else, and for Counsel to

-32-

say she found the "tapes and final transcript compatible," doomed Petitioner to a conviction from the onset.

Thirdly, the Government even went as far as to concocted two seperate conversations together to make up the March 21, 2002 version that was played for the Jury with absolutely no objection from Counsel, because Counsel "found the transcript and the tapes to be comptible".

The contents after Page 19 of the "final" transcript were not included in the "draft" transcript. Neither were they on the recording disclosed by the Government. This portion of the recording was first heard when it was played for the Jury at trial. Counsel had in her possession a "final" transcript with additional content that was neither on the "draft" transcript nor the recording that was disclosed by the Government, yet Counsel claimed that she listened to tapes and found them to be compatible with the final transcript. See App 0089 and 0109-0112, Compare.

Counsel made no objection to this blatent Government tampering with evidence because Counsel found that the tampering was "compatible" with the original disclosed recording and "draft" transcript, which they were obviously not. Counsel failed to read and review the March 21, 2002 final transcript to make the necessary comparison to the disclosed recorded conversation and "draft" transcript that would have shown the Government edited, altered, and manipulated the evidence in Petitioner's case, denying Petitioner

his constitutional rights to a fair trial. See US v. Myers, 892 F.2d 642 (7th Cir. 1990). Citing Counsel's failure to read police report. Id. at 4. Giving rise to claim of ineffective assistance counsel claim.

Counsel's performance fell below an objective standard of reasonableness laid out by Strickland, Supra, when Counsel failed to object to the Government editing, altering of the final transcript and manipulating the recording of the March 21, 2002 recorded conversation, because Counsel failed to read and review the "final" transcript and make the necessary comparison with the "draft" transcript and the disclosed recording that would have allowed Counsel the opportunity to make a rational decision to object to the Government use of evidence and techniques which violated Petitioner's Constitutional rights.

Counsel's decision    not to object to the Government editing, alteration, and use of manipulated evidence could not have been based on "strategic choice made after thorough investigation of laws and facts relevant to plausible options," because the evidence clearly showed that the "final" transcripts are not "compatible" with the "tape" and the "draft" transcript of the March 21, 2002 recorded conversation, which is easily proven just by a simple cursory comparison.

There is a reasonable probability that, but for Counsel's objectively unreasonable performance, the result of the proceeding would have been different. Strickland, Supra. Id 466 U.S. at 688-89.

-34-

Again, the Government charged Petitioner with attempting the purchase of cocaine from the CI's source. It would have been impossible for the Jury to have convicted Petitioner if Counsel would have objected to the "final" transcript and pointed out to the Jury that what is actually on the recorded conversation was that the CI was planning to rip off cocaine from some guy he set up in a parking lot by paying for the cocaine with the counterfeit money he asked Petitioner to provide him with. And that the CI would arrange his planned robbery to do like Petitioner is the one that "fuck" them up.

It would have been impossible for the Jury to have convicted Petitioner if Counsel would have objected to the "final" transcript and pointed out to the Jury that it was the CI himself who was offering to "sell" his planned stolen cocaine for $10,000 per kilogram, and not some mysterious source as the Government claimed.

It would have been impossible for the Jury to have convicted Petitioner if Counsel would have objected to the "final" transcript and pointed out to the Jury that it was the CI himself who was offering to "sell" his planned stolen cocaine for $10,000 per kilogram while he was an active Government agent.

For Counsel to have neglected these facts, violates the standard laid out in Strickland, Supra.

As a result, this Petitioner submits to the Court that Counsel was ineffective in violation of the Sixth Amendment to the United States Constitution when Counsel failed to read and review discovery

-35-

materials that were edited, altered, tampered with, and manipulated by the Government.

The Petitioner submits that as a result of Counsel's deficient performance at trial, he (Petitioner) was therefore prejudiced and as a result the Government was allowed to deny Petitioner his Constitutional rights to a fair trial through their use of evidence that was edited, altered, tampered with, and manipulated, which caused Petitioner to be convicted and sentenced to 211 months imprisonment. Petitioner's conviction and sentence should be vacated and a new trial be ordered at the Court's earliest convenience.

## Claim Two

> Petitioner's Conviction and Sentence of 211 months imprisonment violates his Sixth Amendment Rights, because Counsel failed to file motion to quash indictment after discoveryevidence in Counsel's possession showed that the prosecutors Mr. Hays and Mr. Collins suborn perjury, violating Petitioner's Constitutional Rights to due process.

### Argument

Counsel was ineffective 4/ where Counsel failed in her obligation to file motion-in-limine to quash indictment after discovery evidence in counsel's possession showed that the prosecutors suburned perjury. The Prosecutors procurred the criminal informant, Allen Dubun, and SSSA Daniel Dick to perjury themselves before the Grand Jury.

---

4/ For the sake of brevity, petitioner will not belabor the Strickland test. Claim One's treatment of Strickland, Supra, is adopted in all ineffective assistance of counsel claims herein.

The CI's primary handler, FBI agent Frank Jack Sodetz, sat in the prosecutor's meeting with the informant in which the informant gave his statement to the prosecutors "regarding the circumstances surrounding the investigation" of Petitioner. Agent Sodetz made a report of what the informant told the prosecutors. According to FBI agent Sodetz's report, that:

> "... On several occasions James (Petitioner) suggested that he could provide the Source (informant) with countefeit money that the source could use and rip off drugs from a dealer, then the source could sell the drugs for cash to pay off his debt...
> The source then approached several Chicago Police Department (CPD) officers who ... introduced the Source to a Drug Enforcement Administration (DEA) agent who told the Source that due to his pending state narcotics case, the DEA would not be willing to work with him...
> It was at that time in 'November of 2001', that the Source walked into the office of the FBI in Chicago and asked to speak with agents." App 0143, para 1,2.

Nothing in the Criminal Informant's (CI) statement of the "circumstances surrounding the investigation" of Petitioner reflected what the prosecutors wrote in their prepared statement. See Prosecutor's prepared statement, App 0058, and the CI's Grand Jury Testimony, App 0060-0063, compared with CI's "statement regarding the circumstances surrounding the investigation" of Petitioner, App 0136-0143.

Based on the CI's statement of the circumstances surrounding Petitioner, it is obvious that the only crime Petitioner could have possibly be guilty of was being in possession of counterfeit money.

So in order to obtain an indictment against Petitioner for Narcotics charges, the Government had to Suborn perjury and create the crimes in their office. Counsel did nothing to protect Petitioner's Constitutional Rights to due process of the law.

The discovery evidence in Counsel's possession clearly showed that the Prosecutor's suburn perjury. It is known from the CI's Grand Jury testimony that he read from a prosecutor's "prepared statement", a contradicting, false and misleading statement as his testimony. SSSA Dick's testimony to the Grand Jury was identical to the CI's testimony. Which means SSSA Dick's testimony was also contreadictory, false, and misleading. Which Counsel could have easily have proven if counsel had filed a motion-in-limine to quash the indictment.

1. SSSA Dick testified that Petitioner agreed with the CI to purchase one kilogram of powder cocaine from the CI's source. The CI testified that Petitioner called him on the same day, March 16, 2002, to purchase this one kilogram of cocaine from the CI's Source. FBI agent Depodesta put in his affidavit to establish probable cause that:

> "On March 16, 2002, James telephonically contacted the source (CI) and they discussed a one kilogram cocaine transaction..." 0047, para 2.

According to the Government's "prepared statement" that was given as the Grand Jury testimony for both the CI and SSSA Dick, this March 16, 2002 phone call to the CI by Petitioner was the phone call that initiated the drug crimes for which Petitioner was

convicted of. However, Petitioner's phone records showed that he did not call the CI on March 16, 2002. App 0068-0070.

None of the "69" calls the CI attempted to Petitioner between February 8, 2002 and March 25, 2002 was made on March 16, 2002. App 0065-0066. The CI and Petitioner did not speak to each other on March 16, 2002. it was impossible for Petitioner to have initiated a drug crim eon March 16, 2002, for which he was later convicted of, if he did not speak to the CI on that date.

2. The CI testified that Petitioner agreed to purchase the 10 kilograms of cocaine from his source on March 21, 2002. SSSA Dick's testimony was that Petitioner wanted to purchase 10 kilograms of cocaine from the CI's source. The CI in his meeting with the prosecutors only mentioned to them that Petitioner only "suggested" that he could provide the CI with counterfeit money. He never mentioned nothing of the sort that the prosecutor wrote in their prepared statement. plus, the discovery recording of the conversation between the CI and Petitioner on March 21, 2002 clearly showed this statement to be false.

On the March 21, 2002 recording the first thing the CI said to Petitioner was:

> "Well like I say, I got the guy set up... I mention to him between seven and ten (kilograms of cocaine)." App 0076, para 15.

The CI continued to say on the recording:

-39-

"Um he (the guy the CI 'set up') live by..., I don't know exactly his house, he's not gonna tell me exactly where it is, cause I could rob him myself... at Naragansett and Diversey in the parking lot. We can do that (rob the guy the CI set up) in the parking lot." App 0083, para 2.

The CI also said:

"... I wanna do (rob the guy) this guy..." App 0085, last line, 0086, first line.

The evidence clearly showed that what took place on March 21, 2002 was the CI setting up a scheme to rob seven to ten kilograms of cocaine from the guy the CI set up in the parking lot at Naragonsett and Diversey in Chicago.

The CI said he would arrange his scheme to Rob cocaine from the guy he set up to:

"do like like you (petitioner) fuck us (the CI and the guy he set up) up." App 0086, para 9.

Meaning that when the guy the CI set up found out that he was Rob, the CI would tell him that it was Petitioner who was responsible for the robbery and not the CI himself, who was the mastermind himself. The CI could then avoid any retaliation from the guy.

All along, this was a scheme by the CI who was following the "instruction" of FBI agent Depodesta to "entrap" Petitioner in a drug crime. When their scheme did not work, they simply perjured themselves before the Grand Jury through the prosecutor's prepared statement, testifying that Petitioner agreed to purchase 10 kilograms of cocaine from the CI's source on March 21, 2002.

This statement could not be any further away from the truth,

because as the recorded evidence of that day showed it was the CI who was offering to "sell" the stolen cocaine if his scheme to rob the guy was successful, and not some mysterious source as the Government claimed.

Putting in context what the CI told Petitioner on the recording, the CI said to Petitioner:

1. "Well like I say, I got the guy set up, I mentioned to him between seven and ten (kilograms of cocaine)." App 0076, para 15.

2. "He (the guy the CI set up) lives by ... I don't know exactly his house, he is not gonna tell me exactly where it is, cause I could rob him myself... At Naragansell and Diversey in the parking lot, we can do that (rob the guy) in the parking lot." App 0083, para 2.

3. "... I wanna do (rob the guy) this guy..." App 0085, last line, 0086, first line.

4. "Yeah, both of them (robbing the guy) are gonna do like you (petitioner) fuck us (the CI and his source) up." App 0086, para 9.

5. "It would be better, how we gonna split it (the stolen cocaine) or what?" App 0076, last line.

6. "Cause I wanna do it like I tell you, ten grand ($10,000), I (CI) gonna "sell" you each one (the stolen cocaine) ten. You make ten, I make ten, but I do not got much people to "sell" it (the stolen cocaine)." App 0077, para 1.

So:

7. "You (Petitioner) help sell them (the stolen cocaine). App 0079, para 10.

Clearly, 1-4 showed that the CI set up a robbery where he would rip off cocaine from a guy he set up in a parking lot. The CI would rip off the cocaine by paying for them with the counterfeit money he asked Petitioner to provide him with, then arrange the rip off to do like Petitioner "fuck" them up (responsible for the robbery).

We see at 5 that the CI wanted to split the stolen cocaine with Petitioner if the robbery attempt was successful, which clearly means that Petitioner could not have been the one that was buying the drugs from the CI's source because if that was the case, the drugs would have belonged to Petitioner, and the CI would not be offering to split it.

The prosecutors procured the CI and SSSA Dick to testify that Petitioner agreed to purchase 10 kilograms of cocaine from the CI's source on March 21, 2002, however, at 6 and 7 the CI is the one offering to "sell" his stolen cocaine for $10,000 per kilogram to Petitioner if Petitioner would "help" him "sell them".

This is the only conversation the CI had with Petitioner on March 21, 2002. The recorded conversation conclusively showed that the prosecutors, who were in possession of the recorded conversation knew that their prepared statement about Petitioner agreeing to purchase 10 kilograms of cocaine on March 21, 2002 from the CI's source was false and misleading.

**3.** Petitioner never called the CI on March 22, 2002 and asked to purchase 20 kilograms of cocaine from the CI's source. The 1

kilogram of cocaine the CI claimed Petitioner called him to
purchase on March 16, 2002 eventually ballooned to several
different numbers. It is still the same CI's plan to rip off the
guy he set up. The CI just changed the amount of cocaine he
wanted to rip off from the guy.

In a March 24, 2002 recorded conversation, the CI said to
Petitioner:

> "I talked to the guy (the guy he said he wanted to rob
> in the parking lot) already... He said fifteen would
> be OK.
> I tell him twenty-five... I (CI) be changing the numbers
> and stuff... He only had ten for us... for when we
> were ready (March 21, 2002) he had another guy to give
> another fifteen but he is going to take five from it."
> App 0114.

This is how the prosecutors came up with the idea to procure
the CI and SSSA to testify that Petitioner had agreed to purchase
20 kilograms of cocaine from the CI's source on March 22, 2002.
As stated before, this is still apart of the CI's plan to rip
off cocaine from the guy he set up. The CI simply changed the
number of cocaine to a higher number.

**4.** Petitioner at no time ever agreed to purchase 15 kilograms
of cocaine from the CI's source on March 24, 2002. The entire
March 24, 2002 recorded conversation is a continuation of how
the CI was going to rob the guy he said he set up in the parking
lot. This is the conversation in which the CI gave Petitioner the
"instruction" on how to arrange the counterfeit money so they
would look like real money and fool the guy.

-43-

Putting the CI's conversation in context, the CI said to
Petitioner on March 24, 2002:

1. "I talk to the guy already (the same he set up)...
   he said fifteen (kilograms of cocaine) will be OK."
   App 0123, 14-16.

2. "Cause I been changing the numbers and stuff."
   App 0124, 1-2.

3. "He only had ten first... whenever we were ready.
   He had another guy to give him another fifteen.
   He's gonna take five from that."
   App 0124.

4. "You gotta set up the bag ready, right? How much is
   total?"
   App 0124, 22-23.

5. "Two hundred only?"
   App 0124, 1.

6. "Alright, you think you can put at least five or ten
   grand ($10,000) good one in the bag, in on top."
   App 0125, 2-5.

7. "Alright... looks like, ... three (the bag with
   $300,000 in counterfeit money), right?"
   App 0126, 9.

8. "Three, hundred? Looks like three hundred?"
   App 0126, 14.

9. "Cause I wanna see (the counterfeit money), so he
   can pass the inspection (fool the guy)."
   App 0126, 24-26.

10. "Just make sure for tomorrow (March 25, 2002, the
    day Petitioner was arrested), just making sure that
    they (counterfeit money) looks like three ($300,000)."
    App 0117, 1.

11. "Yeah. But, we wanna, like, make sure ... we convince
    (that the countefeit money was real) him, too...
    cause he is the one with the stuff and shit."
    App 0130, 21-24.

This is the only conversation between Petitioner and the
CI on March 24, 2002. 1-3 showed that the CI set the number of
cocaine at 15 kilograms, that he wanted to rob from the guy he
"set up" in the "parking lot at Naragansett and Diversey," and
do it like it was Petitioner who "fuck" them "up". 4-11 showed
the CI giving Petitioner instruction on how to arrange the
counterfeit money so the guy with the "stuff" (cocaine) could
be "convince" that the fake money was real. This is the same 15
kilograms of cocaine the prosecutors procured the CI and SSSA
Dick to testify falsely that Petitioner was attempting to
purchase from the CI's source on March 24, 2002.

        5. The most egregous statement the prosecutor procured the
CI to testify falsely about was that:

                "He (Petitioner) told me (CI) that he would pay me (CI)
                $20,000 in real currency for arranging that (the 15
                kilograms) transaction."

        The two recordings showed that this statement is a blatant
lie. The CI is the one that said, he "set the guy up." The CI is
the one that said, if he knew where the guy lived he "could rob
him" by himself. The CI is the one that said he wanted to rob
"this guy". The CI is the one that said "we" could rob the guy in
the parking lot  at Naragansett and Diversey. The CI is the one
that said he would "split" his stolen cocaine with Petitioner, if
Petitioner would "help sell them". The CI is the one that offered
to "sell" each kilogram of the stolen cocaine for $10,000 if his

scheme to rob the guy he "set up" in the parking lot was successful. There is absolutely no ambiguity in the fact that the evidence showed clearly that the CI came up with his scheme to rip off 15 kilograms of cocaine from a guy he set up, by paying for the cocaine with counterfeit money he asked Petitioner to provide him with. This evidence clearly established the fact that the prosecutors procured the CI and SSSA Daniel Dick to testify falsely and perjured themselves before the Federal Grand Jury.

6. Petitioner did not meet at the McDonalds parking lot (at Naragonsett and Diversey) to further discuss the conduct of any transaction on March 25, 2002. Petitioner had no agreement with the CI to purchase 15 kilograms of cocaine from the CI's source on March 25, 2002. So Petitioner could not have gone to any parking lot to discuss the conduct of a transaction that he never agreed to.

The CI said he wanted to rob 15 kilograms of cocaine from the guy he set up at the corner of Naragansett and Diversey. Which is where the McDonalds is located. The CI told Petitioner to bring the counterfeit money to the parking lot, and to:

> "Make sure for tomorrow (March 25, 2002) ... they (counterfeit money) looks like three ($300,000)." App 0117, 1.

and that the CI wanted to:

> "We wanna make sure we convince him (the guy who would be set up)." App 0130, 21-24.

that the counterfeit money was real.

When Petitioner was arrested, he told the SSSA agent who interviewed him that:

> "We were to make an exchange for 15 kilograms
> of cocaine for the counterfeit." App 0154-1055.

This statement was a quick summary of the CI's plan to <u>rob</u> the cocaine from the guy the CI said he set up.

The "we" Petitioner used in his statement was the same "we" the CI used in his phrase:

"'We' wanna make sure 'we' convince him too,"

that the counterfeit money was real. The 'we' simply means that Petitioner went to the parking lot to give the CI the counterfeit money. The CI was to then give the guy he set up the counterfeit money in return for the cocaine. When the guy found out that the money was fake, the CI would then blame Petitioner and tell the guy it was Petitioner who "fuck us up". Just like the CI planned it, as shown in the two recorded conversations on March 21 and 24 2002. Which showed Petitioner had no agreement to purchase drugs from the CI's source on March 25, 2002.

It is unconsionable for Counsel not to have filed a motion-in-limine to quash the indictment based on this overwhelming evidence showing that the prosecutors procured the CI and SSSA Daniel Dick to testify falsely before the Federal Grand Jury. Petitioner has a Constitutional right to due process of law. It was Counsel's responsibility to protect that right as required by

-47-

the Sixth Amendment to the Constitution of the United States. The Government's case depended entirely on the prosecutor's "prepared statement" that was given to the Grand Jury as SSSA Dick and the CI's testimony of the "circumstances of the investigation surrounding" Petitioner; without it, there could have been no indictment and no evidence to carry the case to the Jury. As a matter of Constitutional Rights, Counsel was obligated to file motion-in-limine to quash the indictment based on the evidence which showed that the prosecutors suborned perjury, violating Petitioner's rights to due process of law.

For Counsel to have neglected this fact violates the standard laid out in Strickland, Supra.

As a result, this Petitioner submits to the Court that Counsel was ineffective in violation of the Sixth Amendment to the United States Constitution when Counsel failed to file motion-in-limine to quash the indictment against Petitioner when the discovery evidence in Counsel's possession showed that the prosecutors suborn perjury, violating Petitioner's due process rights.

The Petitioner submits that as a result of Counsel's deficient performance, he (Petitioner) was therefore prejudiced and as a result was indicted, convicted, and sentenced to 211 months imprisonment, as a result of counsel allowing the prosecutors to procure the CI and SSSA Dick to testify falsely before the Grand Jury. Which denied Petitioner due process rights. Petitioner

-48-

conviction and sentence should be vacated and a new trial be
ordered at the Court's earliest convenience.

### Claim Three

> Petitioner's conviction and sentence of 211
> month's imprisonment is in violation of the
> laws of the United States. The indictment was
> obtained against Petitioner because the
> Prosecutor's suborned perjury denying Petitioner
> due process of law.

### Argument

"Whoever procures another to commit perjury is guilty of
subornation of perjury," in violation of 18 U.S.C. 1622. The
Prosecutors violated 18 U.S.C. 1622 when they procured the CI
to testify falsely before the Grand Jury which violated
Petitioner's rights to due process.

The CI in his statement that he gave to the prosecutors
about the circumstances regarding the investigation of
Petitioner told the prosecutors that his reason for going to the
FBI in "November of 2001" was that:

> On several occasions Petitioner suggested that
> he (Petitioner) could provide the CI with
> counterfeit money, that the CI could use and
> buy drugs from a dealer, and the CI (himself)
> could "sell" the drugs for cash to pay off his
> (CI) debt.

Based on this statement the FBI (who the CI had gone to
when the DEA refused to work with him) contacted the United States
Secret Service, on February 8, 2002. The Secret Service was
subsequently charged to investigate Petitioner on three matters

-49-

dealing with counterfeiting United States currency.

The FBI contacted the Secret Service because only the Secret Service has Jurisdiction to investigate matters dealing with counterfeiting currency.

The statement the prosecutors gave to the CI to read as his testimony before the Grand Jury, which was also identical to SSSA Dick's testimony, contradicts everything the CI told them about "the circumstances surrounding the investigation of Petitioner". See Claim 2. If the CI had in fact told the FBI anything resembling the prosecutor's "prepared statement", the FBI could have arrested Petitioner if they found evidence that Petitioner was involved in illegal drug activities. They would not have to contact the Secret Service to do so.

The USSS were contacted by FBI agent Sodetz on February 8, 2002, who told the Secret Service that Petitioner had "suggested" to the FBI controlled CI that he "could provide the CI with counterfeit money". The USSS were then charged to investigate Petitioner on three matters relating to counterfeiting United States Currency. They included:

> 1. Primary case type – Manufacturing United States Currency, number 735-041
>
> 2. Two Secondary Case Types:
>    A) Dealing in United States Currency, number 735-021.
>    B) Crimes involving use of emerging technology, number 848-930.

App 0045, see case type, and secondary case types.

-50-

SSSA Daniel Dick was assigned as the case agent to investigate Petitioner on these three counterfeit related matters.

1. According to the CI's statement he gave in his meeting with the prosecutors, he went to the FBI in "November of 2001". The FBI contacted the USSS on February 8, 2002, which meant that the FBI had three months in which to investigate Petitioner based on what the CI told them when he came in their office in November of 2001. Tr. 204, 16.

The FBI found no evidence that Petitioner was involved in illegal drug activities. They then contacted the USSS and told them that Petitioner suggested to their CI that he could provide him with counterfeit money. SSSA Daniel Dick testified that Petitioner was the "target" of his investigation involving counterfeit currency." Tr. 35, 12-13. SSSA Dick's investigation of Petitioner on the three counterfeit related matters was the only active investigation by any federal agency involving Petitioner after February 8, 2002, when the FBI closed their investigation of Petitioner, with no evidence that Petitioner was involved in illegal drug activities.

Based on the crimes Petitioner was investigated for, and the statement the CI gave to the FBI and the prosecutors about the circumstances surrounding the investigation of Petitioner, it is clear that the CI never mentioned anything to the

prosecutors that reflected what the prosecutors procured him to read as his testimony before the Grand Jury.

**2.** The prosecutor had prior knowledge that they were providing the CI with perjured statements to read as his testimony before the Grand Jury. They were in possession of the March 21, 2002, and March 24, 2002 recordings which showed that Petitioner never entered into any negotiation or agreement to purchase drugs from the CI's source in March of 2002. See Claim 1, 2.

There would not have been neither an indictment against Petitioner, or a trial if the prosecutors did not suborn perjury. The prosecutors created a chain of causation with their "prepared statement," which resulted in the conviction and a sentence of 211 months imprisonment. Prosecutor Hays and Collins contrived a conviction through the pretense of a trial which in truth was used as a means to deprive Petitioner of his liberty through a deliberate deception of the Grand Jury, Court, and Trial Jury by the presentation of testimony known to be false.

Petitioner was deprived of liberty without due process of law. In Mooney v. Holohon, 294 U.S. 103, 112-113, 55 S.Ct. 340, 341-42, 79 L.Ed. 791 (1935) ("A prosecutor's knowing use of perjured testimony violates the Fourteenth Amendment"). See also United States v. Agnis, 427 U.S. 97, 103, and n.8 96 S.Ct. 2393, 2397, and n.8, 49 L.Ed. 342 (1976) (citing cases). The Supreme

Court in <u>Mooney v. Holohon</u>, quoting <u>Robb v. Connolly</u>, 111 U.S. 624, 637, states (upon the State Courts, equally with the Courts of the Union, rest the obligation to guard and enforce every right secured by the Constitution").

In <u>Giglio v. United States</u>, the Court stated, as long ago as <u>Mooney v. Holohon</u>, "this Court made clear that deliberate deception of a Court and Jurors by the presentation of known false evidence is incompatible with 'rudimentary demand of justice'". Id at 108. Which was reaffirmed in <u>Pyle v. Kansas</u>, 317 US 213, 87 L.Ed. 214, 63 S.Ct. 177 (1942) In <u>Napue v. Illinois</u>, 360 US 264, 3L.Ed. 2d 1217, 79 S.Ct. 1173 (1959), the Court said, "the same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Id., at 269. In the instant case the Government did not solicit the false testimony, but were the source of it.

A new trial is required if "the false testimony could ... in any reasonable likelihood have affected the Judgement of the Jury..." <u>Napue</u>, Supra, at 271, 3L.Ed.2d at 1222. The Government's case depended entirely on the prosecutor's prepared statement that was given to the Grand Jury as SSSA Dick's and the CI's testimony of the "circumstances of the investigation surrounding" Petitioner; without it, there could have been no indictment and no evidence to carry the case to the Jury.

The Supreme Court in <u>Pyle v. Kansas</u>, emphasized the premise upon which the defendant asserts the claim, "set forth allegation

-53-

that his imprisonment resulted from perjury testimony knowingly
used by the authorities to obtain his conviction... the allegation
sufficiently charged a deprivation of rights guaranteed by the
Federal Constitution, and if proven, would entitle the Petitioner
to be released from his present cusody." Id. at 215, 216, 63, S.Ct.
117.87 L.Ed. 214 (1959).

As a result, this Petitioner submits to the Court that the
Government violated the laws of the United States, where the
Government violated 18 U.S.C. 1622 in order to obtain an indictment
against Petitioner denying Petitioner his Constitutional rights to
due process of law.

This Petitioner submits that as a result of the Government
denying Petitioner's due process rights, he (Petitioner) was
therefore prejudiced and that as a result, the Government created
a chain of causation that ended with Petitioner convicted and
sentenced to 211 months imprisonment. Petitioner's conviction
and sentence should be vacated and a new trial be ordered at the
court's earliest convenience.

### Claim Four

> Petitioner's conviction and sentence of 211
> months imprisonment violates his Sixth
> Amendment Rights, because Counsel was
> Constitutionally ineffective where in pretrial
> proceedings, trial counsel failed to file
> motion-in-limine to quash indictment after
> the discovery evidence in counsel's
> possession showed that the Government's
> criminal informant and SSSA Daniel Dick
> perjured themselves before the Grand Jury,
> violating Petitioner's rights to due process
> of law.

-54-

## Argument

Counsel was ineffective where in pretrial proceedings, trial Counsel failed to file motion-in-limine to quash the indictment after the discovery evidence in Counsel's possession showed that the Government's criminal informant and SSSA Daniel Dick perjured themselves before the Grand Jury in order to obtain an indictment against Petitioner. 5/

1. The statement given to the prosecutors by the CI about the "circumstances surrounding the investigation" of Petitioner contradicts the CI's own Grand Jury testimony and SSSA Daniel Dick's Grand Jury testimony as well, which was identical to the CI's Grand Jury testimony that were "prepared" for them by the Prosecutors to read before the Grand Jury as their testimony. See CI's statement, App 0143, para 1, 2; SSSA Dick's Grand Jury testimony, App 0228-0239; CI's Grand Jury testimony, App 0060-63.

The only thing the CI told the prosecutors and the FBI which had any relevance during the time period for which Petitioner was investigated was that Petitioner "suggested" that he could provide the CI with counterfeit money. That the CI used the counterfeit money to buy drugs from a dealer, and the CI, himself, could sell the drugs for cash to pay off his debt. Nothing in his statement about the circumstances surrounding the investigation of Petitioner mention that Petitioner wanted to purchase drugs

---

5/ The analysis of the evidence that support this claim is handled in the argument of Claim Two.

from some mysterious source.

Notwithstanding this fact, after the meeting with the prosecutors where the CI gave his statement, the prosecutors prepared a statement for him to read before the Grand Jury that stated that Petitioner had agreed to purchase drugs from the CI's mysterious source. Which the CI proceeded to read before the Grand Jury as the 'circumstances surrounding the investigation' of Petitioner. As mentioned before, which was also SSSA Dick's testimony before the Grand Jury. See App 0058 for prosecutor's prepared statement.

**2.** The evidence of the case is contradictory to the testimony given before the Grand Jury by the CI and SSSA Daniel Dick. 6/ Those pieces of evidence showed that the only thing the CI discussed with Petitioner was how the CI was going to rob cocaine from some guy the CI set up, and how he would arrange his scheme to do like Petitioner "fuck" them "up".

The CI and SSSA Dick's Grand Jury testimony was a deliberate falsity perpetrated upon the Grand Jury, with a reckless disregard for the truth. The perjured testimony before the Grand Jury by the CI and SSSA Daniel Dick were material facts that the Grand Jury relied upon to return an indictment against Petitioner.

Counsel failed to file motion-in-limine to quash the indictment based on the evidence showing the CI and SSSA Daniel Dick perjured

---

6/ See Argument in Claim Two for the analysis of the evidence.

-56-

themselves before the Grand Jury. Petitioner has a Constitutional
Right to due process of law. It was Counsel's responsibility to
protect that right as required by the Sixth Amendment of the
Constitution of the United States. The Government's case depended
entirely on the testimony from the CI and SSSA Dick; without their
perjured testimony, there could have been no indictment and no
evidence to carry the case to the Jury. As a matter of Constitutional
Rights, Counsel was obligated to file motion-in-limine to quash
the indictment based on the overwhelming evidence to the Government's
criminal informant and SSSA Daniel Dick perjured themselves before
the Grand Jury, violating Petitioner's Constitutional rights to
due process of law.

    For Counsel to have neglected this fact violates the standard
laid out in Strickland, Supra.

    As a result, this Petitioner submits to the Court that Counsel
was ineffective in violation of the Sixth Amendment to the United
States Constitution when Counsel failed to file motion-in-limine
to quash the indictment against Petitioner when the discovery
evidence in Counsel's possession showed that the Government
criminal informant and SSSA Daniel Dick perjured themselves before
the Grand Jury, violating Petitioner's due process rights.

    The Petitioner submits that as a result of Counsel's deficient
performance, he (Petitioner) was therefore prejudiced and as a
result was indicted, convicted, and sentenced to 211 months

imprisonment as a result of Counsel not filing motion-in-limine to quash the indictment. Which, in effect, allowed the prosecutors to use perjured testimony from the Government criminal informant and SSSA Daniel Dick to deny Petitioner due process rights. Petitioner's conviction and sentence should be vacated and a new trial to be ordered at the Court's earliest convenience.

### Claim Five

> Petitioner's conviction and sentence of 211 months imprisonment is in violation of the laws of the United States. The indictment was obtained against Petitioner because the Government criminal informant and SSSA Daniel Dick perjured themselves before the Grand Jury, denying Petitioner due process of law.

### Argument

A person commits perjury when he provides false testimony about material facts while under oath or affirmation, with the willful intent to do so, rather than as a result of mistake, faulty memory, or confusion, United States v. Greg, 178 F.3d 891 (7th Cir. 1999); United States v. Woody, 55 F.3d 1257, 1273 (7th Cir. 1995); United States v. Hikok, 77 F.3d, 1007-07 (7th Cir. 1996). The Supreme Court has established a strict standard for what constitutes falsilty under 18 U.S.C. 1623. Section 1623(a), often called the "false swearing statute" punishes anyone knowingly made false material declaration under oath in

a court proceeding, or before a Grand Jury. See United States
v. Sherman, 150 F.3d 306, 310 (3rd Cir. 1999); United States v.
Fowley, 137, F.3d 458, 462 (7th Cir. 1998); See also United
States v. Gellove, 182 F.2d 578 (7th Cir. 1998); Id. 178 F.3d
at 891.

Since Johnson v. United States, 520 U.S. 461, 117 L.Ed.
718 (1997), ("it has been held that materially is an element
of the offense.") The Seventh Circuit has held, ("It is an
element of the false swearing statutes,") Id., 182 F.3d at 578.
The Supreme Court in Goudin observed that the decision whether
a statement is [material] requires the determination of at least
two subsidiary questions of facts, one, what statement was made,
two, what decision the decision maker was trying to make. Id.
at 512, 115 S.Ct. 2313.

Both SSSA Daniel Dick and the CI testified falsely before
the Grand Jury that Petitioner called the CI's cellphone on
March 16, 2002, and initiated a drug "negotiation" in which
Petitioner would pay for one kilogram of cocaine from the CI's
source using counterfeit money. According to SSSA Dick's and
the CI's Grand Jury testimony, this initial March 16, 2002
"negotiation" for one kilogram of cocaine over the next nine
days ballooned up to where Petitioner had agreed to purchase
15 kilograms from the CI's source on March 25, 2002, and would
pay the CI $20,000 in real money for his effort in arranging
the "transaction". 7/

---

7/ See Claim[2]for a list of the false statements and analysis
   of the supporting evidence.

These statements were not only intentionally false, but also formed the basis for Grand Jury returning an indictment against Petitioner. These statements were intended to influence the decision of the decision making body - the Grand Jury, for which their testimony were addressed. In a certified inventory of evidence list for the March 21, 2002, and March 24, 2002 audio recording, SSSA Dick stated that he received the compact disc containing the recorded conversations between Petitioner and CI from agent Depedesta of the FBI. App 0169 and 0171. SSSA Dick then inventoried the discs with the conversations as evidence. He was in possession of the disc and chose to ignore what was actually taking place between March 16, 2002 and March 25, 2002 and testified falsely before the Grand Jury in order to have the Grand Jury return an indictment against Petitioner.

The Government's criminal informant, as proof by his statement that he gave to the prosecutor "regarding the circumstances surrounding the investigation" of Petitioner, knew that he was testifying falsely before the Grand Jury.

SSSA Dick's and the CI's testimony before the Grand Jury were material to the offenses for which Petitioner were charged. The Supreme Court reiterated the long standing held in Neder v. United States, 537 U.S. 1, 25, 119 S.Ct. 1827144 L.Ed.2d 35 (1999), ("a false statement is material if it has a tedency or is capable of influencing the decision of the decision making

body to which it was addressed."); Komgy v. United States, 485
U.S. 759, 770, 108 S.Ct. 1537, 99 L.Ed. 839 (1998); See also
United States v. Branch, 195 F.3d 936 (7th Cir. 1999).

In United States v. Gage, 183 F.3d 711-17 (7th Cir. 1999)
("the Court held, as a general matter, a defendant can't perjury
himself about the state or accuracy of his memory..."). SSSA
Dick and the CI testified before the Grand Jury untruthfully
with the specific intent to obstruct the proper proceeding of
the Government's case against Petitioner rather than as a result
of confusion, mistake, or faulty memory, Dunnigan at 94, 113 S.Ct.
and was intended to influence the decision of the Grand Jury
to which it was addressed. United States v. Ewing, 129 F.3d 430,
434 (7th Cir. 1997); United States v. Apribble, 127 F.3d 583,
588 (7th Cir. 1997).

The threshold matter is whether SSSA Dick's and the CI's
testimony was material to the Grand Jury's inquiry, United
States v. Gulley, 992 F.2d 108, 112-13 (7th Cir. 1993) ("witness
testimony was false and material to a legitimate inquiry"). In
the instant case, the Grand Jury. The Grand Jury inquiry was
based entirely on the SSSA Dick's and the CI's testimony; without
their perjured testimony there could have been no indictment
and no evidence to carry the case to the Jury. SSSA Dick and
the CI intended to impede and obstruct the fair proceedings of
Petitioner's case by their perjury testimony before the Grand

Jury. In Dunnigan, the Court held ("a person committed perjury when he gives false testimony concerning a material matter with the willful intent to provide false testimony.") Dunnigan, 507 at 90, 29.133 S.Ct. 1116, ("... and based on perjury the trial Judge must make an independent finding establishing perjury") Id. 507 at 93. 113 S.Ct. 1117.

The Supreme Court has noted that, in this context, ("It is preferable for a district Court to address each element of an alleged perjury in a seperate and clear finding.") United States v. Dominiquez, 992 F.3d 678, 685 (7th Cir. 1993) Cert denied-U.S.-, 114 S.Ct. 250, 126 L.Ed.2d 203 (1994).

SSSA Dick's and the CI's testimony before the Grand Jury violated 18 U.S.C. 1623(a), "false swearing statute", and was a declaration under oath, see Sherman, 150 F.2d at 310; Gellene 182 F.3d at 578, which violated Petitioner's rights to due process of law.

As a result, this Petitioner submits to the Court that the Govenrment violated the laws of the United States, where the Government violated 18 U.S.C. 1623(a) in order to obtain an indictment against Petitioner, denying Petitioner due process to law.

The Petitioner submits that as a result of the Government's violation of 18 U.S.C. 1623(a), he (Petitioner) was therefore prejudiced and that as a result, the Government created a chain of causation by obtaining an indictment against Petitioner

because of their use of perjured testimony which ended with Petitioner convicted and sentenced to 211 months imprisonment. Petitioner's conviction and sentence should be vacated and a new trial be ordered at the Court's earliest convenience.

### Claim Six

> Petitioner's conviction and sentence of 211 months imprisonment violates his Sixth Amendment rights, because Counsel was Constitutionally ineffective at trial where Counsel failed to request a Jury instruction on entrapment after testimony aduced at trial, and evidence presented by the Government showed that Petitioner was entrapped by the Government's agents.

### Argument

Counsel was ineffective at trial where Counsel failed to request a Jury instruction on entrapment after testimony aduced at trial, and evidence presented by the Government showed that Petitioner was entrapped by the Government's agents.

The criminal informant walked into the FBI's office on "November 26 of 2001 and asked to speak with agents". The reason the CI gave for going to the FBI on November 26, 2001 was that:

> "On several occasions Petitioner suggested that he (Petitioner) could provide the source (CI) with counterfeit money, that the source could use and buy drugs from a dealer, then the source could sell drugs for cash to pay off his debt." App 0143, para 2.

Based on this statement the FBI started investigating Petitioner. Tr. 203, 14-16. The USSS is the only federal agency who has jurisdiction to investigate matters relating to counterfeit

currency. App 0125, 11-16. Based on the statement the CI gave to the FBI, they contacted the appropriate agency, which was the USSS. The FBI did not contact the USSS until February 8, 2002, almost four months after the CI had gone to them. This could only mean that the FBI had almost four months for which they investigated Petitioner to find out if Petitioner was involved in any other criminal activities, like illegal drugs.

During this almost four months time period, the FBI found no evidence that Petitioner was involved in any illegal drug activities. So on February 8, 2002 the CI's primary handler, who is the person familiar with all aspects of cases the CI were involved in, contacted the Secret Service and told them what the CI had told the FBI, which was that Petitioner suggested that he could provide the CI with counterfeit money.

SSSA Daniel Dick was then assigned as the case agent to investigate Petitioner. SSSA Dick was then charged to investigate Petitioner ont he three matters relating to counterfeit currency:

> 1. Primary case type - Manufacturing United States Currency, number 735-041
>
> 2. Two Secondary Case Types:
> A) Dealing in United States Currency, number 735-021.
> B) Use of emerging technology, number 848-930.

which was confirmed by his testimony at trial that Petitioner was the target of the USSS investigation involving counterfeit currency. Tr. 35, 12-13.

FBI agent Depodesta testified at trial that he instructed the CI to contact Petitioner. Tr. 204, 18-20. He testified that the CI had tried to contact Mr. James (Petitioner) on numerous occassions and Petitioner would not cooperate with him. Tr.230, 23-25. He also testified that the first time he took part in any law enforcement activities involving Petitioner was on March 21, 2002. Tr. 100, 12-13.

The only "law enforcement activity" FBI agent Depodesta could have possibly taken part in involving Petitioner was the three related counterfeit matters charged to the USSS to investigate on February 8, 2002, because no other active investigation was ongoing against Petitioner during this time period by any Federal agency.

It was during this time period to be specific, March 21, 2002, that FBI agent Depodesta "instructed" the Government criminal informant to "engage" Petitioner in "drug communication". The U.S. Attorney, Mr. Collins, asked agent Depodesta at trial:

> "I just want to make sure I and the Jury understand what your instruction with Mr. Dubon(CI) was.
>
> Was it your instruction to Mr. Dubon that he should engage in drug communication with the defendant, or just keep in contact with the defendant?"

Agent Depodesta answered:

> "Both."   Tr.248, 11-16.

This "instruction" from FBI agent Depodesta for the CI to "engage" Petitioner in "drug communication" could only come from agent Depodesta on or after March 21, 2002, because March 21, 2002 was the "first time agent Depodesta 'took part in any

-65-

law enforcement activities'" involving Petitioner.

The "drug communication" FBI agent Depodesta "instructed" the CI to "engage" Petitioner in on March 21, 2002 was recorded on the Government's recorded evidence that was played for the Jury at trial, as the "negotiation" of Petitioner purchasing cocaine from the CI's source. However, a close examination of this piece of evidence showed the Government's assertion about a "negotiation' not to be the facts. In fact, the recording showed that the Government's criminal informant and FBI agent Depodesta attempted to originate, create, incite, and instigate a drug crime when Petitioner was being investigated by the USSS on three matters relating to counterfeit matters. 8/

Counsel missed the whole concept of the entrapment defense because Counsel "listened to the tapes and the final transcripts and found the tapes and transcripts compatible", which clearly they were not. See Claim One.

When FBI agent Depodesta plainly told the Jury at trial that the CI and himself entrapped Petitioner in a drug crime, Counsel did not understand the significance of agent Depodesta's testimony because Counsel did not read and review the discovery evidence to understand Petitioner's case.

Drugs only became a part of Petitioner's case because FBI agent Depodesta "instructed" the Government criminal informant to originate, create, incite, and instigate a drug crime; which

---

8/ See the argument in Claim Two of this motion for a detailed analysis and examination of the recorded evidence in Petitioner's case.

was not a part of the investigative responsibility charged to
the USSS involving Petitioner. For Counsel to have neglected
this entrapment testimony at trail, and the evidence presented
by the Government at trial, which showed Petitioner was entrapped
into a drug crime by the Government's criminal informant and FBI
agent Depofesta, and not requested a Jury instruction on
entrapment violates the standard laid out in Strickland, Supra.

As a result, this Petitioner submits to the court that
Counsel was ineffective in violation of the Sixth Amendment to
the United States Constitution at trial, where Counsel failed
to request a Jury instruction on entrapment after testimony
aduced at trial, and evidence presented by the Government
showed that Petitioner was entrapped into a drug crime by the
Government's agents.

The Petitioner submits that as a result of Counsel's
deficient performance at trial where Counsel failed to request
a Jury instruction on Petitioner's entrapment defense, he
(Petitioner) was therefore prejudiced and as a result, Petitioner
was convicted of narcotics, and narcotics related charges,
whcih caused Petitioner to be sentended to 211 months imprison-
ment, instead of the 9 months Petitioner would have received
if he was only convicted and sentenced to counterfeit currency
related matter.

### Claim Seven

> Petitioner's conviction and sentence of 211
> months imprisonment violated his Sixth
> Amendment Rights, because Counsel was
> Constitutionally ineffective due to "Counsel's
> mistaken beliefs" that the Judge had ruled
> against Petitioner's proffer for the defense
> of entrapment.

### Argument

In responding to the Government's consolidated motion-

in-limine, Petitioner's Counsel, Carothers, submitted to the

Court a proffer and an amendment proffer outlining the evidence

that she thought would satify Petitioner's "burden of production"

to be allowed to use the entrapment and coersion as a defense.

App. 0207-12, 0244-42.

The Court Pretrial ruling on petitioner's entrapment proffer

was that:

> "all the evidence contained within defendant's
> entrapment proffer could be introduced. The only
> restriction was that the word entrapment not be
> used until the defendant presented enough
> evidence to warrant an entrapment defense."

The Court held that it would:

> "reserve a final ruling until the defendant
> presented his evidence at trial."

Counsel was ineffective in abandoning Petitioner's entrapment

and coersion defense due to "Counsel's mistaken beliefs" that

the Judge had ruled against Petitioner's proffer outlining his

entrapment and coersion evidence. Counsel's understanding of

the Court's ruling on Petitioner's proffer was that:

> "Mr. James was effectively precluded from
> presenting his entrapment defense where the
> Court ruled at pretrial that defendant's proffer
> was insufficient to support entrapment."
> App 0175 at 2.

After Counsel submitted none of the evidence she cited in

Petitioner's proffer, Petitioner was found guilty of all three

counts of the indictment. Counsel filed "motion for new trial

and/or Judgement of acquittal." In her "draft" copy of the

motion which she discussed with Petitioner, Counsel wrote:

> "The Court erred in ruling that James (Petitioner)
> had not made a sufficient pretrial showing of
> entrapment to warrant the presentation of a Jury
> instruction for the defense of entrapment."
> App 0172 at 2.    9/

While discussing the "draft" motion with Petitioner, Counsel

used a pen and marked out the words "erred in ruling", and

wrote:

> "Mr. James was precluded from presenting his
> entrapment defense where the Court ruled that
> James..."    App 0172 at 2.

In the final copy of her Rule 29 motion, Counsel again

made another change to what she explained to Petitioner her

understanding of the Court's ruling to the entrapment proffer

was. Counsel wrote in her final Rule 29 motion:

> "Mr. James was effectively precluded from presenting
> his entrapment defense where the Court ruled at
> pretrial that defendant's proffer was insufficient
> to support entrapment."
> App 0175 at 2.

The Govenrment responded to Counsel's Rule 29 motion

stating that "Counsel's assertion of the Court's ruling is a

---

8/ See the typed portion of the draft motion at 2.

"misstatement" and that the Court in no way "precluded" defendant's entrapment defense. The Government in their response to Counsel's motion went on to clarify to Counsel that the Court ruling was:

> "The Court explicitly held that all the evidence contained within defendant's entrapment proffer could be introduced. The only restriction was that the word 'entrapment' not be used until the defendant presented enough evidence to warrant an entrapment defense".    App 0186 at B.

Petitioner wrote in a post-trial letter to Counsel in which he accused Counsel of failing to expose the case in it's entirety, and that Counsel failed to expose how the CI lured Petitioner in the crimes charged. APp 0196 at 1 and 5.

Counsel responded to Petitioner's accusation in a blistering letter, stating that she discussed the problems in presenting an entrapment defense with Petitioner prior to trial, and during trial. In Counsel's post-trial letter to Petitioner, Counsel wrote:

> "The Court did not preclude the defense from proceeding with presenting evidence of entrapment... The defense presented nc evidence of entrapment and consequently we did not receive an entrapment instruction..." App 0199 at 3.

This statement conflicts with what Counsel wrote in her Rule 29 motion for a new trial. It was Counsel's responsibility to present all the evidence cited in her proffer to the Jury. Counsel failed to present these evidence because she "mistakenly believed" that the COurt "effectively precluded" the defense

from presenting  his evidence. It is clear from the proffer
and the amended proffer Counsel submitted to the Court, and
her admonition that the Court "effectively precluded"
Petitioner from presenting his entrapment defense, that Counsel
belief was that Petitioner had an entrapment issue, which she
was unable to argue because the Court stopped her.

Counsel's statement in her letter that she discussed the
problems in presenting an entrapment defense with petitioner
prior to trial, and during trial is another "misstatement".
Petitioner proceeded to trial because Counsel told him he had
an entrapment issue, which is proof by the proffer Counsel
submitted and her Rule 29 motion. Counsel simply abandoned
Petitioner's strongest defensive strategy due to her "mistaken
belief" that the Court had ruled against Petitioner's proffer.
Counsel did not abandon  this defensive strategy because she
made a rational "strategic decision" to do so, but, because
of incompetence and confusion of the utmost. It took the
prosecutors to clarify the Court's pretrial ruling on
Petitioner's proffer for Counsel. Counsel's new found clarification
of the Judge's ruling that she wrote in her post-trial letter
came a bit late to have prevented the damage Counsel had already
caused.

Counsel had all the evidences that are included into
Petitioner's Appendix supporting this motion in her possession

-71-

before and during trial. The se evidence as analyzed in Claim Two and Petitioner's affidavit of truth clearly support Petitioner's claim of entrapment. 10/ Counsel's "mistaken belief" that the Judge ruled against Petitioner's Proffer caused her to abandon the defense of entrapment violates the standard laid out in Strickland, Supra.

As a result, this Petitioner submits to the Court that Counsel was ineffective in violation of the Sixth Amendment to the United States Constitution at trial where Counsel abandoned Petitioner's entrapment defense due to Counsel's "mistaken belief" that the Judge had ruled against Petitioner's pretrial entrapment proffer.

Petitioner submits that as a result of Counsel's deficient performance at trial, he (Petitioner) was therefore prejudiced and that as a result, Petitioner was convicted and sentenced to 211 months imprisonment. Petitioner's conviction and sentence should be vacated and a new trial be ordered at the Court's earliest convenience.

### Claim Eight

> Petitioner's conviction and sentence of 211 months imprisonment violates his Sixth Amendment Rights, because Counsel was Constitutionally ineffective when Counsel failed to call Petitioner as a witness in his case-in-chief to establish the facts that he was entrapped by the Government's agents.

### Argument

Petitioner wrote in his post-trial letter to Counsel:

10/ See Appendix 0002-0043 for Petitioner's affidavit of truth.

> "Not allowing me to take the stand also
> prevented certain details from surfacing."
> App 0196 at 3.

Counsel responded by stating:

- A. Had you testified, the Government was prepared
  to call Allen Dubon(CI) as a rebuttal witness
  to testify about other drug dealings he said he
  had with you, at least one of which may have been
  corraborated by Black;
- B. Had you testified, the Government was also
  prepared to call Blacks (Dale Braggs) as a
  rebuttal witness to testify about prior drug
  dealings in which he said you were involved in
  a heroin deal;
- C. Had you testified, the Government would have
  been allowed to present evidence of the marijuana
  case out of California in which, like this case,
  you provided a written confession.
  App 0197 at 1.

Counsel was ineffective when Counsel failed to put
Petitioner on the stand to testify in his case-in-chief to
establish the facts that he was entrapped by the Government's
agents.

First, prior to trial and during trial, Counsel never
discussed with Petitioner any problems with presenting his
entrapment defense. If Counsel would have told Petitioner that
there were problems in presenting his entrapment defense,
Petitioner would not have gone to trial with this Counsel
representing him. Counsel offered up nothing but excuses in
her post trial letter to cover up her incompetence in her
representation of Petitioner before and during trial.

Counsel first excused why she did not put Petitioner on
the stand does not make sense. Counsel forgot that she had

-73-

tried to call Allen Dubon (CI) as a witness in Petitioner's case-in-chief. His attorney came in the Courtroom and told the Court that his client (CI) would plea the fifth.

The only reason the CI would plea the fifth was that he knew that he had already perjured himself in getting Petitioner indicted. See Claim Three. The CI's attorney knew that any half competant trial lawyer could have easily proven that the CI had perjured himself. Pleading the Fifth was a way the CI's attorney prevented further damages to his client.

Second, the Government had no evidence that Dale Braggs and Petitioner had any previous drug dealing relationship. Dale Braggs was an active criminal informant for the FBI. The FBI investigated Petitioner from "November of 2001" until they turned the investigation involving Petitioner over to the USSS on February 8, 2002. If Dale Braggs and Petitioner was involved in illegal drug activities, the FBI would have had evidence of it through their criminal informant, Dale Braggs. They had no evidence to support this claim, which is the reason they turned the case over to the USSS, because Petitioner was never involved in any illegal drug activities. Counsel's second excuse not to put Petitioner on the stand does not make sense either.

Counsel's third excuse not to put Petitioner on the stand does not make sense either. Two things are wrong with this excuse. (1) The Court had ruled that unless the defense opens

up the door, the Government could not use Petitioner's arrest out of California because it would have been too prejudicial. (2) Petitioner did not give a written confession about purchasing drugs.

Petitioner gave the agent that interviewed him a statement after Petitioner was arrested. Petitioner wrote:

> "We were to make an exchange for 15 keys of cocaine for the counterfeit."

This is not a confession by Petitioner. 11/ Counsel simply did not understand the facts and the laws involved with Petitioner's case when she called what Petitioner wrote a confession. Counsel simply just went along with what the Government said it meant. Even though the evidence of the case showed that Petitioner had no agreement with the CI to purchase drugs from the CI's source in March of 2002. Contradicting any notion that Petitioner's statement was a confession.

Petitioner was adamant about taking the stand in his defense, only to relinquish this right when Counsel promised Petitioner that he did not need to take the stand because she would call the CI as a witness in Petitioner's case-in-chief. Counsel advised Petitioner that she would introduce Petitioner's entrapment evidence through the CI, so there was no need for Petitioner to take the stand. Petitioner followed Counsel's advise and told the Judge that he would not take the stand. Before Petitioner relinquished this Right on the advise of

---

11/ See the analysis in Claim Two, Section Six for the meaning of this phrase. See also affidavit of truth, App 0026-0033.

Counsel, there was side-bar conversation about Petitioner taking the stand. Cocounsel Hill McClain told the Judge that she thinks Petitioner should take the stand, and that he will take the stand even if she has to walk over her cocounsel, MR. Carothers.

Counsel woman McClain told cocounsel Carothers that Petitioner would be found guilty if he did not take the stand. They both came to an agreement that instead of putting Petitioner on the stand they would call the CI instead and introduced Petitioner's entrapment evidence through him. Cocounsel McClain agreed that she would question the CI and "throw the kitchen sink at him".

Counsel walked in the courtroom and Petitioner following Counsel's advice because of their promise to put the CI on the stand, waived his Right to take the stand. Counsel then attempted to call the CI to the stand when his attorney walked in the courtroom and said his client pleas the Fifth. Petitioner instructed Counsel to put the CI on the stand anyway and question him. Counsel advised Petitioner that the CI was not going to answer her questions and it would be a waste of time to put him on the stand. Counsel then instructed the Court that she would not call the CI to the stand, which is the reason why Petitioner never got a chance to introduce his entrapment evidence to support his claim.

If Petitioner would have taken the stand, Petitioner would have pointed out the facts that it was the CI's plan to Rob 15

kilograms of cocaine by paying for them with the counterfeit money in the "parking lot at Naragansett and Diversey". Petitioner would have pointed out that the CI offered to "split" his stolen cocaine with Petitioner if Petitioner would "help him sell them". Petitioner would have pointed out that it was the CI who was offering to "sell" his stolen cocaine for $10,000 per kilogram and not some mysterious source as the Government claims. Petitioner would have pointed out that the CI wanted to Rob the cocaine from the guy he set up in the parking lot and do his planned Robbery "like it was Petitioner who "fuck" up the guy". See Claim One and Two. Petitioner would have pointed out that his statement given to the USSS was not a confession, and was just a short summary of how the CI said he wanted Petitioner to help him rip off the guy in the parking lot.

Counsel (1) had a "mistaken belief" that the Judge had ruled against Petitioner presenting his entrapment defense. (2) Counsel did not understand the contents of the Government's recorded evidence that showed Petitioner was entrapped. When Petitioner waived his Rights to take the stand following Counsel's advice, and the CI's attorney informed the Court that his Client would plea the Fifth, Counsel became lost and stopped advocating Petitioner's cause.

Counsel wrote in her post trial response to Petitioner's letter that:

> "The defense presented no evidence of entrapment, and consequently we did not receive an entrapment instruction. Without your testifying, there is nothing in the record to establish entrapment," App 0199 at 3.

Here Counsel knew all along that if Petitioner did not take the stand, his entrapment defense would not be established. Yet, Counsel advised Petitioner to waive his Right to take the stand. Counsel abandoned Petitioner's cause and failed to put Petitioner on the stand because of confusions and incompetency, which is a violation of the standard laid out in Strickland, Supra.

As a result, this Petitioner submits to the Court that Counsel was ineffective in violation of the Sixth Amendment to the United States Constitution at trial where Counsel failed to put Petitioner on the stand to establish his entrapment defense.

Petitioner submits that as a result of Counsel's deficient performance at trial, he (Petitioner) was therefore prejudiced and that as a result, Petitioner was convicted and sentenced to 211 months imprisonment because his Jury did not get a chance to see or hear his entrapment arguments. Petitioner's conviction and sentence of 211 months should be vacated and a new trial be ordered at the Court's earliest convenience.

### Claim Nine

Petitioner's conviction and sentence of 211
months imprisonment violates his Sixth
Amendment Rights, because Counsel was
ineffective when Counsel failed to put the
Government's Criminal Informant on the stand
as a witness in Petitioner's case-in-chief
to establish the facts that he entrapped
Petitioner in drugs and drug related crimes,
denying Petitioner his Constitutional rights
to confront his accuser.

### Argument

Petitioner wrote in his post-trial letter to Counsel:

"Not calling the witness (CI) to cross examine
him stopped him from being accountable for his
statements."
App 0196 at 2.

Counsel responded by stating:

"I interviewed Allen Dubon (CI), and made a
strategic decision not to call him in the defense
case, because nothing he said would have helped
the defense. In my opinion, his testimony
would have been devestating and would have
assisted nobody but the Government in proving
that there was no entrapment..." App 0197 at 2.

Counsel was ineffective when Counsel failed to put the
Government's Criminal Informant on the stand as a witness in
Petitioner's case-in-chief to establish the fact that he
entrapped Petitioner in criminal activities.

Counsel's response to Petitioner's post-trial letter on
the issue of not putting the CI on the stand further demonstrated
Counsel's confusion and incompetency, and is another excuse to
cover her actions. Counsel interviewed the CI and after the

interview, Counsel told Petitioner that she would put the CI on the stand to testify. Counsel advised Petitioner not to take the stand in his case-in-chief because she would introduce all of Petitioner's entrapment evidence through the CI. Petitioner then relinquished his right to testify only because of Counsel's promise to put the CI on the stand instead.

After Counsel advised Petitioner to relinquish his right to testify, Counsel walked into the courtroom and told the Court that her next witness would be "Allen Dubon" (CI). The CI's attorney then walked into the courtroom and told the Court that his Client pleas the "fifth". Counsel and the prosecutors went back and forth about immunity for the CI, when out of nowhere, Counsel threw up her hands and told the Court that she would not call the CI to testify.

Counsel's statement in her post-trial letter to Petitioner that she made a "strategic decision not to call" the CI "in the defense case" is another "misstatement" by Counsel, because as Counsel's action in the court room showed, she did attempt to call the CI to testify. Counsel did not make a strategic decision not to call the CI. Counsel simply got lost and did not know what else to do when she advised Petitioner to relinquish his right to testify, and when the CI's attorney came in the court room and informed the Court that his Client would plea the "Fifth".

If the CI would have testified, he would have had to explain to the Jury, how was it possible for Petitioner to have initiated a drug crime on March 16, 2002 by calling the CI when the evidence showed that Petitioner did not call the CI on that date.

If the CI would have testified, he would have had to explain to the Jury, why he was asking Petitioner to help him rob 15 kilograms of cocaine from a guy in the parking lot at Naragansett and Diversey in Chicago when Petitioner was only being investigated for counterfeit United States currency only.

If the CI would have testified, he would have had to explain to the Jury, if Petitioner was the one attempting to purchase the 15 kilograms of cocaine from the CI's source, then why was it that it was the CI himself, who was offering to "sell" the stolen cocaine for $10,000 per kilogram.

If the CI would have testified, he would have had to explain to the Jury, if Petitioner was the one attempting to purchase 15 kilograms of cocaine from the CI's source, then why was it that it was the CI offering to "split" the 15 kilograms of cocaine with Petitioner if Petitioner would "help" him "sell" the stolen cocaine.

If the CI would have testified, he would have had to explain to the Jury, if Petitioner was attempting to purchase 15 kilograms of cocaine from the CI's source, then why was the

-81-

CI telling Petitioner that he wanted to rob the 15 kilograms
of cocaine from the guy in hhe parking lot and do it like it was
Petitioner who "fuck" us up.

The answer to these questions would have proven without
a doubt that Petitioner was, and is, innocent of the charges
brought against him by the Government.

Counsel submitted a proffer to satisfy Petitioner's "burden
of production" to be allowed to be able to use the entrapment
defense. Counsel then "mistakenly believed" that the Court had
ruled against Petitioner's proffer,'effectively precluding'
Petitioner from arguing entrapment, which the Court did not do.

Counsel advised Petitioner not to take the stand because
she would call the CI instead and introduce Petitioner's
entrapment evidence through the CI. Because of confusions and
her incompetence, she failed to call the CI to the stand.

Counsel's action in failing to put the CI on the stand is
not a trial strategy, but just one more blunder in her
representation of Petitioner, which is a violation of the
standard laid out in Strickland, Supra.

As a result, this Petitioner submits to the Court that
Counsel was ineffective in violation of the Sixth Amendment to
the United States Constitution at trial where Counsel failed in
her obligation to call the Government criminal informant to the
stand so Petitioner could face his accuser as required by the

-82-

by the Constitution to show that he was entrapped in a drug
and a drug related crime by the Government's criminal informant.

Petitioner submits, that as a result of Counsel's deficient
performance at trial, he (Petitioner) was therefore prejudiced
and that as a result, Petitioner was convicted and sentenced to
211 months imprisonment. 202 more months imprisonment than if
Petitioner was just convicted of the counterfeiting currency
related matters which were the subject of the investigation
authorized involving Petitioner. Petitioner's conviction and
sentence should be vacated and a new trial be ordered at the
Court's earliest convenience.

## Claim Ten

> Petitioner's conviction and sentence of 211
> months imprisonment violated his Sixth
> Amendment rights, because Counsel misled
> Petitioner in believing Counsel would
> advocate an entrapment and coersion defense
> strategy.

### Argument

Counsel stated in her response to Petitioner's post-trial
letter that she interviewed Allen Dubon (CI) and made a strategic
decision not to call him in the defense case, because:

> "In my opinion, his testimony would have been
> devestating and would have assisted nobody but
> the Government in proving that there was no
> entrapment." App 0197, 2.

Counsel was ineffective when Counsel misled Petitioner to
believe Counsel would advocate an entrapment and coersion defense

-83-

strategy. Counsel advised Petitioner before trial that "in her opinion the evidence showed that Petitioner was entrapped by the criminal informant". Counsel further advised Petitioner that her defensive strategy was going to argue entrapment. Following COunsel's advice and the confidence placed in Counsel for the knowledge expected of a trial lawyer, Petitioner decided to go to trial.

Counsel submitted a proffer and an amended proffer to satisfy defendant's "burden of production" to use the entrapment and coersion as a defense. Counsel then advised Petitioner not to take the stand in his own case because she would call the Government's criminal informant to the stand instead, and she would introduce Petitioner's entrapment evidence through the informant. Counsel then failed to put the Govenrment's criminal informant on the stand as she promised Petitioner she would do. As a result, the Jury never got a chance to hear Petitioner's entrapment evidence. As such, the Government's case was never subject to any adversarial testing, and Petitioner was convicted.

On one hand, based on Counsel's post-trial letter, Counsel did not believe that Petitioner had an entrapment issue when Counsel wrote:

> "In my opinion, his testimony would have been devestating and would assist nobody but the Government in proving that there was no entrapment." App 0197 at 2.

-84-

This could only be the case "only" if Counsel did not read and understand the discovery materials associated with Petitioner's case. See Claim One.

On the other hand, Counsel attempted to argue entrapment and coersion as a trial strategy. She submitted a proffer and an amended proffer to support entrapment. Counsel even admonished the court from "effectively precluded" Petitioner from presenting his entrapment defense. Counsel even attempted to put the Government informant on the stand to testify to show that he entrapped Petitioner. Counsel did all of this, while all along in her "opinion" the Government informant's testimony would have been "devestating" to Petitioner. Worst of all, Counsel attempted to put the CI on the stand knowing all along in her "opinion" the CI's testimony would "assist nobody but the Government in proving that there was no entrapment".

Counsel proceeded all the way through trial convincing Petitioner that he was entrapped and that Petitioner would have prevailed at trial arguing entrapment and coersion. Counsel waited until after trial to tell Petitioner her true feelings, which was that, in her "opinion", there was no "entrapment".

By advising Petitioner that he had an entrapment issue that would prevail at trial, Counsel took the option away from Petitioner to enter into a plea argreement with the Government which would have been more favorable to Petitioner,

which is in violation of the standard laid out in <u>Strickland</u>,
Supra.

As a result, this Petitioner submits to the court that
Counsel was ineffective in violation of the Sixth Amendment
to the United States Constitution at trial when Counsel misled
Petitioner in believing Counsel would advocate an entrapment
and coersion defense strategy.

Petitioner submits that as a result of Counsel's deficient
performance at trial, he (Petitioner) was therefore prejudiced
and that as a result, Petitioner was convicted and sentenced
to 211 months imprisonment, when Petitioner could have entered
into a plea agreement with the Government that would have been
more favorable to Petitioner in the amount of prison time
Petitioner would have to serve. Petitioner's conviction and
sentence should be vacated and a new trial be ordered at the
Court's earliest convenience.

## Claim Eleven

> Petitioner's conviction and sentence of 211
> months imprisonment are in violation of the
> "policy of the law" of the United States,
> where Petitioner was denied due process
> because the Government's agents entrapped
> Petitioner into criminal activities.

### Argument

The Government's criminal informant in Petitioner's case
had gone to the FBI in "November of 2001". Tr.138, 12-13. Based
on what the CI told the FBI they started investigating Petitioner

Tr.204, 16. During the trial proceedings, the case agent Daniel Dick testified that Petitioner was the "target" of the Secret Service investigation "involving counterfeit currency". Tr.35, 12-13.

Petitioner was entrapped into criminal activities by the Government's agents. According to FBI agent Depodesta's testimony at trial, the FBI started investigating Petitioner when the CI walked into the FBI's office on "November 26, 2001". The CI's primary handler, FBI agent Sodetz, contacted the United States Secret Service on February 8, 2002 and told them what the CI had told the FBI about Petitioner.

On that same day, SSSA Daniel Dick was assigned by his supervisor as the agent in charge (Case agent). SSSA Dick was charged to investigate Petitioner on three matters relating to counterfeiting United States Currency.

The primary case SSSA DIck was charged to investigate involving Petitioner was, primary case type – Manufacturing United States Currency. SSSA Dick was also charged to investigate Petitioner for two secondary case types, (1) Dealing in United States Currency, and (2) Use of Emerging Technology.

When the CI went to the FBI in November of 2001, FBI agent Sodetz was assigned as his primary handler. When dealing with criminal informants, they are assigned a primary handler who "has all the information pertaining to the case". Tr.217,

25. 213, 1. FBI Agent Sodetz was the CI's primary handler who
had all the information relevant to Petitioner's case.

Agent Sodetz made a report of the statement the CI gave
to the FBI about Petitioner in November of 2001. The CI told
the FBI that:

> "On several occasions, James (Petitioner) suggested
> that he could provide the source (CI) with
> counterfeit money that the source could use and
> rip off drugs from a dealer, then the source
> could sell the drugs for cash to pay off his
> debt".   App 0143, para 2.

The criminal informant continued to tell the FBI that it
was because of this suggestion by Petitioner why he went to
the FBI. App 0143, para 3.

Based on what the CI told the FBI about Petitioner, they
started investigating Petitioner. The FBI did not contact the
USSS to inform them about Petitioner until February 8, 2002.
The FBI does not have Jurisdiction to investigate cases involving
only counterfeit United States currency. Based on what the CI
claimed that Petitioner "suggested" to him, the matter seemed
to be a Secret Service matter. However, the FBI did not contact
the USSS right away. They did an investigation of their own for
almost four months. When it was clear to them that Petitioner
was not involved in any illegal drug activities, they contacted
the Secret Service and told them that they had a criminal
informant who mentioned that Petitioner "suggested" to the
informant that he could provide the informant with counterfeit
money.

The statement the informant gave to the FBI and the
prosecutors in his meeting with them about the circumstances
regarding the investigation of Petitioner showed that
Petitioner was never involved in any drug deals in the past
before the informant went to the FBI. The informant told the
FBI that "he felt that he needed to have a couple of cases
lined up with people he knew were involved in drug trafficking
in order to convince the FBI to work with him". App 0143, para
4. Petitioner was never one of those persons, because all the
informant told the FBI from the start was that Petitioner
"suggested" that he could provide the informant with counterfeit
money. According to the informant, Petitioner is the reason
that he went to the FBI in the first place. If Petitioner and
the informant had a prior drug relationship, the informant
could have easily arranged a drug deal with Petitioner before
he went to the FBI.

The informant's statement to the prosecutors even showed
that Petitioner had no intention on taking possession of any
kind of drugs from the informant. Or had no agreement to
purchase drugs neither from the informant nor from the informant's
source. The informant told the prosecutors that Petitioner
suggested that he (Petitioner) could provide the informant with
counterfeit money that the informant could use and rip off drugs
from a dealer, then the <u>informant himself "could sell the drugs</u>
for cash to pay off his debt". And this was his reason for

going to the FBI in "November of 2001".

The informant statement to the FBI and the prosecutors showed a classic case of entrapment. Not only did the informant never mentioned to the Government that Petitioner ever requested to purchase drugs from him or his source, but for him to get Petitioner to provide the counterfeit money he had to threaten Petitioner with bodily harm. He had to call Petitioner continuously. When Petitioner changed his phone number because of the informant's threats, he paid $1000 to an employee at a local phone company to get Petitioner's new number. He then proceeded to call Petitioner with more threats of bodily harms. Then according to his statement as soon as he got Petitioner to agree to provide him with the counterfeit money, he then went to the authorities.

AFter a four month investigation of Petitioner by the FBI, USSS then took over the investigation on February 8, 2002 and was charged to investigate Petitioner for counterfeiting matters.

It was after this time period, to be specific March 21, 2002, that FBI agent Depodesta "first took part in any law enforcement activities" involving Petitioner "on March 21, 2002". Tr.109,12-13. The only law enforcement activities agent Depodesta could have taken part in involving Petitioner on March 21, 2002, was the counterfeit matters Petitioner were being investigated for by the Secret Service, because as mentioned before, there was no other active investigation involving Petitioner that was ongoing on March 21, 2002.

When agent Depodesta got involved in the counterfeiting matters Petitioner were being investigated for by the USSS, he "instructed" the informant to "contact" Petitioner. Tr.204, 20. Agent Depodesta testified that after the informant had gone to Petitioner on numerous occasions, Petitioner would not cooperate with him. Tr.220, 23-25. 221, 1. When Petitioner refused to cooperate with the CI, agent Depodesta then pushed him harder. This time agent Depodesta "instructed" the CI to "engage" Petitioner in "drug communication". 243, 11-16. Never mind the fact that his own agency, the FBI, had investigated Petitioner for almost four months in which they found no evidence that Petitioner was involved in any illegal drug activities. Moreover, he gave the "instruction" to the CI to "engage" Petitioner in "drug communication" when Petitioner was only being investigated by a seperate agency, the Secret Service, on counterfeit matters only.

The "drug communication" agent Depodesta "instructed" the CI to "engage" Petitioner in on March 21, 2002 was recorded. A cursory review of this recording showed the sinistism in which agent Depodesta and the Government's criminal informant created, instigated, incited, and lured Petitioner into the crimes for which Petitioner were convicted.

The first thing the March 21, 2002 recording showed was that the CI set up a plan to rip off 15 kilograms of cocaine

from his own source in the parking lot at Naragansett and Diversey by paying for the cocaine with the counterfeit money he asked Petitioner to provide him with.  12/

Secondly, a cursory review of the same March 21, 2002 recording also showed that it was the CI who offered to "split" the 15 kilograms of stolen cocaine with petitioner.

Third, it was the CI who was offering to "sell" the 15 kilograms of the stolen cocaine for $10,000 per kilogram if Petitioner would "help" him "sell them".

The tactics employed by the Government's criminal informant and FBI agent Depodesta were not decoys to entrap someone who was looking to buy narcotics. As the evidence clearly showed, Petitioner was lured into providing the Government criminal informant with counterfeit money. FBI agent Depodesta himself testified that "Petitioner would not cooperate with the Government criminal informant to provide him with money". Tr. 220, 23-25.

Once the Government's criminal informant and FBI agent Depodesta succeeded into luring Petitioner to agreeing to try and find someone with counterfeit money, they then moved to the other level, which was an endeavor to cause, to create, a drug crime. FBI agent Depodesta "instructed" the Government criminal informant to set up a scenario in which the CI would take the counterfeit money - which he convinced Petitioner to get for him, to a guy the CI "set up" in the parking lot at Naragansett and

12/ For the sake of brevity, Petitioner will not belabor the analysis of the tapes. They are analyzed in the factual basis in Claim One, Two, Six, and Affidavit of Truth, App 0002-43.

Diversey. The CI would then give the guy the counterfeit money for the 15 kilograms of cocaine. Then "do" it like it was Petitioner who "fuck" them up by paying for the cocaine with the counterfeit money.

FBI agent Depodesta then "instructed" the Government criminal informant to tell Petitioner that it would be better for them to "split" the 15 kilograms of stolen cocaine with Petitioner by "selling" the 15 kilograms of stolen cocaine for $10,000 per kilogram if Petitioner would "help him sell them".

These tactics employed by the Government's agent were not decoys to entrap someone who was looking to buy narcotics, but was an endeavor to cause, to create a crime which would result in a more severe crime. Sorrells v. United States, 284, U.S. 435 (1932), Id 287 U.S. 435, and Sherman v. United States, 356 U.S. 369, 2L.Ed. 848 78 S.Ct. 819, it is prohibited for law enforcement officers to instigate criminal acts by otherwise innocent person in order to lure them to commit crimes and punish them. Mr. Justice Frankfurter in his opinion in Sherman, Supra, at 382 383:

> "... the underlying reason for the defense of entrapment, no matter what the defendant's past record and present inclination to criminality, or the depths to which he has sunk in the estimation of society, certain police conduct to ensnare him into further crime is not to be tolerated by an advanced society."

In the instant case, the FBI investigated Petitioner for almost four months. They found no evidence that Petitioner was involved in any kind of illegal drug activities. They then

-93-

passed the investigation of Petitioner over to the USSS who were charged to investigate Petitioner on three counterfeit related matters. During the Secret Service investigation of Petitioner, FBI agent Depodesta and an unsupervised Government criminal informant set out to originate, create, instigate, incite, and lure Petitioner in a drug crime. A crime to which FBI agent Depodesta's own agency found during an almost four month investigation that Petitioner was never involved in.

Mr. Justice Frankfurter further wrote,

> "It also is desirable that the Government should not itself foster and pay for other crimes, when they are the means for which the evidence is to be obtained..." Sherman, 356 U.S. 369 at 855.

The law is also clear in United States v. Mathues, 22 F.2d 979 (D.C.E.D. Pa 1927) "where a Government agent ... having charged of investigating and obtaining evidence concerning an unlawful business, ... offers himself as a participator in a different offense not connected with the business under investigation ... but a crime to which he himself must be a party, and under the evidence, there has been no intention on the part of the entrapped to commit such an offense until he was lured into it, the policy of the law will not permit a prosecution based on such entrapment to be carried on". Id.

The "instruction" given to the CI by agent Depodesta to "engage" Petitioner in "drug communication" and the scenario set up by the Government criminal informant was a scheme that was

-94-

impossible without the direct participation of the CI himself, who was an active Government agent at the time of his scheme.

The USSS was charged to investigate counterfeiting matters. Here, an agent from a seperate federal agency who does not have Jurisdiction in the matters Petitioner were being investigated for, offered himself through his uncontrolled and unmonitored criminal informant as a participator in a different offense not connected with the business under investigation, but a crime to which they themselves was the instrumental party.

The view that is held in the seventh circuit is "so that when an officer induces a person who has had no intention of committing a crime, to violate the law, the Court will not lend their aid in the punishment of persons thus lured into committing crimes". O'brien v. United States, 57 F.2d 74 (7th Cir. 1931).

The fundamental part of the entrapment defense is defendant's predisposition. The Government must prove "beyond a reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by the Government agents". U.S. v. Lahick, 23 F.3d 1203 (7th Cir. 1944) (defining pre-disposition as "one who is prepared and eager for opportunity to commit crime"). In Jacobson v. U.S., -U.S-, 112 S.Ct. 1535 (1992) (defendant must be predisposed to commit the crime prior to being first approached by agents; although one may become

-95-

predisposed to break the law, Government must prove predisposition was independent and not the product of entrapment.) 112 S.Ct. at 1540.

In the instant case Petitioner was never predisposed to purchasing 15 kilograms of cocaine. Petitioner was already investigated for any involvement relating to illegal drugs by the FBI during a four month investigation in which no evidence was ever produced that Petitioner could have or was capable of purchasing 15 kilograms of cocaine with counterfeit money.

It was the Government's criminal informant who had to resort to the use of trickery to pull Petitioner in a fake scenario to rob cocaine from some guy in a parking lot, which further goes to show Petitioner was not predisposed to purchase 15 kilograms of cocaine for $300,000 in counterfeit money. No independent predisposition existed in Petitioner's case, as required by Jacobson, Supra.

"The violation of the unwary into crime should be dealt with by the Court no matter by whom or at what stage of the proceedings the facts are brought to it's attention ... a Jury verdict, although it may settle the issue of entrapment in a particular case, cannot give significant guidance for official conduct of the future." Sherman, at 858. The Government's action in the instant case rises to the level of true entrapment. United States v Cotts, 14 F.3d 300 n.2 (7th Cir. 1994).

As a result, this Petitioner submits to the Court that the Government violated "the policy of the laws" of the United States by denying Petitioner due process, where Petitioner was entrapped into criminal activities by the Government agents.

The Petitioner submits that as a result of the Government's violation of the "principles of justice" by the entrapment of Petitioner into criminal activities, he (Petitioner) was therefore prejudiced and that as a result, Petitioner was convicted and sentenced to 211 months imprisonment for crimes which were the result of entrapment. Petitioner's conviction and sentence should be vacated with prejudice at the Court's earliest convenience.

### Claim Twelve

> Petitioner's conviction and sentence of 211 months imprisonment violates his Sixth Amendment Rights, because Counsel was Constitutionally ineffective, where Counsel failed to file motion-in-limine requesting a Franks hearing to quash the indictment after the discovery materials in Counsel's possession showed that the FBI knowingly and intentionally submitted a false and misleading complaint affidavit to the Federal Magistrate to show probable cause, in violation of the Fourth Amendment.

### Argument

On March 21, 2002, Petitioner was arrested by the United States Secret Service. Petitioner's case was presented to Assistant United States Attorney Valarie Hays, who in turn presented the case to the Federal Magistrate Judge. A complaint affidavit sworn to under penalty of perjury by FBI agent

-97-

Depodesta was presented to the Magistrate Judge. The purpose of the affidavit was to establish probable cause.

On March 25, 2002 the Magistrate Judge appointed Helen Kim of the Federal Defenders office as Counsel to represent Petitioner. A preliminary hearing was set for March 28, 2002. Counsel woman Kim waived Petitioner's rights to this hearing. Bond was set at $200,000.

Petitioner retained Anita Rivkin-Carothers as his attorney before he was arraigned. Petitioner pled not guilty to the charges against him at his arraignment. Petitioner was convicted on September 10, 2002 of all three counts of the indictment.

Ms. Carothers was immediately dismissed at the end of trial for lack of advocating Petitioner's cause and irreconcilable differences. The Court then appointed Ellen Dump as Petitioner's new Counsel. Ms. Dump was also dismissed by Petitioner for refusing to raise Petitioner's issues before the Court. Petitioner then retained Gary Stornberg as his new attorney.

Counsel was ineffective where Counsel failed to file motion-in-limine requesting to quash the indictment after the discovery materials in Counsel's possession showed that the FBI knowingly and intentionally filed a false and misleading affidavit to the Federal Magistrate to show probable cause.

FBI agent Depodesta wrote in his affidavit to establish probable cause that:

-98-

1.  "In March 2002, a cooperating individual(CI)
    provided the FBI with information about an
    individual known to the CI as "James". The
    CI explained that James asked if the CI
    would be willing to arrange a narcotics
    transaction in which James would pay for
    powder cocaine with counterfeit money."
    App 0051 at 4.

Agent Depodesta knew that this statement was false and

misleading. The CI went to the "FBI on November 26 of 2001"

and told the FBI that Petitioner "suggested" that he could

provide the CI with counterfeit money. The CI never told

anyone including the FBI or the prosecutors that Petitioner

ever asked him to purchase drugs from his source. See Claim

Two and Three.

The FBI investigated Petitioner before they handed the

investigation of Petitioner over to the USSS, who was then

charged to investigate Petitioner on counterfeiting matters.

It was not until March 21, 2002 that drugs came into play

in the investigation of Petitioner, and it was FBI agent

Depodesta who "instructed" the Government criminal informant

to "engage" Petitioner in "drug communication", see Claim

Eleven, which was a scheme for the CI to rob 15 kilograms of

cocaine from a guy the CI set up in the parking lot at

Naragansett and Diversey in Chicago.

2.  "On March 21, 2002, ... James and the CI
    agreed to purchase 10 kilograms of cocaine
    from the CI's source for $200,000 in
    counterfeit money." App 0052 at 7.

-99-

FBI agent Depodesta knew this statement was false and
misleading. He keew that Petitioner never agreed to purchase
any amount of cocaine from the CI's source on March 21, 2002.
This 10 kilograms of cocaine agent Depodesta said Petitioner
and the CI agreed to purchase from the CI's source are the
same 10 kilograms of cocaine the CI said, "I could rob by
myself", if I knew "where he lives". They are the same 10
kilograms of cocaine the CI said in the March 21, 2002
recording "I wanna" rob them from "this guy". See Claim One
and Two. This conversation is part of the "drug communication"
FBI agent Depodesta "instructed" the CI to "engage" Petitioner
in.

> 3. "On March 22, 2002, the defendant Donville James
>    asked the CI if he could obtain 20 kilograms of
>    powder cocaine". App 0052 at 9.

> 4. "On March 24, 2002, the CI placed a recorded
>    call to defendant Donville James. They agreed
>    on purchasing 15 kilograms of powder cocaine for
>    $300,000". App 0052 at 10.

These statements in FBI agent Depodesta's affidavit were
completely false and misleading. They were the product of the
prosecutor's "prepared statement" which were created by the
prosecutors to mislead the Magistrate, the Grand Jury, the
trial court, and the trial Jury. See Claim Two and Three.

The complaint must contain enough of an explanation of
the circumstances so that the basis for the conclusions and
allegations are clear. See Whololey v. Warden, 401 U.S. 560(1971).
Also see Rule 4 of the Fed. R.Crim.P.

File Date: _March 10 2008_

Case No: _08cv1416_

ATTACHMENT # _1_

EXHIBIT _____

TAB (DESCRIPTION) _Pages 101 -151_

If the defendant is arrested without a warrant, the complaint is filed at the time of presentment to the Magistrate Judge, Rule 5(a) of the Fed.R.Crim.P.

The Fourth Amendment requires that warrants issued "upon probable cause, supported by oath or affirmation". The significance of the oath requirement is "that someone must take the responsibility for the facts alleged, giving rise to the probable cause for the issuance of a warrant". United States v. rel. Pygh v. Pate, 401 F.2d 6 (7th Cir. 1968); see also Frazier v. Roberts, 441 F.2d 1124 (8th Cir. 1997).

An attack on the veracity of the allegations contained in the affidavit may be permitted. See Frank v. Delaware, 438 U.S. 154 (1978); United States v. Carmichael, 489 F.2d 982 (7th Cir. 1973) (en banc); United States v. Botsch, 364 F.2d 542 (2nd Cir. 1966); cert. den. 386 U.S. 937 (1967).

Counsel was ineffective where Counsel failed to file pretrial motion-in-limine to quash indictment pursuant to Frank v. Deleware, Supra, where the discovery materials in Counsel's possession showed that the FBI agent Frank Depodesta knowingly and intentionally submitted a false and misleading affidavit to the Magistrate to establish probable cause to arrest Petitioner.

The court in United States v. Burton, 575, F.Supp. 130 (E.D. of Texas 1983) noted that, "Counsel must be familiar with the laws and facts of the case in order to provide effective assistance of counsel."

If Counsel was familiar with the facts of Petitioner's discovery materials in her possession, see Claim One, it would have been obvious that FBI agent Depodesta intentionally misrepresented the truth in his complaint affidavit establishing probable cause to the Magistrate Judge.

Petitioner has a Constitutional Right against illegal search and seizure, including his person. It was Counsel's responsibility to protect that right as required by the Sixth Amendment to the Constitution of the United States. The Government's case depended entirely on probable cause being established; without probable cause there could have been no indictment and no case to take to the Jury. As a matter of Constitutional rights, Counsel was obligated to file motion-in-limine to quash the indictment based on the evidence in her possession which showed that FBI agent Depodesta submitted a false affidavit to the Magistrate Judge to establish probable cause, violating Petitioner's rights against illegal search and seizure.

For Counsel to have neglected this fact violates the standard laid out in Strickland, Supra.

As a result, this Petitioner submits to the Court that Counsel was ineffective in violation of the Sixth Amendment to the United States Constitution when Counsel failed to file motion-in-limine to quash the indictment against Petitioner when the discovery evidence in Counsel's possession showed that

-102-

FBI agent Depodesta submitted a false and misleading affidavit to the Magistrate Judge to establish probable cause, in violation of the Fourth Amendment to the Constitution.

The Petitioner submits that as a result of Counsel's deficient performance, he (Petitioner) was therefore prejudiced and as a result was indicted, convicted, and sentenced to 211 months imprisonment as a result of probable cause being established because of an intentionally false and misleading complaint affidavit, Petitioner's conviction and sentence should be vacated and a new trial be ordered at the Court's earliest convenience.

## Claim Thirteen

> Petitioner's conviction and sentence of 211 months imprisonment violates his Sixth Amendment rights, because Counsel was Constitutionally ineffective when Counsel failed to request from the Government the consent form the criminal informant signed giving the FBI permission to place a wire on his body and to record his phone calls with Petitioner, violating Petitioner's Fourth Amendment rights.

### Argument

Chapter 119, Title 18, Section 2511(7)(c) makes it permissable for one party to a conversation to give consent to intercept a wire, oral, or electronic communication.

A criminal informant cooperating with the Federal Bureau of Investigation must give consent by signing a FD-472 form

that gives the FBI permission to place a body wire on his
body.

FBI agent Depodesta and the Government criminal informant
attempted to lure Petitioner in a drug crime for which was not
a part of the investigation authorized involving Petitioner.
When their scheme did not work, in order to get an indictment
against Petitioner on drug charges, the prosecutors procured
the criminal informant and SSSA Daniel Dick to perjury themselves
before the Grand Jury.

All recorded conversation in Petitioner's case ws done by
and recovered from FBI agent Depodesta. App 0165, 0167, 0169,
and 0171. The criminal informant could not have given the FBI
permission to do these recordings. Agent Depodesta illegally
recorded these conversations. The criminal informant was an FBI
controlled informant starting in the summer of 2001. Based on
the testimony of agent Depodesta, the FBI started investigating
Petitioner from "November of 2001". On February 8, 2002, the
FBI agent who was authorized to investigate Petitioner
concluded his investigation involving Petitioner with no evidence
that Petitioner was involved in illegal drug activities. He then
contacted the USSS and told them that his criminal informant
had mentioned to him that he knew someone who "suggested" that
he could provide the criminal informant with counterfeit money.
SSSA Daniel Dick was then charged to investigate Petitioner on

three matters relating to counterfeiting United States currency on the same day, February 8, 2002. The FBI had no active investigation involving Petitioner after February 8, 2002.

After the FBI closed their investigation of Petitioner on February 8, 2002, agent Depodesta continued to target Petitioner without probable cause, knowledge, or authorization of his supervisors. SSSA Daniel Dick who was charged to investigate Petitioner on the three counterfeiting matters testified that he did not work with the informant directly. He was not the person who signed the informant to be an informant. And other than March 25, 2002, he had never met with the informant on any other occasion. Tr. 75, 7-15.

FBI agent Depodesta testified that the FBI directed the CI to call Petitioner. Tr. 109, 23. He also testified that he equipped the CI with a concealed recording device to record his conversation with Petitioner. Tr.112, 12. Which means that the criminal informant would have to give the FBI permission to record his conversations with Petitioner.

The FBI may have had permission from the CI to record his conversation with Petitioner during the FBI's own investigation which took place between November 26, 2002 and February 8, 2002. This permission ended on February 8, 2002 when the USSS took over the investigation and was only charged to investigate counterfeiting matters. SSSA Mckenna testified that the Secret

Service investigate crimes involving counterfeiting money, and does not investigate narcotics or firearms. Tr. 279, 2-4. The FBI had no Jurisdiction in the three counterfeiting matters the USSS was charged to investigate involving Petitioner after February 8, 2002. Plus, the FBI had no active investigation involving Petitioner after February 8, 2002. So the criminal informant could have never given agent Depodesta permission to record his conversation in an investigation that, (1) he had no Jurisdiction in, and (2) the FBI had no ongoing active investigation involving Petitioner.

Petitioner's case was never a joint FBI, USSS operation. The USSS was the only agency authorized to investigate Petitioner on the three related counterfeiting matters. FBI agent Depodesta and the criminal informant set out to entrap Petitioner in a drug crime, then testified falsely to indict Petitioner on drug charges. Agent Depodesta did not file a report about his own  activities involving Petitioner with his own agency until after Petitioner was arrested. He then filed a report on April 25, 2002 that his accomplishment involved drugs, and that the USSS was the assisting agency, App 0244, which was in fact false. The USSS was the investigating agency. and FBI agent Depodesta entrapped Petitioner in a drug  crime. Petitioner has never spoken to a single FBI agent all through the post-arrest activities. The FBI never attempted to speak

-106-

with Petitioner. SSSA Mckenna testified that he was asked to
conduct the interview regarding the aspect of counterfeiting
currency and the FBI would handle any narcotics or firearms
violations. Tr. 279, 1-8. But there was only one problem. The
FBI never had any Jurisdiction in the investigation involving
Petitioner so the FBI never conducted any interview, or even
attempted to interview Petitioner on any narcotics or firearms
violations. Which further goes to show that Petitioner's case
was not a Joint FBI, USSS operation.

Since Petitioner was a "target" of the Secret Service
investigation "involving counterfeit", the Secret Service
needed the CI's permission to record his calls and to put a
wire on his body to record his calls with Petitioner, or at
the very least, if the USSS depended on FBI agent Depodesta to
record the informant's calls with Petitioner, agent Depodesta
needed the informant's permission to do so and could not just
assume he could just record the informant's conversations with
Petitioner because the informant was working with the FBI on
other investigations not related to Petitioner. Agent Depodesta
did not seek the informant's permission, because he did not
want to explain to his supervisors the fact that he had targetted
Petitioner to entrap Petitioner in a drug crime after they closed
their investigation of Petitioner on February 8, 2002.

Gathering electronic evidence without the proper authorization
and/or permission is a violation of Chapter 119, Title 18, Section

-107-

2511(2)(c) and (d), which amounted to a denial of Petitioner's due process of law and the right to be protected against illegal search and seizure. Counsel did nothing to protect Petitioner from the egregous violation of the laws and Constitution of the United States, which is a violation of the standard laid out in Strickland, Supra.

As a result, this Petitioner submits to the Court that Counsel was ineffective in violation of the Sixth Amendment to the United States Constitution when Counsel failed to request from the Government to produce the consent from the criminal informant giving the FBI permission to place a wire on his body and to record his phone calls with Petitioner.

The Petitioner submits that as a reuslt of Counsel's deficient performance at trial, he (Petitioner) was therefore prejudiced and as a result the Government was allowed to use recorded evidence against Petitioner which was unauthorized for them to gather, which caused Petitioner to be convicted and sentenced to 211 months imprisonment. Petitioner's conviction and sentence should be vacated and a new trial be ordered at the Court's earliest convenience.

### Claim Fourteen

> Petitioner's conviction and sentence of 211
> months imprisonment is a violation of the laws
> and Constitution of the United States, where
> the Government admitted to destroying all
> "original" copies of the recorded conversations
> in Petitioner's case, in violation of 18 U.S.C.
> 2518(8)(a), 18 U.S.C. 2517(1),(2),(3) and

2511(2)(c), denying Petitioner a fair
trial.

## Argument

In the Government's motion responding to defendant's
"motion for the Government to Produce the March 25, 2002
Audiotape and tape recorder which 'failed' for examination by
Defendant's tape expert," the Government wrote:

> "Defendant's request to examine the 'tape
> recorder which failed' should be denied. The
> 'tape recorder' is actually a digital recorder
> which burns recorded conversations directly onto
> a CD-ROM. When the conversations are recorded
> on the CD-ROM, they are automatically erased
> from the digital recorder, and the CD-ROM
> itself becomes the evidence".

The Government continued to tell the Court in their motion
that:

> "The audiotapes that will be provided to defense
> Counsel are dubbed from the CD-ROM". App 0224 at H.

Chapter 119, Title 18, Section 2518 governs the procedures
in which oral communications are intercepted and recorded. 18
U.S.C. 2518(8)(a) states:

> "The contents of any wire, oral, or electronic
> communication intercepted by any means
> authorized by this Chapter shall, if possible,
> by recorded on tape, wire, or other comparable
> device... the recording ... shall be done in
> such a way as to protect the recording from
> editing or other alterations...
> They shall not be destroyed ... and in any
> event shall be kept for ten years..."

The clause, "or comparable device" are in place so the
statute would be flexible to move with the change in technology.
Recording a conversation directly to a CD-ROM would be in full

compliance with the statute, as the CD-ROM would take place as a "comparable" device.

However, recording the conversation in the "memory of a device" and then at some later time copying the conversation over to a CD-ROM, then "erasing" the original conversation from the memory of the device is a blatent violation of 18 U.S.C. 2518(8)(a).

The device could only be used as a "comparable device" if and only if the device with the "original" conversation in it's memory was preserved. The statute calls for the original recording "shall" not be "destroyed", and in any event shall be kept for "ten years". The Government violated this clause of the statute when they "allegedly" erased the original recording from the memory of the device.

The Government altered, tampered with, and manipulated all the recorded conversations in Petitioner's case, then disclosed their manipulated copies of all the recordings to Petitioner's Counsel as discovery materials. They then claimed that they destroyed the original conversations, leaving Petitioner no way of comparing for authenticity. The Government pulled the exact stunt the statute was enacted to prevent. (1), where they conveniently made sure the conversation of the CI's body wire of March 25, 2002, which would have been devestrating to their case, did not get recorded on the CD-ROM they created for disclosure. (2) They conveniently made sure the Jury would only

-110-

hear their concocted version of the March 21 and March 24 recorded conversation.

The Government cannot have their cake and eat it at the same time. They chose not to disclose the original recordings which were in their possession, then use reasons that violate the laws of the United States for the Court to deny Petitioner access to these tapes and the recording device.

The reasons the Government gave to the Court to have Petitioner request for the tapes and the recording device be denied is in violation of 18 U.S.C. 2518(8)(a), 2517(1),(2) and (3), and 2511(2)(c) of Chapter 119, which denied Petitioner his Constitutional right to a fair trial.

As a result, this Petitioner submits to the Court that the Government destroyed the "original" copies of all the recordings in Petitioner's case, he (Petitioner) was therefore prejudiced and that as a result, Petitioner was denied the right to a fair trial and was convicted and sentenced to 211 months imprisonment becamse of the Government use of altered, manipulated, and recorded evidence that was tampered with. Petitioner's conviction and sentence should be vacated and a new trial be ordered at the Court's earliest convenience.

### Claim Fifteen

Petitioner's conviction and sentence of 211
months imprisonment is in violation of the
laws and the Constitution of the United
States where the Government intentionally
presented false testimony to the Court in
order to suppress material evidence,
violating Petitioner's rights to due
process to the law.

### Argument

Counsel for Petitioner filed two pretrial motions requesting

(1), Copies of all Audiotapes, (2), Motion for the Government

to produce Tape and Recorder which "failed" on March 25, 2002.

The Government responded by stating to the Court that:

"Defendant request to examine the "tape
recorder which failed" should be denied.
The 'tape recorder' is actually a digital
recorder which burns recorded conversations
directly onto a CD-ROM.
When the conversations are recorded onto the
CD-ROM, they are automatically erased from
the digital recorder, and the CD-ROM itself
becomes the evidence.
The Audiotapes that will be provided to defense
Counsel are dubbed from the CD-ROM".

The Government continued to tell the Court that:

"The recorder 'failed' at the time of the
March 25 transaction at issue because it was
not turned on. The agents involved in the
case were testing the equipment prior to
the transaction. In testing the equipment,
they were turning it on and off. After
testing the equipment, they left it off by
mistake". App 0224-25 at H.

The Government's response to Petitioner's request for

the tape and the tape recorder was false and misleading and

was meant to suppress the March 25, 2002 informant body wire

-112-

recorded conversation which would have been devestating to the Government's case had the Jury listened to it.

The FBI agents who were testing the recording device did not "left it off by mistake". The FBI agent Depodesta did record the March 25, 2002 conversation between Petitioner and the Government criminal informant. In the Disposition of Evidence, Contraband, and Personal Property list compiled by SSSA Daniel Dick, he logged the March 25 2002 CI's wire recording as:

> "One compact disc containing the recording of the body wire placed on the criminal informant by the Federal Bureau of Investigation on 3/25/02 (March 25, 2002), has been inventoried on SSF 1544 Serial Number 201 2002 CE 00442". App 0163 para 4.

In the Certified Inventory of Evidence list also compiled by SSSA Daniel Dick, he inventoried the March 25 2002 CI's body wire recorded conversation in the Description of Evidence Section as:

> "The below listed item was recovered from agent Depodesta of the Federal Bureau of Investigation on 3/25/02 (March 25, 2002)"
>
> Marked for identification: "DD 3/25/02" (SSSA Daniel Dick).
>
> 1 (one) compact disc, approximately 41 minutes in length, compact disc is contained in a jewel case". App 0165.

The certified inventory of the March 25, 2002 CI's body wire recorded conversation was done on March 25, 2002 by SSSA

-113-

Daniel Dick. The inventory of the disc was witnessed by SSSA Michael J. Newberg on March 25, 2002. The reviewing supervisor for the inventory of the disc was SSSA Glenn R. Westlund. The disc ws inventoried and placed in SSF(Secret Service File) 1544, with serial number 201 2002 CE 000442, the same serial number as the Disposition of Evidence, Contraband, and Personal Property list compiled by SSSA Daniel Dick.

Agents of the federal law enforcement agencies are quite aware of the procedures of Chapter 119, Sections 2518(8)(a), 2517(1),(2),(3) and 2511(2)(c) and would not have gathered the recorded electronic evidence in the manner described by the Government to the Court. See Claim Fifteen. The certified inventory list showed that FBI agent Depodesta did record the conversation between the Government informant and Petitioner on March 25, 2002.

It is beyond fantastic to believe that SSSA Daniel Dick would recover evidence from FBI agent Depodesta in a criminal investigation and not review them before placing them into evidence. Even more perplexing is how a witness and a supervisor would witness and supervise something without not knowing what they were witnessing and supervising. It is known that SSSA Daniel Dick did listen to the recorded conversations before he placed them into evidence. SSSA Dick testifying about a CD that he also placed into evidence on March 25, 2002 said he listened to the CD before he marked it for identification. Tr.44, 22-24.

-114-

SSSA Daniel Dick listened to the March 25, 2002 CI's body wire and gave an accurate description of what he heard on the disc, which was, "the body wire placed on the criminal informant by the Federal Bureau of Investigation on March 25, 2002. Approximately 41 minutes in length".

According to the testimony of FBI agent Depodesta at trial, he found out the same day he recorded the disc that the recorded did not record the conversation between the CI and Petitioner.  Tr.189, 5-14. FBI agent Depodesta allegedly found out that the recorder did not record the conversations before he turned the disc over to SSSA Daniel Dick. He did not make any report of the conversation not being recorded. He did not mention to SSSA Dick that the conversation did not record. But still, SSSA Dick was able to listen to the disc and determine that it was the conversation between the Government criminal informant and Petitioner, and the conversation was 41 minutes in length. SSSA Newberg was able to witness that it was a 41 minute conversation between Petitioner and the CI on March 25, 2002.

The Government wanted this piece of evidence shrouded from the Court and the Jury and was willing to do anything in their power to accomplish that. Even to offer false and misleading information to the Court and to the Jury at trial.

Petitioner filed a motion to produce the Tape and the

Recorder which "failed". Fed.R.Crim.P. 16 states that "[u]pon a defendant's request, the Government must permit the defendant to inspect ... tangible objects ... or copies or portions of any of these items, if the item is within the Government's possession, custody, or control". (i) The item is material to preparing the defense; or (ii) the Government intented to use the item in it's case-in-chief at trial". These requirements were clearly made here.

First, the Disposition of Evidence, Contraband, and Personal Property list along with the certified inventory of evidence showed that the Government possessed the March 25, 2002 criminal informant's recorded body wire. App 0163, para 4, App 0165.

Second, the Government showed that they were intending on referencing the recording in it's case-in-chief. The Government stated in their motion, "Government's consolidated response to Defendant Donville James' Pretrial Motion", that Petitioner said to the criminal informant on March 25, 2002, "I don't have to use my gun then, right?" The CI responded, "No," and walked away. Motion at 3. The Prosecutor told the Jury that a body recorder was placed on the criminal informant to record the conversation but unfortunately the body recorder did not tape the conversation that day, but they would hear from the agents who actually ... listened to the conversation as it was occuring. Tr.21, 1-10.

-116-

The story the Government told the Jury occured on March
25, 2002 was twisted to have the Jury convict Petitioner. The
Government misled the Jury and the Court about the nonexistance
of the most important piece of evidence that would have shown
the Jury exactly what occured on March 25, 2002 that would
allow them to make their determination based on facts.

The March 25, 2002 Government criminal informant's body
wire recorded conversation was material to Petitioner's
defense. The events that took place on March 25, 2002 was the
cornerstone   of the Government's arguments against Petitioner.
Amongst other things, it would have allowed Petitioner to
properly prepare for and make informed decisions regarding trial
and to evaluate questions concerning the Government's version
of the case. In sum, disclosure of the March 25, 2002 recording
would have served the stated purposes of Rule 16, which are to
"contribute[] to the fair and efficient administration of
criminal Justice" and to "promote broader discovery". Fed.R.
Crim.P. 16 advisory committe's note B. (1975).

In the instant case, the Government egregiously misled the
Court and the Jury through the presentation of false and
misleading motions and testimonties by SSSA Daniel Dick and
FBI agent Depodesta about the nonexistance of the March 25,
2002 recording which was cruicial to Petitioner's defense. The
Government had the recording inventoried into evidence.

-117-

Because the recording would have been devestating to their case against Petitioner, the Government created a story about how they went about recording the conversation, which is in violation of the laws of the United States, 18 U.S.C. 2513(8)(a), 2517(1),(2),(3) and 2511(2)(c).

None of the federal agencies would have ever gathered electronic surveillance in the manner described by the prosecution to the Court. In fact, the federal agency who did the recording in Petitioner's case did use the right equipment prescribed by Chapter 119, Title 18 Section 2518(8)(a). The evidence was inventoried as evidence in Petitioner's case, in SSF(Secret Service file) 1544 by SSSA Daniel Dick on March 25, 2002, with Serial Number 201 2002 CE 000442. The prosecutors could not disclose the recording and allowed the Jury to hear the truth of what took place on March 25, 2002, because it would have proven that Petitioner was innocent of the charges the Government brought against him.

Deliberate deception of a court and jurors in a criminal case by the presentation of known false evidence is incompatible with the rudimentary demands of Justice. Giglio v. United States, 405 US 150, 31 L.Ed. 2d 104, 92 S.Ct. 763 (1972). Thereafter Brady v. Maryland, 373 US at 87, 10 L.Ed 2d, 218, 83 S.Ct. 1194 (1963), held that suppression of material evidence justifies a new trial "irrespective of the good faith or bad faith of the prosecution". See American Bar Association, Project on Standards for Criminal Justice, Prosecution

-118-

Function and the Defense Function Section 3.11(a).

A new trial is required if "the false testimony could ... in any reasonable likelihood have affected the Judgement of the Jury ... " <u>Napue v. Illinois</u>, 360 U.S. 264, 3 L.Ed.2d 1217, 79 S.Ct. 1173 (1959). In order to suppress the March 25, 2002 recording the prosecutors not only allowed the agents to falsely testify about how they went about gathering the recorded evidence, but the prosecutors themselves solicited the agents to testify falsely, because there were no problems of the chain of custody of the evidence to show that the agents did not record the March 25, 2002 conversation until the agents gave a copy of the "original" to the prosecutors and replaced the "original" copy back in SSF 1544 to be maintained for ten years as the governing statute requires. The prosecutors then made sure that the conversation did not duplicate for disclosure. Then invented a story of why the Government did not record the conversation.

The nondisclosure of the recorded conversation was not a result of negligence. It was by design. It was the responsibility of the prosecutors to disclose the conversation. The law and applicable rules require the Government to produce evidence that is material to the defense. Having made the tactical decision to withhold the recording by misleading the Court and the Jury, the Government is responsible for the consequences of it's non-disclosure. Petitioner is entitled to a new trial.

-119-

See <u>Brady v. Maryland</u>, 373 US at 87, 10 L.Ed. 2d at 218, 83
S.Ct. 1194 (1963).

As a result, this Petitioner submits to the Court that the
Government intentionally presented false testimony to the Court
in order to suppress the recording device and the original
outputs of the recording device which were material to Petitioner's
case, violating Petitioner's rights to due process.

The Petitioner submits that as a result of the Government's
suppression of material evidence, he (Petitioner) was therefore
prejudiced when his Jury did not get a fair and objective chance
to view the evidence in it's entirety and returned a conviction
against Petitioner who was then sentenced to 211 months
imprisonment as a result of the convictions. Petitioner's
conviction and sentence should be vacated and a new trial be
ordered at the Court's earliest convenience.

### Claim Sixteen

> Petitioner's conviction and sentence of 211
> months imprisonment violates his Sixth
> Amendment Right, because Counsel was
> Constitutionally ineffective at trial when
> Counsel stipulated with the Government to
> relinquish Petitioner's Rights to Disclosure
> of the recording device placed on the
> Government's informant.

### Argument

Counsel at first vigorously asserted Petitioner's rights
at trial to inspect the recording device the Government placed
on their criminal informant that recorded all the conversations

in Petitioner's case. The Government, however, asserted that
allowing Petitioner to inspect the device would comprimise
National Security, and claimed, therefore, that the Government
was entitled to deny Petitioner access to the device under a
"national security privilege". Nontheless, the Government did
indicate that it would be willing to stipulate to any facts that
Petitioner wished to argue to the Jury regarding the device.
Therefore, rather than ruling on the Government's claim of
privilege, the Court asked Petitioner's trial counsel to draft
a stipulation and see if the Government would accept it.
Eventually a stipulation draft by Petitioner's Counsel was
agreed upon. The stipulation, as read to the Jury, states:

> It is stipulated between the parties that
> the recording and transmitting device used
> by the Government on March 25, 2002 in this
> case was not malfunctioning on that day. The
> device was capable of recording and transmitting
> and the device was capable of being turned
> on and off by the Government's agents and
> informant involved in the case.

> [I]t is further stipulated that the Government
> has declined to produce the recording [/]
> transmitting device for viewing by the Jury
> pursuant to a privilege which the Court has
> deemed valid.

This stipulation drafted by trial counsel constitutes the
intentional relinquishment of a known right. Counsel was
ineffective when Counsel in agreement with the Government
drafted a stipulation relinquishing Petitioner's right to have
the Government produced for inspection to the Court and the

-121-

Jury the recording device used by the Government to record the body wired conversations in Petitioner's case.

Petitioner vigorously asserted this right to have his Jury inspect the recording device because the Government refused to disclose the recorded conversation that took place on March 25, 2002, which was the output of this device. The Government told the Court that:

> "The recorder 'failed' at the time of the March 25 (200) transaction at issue because it was not turned on. The agents involved in the case were testing the equipment prior to the transaction. In testing the equipment, they left it off by mistake". App 0221 at H.

1. Counsel failed to present discovery evidence in her possession at the time the Government claimed they 'left the recorder off by mistake'. Evidence that would have shown that the equipment was turned on, and recorded a conversation which was 41 minutes in length.

In a FD-302 report done by agent Depodesta he stated that on March 25, 2002, the date in question:

> "At approximately 11:06am, a concealed recording device and a transmitting device was activated by the author Agent (agent Depodesta) and placed on the Source (CI)". App 0159, para 5.

At the end of the same report, agent Depodesta wrote:

> "At approximately 12:30pm, the concealed recording device and the transmitting device were retrieved by the author agent and deactivated". App 0161, para 3.

This report showed that the recording and transmitting

-122-

device was not 'left off by mistake'. Agent Depodesta in this report nor any other report ever mentioned that he had a problem with the recording device or that it was left off by mistake and did not record the conversation on March 25, 2002.

2. A disposition of evidence list dated 6/4/02 (June 4, 2002) at 3:57pm was created by SSSA Daniel Dick in which he stated that:

> "One (1) compact disc containing the recording of the body wire placed on the criminal informant by the Federal Bureau of Investigation on 3/25/02 (March 25, 2002), has been inventoried on SSF 1544 serial number 201 2002 CE 000442". App 0163 para 4.

3. A second piece of evidence called the "certified inventory of evidence" list the recording compact disc containing the conversation on March 25, 2002 as:

> "The below listed item was recovered from agent Depodesta of the Federal bureau of Investigation on 3/25/02 (March 25, 2002)".

> "Marked for identification: "DD 3/25/02". (SA Daniel Dick).

> "1 (One) compact disc, approximately 41 minutes in length. Compact disc is contained in a Jewel case." App 0165.

The certified inventory of evidence looged the compact disc as being labeled with serial number 201 2002 CE 000442 - the same serial number as listed in the Disposition of Evidence, Contraband, and Personal Property list. The disc that was recorded on March 25, 2002 with a piece of equipment which 'failed' or was 'left off by mistake', was 41 minutes in length,

-123-

inventoried by SSSA Daniel Dick on March 25, 2002, witnessed
by SSSA Michael J. Newberg on March 25, 2002, and supervised
by SSSA Glenn R. Westluned on March 25, 2002. See App 0165.

Those two pieces of evidence coupled with the report
created by agent Depodesta showed that recording and transmitting
device was working properly and was not 'left off by mistake',
and that the device did produce a recorded conversation which
was 41 minutes in length.

3. FBI agent Depodesta testified at trial that after he
retrieved and deactivated the recording device from the
criminal informant at some later time, he:

> "Plug in a cord to the recording device
> and transfers the recording to a CD-ROM
> or a compact disc". Tr. 189, 13-14.

This way of gathering electronic evidence violates the
statute governing the procedures for collecting and preserving
electronic evidence, which violated Petitioner's Fourth Amendment
Right to illegal search and seizure, and his right to due
process of the law. Counsel did nothing to protect these rights.

If possible, the contents of any wire, oral, or electronic
communication intercepted shall be recorded on tape or wire or
other comparable device. The recording shall be done in such a
way as to protect the recording from editing or other alteration.
See 18 U.S.C. 2518(8)(a).

There was absolutely nothing spectacular about the
investigation of Petitioner's case that would require a coldwar,

-124-

James Bond type piece of equipment to record a simple conversation in a simple investigation. There was no reason not to use a tape, wire, or a comparable device like a CD-ROM.

The device as described by the Government could not fill the place of a comparable device. The only way that the device could have taken the place as a comparable device was if the Government had preserved the device with the content stored in memory. This was not done in the instant case. The agent said he, at a later time "plug a cord in the recording device and transferred the content over to a CD-ROM". Then "erased" the original content from the recording. But, in Petitioner's case, the agent made sure that anything that was devestating to the Government's case did not get transferred over. And with the original being destroyed, there is nothing to prove the Government wrong. Which is exactly why Congress enacted Chapter 119 United States Code Title 18, Sections 2518(8)(a).

Agents of the Federal Law Enforcement agencies are quite aware of the procedures of 18 U.S.C. 2518(8)(a), and would not have gathered recorded evidence in the manner described by the Government. In fact, all the recordings in Petitioner's case were done using equipment prescribed by 18 U.S.C. 2518(8)(a). The "original" copie[s] were not "automatically erased" as the Government claimed. They are locked away in Secret Service File 1544 with serial numbers listed in their respective "certified inventory of evidence" list. The Government simply misled the

Court and the Jury using a fantastic story about a device from the Cold War era and the James Bond movies. The copies that were disclosed and played for the Jury by the Government were all egregiously manipulated. Petitioner made a timely request for discovery materials. When faced with the Government's refusal to disclose the recorder, Counsel failed to show that the Government did indeed produce a recorded conversation which was 41 minutes in length, which showed that the device could not have been "left off by mistake".

If Counsel had not entered into a stipulation with the Government relinquishing Petitioner's right to have his Jury inspect the recording device, the Government would have had to disclose the device. The Jury would have then seen that the device was just a simple body recorder used in every day investigation and not some high tech gadgetry. The Jury would have realized that the only reason the Government did not want them to hear the March 25, 2002 recording was that it would have conveyed the truth of what transpired and showed that Petitioner was entrapped by the Government's agents. Counsel failed to force the Government to disclose under Rule 16, Fed.R.Crim.P. and Brady, Supra, by entering into a stipulation with the Government, which violates the standard laid out in Strickland, Supra.

As a result, this Petitioner submits to the Court that Counsel was ineffective in violation of the Sixth Amendment to

the United States Constitution when Counsel entered into a
stipulation with the Government that prevented the Government
from fulfilling their obligation under Rule 16, Fed.R.Crim.P.
and Brady, Supra, to disclose the recording device which was
used to record body wired conversations in Petitioner's case.

The Petitioner submits that as a result of Counsel's
deficient performance in Petitioner's case, he (Petitioner) was
therefore prejudiced and as a result, Petitioner's right to a
fair trial was violated that caused Petitioner to be convicted
and sentenced to 211 months imprisonment. Petitioner's conviction
and sentence should be vacated and a new trial be ordered at the
Court's earliest convenience.

### Claim Seventeen

> Petitioner's conviction and sentence of 211
> months imprisonment is in violation of the
> laws of the United States where it is
> "legally impossible" and legally incapable
> for Petitioner to have  taken a "substantial
> step" to violate 18 U.S.C. 841(a) in
> violation of 18 U.S.C. 846.

### Argument

On March 25, 2002, Petitioner was arrested by the United
States Secret Service. He was taken to their field office in
Chicago where he was questioned about counterfeiting matters.

Petitioner was interviewed by SSSA McKenna, who told
Petitioner he was arrested for counterfeiting United States
currency. Agent McKenna testified that he was asked to conduct
the interview with Petitioner regarding counterfeiting currency.

-127-

He testified that the USSS does not have jurisdiction to investigate narcotics and firearms violations, that it was the FBI who was responsible for those types of investigations. Tr. 279, 1-8.

In his interview with petitioner, SSSA McKenna testified that he never asked Petitioner anything regarding the question of any involvement in attempting to purchase cocaine. Counsel asked Agent McKenna:

> "Did you ask him (Petitioner) questions regarding the question of cocaine?"

Agent McKenna responded:

> "No Ma'am... I told him (Petitioner) the purpose of my interview was to find out where the counterfeit came from or who gave him the counterfeit or how it was manufactured."
> App 0150, 12-22.

SSSA Newberg told the Court at the suppression hearing that the United States Secret Service does not have jurisdiction to investigate narcotics. He told the Court that:

> "We do not have jurisdiction over drugs, our (USSS) main concentration is counterfeit. That is what I am assigned to, is counterfeit. But any types of crimes that occurs also, we do take concern of that and advise the appropriate agencies that are involved with that Jurisdiction." App 0152, 11-16.

It was legally impossible and legally incapable for Petitioner to have taken a "substantial step" to violate 21 U.S.C. 841(a), in violation of 21 U.S.C. 846. The criminal informant told the Government that on "several occasions" Petitioner "suggested" to the criminal informant that he could

-128-

provide the criminal informant with counterfeit money that the informant himself could sell the drugs for cash to pay off his debt he had with the Mexican Mafia organization.

Based on this statement, the USSS was charged to investigate Petitioner on three matters relating to counterfeit United States currency. During the process of this investigation, a sting was put into play. The Government "instructed" the informant to call petitioner and try to carry out the "suggestion" that Petitioner allegedly made about providing counterfeit money so the CI could buy drugs from a dealer so he could "sell" himself to pay off his debt with the Mexican Mafia.

The Informant attempted to get Petitioner to provide him with counterfeit money for almost five months, from November of 2001 to March of 2002. Finally on March 21, 2002 Petitioner agreed to give the informant the counterfeit money he asked for. The entire Government Scheme was recorded on March 21, 2002. A cursory review of this recording showed that it was legally impossible and legally incapable for Petitioner to have attempted to take a substantial step to purchase drugs from the criminal informant's source on March 25, 2002.

First, the informant's scheme was for him, himself, to purchase cocaine with the counterfeit money he asked Petitioner to provide him with. The first thing the informant said to Petitioner on March 21, 2002 was that:

-129-

"Well like I say, I got the guy set up".
App 0076, para 15.

Then he continued to tell Petitioner:

"He lives (the dealer who the CI set up),
I don't know exactly where it (the guy's
house) is, he is not gonna tell me exactly
where it is, <u>cause I could rob him by
myself</u>. We can do that (rob the guy by
paying for the cocaine with the counter-
feit money) in the parking lot at the
Corner of Naragansett and Diversey."
App 0083, para 2.

The informant said to Petitioner:

"I wanna do (give the guy the counterfeit
money for his cocaine) this guy." App 0085,
para 1.

The CI even told Petitioner that he would arrange the
paying for the cocaine with counterfeit money to look like it
was Petitioner who was responsible for doing it. That's what is
meant when the informant told Petitioner that:

"Yeah, both of them (the pay for cocaine
with counterfeit money) are going to do
like you fuck us up". App 0086, para 9.

The informant clearly said he wanted to purchase the cocaine
from the guy he sets up in the parking lot, and that if he knew
where the guy lived he would go and purchase the cocaine with
the counterfeit money by himself. This makes it legally impossible
and incapable for Petitioner to be the one attempting to purchase
drugs from the informant's source.

Second, the informant was the person who was offering to
"sell" the cocaine he said he wanted to purchase with the
counterfeit money from the guy in the parking lot.

1. The Government criminal informant said to Petitioner:

> "It would be better, how we gonna split
> it (the cocaine) or what? Cause I wanna
> do it just like I tell you, ten grand
> ($10,000), I (CI) gonna <u>sell</u> you each one
> (the cocaine that he was to purchase with
> the counterfeit money) ten. You make ten,
> I make ten, but I do not got that much
> people to <u>sell</u> it (the cocaine)."
> App 0076, para 1.

This statement showed clearly that it was the Government informant who was offering to <u>sell</u> the stolen cocaine himself, and not some mysterious source as the Government claims.

2. The informant went as far as telling Petitioner that:

> "you help <u>sell</u> them (the cocaine)".
> App 0079, para 10.

Petitioner could not have attempted to be the one purchasing the drugs from the informant's source when the informant was the one offering to <u>split</u> the stolen cocaine with Petitioner for $10,000 per kilogram if Petitioner would help him <u>sell</u> them.

In <u>United States v. Estrada</u>, cited as 256 F.3d 466 (7th Cir. 2001), the record before the Court must be very sufficient in nature ... to support a finding by a preponderance of the evidence to establish that defendant engaged in: conduct constituting a 'substantial step' towards the commission of a crime, the Court must focus on what acts the defendant took to complete a substantive crime.

It was legally impossible as well as legally incapable for Petitioner to have attempted to violate U.S.C. 841(a), in

-131-

violation of 18 U.S.C. 846. The evidence in the instant case showed that the Government's agents including the criminal informant who was at the time an active government agent, originated, created, instigated, incited, and attempted to lure Petitioner in a drug crime. A drug crime to which they themselves were the instrumental parties. In this context, attempt, 18 U.S.C. 846(b) is the same as conspiracy, 18 U.S.C. 846(a). The gist of a conspiracy is the agreement between two or more people. United States v. Duff, 76 F.3d 122, 125 (7th Cir. 1996). Conspiracy focuses on the agreement between two or more parties, and in Duff at 125; the other person must be someone other than a confidential informant.

In the instant case, the attempt must focus on the action of Petitioner, Petitioner's actions must be independent of the informant's actions who was acting as a government agent to violate 18 U.S.C. 846(A) or (B), for like in Duff, Petitioner cannot conspire with the Government criminal informant, Petitioner cannot attempt to violate the law with the Government criminal informant, when the Government criminal informant's actions were the only means by which the laws could have been violated.

Petitioner had no agreement with the informant to purchase cocaine from the informant's source on March 25, 2002. As the evidence showed, the informant asked Petitioner to provide him

-132-

with counterfeit money. Petitioner went to the parking lot to give the informant what looked like counterfeit money. The informant then attempted to bury Petitioner deeper into crimes by suggesting they split the stolen cocaine. If Petitioner would agree to split the stolen cocaine and help the informant sell them, the informatn would have selled each kilogram of the stolen cocaine for $10,000 per kilogram.

The evidence showed that it is the informant himself who was offering to sell his stolen cocaine and not some mysterious source as the Government claims. The informant was the only other person involved in Petitioner's case. He is the only one offering to sell drugs in Petitioner's case.

As a result, this Petitioner submits to the court that it is legally impossible and legally incapable for Petitioner to have taken a "substantial step" to violate 18 U.S.C. 841(a), in violation of 18 U.S.C. 846, when (1), Petitioner had no agreement with the Government informant to purchase cocaine from the informant's source. (2), the only other person involved in Petitioner's case was the Govenrment criminal informant.

The Petitioner submits that as a result of the legal impossibility and the legal incapability of Petitioner violating 18 U.S.C. 846 he (Petitioner) was therefore prejudiced with the conviction of Count One and Count Two of the indictment which caused Petitioner to be sentenced to an additional 202 months imprisonment instead of the 9 months he would have gotten for

-133-

a conviction of Count Three. Petitioner's conviction and
sentence for Counts One and Two should be vacated with prejudice
at the Court's earliest  convenience.

### Claim Eighteen

> Petitioner's conviction and sentence of 211
> months imprisonment violates his Sixth
> Amendment rights, because counsel was
> Constitutionally ineffective when Counsel
> failed to subject the prosecution's case
> to a meaningful adversarial testing.

### Argument

Counsel was constitutionally ineffective at trial where
Counsel failed to subject the prosecution's case to a meaningful
adversarial testing. The premise of the Government's case
against Petitioner was built on the notion that, on March 16,
2002, Petitioner initiated a drug sale with the CI in which
Petitioner would purchase cocaine from the CI's source by
using counterfeit money. COunsel made no attempts to refute
the Government's claim. Which could have been easily done if
Counsel would have only put the Government's case to some sort
of adversarial testing.

1. Ab initio, there was no agreement between Petitioner
and the CI to enter in any sort of drug deals. The CI and SSSA
Daniel Dick testified before the Grand Jury that:

> "On March 16, 2002," Petitioner called the CI
> and they "agreed" that Petitioner would purchase
> 1 kilo of cocaine from the CI's source for
> $20,000 in counterfeit currency and Petitioner
> would pay the CI $10,000 in real currency.
> App 0060-63. 0 228-40.

-134-

It was stipulated between Petitioner and the Government that Allen Dubon (CI) ued telephone number (773)-225-0485 during the period from January 1, 2002 to March 25, 2002.

It was also stipulated that Petitioner used telephone number (847)-409-6737 during the period from January 1, 2002 to March 25, 2002. See Appendix 0210 for stipulation.

Petitioner's phone record for telephone number (847)-490-6737 showed that Petitioner made 59 calls on March 16, 2002. Petitioner's phone record for March 16, 2002 showed that not one of the 59 calls Petitioner made on that day was to the CI. See Appendix 0068-70.

The CI's phone record for telephone number (773)-255-0485 showed that the CI made 24 calls on March 16, 2002. The CI's phone record for March 16, 2002 showed that not one of the 24 calls the CI made on that day was to Petitioner. See Appendix 0065-66.

It is simply impossible for Petitioner to have initiated a drug crime on March 16, 2002, if Petitioner or the CI did not call each other or spoke to each other that date.

2. The USSS was charged to investigate Petitioner on three counterfeiting related matters on February 8, 2002. The informant had gone to Petitioner on numerous occasions and Petitioner would not cooperate with him. Tr.220. The first time Agent Depodesta took part in any law enforcement activity involving Petitioner was on March 21, 2002. Tr. 109. When

-135-

agent Depodesta got involved in the law enforcement activities on March 21, 2002 he "instructed" the CI to "engage" Petitioner in'drug communications'. Tr. 248.

It never occured to Counsel to ask FBI agent Depodesta a simple question. If the CI never told the FBI, ab initio, that Petitioner was looking to purchase cocaine with counterfeit money, then why would he "instruct" the CI to "engage" Petitioner in drug communication in a USSS investigation involving just counterfeit money?

It never occured to Counsel to ask agent Depodesta, was he charged by his supervisor to investigate Petitioner on drugs related matters after February 8, 2002, after the FBI transferred the investigation of Petitioner over to the USSS?

It never occured to counsel to ask agent Depodesta, SSSA Dick, and the CI, how was it possible for Petitioner to have initiated a drug crime on March 16, 2002 by calling the CI's cellphone when he did not call or speak to the CI on that date.

3. The Government's case against Petitioner started with one kilogram of cocaine on March 16, 2002, which ballooned up to 15 kilograms by March 25, 2002. Petitioner was to have attempted to purchase these fifteen kilograms of cocaine from the CI's source in the parking lot at Naragansett and Diversey in Chicago by paying for the cocaine with counterfeit money.

It never occured to Counsel to ask any of the Government

agents, especially agent Dick, Depodesta, and the CI himself, if Petitioner was attempting to purchse drugs from the CI's source, then why did the CI set up the source and told Petitioner that he (CI) wanted to rob the cocaine from the source in the parking lot at Naragansett and Diversey? Why did the CI tell Petitioner that if he (CI) knew where his source lived, he could rob the source by himself?

It never occured to Counsel to ask any of the Government agents, including the CI, if Petitioner was attempting to purchase cocaine from the CI's Source, then why was the CI telling Petitioner that he (CI) was going to fix up his plan to rip off his own source by paying for their cocaine with counterfeit money, and do it like it was Petitioner who "fuck" them "up"?

It never occured to Counsel to ask any of the Government's agents, including the CI, if Petitioner was attempting to purchase cocaine from the CI's source, then why was it that the CI was telling Petitioner that "it would be better if they both 'split' the stolen cocaine"? Obviously if Petitioner was purchasing cocaine from the CI's source it would be very unlikely that the CI would have made a suggestion to "split" something that Petitioner was purchasing.

For the most important question of all, it never occured to Counsel to ask if Petitioner was attempting to purchase cocaine from the CI's source, then why was it that the CI was

-137-

the one offering to "sell" the cocaine himself and not his source?

The evidence to answer these questions were all in Counsel's possession at trial. Counsel simply failed to ask the necessary questions that would have proven that Petitioner was innocent of the crimes charged. There was no rational reason why Counsel did not ask these questions when the answers to these questions would have proven Petitioner's innocence. Counsel's failure to subject prosecutor's case to a meaningful adversarial testing, Hatrasso v. Nelson, 121 F.3d. 297 (7th Cir. 1997), violates the standard laid out in Strickland, Supra.

As a result, this Petitioner submits to the Court that Counsel was ineffective in violation of the Sixth Amendment to the United States Constitution at trial where Counsel failed to subject the prosecution's case to a meaningful adversarial testing.

The Petitioner submits that as a result of Counsel's deficient performance at trial he (Petitioner) was therefore prejudiced and as a result, Petitioner was convicted and sentenced to 211 months imprisonment. Petitioner's conviction and sentence should be vacated and a new trial be ordered at the Court's earliest convenience.

### Claim Nineteen

> Petitioner's conviction and sentence of 211
> months imprisonment violates his Sixth
> Amendment rights, because Counsel was
> Constitutionally ineffective when Counsel
> failed in her obligation to file a motion-
> in-limine seeking to dismiss Count 2 on
> the grounds that it was not an "offense" nor
> a "prohibited act" but a mere "penalty" to
> be imposed at sentencing.

### Argument

On May 31, 2005, the District Court sentenced Petitioner

to 151 months on Count One and Three, to run concurrently, and

60 months on Count Two, to run consecutively to Counts One and

Three. On July 15, 2005, the District Court issued an amended

Sentencing Judgement to clarify that Petitioner was to be

sentenced to a total of 211 months.

Counsel was ineffective where in pre-trial proceedings,

trial counsel failed in her obligation to file a pre-trial

motion-in-limine seeking to dismiss Count 2 on the grounds

that it was not an "offense" nor a "prohibited act" but a mere

"penalty" to be imposed at Sentencing.

The indictment in this case was faulty as to Count 2,

because 18 U.S.C. 924(C)(1)(A) is a "penalty" enhancement within

18 U.S.C. 921-930 and is neither an "offense" nor a "prohibited

act". Therefore, petitioner did not receive a fair trial.

The Gun Control Act of 1968, 18 U.S.C.A. 921 et Sequitur,

has been "on the books" for ages in Chapter 44. It is clearly

divided into several sections, including U.S.C. 922 – unlawful

-139-

acts and  18 U.S.C. 924 - Penalties. A quick look at 18 U.S.C.
924 clearly demonstrates the "penalties" for "unlawful acts"
that appear under 18 U.S.C. 922. However, 18 U.S.C. 924(C)(1)(i)
is to be the "penalty enhancement" Petitioner ran afoul of --
does not address the "offense" or "prohibited acts" under 18
U.S.C. 922 but instead, looks to violations under 21 U.S.C. 801,
21 U.S.C. 951 or 46 U.S.C. App 1901 et Sequitur.

Put in cogent and cuccint terms, Petitioner fell under
the spell of 18 U.S.C. 924(c)(1)(A) because a Jury found him
guilty of other offenses as spelled out in the indictment in
Count 1 and 3. So, when the bench fashioned Petitioner's
sentence, it had to be enhanced, under 18 U.S.C. 924(c)(1)(A)
for the conviction, under 21 U.S.C. 841(a); 846.

In addition, Count 2 was superflous because it need not
have gone to the Jury and the prosecutor had nothing to prove
since 18 U.S.C. 924(c)(1)(A) is clearly a "penalty" and not an
"offense" or a "prohibited act" chargable under either 21 U.S.C.
841(a), 21 U.S.C. 846, or 18 U.S.C. 472(g).

One simply cannot be indicted under the "penalty" phase
of a federal statute. This offends basic statutory construction
of a law. Counsel did nothing to protect Petitioner from this
Count which was unconstitutional on it's face. For Counsel to
neglect this is a violation of the standard laid out in
Strickland, Supra.

As a result, this Petitioner submits to the Court that
Counsel was ineffective in violation of the Sixth Amendment to

the United States Constitution, in pre-trial proceedings where Counsel failed in her obligation to file pre-trial motion-in-limine seeking to dismiss Count Two of the indictment on the grounds that it was not an "offense" nor a "prohibited act" but a mere "penalty" to be imposed at sentencing.

The Petitioner submits that as a result of Counsel's deficient performance in pretrial proceedings, he (Petitioner) was therefore prejudiced and that as a result was convicted of the "penalty" part of a federal statute, which was neither an "offense" nor 'a "prohibited act", and sentenced to an additional 60 months imprisonment because of this conviction. Petitioner's conviction for Count Two should be vacated with prejudice at the Court's earliest convenience.

### Claim Twenty

> Petitioner's conviction and sentence of 211
> months imprisonment violates his Sixth
> Amendment rights, because sentencing Counsel
> was Constitutionally ineffective when Counsel
> failed to file sentencing memorandum seeking
> that an additional 60 months for Count Two
> running consecutively with 151 months for
> Count 1 and Count 3 was in violation of
> the laws of the United States.

### Argument

Petitioner's Sentencing Counsel was ineffective where in Sentencing proceedings, Counsel failed to file a Sentencing memorandum seeking that an additional 60 months for Count 2 running consecutively with 151 months for Count 1 and 3 was in violation of the laws of the United States.

-141-

At Sentencing, the additional 60 months for Count 2 running consecutively with Count 1 and 3 could not be imposed on Petitioner.

A cursory reading of 18 U.S.C. 924(c)(1)(A) clearly declares that:

> "[E]xcept to the extent that a <u>greater minimum</u> is otherwise provided by this subsection or by <u>any other provision of law</u>, ..."

Because Petitioner was sentenced to 151 months imprisonment on Count 1 and 3, he could not have been sentenced, under 18 U.S.C. 924(c)(1)(A), to <u>any</u> additional sentence, because he received lengthy custodial terms under "other provisions of law"; 21 U.S.C. 841(a), [846] and 18 U.S.C. 472.

Sentencing Counsel did nothing to protect Petitioner from this additional 60 months imprisonment. For Counsel to neglect this is a violation of the standard laid out in <u>Strickland</u>, Supra.

As a result, this petitioner submits to the Court that Sentencing Counsel was ineffective in violation of the Sixth Amendment to the United States Constitution, at the sentencing proceedings where Sentencing Counsel failed to file sentencing memorandum seeking that an additional 60 months for Count 2 running consecutive with 151 months for Count 1 and 3 was in violation of 18 U.S.C. 924(c)(1)(A).

The Petitioner submits that as a result of Counsel's deficient performance at Sentencing proceedings, he (Petitioner)

was therefore prejudiced and that as a result was sentenced to
an additional 60 months imprisonment to run consecutive with
151 months for two other counts. Petitioner's sentence should
be vacated and a new sentencing hearing be ordered at the Court's
earliest convenience, and Petitioner be sentenced according to
18 U.S.C. 924(c)(1)(A), which calls for no additional time be
given to Petitioner, because he was sentenced to 151 months
which is greater than the 60 months minimum the statute required
if someone is sentenced under 18 U.S.C. 924(c)(1)(A).

### Claim Twentyone

> Petitioner's sentence of 211 months imprison-
> ment violates his Sixth Amendment rights,
> because Sentencing Counsel was Constitutionally
> ineffective when Counsel failed to file
> Sentencing Memorandum seeking a downward
> departure due to the fact that the
> Government's agents involved themselves in
> "Sentencing Entrapment".

### Argument

Petitioner's Sentencing Counsel was ineffective where in
Sentencing Proceedings, Counsel failed to file Sentencing
Memorandum seeking a downward departure due to the fact that
the Government's agents involved themselves in "Sentencing
Entrapment".

Section 18 U.S.C. 3553(b) provides for a valid legal
basis for downward departure if the Government agents involved
themselves in Sentencing Entrapment.

The Seventh Circuit in U.S. v. Garcia, cite as 79 F.3d 74
(7th Cir. 1996) stated that "sentencing entrapment ... occurs

when Government cause defendant initially predisposed to commit lesser crime to commit more serious offense".

In the instant case, the United States Secret Service was the only federal agency who had an active ongoing investigation that involved Petitioner. The Secret Service was charged to investigate Petitioner on three matters relating solely to counterfeiting United States Currency.

During the Secret Service investigation of Petitioner, FBI agent Depodesta "instructed" the CI to "engage" Petitioner in "drug communication". FBI agent Depodesta worked for the FBI. The FBI does not have jurisdiction to investigate counterfeit currency, which were the matters for which Petitioner were being investigated for.

FBI agent Depodesta's agency had previously investigated Petitioner for almost four months - from November 2001 when the CI first came to them, until February 8, 2002, when the FBI contacted the Secret Service and turned the investigation over to them, because they found no evcidence that Petitioner was involved in any illegal drug activities.

When the CI had first went to the FBI he told them that Petitioner had "suggested" to him that he (Petitioner) could supply the CI with counterfeit money. This was the FBI's reason for contacting the Secret Service, after they did their own investigation and found no evidence that Petitioner was involved in illegal drug activities.

-144-

Four days prior to Petitioner being arrested on counterfeiting matters, FBI Depodesta "instructed" the CI to "engaged" Petitioner in "drug communication" which, again, is totally unrelated to the matters Petitioner were being investigated for.

The "drug communication" agent Depodesta "instructed" the CI to "engaged" Petitioner in was for the CI to rip off cocaine from his own source by paying for the cocaine with the counterfeit money he asked Petitioner to provide him with. The CI was to then arrange the rip off of the cocaine to have the appearance like it was Petitioner who "fuck" them "up"(responsible for the rip off).

Agent Depodesta then "instructed" the CI to offer to "split" his stolen cocaine with Petitioner if Petitioner would "help" him "sell" the stolen cocaine. And if Petitioner would "help" the Ci "sell" the stolen cocaine, agent Depodesta "instructed" the CI to offer to "sell" each kilogram of the stolen cocaine for $10,000.

No other individuals were involved in Petitioner's case, but the CI and Petitioner, in which the CI was an active Government agent. A drug crime in the instant case would be impossible if the Government agents involved, were not a party. "Where a Government agent ... having charge of investigating and obtaining evidence concerning an unlawful business ... offers himself as a participator in a different offense not connected with the business under investigation ... but a crime

-145-

to which he himself must be a party, and, under the evidence, there has been no intention on the entrapped to commit an offense until he was lured into it, the policy of the laws will not permit a prosecution base on such entrapment to be carried on". United States v. Matthues, 22 F.2d 979 (D.C.E.D. Po. 1927). See also Sherman, 356 US 369 at 355 stating, "it also is desirable that the Government should not itself foster and pay for other crimes, when they are the means for which the evidence is to be obtained'. Id.

The evidence is very clear that the instant case only became a narcotics case through false and misleading testimony, see Claim 2, 3, and 4, and because of the creative activities of the Government CI. The result of which increased Petitioner's offense level from level 9 for Count 3 to a level 32 for Count 1, a drug crime.

Sentencing Entrapment may be legally relied upon to depart downward under the Sentencing Guidelines, U.S.S.G. Section 1B1.1 et Seq., 18 U.S.C. A.App. US v. Staufer, cite as 38 F.3d 1103 (9th Cir. 1994).

Sentencing entrapment provides a valid legal basis for a downward departure under 18 U.S.C. Section 3553(b), which allows the Sentencing Court to depart on the basis of a ground not adequately considered by the Sentencing Commission. Amend. Commentary to 2B1.1 89 (effective Nov. 1993) (Stating that the District Court may depart downward if the Government's agents

engaged in Sentencing Entrapment in a reverse sting operation).
Here in Petitioner's case, agent Depodesta "instructed" the CI
to "engage" Petitioner in "drug communication" when the only
thing Petitioner was being investigated for was counterfeit
currency related matters. In Staufer, 38 at 1107, the Court
stated that the significance of the amendment is that it shows
that the Sentencing Commission is aware of the unfairness and
arbitrariness of allowing drug enforcement agent to put
unwarranted pressure on defendant in order to increase his or
her sentence without regard for his predisposition, his capacity
to commit the crime on his own, and the extent of his
culpability.

The Court finding in Staufer, is that "Sentencing Entrapment
is warranted ... is motivated by the same concerns, and as such,
is fully consistant both with the Amendment and with the
Sentencing factors prescribed by COngress" (A court may depart
downward on the basis of circumstances not taken into consideration
by the Sentencing Commission only as so long as "the circumstances
upon which it seeks to base it's departure is consistant with
the Sentencing factor prescribed by Congress") (internal citation
omitted), Pacheco-Osuma, 23 F.3d 29 at 271 (9th Cir. 1994).

Application note 13, U.S.S.G. 2D1.1 states that the Court
shall exclude from the offense level determination the amount
of controlled substances that defendant established that he did
not intend to provide or was not reasonably capable of providing.

Th evidence in this case showed that Petitioner did not intent to, or had any agreement with the criminal informant in which Petitioner would purchase cocaine from the CI's source with counterfeit money. If not for the creative activities of the Government's CI, and the substantial denial of Petitioner's substantial rights by the prosecutors, Petitioner would only be charged with Count Three of the indictment.

In pursuant to the ruling in Staufer v. United States, and Application note 13, U.S.S.G. 2D1.1, the District Court should have granted Petitioner a downward departure for Count One of the guilty verdict. For Counsel to neglect this is a violation of the standard laid out in Strickland, Supra.

As a result, this Petitioner submits to the Court that Sentencing Counsel was ineffective in violation of the Sixth Amendment to the United States Constitution, at the Sentencing Proceedings where Sentencing Counsel failed to file Sentencing Memorandum seeking a downward departure for Count One, due to the Government's agents involvement in Sentencing Entrapment.

The Petitioner submits that as a result of Counsel's deficient performance at Sentencing proceedings, he (Petitioner) was therefore prejudiced and that as a result was sentenced to an additional 202 months imprisonment. Petitioner's sentence should be vacated and a new sentencing hearing be ordered at the Court's earliest convenience. Petitioner should be sentenced only for Count Three of the guilty verdict which carries 9 months, because Count Two of the indictment is not an "offense" or a

-149-

"prohibited act" and only came into play because of Count One.
See Claims 14, 15.

---

13.  If any of the grounds listed above were not previously
     presented, state briefly what gorunds were not so
     presented, and give your reasons for not presenting them.
     By virtue of the incompetence of trial counsel, none of
     the claims raised herein were presented by Counsel.
     Notwithstanding, as noted above (See <u>Massara</u>, Supra, at 5),
     ineffective assistance claims are properly raised on
     Section 2255 motions.
     Petitioner acting Pro Se for a brief period of time between
     trial and sentencing attempted to raise the issues, but
     the Court denied Petitioner's motions without prejudice.

14.  Do you have any petition or appeal now pending in any
     Court as to the Judgement under attack?   No.

15.  Give the names and addresses, if known, of each attorney
     who represented you in the following stages of the Judgement
     attacked herein:
     (A) At preliminary hearing: Helen Kim, 55 E. Monroe, Suite
         2800, Chicago, Illinois 60603
     (B) At arrainment and plea: Anita Revkin-Carothers, 33 North
         LaSalle Street, Suite 3300, Chicago, Illinois 60602
     (C) At trial: Anita Revkin-Carothers, 33 North  LaSalle
         Street, Suite 3300, Chicago, Illinois 60602

(D) At Sentencing: Gary Sternberg, 2635 North Kedzie, Chicago, Illinois 60647

(E) On appeal: John T. Ruskusky, Ungaretti and Harris LLP, 3500 Three First National Plaza, Chicago, Illinois 60602

(F) In any post-conviction proceeding:    N/A

(G) On appeal from any adverse ruling in post-conviction proceeding:    N/A

16. Were you sentenced on more than one Count of an indictment, or on more than one indictment, in the same Court and at approximately the same time?    Yes.

17. Do you have any future sentence to serve after you complete the Sentence imposed by the Judgement under attack?    No.

### Request for Evidentiary Hearing

Petitioner respectfully requests this Court hold an evidentiary hearing based on the claims raised herein. Wherefore, movant prays that the Court grant him all relief to which he may be entiled in this proceeding.

Donville James, Pro se.

I declare under penalty of perjury that the forgoing is true and correct.
Executed on ___January 24/08___
                         date

Signiture of movant

-151-

File Date: _March 10, 2008_

Case No: _08cv 1416_

ATTACHMENT # _1_

EXHIBIT _10-23_

TAB (DESCRIPTION) _____

"**EXHIBIT**, <u>MARCH 24, 2002 DISCOVERY TRANSCRIPT</u>"
"8 PAGES"

EXHIBIT "H"

# TRANSCRIPTION OF CONSENSUALLY MONITORED TELEPHONE CALL TO 'JAMES' BY FBI CI 3/24/02 6:03PM-6:13 PM. MONITORED BY SPECIAL AGENT FRANK DEPODESTA OF THE FBI.

**DePodesta:** Testing, Testing...,,Testing, Testing, This is Special Agent Frank DePodesta, the date is March 24, 2002. The time is approximately 6:03 PM. At this time a cooperating witness is going to place a recorded telephone call to an individual known as 'James' at telephone number 847-409-6737.

(Telephone Ringing)

**James:** Hello?

**CI:** Hey, James?

**James:** Yeah, this is James.

**CI:** Hey, uh I talked to, I talked to the guy already, he is on his way back. He said fifteen would be ok.

**James:** Ok.

**CI:** And um, he just asked me, you know because and I tell him twenty-five you know and stuff and so he tells me you know if I know you guys better, you know, good then maybe you guys are not police or anything because.

**James:** Ah.

**CI:** I be changing the numbers and stuff.

**James:** Ah.

**CI:** So you know, I tell them you know, that you guys are straight, you know.

**James:** Yeah, ok.

**CI:** Yeah. So buddy, uh.

**James:** Right.t

**CI:** He just gonna because he only had ten for us, for you know, for you know, for when we were ready he had another guy to give another fifteen but he is going to take five from it.

**James:** Ok.

**CI:** So he is going to come from so he is going to do that favor for me.

**James:** All right.

**CI:** So he is going to take five from the other fifteen that he got to give to other guy.

**James:** All right, ok,

**CI:** Ok, um and um, and so you got you got, you got set up the bag ready, right? How much is total? The the?

**James:** Well, um I listed um like twenty-one seventy in there.

**CI:** How much?

**James:** I am going to put, I'm going to put a couple of two hundreds in there.  *The price for Teis*

**CI:** Two hundred only?

**James:** Yeah.

**CI:** All right, um you see, you can um, you could put at least five or ten grand good one in the bag on top.

**James:** Ah.

**CI:** So, he can…(Inaudible)

**James:** No, hey I'll meet you and talk to you.

**CI:** What?

**James:** I will have to meet you and talk to you.

**CI:** In the morning?

**James:** No, um, you wanna meet, can I meet you later on?

**CI:** Um.

**James:** In about, uh, and hour or so?

**CI:** Oh, because I am painting the house right now.

**James:** Ok, what time are you going to be done?

**CI:** Um, about…shit, well we can meet um tomorrow morning before we do it, that's fine,

**James:** Ok, listen, listen.

**CI:** Just to let you read it? (Questionable/Inaudible)

**James:** I don't want to talk much n the phone.

**CI:** All right, but um real quickly, you know, before um, he said he's going to go at about twelve o'clock so at about eleven is fine with you, or what?

**James:** Yeah.

**CI:** Or eleven o'clock?

**James:** Yeah.

**CI:** It looks like three, because the total comes out to be three, but it looks like three, right?

**James:** Huh?

**CI:** Three hundred?

**James:** Yeah, yeah.

**CI:** Look like three hundred?

**James:** Yeah, yeah, yeah.

**CI:** All right, um, so see about.

**James:** Just hey, just hey, just tell them it is going to be in hundreds and fifties.

**CI:** Ok, all right cause he told me to meet him later on too, that is why I cannot meet you at that time, but um...

**James:** Ok.

**CI:** I am painting the house so I am going to meet him and um, cause I want to see if he, if he can pass the inspection you know, you should.

**James:** Hey.

**CI:** Hmmm....

**James:** When you going to meet him? Can't you let me, uh, you know, know where you are going to be so I can follow him home?

**CI:** All right, no cause he don't meet me at the house though.

**James:** I know, but once you, once you with him, right.

**CI:** Yeah, oh yeah.

**James:** I was wondering if you could just follow him. You don't want to do that?

**CI:** Yeah, that's fine. Look at um, he is going to call me though see what time, and I give you a call.

**James:** Ok, all right then, ok, all right just call me back then, all right?

1  CI:  But just uh, just make sure for tomorrow, just makind sure that they look like um three.

2  James:  Hey, look, hey, you remember, what, what, what, what, you asked for before?

3  CI:  The what?

*government affidavit*

James:  What did you do with those?

CI:  The what?

James:  The one's that I gave you before, what did you do with those?

CI:  What do you mean?

James:  You know, the one, the one, I used before with you?

CI:  Yeah.

James:  What you do with those?

CI:  Oh, the other guys, um took it, I don't know where.

James:  Ah, ah, all right.

CI:  I think they sold it.

James:  Ah, um they are going to look just like those then.

CI:  They are going to look just like those? All right.

James:  Yeah.

CI:  All right, so but you think, well we can talk tomorrow morning then, but do you think you can put uh like some so it looks like on top some of the good ones?

James:  We'll talk about it, we'll talk about it in the morning.

CI:  All right, you know, so you can pass these inspections, and so he can look at it real quick and shit.

James:  I mean, are you going, are you going to give him the (bag or back) to look at?

CI:  No, but uh if he, because he was asking me too much questions. At first it was fifteen, twenty, twenty-five. You know he was like.

James:  Oh, don't worry about it, and um.

CI:  He, he might, he might as me to show him some good ones, you know, and if he sees ten good ones, just a little bit like this real quick.

James: Hey man, look, tell him that, tell him I didn't see a thing, so he is not going to see my money when he gives me the stuff in the car, they will give him the bag. Tell him I am really nervous about the whole thing you know, so, you know I can't, you know be showing up like that.

CI: Because if we show him a little bit good, he is going to go for it real faster and where we can.

James: Hey, you don't have to show nothing, man, you just have to go out and do the deal just like we it happened the last time because he is not showing me anything, and I am taking his word that everything is there. He has to take my word that everything is there.

CI: All right.

James: Don't be, don't be nervous man, you know.

CI: No, I just want , I just want him to buy the, you know, the look's good and shit.

James: Yeah, we just going to, you know, you going to put the stuff in the car man, and um we just give him the tapes, that's it, you know?     *Need to have tapes -*

CI: All right.

James: Yeah, don't get nervous about it, man just go out and go ahead and do it.

CI: No, I know cause we just go from there you know, and as soon as we do it, we leave from there real quick.

James: Yeah.

CI: You know, he don't know where I live.

James: Don't be nervous about it man, you know, fuck it. Um, we just give him the bag after you know he gives us the thing and no need for me to take it or need me to show it, because he aint taking nothing to show me.

CI: Yeah.

James: You know, just I mean, you know, the guy is really nervous about his money and I got to do it real fast you know, just to make it look like I am really nervous about the whole situation and I want to get out of there real fast.

CI: Yeah, we want to like make sure he wants make sure he we convince him too, you know what I am saying because he is the one with the stuff and shit.

0118

**James:** Yeah, but you can tell him, hey the money is just as important as the stuff in we can always go other places and shop.

**CI:** Ah.

**James:** Don't let him know that, you know, hey.

**CI:** No, I know, I just wanted to at least show him a, you know, if he asked me to bring him five good ones or something we.

**James :** Why would he ask you for that?

**CI:** Just in case, because it is, you know twenty. No one is going to let twenty go away real quick like that.

**James:** Dude.

**CI:** We will see what happens, man. We will see what happens. Hopefully everything goes fine tomorrow.

**James:** Yeah, we just do it real fast, man. There is no way for you know, he is expecting good money, so he can't ask for you know like to bring five good ones cause he expecting good ones

**CI:** Yeah.

**James:** So he can't ask us to bring something because he is expecting.

**CI:** No, but on top of it you know, at least he wanted to look at. He might ask you look or the guy who bringing it, you know flip it a little bit, you know, you can show him a little bit and don't have to show him the whole bag.

**James:** Oh, you will see it dude. I'm going to put it on top of the bag and show it to him and put it in the car and give him the bag.

**CI:** Yeah, but it makes sense you know what I am saying though, show him a little bit that is good.

**James:** Yeah.

**CI:** Like at least one small stack of two or three good ones and flip it like this for him and shit so he can he, he can say ok and put it in the car.

**James:** All right.

**CI:** You know what I am saying?

**James:** Yeah.

**CI:** It would work better. You know we just, we gonna lose five bad ones, five good ones but you know we gonna.

**James:** I know what you are saying.

**CI:** We are gonna get more stuff than that though.

**James:** Yeah, all right, um look, I'll talk to you, man. We talked too much on the phone right now.

**CI:** All right man, so I'll talk to you when he calls me early in the morning, I give you a call so we can meet him.

**James:** When you going to meet him? You going to meet him tonight?

**CI:** We are gonna, we are gonna try to meet him tonight because he says he should be here in an hour hour and a half.

**James:** Do you want me to follow him?

**CI:** So, if um you going to be around the city here?

**James:** Yeah.

**CI:** All right, if he calls me, I give you a call see where we can, so you can follow him whenever I meet him.

**James:** Yeah, yeah, all right.

**CI:** So not um, he said that he wasn't going to call early in the morning cause he had to rest because they coming already from over there and shit, for the trip.

**James:** All right, then.

**CI:** So, I give you a call or if whenever he calls me early in the morning, anyways to, um we just uh, meet early, right?

**James:** Yeah.

**CI:** So we can, I can, we can call him from there.

**James:** Ok.

**CI:** All right?

**James:** Yeah.

**CI:** All right man, I give you a call. See if he, he want me to see me, he got time for me today cause he say it fine.

O 120

**James:** Ok.

**CI:**  All right?

**James:** All right, ok.

**CI:**  I give you a buzz so you can maybe follow him or whatever.

**James:** All right then.

**CI:**  All right, bye.

**(CI hangs up phone)**

**DePodesta:** This is Special Agent Frank DePodesta, the time is approximately 6:13 PM.

**(Call terminated)**

O121

2 oo2

# "**EXHIBIT**, <u>MARCH 24, JURY TRANSCRIPT</u>"
## "12 PAGES"

DATE:          03/24/02
TIME:          6:03PM

SPEAKERS:      AGENT:  FRANK DEPODESTA
               C.W.:   ALLAN DUBON
               JAMES:  DONVILLE JAMES        *14388424*

1  AGENT :   TESTING, TESTING.  TESTING, TESTING.  THIS IS SPECIAL
2            AGENT FRANK DEPODESTA.  THE DATE IS MARCH TWENTY-
3            FOURTH, TWO THOUSAND TWO.  THE TIME IS
4            APPROXIMATELY SIX-O-THREE, P.M.  AT THIS TIME, A
5            COOPERATING WITNESS IS GONNA PLACE A RECORDED
6            TELEPHONE CALL TO AN INDIVIDUAL KNOWN AS JAMES AT
7            TELEPHONE NUMBER 847-409-6737.

8  (TELEPHONE RINGING)

9  JAMES     :    HELLO?

10 C.W.      :    HEY, JAMES?

11 JAMES     :    YEAH.

12 C.W.      :    HEY -

13 JAMES     :    WHAT?

14 C.W.      :    I TALKED TO, UH, I TALKED TO THE GUY ALREADY.
15               AND UM, HE'S ON HIS WAY BACK, UM, HE JUST, UH, HE
16               SAYS FIFTEEN WILL BE OKAY.

17 JAMES     :    OKAY.

18 C.W.      :    AND, UM, HE, HE JUST ASKED ME, YOU KNOW, 'CAUSE
19               I TELL HIM TWENTY-FIVE AND ALL THIS STUFF, AND
20               SO HE, HE JUST TELLS ME, YOU KNOW, IF, IF I KNOW
21               YOU GUYS BETTER, YOU KNOW, GOOD, THEN MAYBE
22               YOU'RE NOT, YOU GUYS ARE NOT POLICE OR
23               ANYTHING.

24 JAMES     :    OH.

1

0123

| | | |
|---|---|---|
| 1 C.W. | : | 'CAUSE I BEEN CHANGING THE, YOU KNOW, THE |
| 2 | | NUMBERS AND STUFF. |
| 3 JAMES | : | OH. |
| 4 C.W. | : | SO, YOU KNOW, I TELL HIM, YOU KNOW, THAT YOU |
| 5 | | GUYS ARE STRAIGHT, YOU KNOW? |
| 6 JAMES | : | YEAH. OKAY. |
| 7 C.W. | : | SO, BUT, UM - |
| 8 JAMES | : | ALRIGHT. |
| 9 C.W. | : | HE JUST GONNA, 'CAUSE HE ONLY HAD TEN FIRST, |
| 10 | | BUT, YOU KNOW, FOR, YOU KNOW, WHENEVER WE |
| 11 | | WERE READY. BUT, HE HAD ANOTHER, A GUY TO GIVE |
| 12 | | HIM ANOTHER FIFTEEN. BUT, HE'S GONNA TAKE FIVE |
| 13 | | FROM THAT. |
| 14 JAMES | : | OKAY. |
| 15 C.W. | : | SO, HE'S GONNA COME FROM, SO, HE'S GONNA DO |
| 16 | | THAT FAVOR FOR ME. |
| 17 JAMES | : | ALRIGHT. |
| 18 C.W. | : | TO GET FIVE FROM THE OTHER FIFTEEN THAT HE GOT |
| 19 | | TO GIVE THE OTHER GUY. |
| 20 JAMES | : | ALRIGHT, OKAY, SO - |
| 21 C.W. | : | UM, AND, UM, SO YOU GOT, UH, YOU GOTS, YOU |
| 22 | | GOTTA SET UP THE BAG READY, RIGHT? HOW MUCH |
| 23 | | IS TOTAL, THAT THERE? |
| 24 JAMES | : | WELL, I'M GONNA PUT ON, UM, LIKE (INAUDIBLE) - |
| 25 C.W. | : | HOW MUCH? |
| 26 JAMES | : | I'M GONNA PUT, I'M GONNA PUT, UH, TWO, TWO |
| 27 | | HUNDRED IN THERE. |

1

2

2

| | | |
|---|---|---|
| 1 C.W. | : | TWO HUNDRED ONLY? |
| 2 JAMES | : | YEAH. |
| 3 C.W.<br>4<br>5 | : | ALRIGHT.  UM, YOU, YOU THINK YOU CAN, UM, PUT AT LEAST FIVE OR TEN GRAND GOOD ONE IN THE BAG, IN, ON TOP? |
| 6 JAMES | : | YEAH (INAUDIBLE) - |
| 7 C.W. | : | SO, SO HE CAN - |
| 8 JAMES | : | NO, HEY. |
| 9 C.W. | : | MM-HMM? |
| 10 JAMES | : | I NEED TO TALK TO YOU. |
| 11 C.W. | : | WHAT? |
| 12 JAMES | : | I HAVE TO MEET YOU AND TALK TO YOU. |
| 13 C.W. | : | IN THE MORNING? |
| 14 JAMES<br>15 | : | NO, UM, YOU KNOW WHAT I MEAN?  UH, CAN I MEET YOU LATER ON? |
| 16 C.W. | : | UM - |
| 17 JAMES | : | 'CAUSE, UH, IN A HOUR, OR SO? |
| 18 C.W. | : | OH, 'CAUSE I'M PAINTING THE HOUSE RIGHT NOW. |
| 19 JAMES | : | OKAY.  WHAT TIME YOU GONNA BE DONE? |
| 20 C.W.<br>21<br>22 | : | UM, ABOUT, SHIT, WELL, WE CAN MEET UM, TOMORROW MORNING BEFORE WE DO IT, THAT'S FINE. |
| 23 JAMES | : | OKAY.  JUST (INAUDIBLE) ON THE PHONE. |
| 24 C.W. | : | JUST, JUST, JUST MEET, UH - HUH? |

3

| 1 | JAMES | : | I DON'T WANNA TALK TOO MUCH ON THE PHONE.  SO - |
|---|---|---|---|
| 2<br>3<br>4<br>5 | C.W. | : | YEAH.  ALRIGHT.  BUT UM, NO, JUST, REAL QUICK, YOU KNOW, BEFORE, UH, UH, HE, UM, SAID, UM, 'CAUSE HE'S GONNA GO AT ABOUT TWELVE O'CLOCK. SO, ABOUT ELEVEN IS FINE WITH YOU, OR WHAT? |
| 6 | JAMES | : | YEAH. |
| 7 | C.W. | : | OR ELEVEN O'CLOCK? |
| 8 | JAMES | : | YEAH. |
| 9 | C.W. | : | ALRIGHT.  LOOKS LIKE, LOOKS LIKE THREE, RIGHT? |
| 10 | JAMES | : | YEAH, HUH?' |
| 11<br>12 | C.W. | : | IT LOOKS LIKE THREE.  'CAUSE TOTAL COMES OUT TO BE THREE.  BUT, IT LOOKS LIKE THREE, RIGHT? |
| 13 | JAMES | : | YEAH, YEAH. |
| 14 | C.W. | : | THREE HUNDRED?  LOOKS LIKE THREE HUNDRED? |
| 15 | JAMES | : | YEAH, YEAH. |
| 16 | C.W. | : | (SIGHS) UM, SO, SEE YOU ABOUT - |
| 17<br>18 | JAMES | : | JUST, JUST, HEY.  JUST TELL HIM IT'S GONNA BE IN HUNDREDS AND FIFTYS. |
| 19<br>20<br>21<br>22 | C.W. | : | OKAY.  ALRIGHT, 'CAUSE I, 'CAUSE HE TELL ME TO MEET HIM LATER ON, TOO.  THAT'S WHY I CANNOT MEET YOU AT THAT TIME.  BUT, I'M PAINTING THE HOUSE. |
| 23 | JAMES | : | OKAY. |
| 24<br>25<br>26 | C.W. | : | SO, I'M GONNA MEET HIM AND, UM, 'CAUSE I WANNA SEE, CAN, YOU KNOW, SO HE CAN PASS THE INSPECTION, YOU KNOW. |
| 27 | JAMES | : | HEY. |

4

| | | |
|---|---|---|
| 1 C.W. | : | MM-HMM? |
| 2 JAMES<br>3<br>4 | : | WHEN YOU GO MEET HIM CAN'T YOU LET ME, UH, YOU KNOW, LET ME KNOW WHERE YOU'RE GONNA BE SO I CAN FOLLOW HIM HOME? |
| 5 C.W.<br>6 | : | ALRIGHT, NO, 'CAUSE HE DON'T MEET ME AT THE HOUSE. |
| 7 JAMES<br>8 | : | I KNOW, BUT, ONCE YOU, ONCE YOU'RE WITH HIM, RIGHT? |
| 9 C.W. | : | YEAH. OH, YEAH. |
| 10 JAMES<br>11 | : | THEN WE'LL KNOW WHERE HE LIVES BECAUSE WE JUST FOLLOW HIM. YOU DON'T WANNA DO THAT? |
| 12 C.W.<br>13<br>14 | : | YEAH, THAT'S FINE. LET ME, UM, HE'S GONNA CALL ME, THOUGH, TO SEE WHAT TIME. AND I'LL GIVE YOU A CALL. |
| 15 JAMES<br>16 | : | OKAY. ALRIGHT THEN, OKAY. ALRIGHT, JUST CALL ME BACK, THEN. ALRIGHT? |
| 17 C.W.<br>18 | : | JUST, UH, JUST MAKE SURE FOR TOMORROW, JUST MAKING SURE THAT HE LOOKS LIKE, UM, LIKE THREE. |
| 19 JAMES | : | HEY. HEY - |
| 20 C.W. | : | YEAH? |
| 21 JAMES<br>22 | : | REMEMBER WHAT, WHAT, WHAT, WHAT, THE ONES THAT YOU HAD BEFORE? |
| 23 C.W. | : | THE WHAT? |
| 24 JAMES | : | WHAT DID YOU DO WITH THOSE? |
| 25 C.W. | : | THE WHAT? |
| 26 JAMES<br>27 | : | THE ONES THAT I HAD GAVE YOU BEFORE. WHAT DID YOU DO WITH THOSE? |

5

0127

| 1 | C.W. | : | WHAT DO YOU MEAN? |
|---|------|---|------------------|
| 2<br>3 | JAMES | : | YOU KNOW, THE ONES, THE ONES THAT I USED BEFORE WITH YOU. |
| 4 | C.W. | : | YEAH. |
| 5 | JAMES | : | WHAT DID YOU DO WITH THOSE? |
| 6<br>7 | C.W. | : | UH, THE OTHER GUYS, UM, TOOK IT. I DON'T KNOW WHERE. |
| 8 | JAMES | : | OH. UM, ALRIGHT, UM - |
| 9 | C.W. | : | I THINK, I THINK THEY, THEY SOLD IT. |
| 10<br>11 | JAMES | : | OH. UM, THEY GONNA LOOK JUST LIKE THOSE (INAUDIBLE) |
| 12 | C.W. | : | THEY'RE GONNA LOOK JUST LIKE THOSE, ALRIGHT? |
| 13 | JAMES | : | YEAH. |
| 14<br>15<br>16<br>17 | C.W. | : | ALRIGHT. (CLEARS THROAT) SO, BUT, YOU THINK, WELL WE CAN TALK TOMORROW MORNING, THEN. BUT, YOU THINK YOU CAN PUT LIKE, TO MAKE SURE IT LOOKS LIKE, ON TOP, SOME OF THE GOOD ONES? |
| 18<br>19 | JAMES | : | WE'LL TALK ABOUT THIS (INAUDIBLE) - WE'LL TALK ABOUT THAT IN THE MORNING. |
| 20<br>21<br>22 | C.W. | : | ALRIGHT, YOU KNOW, SO YOU CAN PASS HIS INSPECTION, SO YOU CAN LOOK AT REAL QUICK AND SHIT. |
| 23<br>24 | JAMES | : | (INAUDIBLE) - HEY, YOU GONNA GIVE, YOU GONNA GIVE HIM A STACK TO LOOK AT? |
| 25<br>26<br>27<br>28 | C.W. | : | NO, BUT, UH, IF HE, BECAUSE SEE, HE WAS ASKING ME TOO MUCH QUESTION. FIRST WITH TEN, FIFTEEN, TWENTY, TWENTY-FIVE. YOU KNOW WHAT I'M SAYING? |

6

0128

| 1 | JAMES | : | OH, DON'T WORRY ABOUT THAT, UM - |
|---|---|---|---|

2 C.W.    :    AND, UM, HE, HE, HE MIGHT, HE MIGHT ASK ME TO
3              SHOW HIM, YOU KNOW, AT LEAST TEN, TEN GOOD
4              ONES, YOU KNOW? AND IF HE SEES TEN GOOD ONES
5              JUST A LITTLE BIT, LIKE THIS, REAL QUICK, THEN LIKE
6              --

7 JAMES    :    HEY, MAN, LOOK. TELL HIM THAT, LOOK. TELL HIM, I
8              DIDN'T SEE HIS FACE, SO HE'S NOT GONNA SEE MY
9              MONEY. WHEN HE GIVES ME THE STUFF IN THE CAR,
10             THEN I'LL GIVE HIM THE BAG. TELL HIM THAT I'M,
11             YOU KNOW, I'M REALLY NERVOUS ABOUT THE WHOLE
12             THING. YOU KNOW, SO, YOU KNOW.

13 C.W.    :    HMM -

14 JAMES    :    I CAN'T, YOU KNOW, BE SHOWING STUFF LIKE THAT.

15 C.W.    :    BUT WE, 'CAUSE WE, 'CAUSE WE SHOW HIM A LITTLE
16             BIT GOOD, HE'S GONNA GO FOR IT REAL FASTER AND,
17             WELL, WE CAN -

18 JAMES    :    HEY, WE DON'T HAVE TO SHOW HIM NOTHING, MAN.
19             YOU JUST GO OUT THERE AND DO THE DEAL JUST LIKE
20             WE, YOU KNOW, IT HAPPENED THE LAST TIME.
21             BECAUSE HE'S NOT SHOWING ME ANYTHING. YOU
22             KNOW, I TAKE HIS WORD THAT EVERYTHING IS THERE.
23             SO, HE'S GOTTA TAKE MY WORD THAT EVERYTHING IS
24             THERE.

25 C.W.    :    ALRIGHT.

26 JAMES    :    DON'T BE, DON'T BE, DON'T BE NERVOUS, MAN.
27             (INAUDIBLE) -

28 C.W.    :    NO, I JUST DON'T WANNA, I JUST WANT HIM TO BUY I
29             AND, YOU KNOW, THAT IT LOOKS GOOD AND SHIT.

30 JAMES    :    YEAH. WE'RE JUST GONNA, YOU KNOW, HE GONNA
31             PUT THE STUFF IN THE CAR, MAN, AND UM, WE JUST
32             GIVE HIM THE BAG, THAT'S IT. YOU KNOW?

0129

| | | |
|---|---|---|
| 1  C.W. | : | ALRIGHT. |
| 2  JAMES<br>3 | : | MAN, DON'T GET NERVOUS ABOUT NOTHING, MAN.<br>JUST GO ON AHEAD AND DO IT. |
| 4  C.W.<br>5<br>6 | : | I KNOW, 'CAUSE WE JUST GO FROM THERE, YOU<br>KNOW.  AS SOON AS WE DO IT, WE, WE LEAVE HIM<br>THERE REAL QUICK. |
| 7  JAMES | : | YEAH - |
| 8  C.W. | : | AND HE, HE DON'T KNOW WHERE I LIVE. |
| 9  JAMES<br>10<br>11<br>12<br>13 | : | DON'T GET NERVOUS ABOUT IT, MAN.  YOU KNOW,<br>FUCK IT.  UM, WE JUST GIVE HIM THE BAG AFTER, YOU<br>KNOW, HE, HE GIVE US THE THING.  THERE AIN'T NO<br>NEED FOR ~~US TO TAKE HIM NOTHING AND SHOW HIM~~.<br>BECAUSE HE AIN'T TAKING NOTHING TO SHOW ME.<br>*me to take it or need me to show it* |
| 14  C.W. | : | YEAH. |
| 15  JAMES<br>16<br>17<br>18<br>19<br>20 | : | YOU KNOW?  JUST TELL HIM THAT, YOU KNOW, THE<br>GUY'S REAL NERVOUS ABOUT HIS MONEY AND HE<br>GOTTA DO IT REAL FAST, YOU KNOW.  JUST MAKE IT<br>LOOK LIKE I'M REALLY NERVOUS ABOUT THE WHOLE<br>SITUATION AND WANNA GET OUTTA THERE REAL<br>FAST. |
| 21  C.W.<br>22<br>23<br>24 | : | YEAH.  BUT, WE WANNA, LIKE, MAKE SURE HE WAN-<br>MAKE SURE HE, WE CONVINCE HIM, TOO, YOU KNOW<br>WHAT I'M SAYING?  'CAUSE HE, HE'S THE ONE WITH<br>THE STUFF AND SHIT. |
| 25  JAMES<br>26<br>27<br>28 | : | YEAH, WELL, IT'S MY MONEY, YOU CAN JUST TELL<br>HIM THAT THE MONEY IS JUST AS IMPORTANT AS THE<br>STUFF, RIGHT?  WE CAN ALWAYS GO (INAUDIBLE) AND<br>SHOP. |
| 29  C.W. | : | MM-HMM. |
| 30  JAMES | : | DON'T, DON'T LET HIM KNOW THAT, YOU KNOW - |
| 31  C.W. | : | I KNOW - |

8

| 1 | JAMES | : | (INAUDIBLE) - |
| 2 | C.W. | : | NO, I JUST WANNA AT LEAST SHOW HIM, YOU KNOW, |
| 3 | | | IF HE ASKED ME, YOU KNOW, BRING ME FIVE GOOD |
| 4 | | | ONES, OR SOMETHING, BEFORE - |
| 5 | JAMES | : | WHY WOULD HE ASK YOU THAT? |
| 6 | C.W. | : | JUST IN CASE, BECAUSE IT'S, YOU KNOW, IT'S |
| 7 | | | TWENTY. NOBODY'S GONNA LET, YOU KNOW, THAT |
| 8 | | | GO FOR TWENTY AWAY REAL QUICK LIKE THAT. |
| 9 | JAMES | : | (INAUDIBLE) - |
| 10 | C.W. | : | WE'LL SEE WHAT HAPPENS, THEN. WE'LL SEE WHAT |
| 11 | | | HAPPENS. HOPEFULLY, EVERYTHING GOES FINE |
| 12 | | | TOMORROW. |
| 13 | JAMES | : | YEAH, WE JUST DO IT REAL FAST. I MEAN, THERE'S NO |
| 14 | | | WAY, YOU KNOW, HE'S EXPECTING GOOD MONEY. SO, |
| 15 | | | HE CAN'T ASK FOR, YOU KNOW, LIKE CAN YOU BRING |
| 16 | | | FIVE GOOD ONES. 'CAUSE HE EXPECTING GOOD ONES. |
| 17 | C.W. | : | YEAH. |
| 18 | JAMES | : | SO, HE CAN'T ASK FOR LIKE BRING SOMETHING. |
| 19 | | | 'CAUSE HE EXPECTING  GOOD ONES. |
| 20 | C.W. | : | NO, BUT ON TOP OF IT, YOU KNOW, AT LEAST HE |
| 21 | | | WANTED TO LOOK AT - ASK, ASK, HE MIGHT ASK YOU |
| 22 | | | TO LOOK, OR THE GUY, WHOEVER BRING IT, YOU |
| 23 | | | KNOW, FLIP IT A LITTLE BIT. YOU KNOW, WE COULD |
| 24 | | | SHOW HIM A LITTLE BIT. WE DON'T HAVE TO SHOW |
| 25 | | | HIM THE WHOLE BAG. |
| 26 | JAMES | : | OH, HE'LL SEE IT. 'CAUSE ON TOP OF THE BAG, I'LL |
| 27 | | | SHOW IT TO HIM WHEN PUT IT IN THE CAR, AND I GIVE |
| 28 | | | HIM (INAUDIBLE) |
| 29 | C.W. | : | NO, BUT IT MAKES SENSE, YOU KNOW WHAT I'M |
| 30 | | | SAYING, THOUGH? |
| 31 | JAMES | : | YEAH. |

9

| | | |
|---|---|---|
| 1 C.W. | : | SHOW HIM A LITTLE BIT, THAT IT'S GOOD. |
| 2 JAMES | : | YEAH. |
| 3 C.W.<br>4<br>5<br>6 | : | LIKE AT LEAST ONE, ONE SMALL STACK OF TWO OR THREE GOOD ONES. AND, FLIP IT LIKE IT'S FOR HIM AND SHIT SO HE CAN BE, SO HE CAN SAY OKAY, PUT IT IN THE CAR. |
| 7 JAMES | : | ALRIGHT. |
| 8 C.W.<br>9<br>10<br>11 | : | YOU KNOW WHAT I'M SAYING? IT WILL WORK BETTER. AND WHICH, WE GONNA LOSE FIVE BAD ONES, FIVE GOOD ONES. BUT, YOU KNOW, WE GONNA - |
| 12 JAMES | : | (INAUDIBLE) I KNOW WHAT YOU'RE SAYING. |
| 13 C.W.<br>14 | : | WE'RE GONNA GET MORE STUFF THAN THAT, THOUGH. |
| 15 JAMES<br>16<br>17 | : | YEAH. ALRIGHT, UM, WELL, I'LL TALK TO YOU, MAN. WE'RE TALKING TOO MUCH ON THE PHONE RIGHT NOW. |
| 18 C.W.<br>19<br>20 | : | ALRIGHT, MAN. SO, UM, OKAY, I'LL CALL, I'LL TALK TO YOU - WHEN HE CALLS ME EARLY IN THE MORNING, I'LL GIVE YOU A CALL SO WE CAN MEET - |
| 21 JAMES<br>22 | : | WHEN ARE YOU GOING TO MEET HIM? WHEN YOU GONNA MEET HIM? |
| 23 C.W. | : | RIGHT - |
| 24 JAMES | : | YOU GONNA MEET HIM TONIGHT? |
| 25 C.W.<br>26<br>27 | : | WE'RE GONNA, WE'RE GONNA TRY TO MEET HIM TONIGHT. 'CAUSE HE SAY HE'S COMING, HE SHOULD BE HERE IN AN HOUR, AN HOUR AND A HALF. SO - |
| 28 JAMES | : | SO YOU DON'T WANT ME TO FOLLOW HIM? |
| 29 C.W. | : | SO. IF, UM, YOU GONNA BE AROUND THE CITY HERE? |

10

| 1 | JAMES | : | YEAH. |
| 2 | C.W. | : | ALRIGHT. IF HE CALLS ME, I'LL GIVE YOU A CALL, SEE |
| 3 | | | WHERE WE CAN, SO YOU CAN FOLLOW HIM |
| 4 | | | WHENEVER I MEET HIM. |
| 5 | JAMES | : | YEAH. ALRIGHT. |
| 6 | C.W. | : | SO, IF NOT, UM, HE, HE SAID ANYWAYS HE'S GONNA |
| 7 | | | CALL ME IN THE MORNING. 'CAUSE HE HAD TO REST |
| 8 | | | BECAUSE THEY COMING ALREADY FROM OVER THERE |
| 9 | | | AND SHIT, FOR THEIR TRIP. |
| 10 | JAMES | : | ALRIGHT, THEN. |
| 11 | C.W. | : | I'LL GIVE YOU A CALL WHENEVER HE CALLS ME. |
| 12 | | | EARLY IN THE MORNING, ANYWAYS, TOO, UM, WHICH |
| 13 | | | IS, UM, MEET EARLY, RIGHT? SO WE CAN - I CAN, I CAN |
| 14 | | | CALL, WE CAN CALL HIM FROM THERE. |
| 15 | JAMES | : | OKAY. |
| 16 | C.W. | : | ALRIGHT? |
| 17 | JAMES | : | YEAH. |
| 18 | C.W. | : | ALRIGHT, MAN, I'LL GIVE YOU A CALL. SEE IF HE, HE |
| 19 | | | WANT ME TO SEE, IF HE GOT TIME FOR ME TODAY. |
| 20 | | | 'CAUSE HE SAID IT'S FINE. |
| 21 | JAMES | : | OKAY. |
| 22 | C.W. | : | ALRIGHT? |
| 23 | JAMES | : | ALRIGHT, YEAH. |
| 24 | C.W. | : | I'LL GIVE YOU A CALL SO YOU CAN MAYBE FOLLOW |
| 25 | | | HIM OR WHATEVER. |
| 26 | JAMES | : | ALRIGHT, MAN. |
| 27 | C.W. | : | ALRIGHT, BYE. |

11

1  (END OF TELEPHONE CONVERSATION)

2  AGENT :      THIS IS SPECIAL AGENT FRANK DEPODESTA.  THE TIME NOW
3                    IS APPROXIMATELY 6:13 P.M.

4  (END OF TAPE 1)

0134

"**EXHIBIT**, INFORMANT'S INTERVIEW WITH
PROSECUTORS"
"8 PAGES"

FD-302 (Rev. 10-6-95)

EXHIBIT "A"

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    09/02/2002

        A Source, who is in a position to testify, provided the
following information:  (Also present during the interview were
Assistant United States Attorneys (AUSA) VALERIE HAYS and PATRICK
COLLINS of the United States Attorney's Office, Northern District
of Illinois.  As Spanish is the native language of the Source, the
United States Attorney's Office provided a Spanish speaking
interpreter, ROBERTO MENDOZA who translated the interview from the
English language to the Spanish language and from the Spanish
Language to the English language).

        Source first came to the United States in the company of
his Mother and four Sister's approximately fifteen years ago from
Guatemala.  Source entered the United States lawfully and is a
legal Resident Alien.  Source lived in the Chicago, Illinois area
for approximately thirteen years, moving around between the North
side and the South side of Chicago however, lived predominately in
the South side.  Source completed his Junior year in High School,
however dropped out due to his girlfriend becoming pregnant and his
need to seek employment.  Source started working for temporary
employment agencies until approximately four years ago where he
gained employment from OLAN INDUSTRIES in Northbrook, Illinois as
an assistant supervisor over the warehouse.  In September of 2001,
the Source was laid off from that job and has been unemployed ever
since.

        In mid to late 1999, the Source first became involved in
selling narcotics.  Source was frequenting a bar in the area of
Fullerton and Linder in Chicago, Illinois.  Source was a casual
user of powder cocaine, using the drug on weekends when he would
drink at the bar and would purchase small quantities of cocaine
from customers within the bar.  After observing others selling the
drug, the Source came up with the idea that he could also make some
money selling small quantities of cocaine and purchased an "eight
ball" or an eight of an ounce to break down into ten dollar
($10.00) quantities.  Source purchased the "eight ball" from a
customer in the bar and sold the cocaine, which he broke down into
smaller quantities at home, to other customers in the bar.  Source
recalled purchasing "eight balls" approximately four times between
1999 and 2001.

---

Investigation on    08/28/2002    at  Chicago, Illinois

File #  270F-CG-117142-A; 281C-CG-117362-BC1          Date dictated    09/02/2002

by   Frank Jack Sodetz III:fjs

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;          0136

FD-302a (Rev. 10-6-95)

270F-CG-117142-A; 281C-CG-117362-BC1

Continuation of FD-302 of _____Source_____, On __08/28/2002__, Page __2__

  Source became acquainted with other individuals from the bar who dealt in larger quantities of cocaine and became friends with them. Source realized he could make more money by brokering, or acting as the middleman, for larger cocaine deals between customers and his friends. Source then began to introduce customers for larger quantities of cocaine to his friends at the bar for which he would be paid a fee ranging from $150.00 to $1,000.00. The first deal he recalled brokering was for one half a kilogram of cocaine. Then from 1999 to mid 2001, the Source brokered between eight (8) and nine (9) deals for one kilogram of cocaine at a time to various customers. The Source recalled that the price for a kilogram of cocaine ranged from $20,500.00 to $22,000.00 per kilogram.

  During this period, the Source also brokered three marijuana deals with the same suppliers as the cocaine. The first deal was for one (1) pound of marijuana with a customer he could not recall, the second was for ten (10) pounds of marijuana with an individual the Source knew as VINCENT HEARD and the last marijuana deal with an individual the Source knew as JAMES later identified as DONVILLE JAMES for nighty eight (98) pounds. It was during this deal, in the Summer of 2001, that JAMES paid the Source for the marijuana in counterfeit United States currency.

  The Source recalled brokering three cocaine deals with JAMES between the Summer of 2000 and the Summer of 2001. The Source met JAMES through a co-worker at OLAN INDUSTRIES named Derrick who in turn introduced the Source to an individual Derrick referred to as his cousin Josh. Derrick introduced Josh to the Source for the purpose of brokering a one (1) Kilogram cocaine deal. Derrick was described as a black male, 5'4" tall, very thin build, approximately 40 to 50 years old. Josh was described as a black male, heavy set, with gold or silver teeth, 20 to 35 years old, with a Jamaican accent. When Josh showed up at the parking lot of OLAN INDUSTRIES to negotiate the deal with the Source, he brought JAMES with him and introduced JAMES as a friend and partner. The Source, Josh and JAMES agreed to a price of $21,000.00 for the kilogram of cocaine during that meeting.

  The Source approached two individuals he knew as Joe and David to obtain the kilogram of cocaine. The Source did not have money to purchase the kilogram of cocaine and asked Joe and David to front it to him. Since Joe and David did not know Josh and JAMES, they refused to front the kilogram of cocaine and required to be present during the deal. On the day the deal was conducted,

0137

FD-302a (Rev. 10-6-95)

270F-CG-117142-A;  281C-CG-117362-BC1

Continuation of FD-302 of ___Source_____ , On _08/28/2002_ , Page _3_

the Source met JAMES and Josh at a JEWEL/OSCO parking lot at Lawrence and Central in Chicago, Illinois.  JAMES was driving an older, brown in color, NISSAN automobile and Josh was in a stretch limousine, dark grey or black in color.  Josh, JAMES and the Source then entered the back of the limo and the Source was shown the money.  Once the Source was satisfied the money was okay, the Source directed Josh in the Limo and JAMES in his brown NISSAN to follow the Source to his residence located just three blocks away on Central.  The Source recalled that JAMES had a black female with him which he referred to as his girlfriend in the car.  When they arrived at the Source's residence, the limo parked in front of the house, while JAMES and his girlfriend parked on the street.  While waiting for Joe and David to arrive with the kilogram of cocaine, the Source, JAMES and his girlfriend talked outside in front of the house.  JAMES's girlfriend saw a small dog the Source had and asked the Source about purchasing it from him.  A short time later, Joe and David arrived with the kilogram of cocaine and Joe, David, JAMES and the source went into the Source's house.  JAMES placed the money for the cocaine on the kitchen table, while Joe and David placed the kilogram of cocaine on the table.  Once Joe and David counted the money, the kilogram of cocaine was given to JAMES who departed the residence.  The Source said he made $500.00 for brokering that deal.

Less than one month later, JAMES contacted the Source and said the kilogram of cocaine had been good and wanted to purchase another one.  The Source contacted Joe and David and set the deal up.  The Source directed JAMES to David's residence in the area of Damon and Cicero in Chicago, Illinois.  JAMES arrived at the residence alone, driving the brown NISSAN, parking the car in the garage at the residence.  JAMES entered David's house, showed the money and was given a kilogram of cocaine by David.  After JAMES departed the house with the kilo, the Source, Joe and David counted the money provided by JAMES and discovered the money was $500.00 short.  The Source then called JAMES to tell him the money was short, and JAMES agreed to meet the Source the next day to pay the difference.  The following day, the Source met JAMES on a street corner and JAMES paid the Source the $500.00 which the Source kept as his profit for brokering the deal.

Approximately three to five days later, JAMES contacted the Source and told him the kilogram of cocaine he had purchased was bad and that he wanted to return it.  The Source argued with JAMES that the day of the deal, JAMES had told the Source the kilogram of cocaine had been good and at that time, there had been

0138

FD-302a (Rev. 10-6-95)

270F-CG-117142-A; 281C-CG-117362-BC1

Continuation of FD-302 of _____ Source _____ , On __08/28/2002__ , Page __4__

no problem. JAMES told the Source that the guy he had provided the
kilogram of cocaine to was having problems cooking it (converting
it to crack cocaine) and he wanted to return it as Joe and David
had guaranteed it was good. JAMES told the Source that the guy he
provided the kilogram of cocaine to refused to pay him for it so
JAMES was forced to beat the guy up and take his car until the
situation could be resolved. The Source then contacted Joe and
David who told the Source to have JAMES bring the kilogram of
cocaine to the Source's residence where they would all meet and
check the kilogram of cocaine. The next day, JAMES, Joe, David and
the Source met at the Source's residence, at which time JAMES
produced the kilogram of cocaine. The kilo had been broken down
and was now in four separate packages, three bags and the original
wrapper. JAMES told Joe and David that his customer did not like
the quality of the cocaine and was having problems cooking it, and
that he (JAMES) wanted a new kilo. Initially David and Joe refused
to exchange the kilo, however the Source told them that he did not
want to have problems with JAMES and that JAMES had made threats to
the Source about the incident. David and Joe then agreed to
exchange the kilo and provided a new kilogram of cocaine to JAMES.
David and Joe told the Source they would take the kilo returned by
JAMES and break it down into ounces for sale to recover the money.

Sometime in early Summer of 2001, JAMES contacted the
Source and wanted to purchase another kilogram of cocaine. The
Source contacted David and Joe who told the Source they did not
have any kilograms of cocaine available. The Source then contacted
another source of supply named Tonio who told the Source he could
provide the kilogram of cocaine. The Source then contacted JAMES
and let him know he could provide the cocaine and for JAMES to call
him when he was ready with the money. Two to three days later
JAMES contacted the Source and said he was ready to do the deal.
The Source then met JAMES at a WENDY's restaurant parking lot
located at Kimball and Belmont in Chicago, Illinois. When the
Source arrived at the parking lot, he observed JAMES on a
motorcycle parked next to a car occupied by a black male, and that
the two were talking as though they were together. When the Source
approached JAMES, the car driven by the black male departed. The
Source told JAMES that they would do the deal at Tonio's house a
few blocks away. At first JAMES did not want to go to the house,
however the Source assured him that there would be no problems and
for JAMES to follow him to the house. JAMES followed the Source on
the motorcycle while the Source drove his car to Tonio's residence
on Avers. When they arrived at the house, the Source parked on the
street in front of the house, while JAMES parked in the rear of the

0139

FD-302a (Rev. 10-6-95)

270F-CG-117142-A; 281C-CG-117362-BC1

Continuation of FD-302 of _____Source_____ , On _08/28/2002_ , Page __5__

house. JAMES then removed a tube, the shape of a PRINGLES brand potato chip can, from the motorcycle which contained the money for the cocaine. JAMES, the Source, Tonio and Tonio's brother then went inside the house, where JAMES provided the money to Tonio and Tonio provided the kilogram of cocaine to JAMES. At the conclusion of the deal, JAMES asked the Source to follow him out of the neighborhood to provide security to him as he did not know the area and was afraid of the police. The Source then followed JAMES (the Source in his car, JAMES on his motorcycle) back to the area of the WENDY's restaurant.

In June of 2001, while working at OLAN INDUSTRIES, the Source met a co-worker, a black male named Bryan, later identified as BRYAN KIRKWOOD who said he knew an individual, a black male named Robert, later identified as KENNETH CARROLL who wanted to buy quantities of powder cocaine. The Source, KIRKWOOD and CARROLL conducted four deals together, each for a kilogram of cocaine supplied by Joe and David. In late June, 2001, KIRKWOOD and CARROLL contacted the Source and requested to purchase a quarter kilogram of cocaine (four and one half ounces). The Source, KIRKWOOD and CARROLL agreed to do the deal on a Friday in the parking lot of OLAN INDUSTRIES. When KIRKWOOD and CARROLL arrived to do the deal, the Source exited OLAN INDUSTRIES with the drugs and entered a car driven by KIRKWOOD and CARROLL. Once in the car, CARROLL placed a gun to the side of the Source and KIRKWOOD and CARROLL stole the cocaine, the Source's cellular telephone, and the Source's car keys and forced the Source from the vehicle. The Source then contacted the NORTHBROOK POLICE DEPARTMENT via 911 and reported he was robbed. The police located CARROLL and KIRKWOOD and in the ensuing investigation it was determined that the reason for the robbery was a drug deal at which time the Source was arrested.

The Source bonded out of jail and contacted David and Joe to obtain money for a lawyer for his case. David and Joe refused to provide the money for the lawyer and in addition, told the Source he was responsible to them for the quarter kilogram of cocaine lost in the robbery. The Source then contacted Tonio for assistance and was told that the best way to make money for a lawyer was to bring more customers for narcotics to him. The Source then contacted JAMES and asked if JAMES needed anything. JAMES told the Source he was aware he had been arrested and asked if everything was okay. The Source told JAMES he needed to make money to pay for a lawyer. JAMES asked the Source if he could get him one hundred and fifty (150) pounds of marijuana. Source then

O140

FD-302a (Rev. 10-6-95)

270F-CG-117142-A; 281C-CG-117362-BC1

Continuation of FD-302 of ___Source_____ , On __08/28/2002__ , Page __6__

contacted Tonio to see if he could obtain the drugs.   Tonio then
called around and was able to obtain approximately ninety eight
(98) pounds of marijuana from suppliers named Jorge and Primo.   The
Source was to make $4,000.00 on the deal.

        The Source then contacted JAMES and said he could only
obtain the ninety eight (98) pounds of marijuana and asked JAMES if
he still wanted to do the deal.   JAMES agreed and the deal was set
up for later that afternoon for a price of sixty eight thousand
dollars ($68,000.00) .   The Source then went to Tonio's house, met
with Jorge, Primo and Tonio, and waited for the marijuana to arrive
at the house.   A short time later, a car arrived with a large
suitcase in the trunk containing the marijuana.   The suitcase was
then removed from the car and placed in the house.   The Source then
called JAMES and told him the drugs had arrived and they were ready
to do the deal.

        A short time later, JAMES contacted the Source and told
him he was at the WALLGREEN's parking lot at Diversey and Pulaski.
The Source then drive to the parking lot to meet with JAMES.   JAMES
was next to his brown NISSAN and told the Source he had locked the
keys in the car and that the money was also in the car.   Also in
the parking lot was a black in color LINCOLN CONTINENTAL with
Livery plates driven by a light skinned male, heavy set, tall, with
a mustache.   The Source thought he was either Hispanic or American.
The Source said he was told by Tonio to check and see if the money
was okay, but by the time JAMES was able to open the car, the
Source was concerned about how much time had go by.   The Source
told JAMES he would trust him and did not need to see the money.
The Source then parked his car around the block and got into the
LINCOLN, sitting in the front with the driver.   JAMES then follows
in his car as the Source directed the driver of the LINCOLN towards
Tonio's house.   Approximately one block away from Tonio's house,
the LINCOLN driver received a cell phone call from JAMES.   At the
end of that call, the LINCOLN driver told the Source that they were
going to return to the Source's car and pick it up.   The LINCOLN
driver then drove back to the Source's car, dropped the Source off,
and the Source then drove to Tonio's house with JAMES (driving his
NISSAN) and the LINCOLN following.

        When the Source arrived at Tonio's house, the LINCOLN
double parked on the street directly in front of the residence.
JAMES parked on the corner, and the Source parked on the street
nearby.   The Source then went inside of Tonio's house while JAMES
and the LINCOLN driver remained outside in the respective cars.

O141

FD-302a (Rev. 10-6-95)

270F-CG-117142-A; 281C-CG-117362-BC1

Continuation of FD-302 of _____ Source _____ . On _08/28/2002_ , Page _7_

The Source then argued with Tonio over who would deliver the
suitcase of marijuana to the LINCOLN and who would collect the
money from JAMES.  It was agreed that Tonio would collect the money
from JAMES and the Source would deliver the suitcase.  Tonio's
brother then helped the Source load the suitcase on his shoulder
while Tonio went to JAMES's vehicle.  Once the Source placed the
suitcase into the trunk of the LINCOLN, JAMES handed a black bag to
Tonio through he car window.  The LINCOLN driven by the white male,
and the NISSAN driven by JAMES then departed and the Source and
Tonio went inside Tonio's residence to check the money.

Once the Source and Tonio were inside, they check the
money and determine the money was fake, consisting of $100.00 and
$20.00 counterfeit bills.  Tonio then called Jorge and Primo to
tell them there was a problem while the Source called JAMES.  JAMES
answered the phone and the Source told him the money was bad.
JAMES told the Source that the driver of the LINCOLN must have been
responsible for the rip off.  A few days later, the Source
contacted JAMES on his cellular telephone again to discuss the rip
off.  During that conversation, the Source and JAMES argued over
the deal, at which time JAMES told the Source that if the Source
wanted, he could attempt to locate him and he and the Source could
fight it out and they would see who killed who.  After that
conversation, JAMES would not answer his phone when the Source
called.

As a result of the deal with JAMES going bad, Jorge and
Primo held the Source responsible for the loss and began to
pressure him for the money.  Sometime in September or October,
Jorge and Primo called the Source to a meeting at a park located at
Narraganset and Fullerton where approximately six Hispanic males
were waiting.  Jorge and Primo set a deadline for the Source to
come up with the money or else he or his family would be harmed.

Source was not able to reach JAMES on his cellular
telephone, and was desperate to speak to him.  Source was aware of
an individual named David who worked for PRIMECO who for $1,000.00,
could obtain telephone numbers and addresses for people.  Source
then borrowed $500.00 from a friend and convinced David to provide
a telephone number as well as an address for JAMES and that the
Source would pay David the remaining $500.00 later.  David then
gave the Source a cellular telephone number that was supposed to be
used by JAMES and an address for TOMIKA ADDISON, the subscriber of
the phone.  The Source then spent approximately one week going by
the house at all hours of the day and night in an attempt to locate

O142

FD-302a (Rev. 10-6-95)

270F-CG-117142-A; 281C-CG-117362-BC1

Continuation of FD-302 of ___Source_____ , On _08/28/2002_ , Page _8_

JAMES, without success.  In addition, the Source called the number
provided to him by David and was able to reach JAMES.  After
repeated telephone calls to JAMES, JAMES finally agreed to help the
Source with the situation with Jorge and Primo by providing either
all or at least some of the money owed.

    JAMES told the Source that the marijuana he stole from
the Source was of poor quality and that had he paid for the
marijuana as they had agreed, he would have been out of the money
because the drugs would not have been of a good enough quality to
sell.  The Source continued to call JAMES, a begged him to pay some
amount of money, even if it was only $5,000.00 to $10,000.00
because Jorge and Primo were on his back over the debt.  The Source
told JAMES that Jorge and Primo had threatened him and his family
over the debt, and told JAMES that if anything was to happen to his
family, then he would do something in return to JAMES. [1] On several
occasions JAMES suggested that he  could provide the Source with
counterfeit money that the Source could use to rip off drugs from a
dealer, then the Source could sell the drugs for cash to pay off
his debt. The Source recalled calling JAMES from several telephones
including (773) 580-7585, (312) 286-5618 and (773) 255-0485.

    Source then approached several Chicago Police Department
(CPD) Officers who were friends of his sister.  These officers in
turn introduced the Source to a Drug Enforcement Administration
(DEA) Agent who told the Source that due to his pending state
narcotics case, the DEA would not be willing to work with him.  It
was at that time, in November of 2001, that the Source walked into
the offices of the FBI in Chicago and asked to speak with Agents.

    Source related that just prior to approaching the FBI, he
spoke with a friend named GUADALUPE OVALLE, whom the Source knew to
be involved in selling both cocaine and marijuana.  The Source
asked OVALLE if he could obtain between five and seven kilograms of
cocaine and entered into negotiations with both OVALLE and his
supplier to conduct the deal.  The Source explained that he felt
that he needed to have a couple of cases lined up with people he
knew were involved in drug trafficking in order to convince the FBI
to work with him.

0143

"**EXHIBIT**, MAY 16, 2002 F.B.I LETTER TO
PROSECUTORS"
"2 PAGES"



U.S. Department of Justice

Federal Bureau of Investigation

In Reply, Please Refer to
File No.

FBI Chicago Division
219 S. Dearborn, #905
Chicago, Il 60604
May 16, 2002

Honorable Patrick J.  Fitzgerald
United States Attorney
219 South Dearborn, #500
Chicago, Illinois 60604

Attn: Valerie Hays
      Assistant United States Attorney

        Re: Code Name: Matador

Dear Mr. Fitzgerald:

        The purpose of this letter is to provide the requested
information AUSA Valerie Hays of your office has asked of Special
Agent Frank Jack Sodetz III of our office regarding the
referenced individual.

        The referenced cooperating witness "Matador" was
arrested on June 29, 2001 by the Northbrook Police Department
while in possession of approximately 125 grams of cocaine.  That
State of Illinois criminal case number is 01MC220422401 and is
still pending resolution.  "Matador's" arrest in that case was
prior to his cooperation with the Federal Bureau of Investigation
(FBI).

        The FBI has made no promises to "Matador" that
cooperation in any FBI investigations will aid in resolution of
the above pending state case, nor have promises of monetary
compensation been made.

        To date, as a result of FBI cases "Matador" has
assisted with, "Matador" has been paid a total of $6,000 for
expenses incurred and $6,000 for services provided.

        The FBI is not aware of any history of substance abuse,
alcohol abuse, or mental illness for "Matador".

                        Sincerely,

0148

Thomas J. Kneir
Special Agent in Charge

By:
Thomas J. Van Nuys
Supervisory Special Agent

2

0146

**"EXHIBIT,** <u>INFORMANT'S CRIMINAL HISTORY</u>
<u>REPORT"</u>

0147

This Exhibit will be submitted as a separate report.

"**EXHIBIT**, AGENT MCKENNA STATEMENT AT
SUPPRESSION HEARING"
"1 PAGE"

0149

43

McKenna - cross

1          THE COURT:  Did the case -- could the case -- was

2     the case agent with you the whole time?

3          THE WITNESS:  No, sir.

4          THE COURT:  So is it possible he transferred him

5     downtown?

6          THE WITNESS:  It is a possibility, sir.  I am not

7     sure who transported Mr. James.

8          THE COURT:  Okay.  Thanks.

9          MS. CAROTHERS:  Thank you.

10         THE COURT:  Sorry.

11    BY MS. CAROTHERS:

12    Q.  After Mr. James signed this form at 2:07 p.m., did you

13    then begin to ask him questions about the subject of

14    counterfeiting?

15    A.  Yes, ma'am.

16    Q.  Did you ask him questions regarding the question of

17    cocaine?

18    A.  No, ma'am.

19    Q.  Were you primarily concerned with the counterfeiting?

20    A.  I told him that the purpose of my interview was to find

21    out where the counterfeit came from or who gave him the

22    counterfeit or how it was manufactured.

23    Q.  And when you spoke with him, you asked him questions?

24    A.  Yes, ma'am.

25    Q.  He gave you answers?

"**EXHIBIT**, <u>AGENT NEWBERG STATEMENT AT
SUPPRESSION HEARING</u>"
"1 PAGE"

Newberg - cross

1    THE WITNESS:  They usually -- drugs and counterfeit

2    usually go hand in hand.  Not in all caseas but in many cases

3    they do.

4        THE COURT:  And would you guess you have worked on

5    half a dozen such cases?

6        THE WITNESS:  Yes, sir.

7        THE COURT:  And in any of those cases have you

8    focused on one alleged crime to the exclusion of the other?

9        THE WITNESS:  No, sir.

10       THE COURT:  In terms --

11       THE WITNESS:  We -- we -- I mean we do not -- we do

12   not have jurisdiction over drugs.  Our main concentration is

13   counterfeit.  That is what I am assigned to, is counterfeit.

14   But any type of crimes that occur also, we do take concern of

15   that and we advise the appropriate agencies that are involved

16   with that jurisdiction.

17       THE COURT:  So you have general law enforcement

18   powers?

19       THE WITNESS:  That's correct, sir.

20       THE COURT:  And if in the process of investigating a

21   counterfeit currency situation you encounter some other

22   criminal behavior, is it ever your practice to advise anybody

23   that the other criminal behavior is not the concern of law

24   enforcement?

25       THE WITNESS:  No, sir.

0152

"**EXHIBIT**, <u>DEFENDANT'S WRITTEN STATEMENT</u>"
"4 PAGES"

CITY OF _CHICAGO_ )    DATE _MARCH 25, 2002_

COUNTY OF _COOK_ ) ss:

STATE OF _ILLINOIS_ )    TIME _3:00pm_

I, _DONNIE JAMES_, am _31_ years of age.
I know that I am talking to _SA McKENNA - SA DICK_ and
themselves/himself/herself to me as a Special Agent(s) of the U.S.
Secret Service. No promises or threats have been made to me. I
understand and know what I am doing, and I wish to make the fol-
lowing statements freely and voluntarily.

Approximately two weeks ago I met dale
through one of my friend from school
Brian Smith who told me that dale could
get some counterfeit money that he wanted
to do business with. He dale ask me
if I know any one with heroin. He
wanted to buy heroin with the
counterfeit. I told him I doesn't
know any one with heroin but I
know someone with cocain. We
were to make an exchange for
15 keys of cocain for the

I was to give 1 of 4
allen the counterfeit and allen told me, he
allen was going to get cocain with
the counterfeits.

Counterfit I took Some of the Counter fill and put papers in between them to make it look like three hundred thousand dollars. I met Dale about two weeks ago. he took me to his Condo and show me Some of the Counterfit and told me he Could get any amount I wanted. But the wise $35,000 for each hundred thousand. I then get in touch with ellen and ask him if he Can get any heroin and he said he Can get Cocaine. We decided to do a Cocaine Transaction for three hundred thousand. Dale told me that he would have know problem getting rid of the Cocaine. but what he really wanted is heroin. Dale is a male Black. he is about 5'11", 210 pound. he Stays off ygtos and exchange. he drove limo for Chicago limo. He also said he is a member of the gangster Desiples.

se Meaning
gos going
give g
in the
underfold
if he was
try to get
my self
cain
hush he
ti me
the I
will help
in sell.

2 OF 4

Yesterday I met dale at the corner of egate and exchange. he gave me a bag with the counterfill. He was driving a ble limo. He said there should be about $100,000 in the bag. He agreed to give me $300,000, But only took $100,000 that he said was in the bag. And I put th cut papers in between what he gave me to let it look like it was $300,000. Today I cald allen to make this exchange of the the for $300,000 in counterfill for the fifteen trays of Cocain. He told me to me him and mc Donald to make the exd The counterfill money was in my girlfriends car (Tuneka addison). I told her to follow me to mcDonald. In the parking lot of the branch yard mall I met up with allen and he put a bag in the c That I was driving It was a red monte Carlo The bag that allen put in the car had the cocain in it.

3 of 4

After allen drop of the mes in the car
he said he would not wait when the
police came, and arrest me

This statement is true and correct to the best of my knowledge.  I
have been given an opportunity by Special Agent William McKenna
_____ to make any additional and/or correc-
tions to my statement.

They ast me what he said, I told
Them he didn't say anything. He just put
the bag in the car
and walk away
They told me to write the last sentence
and took the paper, and said thats good enough

Signature

The tape that he was wearing will
show that he didn't say anything at all
SIGNED AND SWORN TO    When he come to the car.

Before ME THIS 25th

Day of March 19 2002.

Authority to Administer Oaths:

Title 5, Section 303, U.S. Code

WITNESS:

SA William McKen

4 OF 4

0157

"**EXHIBIT**, <u>F.B.I FD-302 INVESTIGATED ON 3/25/2002</u>"
"3 PAGES"

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   03/28/2002

        A source, who is in the position to testify, provided the
following information:

        The source, who previously agreed to participate in
consensual recorded conversations, met with an individual known to
the source as JAMES Last Name Unknown (LNU) at the MCDONALD'S
RESTAURANT, located at the Intersection of West Diversey and North
Narragansett, Chicago, Illinois, to conduct a narcotics
transaction.

        At approximately 10:10 a.m., the source telephonically
contacted JAMES LNU at telephone number: (847)409-6737.  The source
told JAMES LNU to meet him at the MCDONALD'S RESTAURANT, located at
the BRICKYARD MALL on West Diversey and North Narragansett.  In
this conversation, JAMES LNU told the source that he was
approximately fifteen minutes from the downtown area and would call
the source when he was near the MCDONALDS.

        At approximately 11:00 a.m., JAMES LNU telephonically
contacted the source and told the source that he was in the
vicinity of the Kennedy Expressway and North Avenue, and would call
again when he was nearby.

        At approximately 11:06 a.m., a concealed recording device
and a transmitting device were activated by the author Agent and
placed on the source.  The source then went to and parked in the
parking lot of the MCDONALD'S RESTAURANT, located at West Diversey
and North Narragansett, Chicago, Illinois.  A short time later,
JAMES LNU telephonically contacted the source and asked the source
to meet him at the WALGREENS at Fullerton and Central.  The source
told JAMES LNU that he was going to stay at the MCDONALDS.  A few
minutes later, JAMES LNU telephonically contacted the source and
told the source that he was near the BURGER KING RESTAURANT at West
Fullerton Avenue and North Narragansett, and wanted the source to
meet him there.  The source told JAMES LNU that he was going to
stay at the MCDONALD'S RESTAURANT because he was going to get
something to eat and asked JAMES LNU to meet at the MCDONALDS
instead.

---

Investigation on   3/25/2002   at  Chicago, Illinois          (telephonically)

File #  270F-CG-117142-A; 281C-CG-117362-BC1      Date dictated  3/26/2002

by    SA FRANK L. DEPODESTA:mkc

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

0189

(Rev. 10-6-95)

270F-CG-117142-A; 281C-CG-117362-BC1

Continuation of FD-302 of _____SOURCE_____ , On 3/25/2002 , Page 2

     Shortly thereafter, JAMES LNU arrived at the MCDONALD'S RESTAURANT in a red colored Monte Carlo. JAMES LNU parked nearby the source and asked the source to get into his car. Once inside the car, JAMES LNU told the source that he was going to bring him to show him the counterfeit money. JAMES LNU, using his cellular telephone, called someone and asked them to bring the counterfeit money. JAMES LNU then pointed to a tan colored NISSAN Altima parked on North Narragansett, and told the source that was the car that contained the money. They pulled out of the MCDONALD'S parking lot and parked directly behind this same NISSAN Altima that was parked on North Narragansett. The NISSAN Altima was occupied by one person. The trunk of the NISSAN Altima was opened. JAMES LNU showed the source a black suitcase style bag in the trunk of the Altima which contained a large quantity of what appeared to be U.S. currency. Much of the currency appeared to be in $50 and $100 bills. The plate of the NISSAN Altima started with "J54."

     After looking at the money, JAMES LNU and the source got back into JAMES LNU's car and traveled back to the MCDONALD'S RESTAURANT. The source asked JAMES LNU how much he paid for this counterfeit money and JAMES LNU responded that he paid $40,000.00 in real U.S. currency for $300,000.00 in fake U.S. currency. JAMES LNU told the source that the source should not worry that he was not going to try and rip him off.

     The source told JAMES LNU that he spoke with the person who was going to supply them the fifteen kilograms of cocaine and said that the kilograms of cocaine were separated in multiple cars in the area. The source told JAMES LNU that he was going to depart and retrieve the first five kilograms of cocaine from a vehicle nearby. JAMES LNU told the source that he wanted to obtain at least ten kilograms of cocaine before he provided the counterfeit money to the source.

     The source then departed to retrieve the first five kilograms of cocaine. While en route, JAMES LNU telephonically contacted the source and again told the source that he (the source) could trust him (JAMES LNU) with the first five kilograms of cocaine. The source retrieved the first five kilograms of cocaine from a government vehicle that the author Agent had instructed the source would contain the cocaine. The source then traveled back to MCDONALDS with the five fake kilograms of cocaine. The source parked in the same area that he had parked before.

0160

(Rev. 10-6-95)

270F-CG-117142-A; 281C-CG-117362-BC1

Continuation of FD-302 of _____SOURCE_____ .On _3/25/2002___ . Page __3_

      JAMES LNU pulled behind the source and popped the trunk
of his (JAMES) car.  Prior to the source being able to place the
five kilograms of fake cocaine into JAMES LNU's trunk, JAMES pulled
away departing the MCDONALD'S parking lot.  JAMES LNU then
telephonically contacted the source and told the source that there
was a white van parked nearby that seemed suspicious.  JAMES LNU
asked the source to come to the adjacent parking lot at the JEWEL
and give him the five kilograms of cocaine there.

      The source departed the MCDONALD'S parking lot and
traveled to the JEWEL parking lot, parking near JAMES LNU's
vehicle.  The source carried the five fake kilograms of cocaine to
JAMES LNU's vehicle and approached the passenger side.  The source
pulled one of the fake kilograms of cocaine from the bag and handed
it to JAMES LNU.  JAMES LNU said that it looked okay and gave it
back to the source to put back in the bag.  The source then placed
the bag containing the five fake kilograms of cocaine onto the
passenger seat of JAMES LNU's vehicle.  JAMES LNU retrieved another
one of the fake kilograms of cocaine from the bag, looked at it,
and placed it back into the bag.  JAMES LNU told the source that
when the source retrieved an additional five kilograms of cocaine
he would then provide the source with the counterfeit money.  JAMES
LNU then told the source something to the extent that, "I don't
have to use my gun then, right."  The source responded, "No," and
then walked away.  As the source walked away he (source) observed
Agents pulling behind JAMES LNU's vehicle.  As soon as the Agents
pulled behind JAMES LNU's vehicle, JAMES LNU pulled away and was
struck by one of the Agent's vehicles.

      The source then traveled to a nearby location and waited
for the author Agent.  At approximately 12:30 p.m., the concealed
recording device and transmitting device were retrieved by the
author Agent and deactivated.

O161

# "EXHIBIT, DISPOSITION OD EVIDENCE, DATED 6/4/02 AT 3:57 PM"
## "1 PAGE"

ONE (1) SMITH AND WESSON S...I AUTOMATIC PISTOL MAGAZINE, SILVER IN COLOR WITH BLACK COLORED BUTT PLATE, HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000438.

FIFTEEN (15) 9MM ROUNDS, TEN (10) HOLLOW POINT ROUNDS AND FIVE (5) BALL ROUNDS, HAVE BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000438.

ONE (1) MAXWELL C45 CASSETTE TAPE CONTAINING A CONSENSUAL TELEPHONE CALL BETWEEN JAMES DONVILLE AND THE CRIMINAL INFORMANT ON 3/24/02, 10 MINUTES IN LENGTH, HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000443.

ONE (1) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ON THE CRIMINAL INFORMANT BY THE FEDERAL BUREAU OF INVESTIGATION ON ▓▓▓▓▓ HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000442.

ONE (1) COMPACT DISC, CONTAINING A RECORDING OF THE CONVERSATION BETWEEN JAMES AND THE CRIMINAL INFORMANT, ON 3/21/02, APPROXIMATELY 41 MINUTES IN LENGTH, HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000446.

ONE (1) XEROX WORKCENTRE M940 COPIER/SCANNER SERIAL #PTO092780, HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000457.

ONE (1) COMPAQ C31000 COPIER/ SCANNER SERIAL #5G0ADGZHJB8, HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000457.

ONE (1) DELL CPU TOWER DIMENSION XPS D300 SERIAL #BG6DD MODEL MMP, HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000457.

ONE (1) QUARTET 12" PAPER CUTTER MODEL 9112, HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000457.

ONE (1) LEXMARK BLACK HIGH RESOLUTION STANDARD PRINT CARTRIDGE 12A1970, HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000457.

ONE (1) LEXMARK COLOR HIGH RESOLUTION STANDARD PRINT CARTRIDGE 12A1980, HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000457.

TWO (2) XEROX BLACK INK CARTRIDGE Y100, HAVE BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000457.

TWO (2) XEROX CYAN INK CARTRIDGE Y101, HAVE BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000457.

TWO (2) XEROX MAGENTA INK CARTRIDGE Y102, HAVE BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000457.

ONE (1) 1LB BAG OF ALLIANCE STERLING RUBBER BANDS, HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000457.

ONE (1) BAG OF PRINTING SCRAPS, HAS BEEN INVENTORIED ON SSF 1544 SERIAL NUMBER 2012002CE000453.

TWO (2) POLAROID PHOTOGRAPHS, TAKEN BY SA JOHN MCCABE, OF A BLACK BAG CONTAINING COUNTERFEIT CURRENCY IN THE TRUNK OF TAMEKA ADDISON'S NISSAN ALTIMA HAVE BEEN INVENTORIED ON SSF 1544, SERIAL NUMBER 2012002CE000452.

THREE (3) POLAROID PHOTOGRAPHS, TAKEN BY MYSELF, OF A BLACK BAG CONTAINING FIVE (5) FAKE KILOGRAMS OF COCAINE IN THE PASSENGER SEAT OF DONVILLE JAMES' 2002 CHEVY MONTE CARLO, HAVE BEEN INVENTORIED ON SSF 1544, SERIAL NUMBER 2012002CE000452.

TWO (2) POLAROID PHOTOGRAPHS, TAKEN BY MYSELF, OF A FIREARM ON THE FLOORBOARD OF THE DRIVER'S SEAT OF JAMES' 2002 CHEVY MONTE CARLO,

"**EXHIBIT**, <u>CERTIFIED INVENTORY OF EVIDENCE,
MARCH 25, 2002 INFORMANT BODY WIRE</u>"
"1 PAGE"

EXHIBIT "D"

COPY

| CERTIFIED INVENTORY OF EVIDENCE | | | SERIAL NUMBER 201 2002 CE 000442 | |
|---|---|---|---|---|

| EVIDENCE HELD AGAINST | ☐ SPECIMEN | CASE NO. 201-735-0131941-S |
|---|---|---|
| JAMES DONVILLE | | OFFICE CHICAGO FIELD OFFICE |

| EVIDENCE INVENTORIED BY | | |
|---|---|---|
| DANIEL A. DICK | 3/25/02 | DATE OF INVENTORY 03/25/02 |
| SIGNATURE - SPECIAL AGENT | DATE | PAGE 1 OF 2 PAGES |

REVIEWING SUPERVISOR

| MICHAEL J. NEWBERG | 03/25/02 |
|---|---|
| SIGNATURE - WITNESS | DATE |

GLENN R. WESTLUND 3/25/02
SIGNATURE DATE

I certify the evidence described in the page(s) of this inventory, not otherwise disposed of per attached documentations, was verified for final retention at: ☐FSD ☐CFT.

SIGNATURE - DIVISION                    DATE

| ITEM NO. | DATE RECEIVED | QUANTITY | DESCRIPTION OF EVIDENCE | VALUE |
|---|---|---|---|---|
| 1 | 03/25/02 | 1 | THE BELOW LISTED ITEM WAS RECOVERED FROM AGENT DEPODESTA OF THE FEDERAL BUREAU OF INVESTIGATION ON 3/25/02. MARKED FOR IDENTIFICATION: "DD 3/25/02" (SA DANIEL DICK). COMPACT DISC, APPROXIMATELY 41 MINUTES IN LENGTH. COMPACT DISC IS CONTAINED IN A JEWEL CASE. | NO VALUE |
| | | | TOTAL ⟶ | NO VALUE |

SSF 1644 (03/86)

UNITED STATES SECRET SERVICE

(A) ORIGINAL WITH SIGNATURES TO CASE FILE
(B) 1 COPY TO REMAIN WITH EVIDENCE AT ALL TIMES
(C) 1 COPY TO ADMINISTRATIVE FILE 710.101
(D) 1 COPY TO WORK FILE

FINAL
AM

0165

"**EXHIBIT**, <u>CERTIFIED INVENTORY OF EVIDENCE,
MARCH 25, 2002 MINI DIGITAL VIDEO</u>"
"1 PAGE"

**COPY**

| CERTIFIED INVENTORY OF EVIDENCE | | SERIAL NUMBER |
|---|---|---|
| | | 201 2002 CE 000454 |

| EVIDENCE HELD AGAINST | ☐ SPECIMEN | CASE NO. |
|---|---|---|
| JAMES DONVILLE | | 201-735-0131941-S |

| | OFFICE |
|---|---|
| | CHICAGO FIELD OFFICE |

| EVIDENCE INVENTORIED BY | | DATE OF INVENTORY | PAGE 1 OF 2 PAGES |
|---|---|---|---|
| MICHAEL J. NEWBERG | 03/25/02 | 03/25/02 | |
| SIGNATURE - SPECIAL AGENT | DATE | | |

REVIEWING SUPERVISOR

GLENN R. WESTLUND   3/25/02
SIGNATURE                    DATE

| DANIEL A. DICK | 3/25/02 |
|---|---|
| SIGNATURE - WITNESS | DATE |

I certify the evidence described in the page(s) of this inventory, not otherwise disposed of per attached documentations, was verified for final retention at:    ☐FSD   ☐CFT.

SIGNATURE - DIVISION                    DATE

| ITEM NO. | DATE RECEIVED | QUANTITY | DESCRIPTION OF EVIDENCE | VALUE |
|---|---|---|---|---|
| 1 | 03/25/02 | 1 | THE BELOW LISTED ITEM WAS PRODUCED BY AN FBI SA ON 03/25/02 DURING A SURVEILLANCE/ARREST OPERATION.  THIS ITEM WAS TRANSFERRED TO SA ROBYN FIELD OF THE USSS CHICAGO FIELD OFFICE ON 03/25/02.

MARKED FOR IDENTIFICATION: "DD 03/25/02" (SA DICK).

MAXWELL MINI DIGITAL VIDEO CASSETTE IN CASE LABELED "JAMES REVERSE BUY/BUST 03/25/02" | NO VALUE |
| | | | TOTAL ⟶ | NO VALUE |

UNITED STATES SECRET SERVICE

SSF 1644 (03/86)

(A) ORIGINAL WITH SIGNATURES TO CASE FILE
(B) 1 COPY TO REMAIN WITH EVIDENCE AT ALL TIMES
(C) 1 COPY TO ADMINISTRATIVE FILE 710.101
(D) 1 COPY TO WORK FILE

FINAL
TM

0167

"**EXHIBIT**, <u>CERTIFIED INVENTORY OF EVIDENCE,
MARCH 24, 2002 AUDIO RECORDING</u>"
"1 PAGE"

EXHIBIT "F"  COPY

| CERTIFIED INVENTORY OF EVIDENCE | | SERIAL NUMBER 201 2002 CE 000443 | | |
|---|---|---|---|---|

EVIDENCE HELD AGAINST    ☐ SPECIMEN

JAMES DONVILLE

EVIDENCE INVENTORIED BY

DANIEL A. DICK                    3/25/02
SIGNATURE - SPECIAL AGENT        DATE

MICHAEL J. NEWBERO              03/25/02
SIGNATURE - WITNESS              DATE

CASE NO.    201-735-0131941-S

OFFICE
CHICAGO FIELD OFFICE

DATE OF INVENTORY
03/25/02        PAGE    1    OF    2    PAGES

REVIEWING SUPERVISOR :

GLENN R. WESTLUND              3/25/02
SIGNATURE                      DATE

I certify the evidence described in the page(s) of this inventory, not otherwise disposed of per attached documentations, was verified for final retention at:    ☐ FSD    ☐ CFT.

SIGNATURE - DIVISION                          DATE

| ITEM NO. | DATE RECEIVED | QUANTITY | DESCRIPTION OF EVIDENCE | VALUE |
|---|---|---|---|---|
| 1 | 03/24/02 | 1 | THE BELOW LISTED ITEM WS RECOVERED FROM AGENT DEPODESTA OF THE FEDERAL BUREAU OF INVESTIGATION ON 3/25/02.  MARKED FOR IDENTIFICATION:  "DD 3/25/02" (SA DANIEL DICK).  CASSETTE TAPE MAXWELL C45, A SIDE LABELED "3/24/02 JAMES DONVILLE, 603PM-613PM COOPERATING WITNESS," B SIDE LABELED "CASE #201-735-131941-S" | NO VALUE |
| | | | TOTAL ——> | NO VALUE |

SSF 1544 (03/86)

UNITED STATES SECRET SERVICE

(A)  ORIGINAL WITH SIGNATURES TO CASE FILE
(B)  1 COPY TO REMAIN WITH EVIDENCE AT ALL TIMES
(C)  1 COPY TO ADMINISTRATIVE FILE 710.101
(D)  1 COPY TO WORK FILE

FINAL
AM

0169

"**EXHIBIT**, <u>CERTIFIED INVENTORY OF EVIDENCE,
MARCH 21, 2002 INFORMANT BODY WIRE</u>"
"1 PAGE"

EXHIBIT "E"  COPY

| CERTIFIED INVENTORY OF EVIDENCE | SERIAL NUMBER |
|---|---|

**SERIAL NUMBER**
201 2002 CE 000446

**EVIDENCE HELD AGAINST**  ☐ SPECIMEN

JAMES DONVILLE

**CASE NO.**
201-735-0131941-S

**OFFICE**
CHICAGO FIELD OFFICE

**EVIDENCE INVENTORIED BY**

DANIEL A. DICK        03/25/02
SIGNATURE - SPECIAL AGENT    DATE

MICHAEL J. NEWBERG      03/25/02
SIGNATURE - WITNESS      DATE

**DATE OF INVENTORY**
03/25/02        PAGE  1  OF  2  PAGES

**REVIEWING SUPERVISOR**

GLENN R. WESTLUND      3/25/02
SIGNATURE          DATE

I certify the evidence described in the page(s) of this inventory, not otherwise disposed of per attached documentations, was verified for final retention at:  ☐FSD  ☐CFT.

SIGNATURE - DIVISION          DATE

| ITEM NO. | DATE RECEIVED | QUANTITY | DESCRIPTION OF EVIDENCE | VALUE |
|---|---|---|---|---|
| 1 | 03/25/02 | 1 | THE BELOW LISTED ITEM WAS RECOVERED FROM AGENT DEPODESTA OF THE FEDERAL BUREAU OF INVESTIGATION ON 03/21/02.  MARKED FOR IDENTIFICATION: "DD 03/21/02" (SA DICK).  COMPACT DISC, WHITE IN COLOR, LABELED WITH "CASE #201-735-131941-S", DATED 03/21/01 CONTAINED IN A JEWEL CASE. | NO VALUE |
| | | | TOTAL ⟶ | NO VALUE |

UNITED STATES SECRET SERVICE                SSF 1544 (03/86)

(A) ORIGINAL WITH SIGNATURES TO CASE FILE
(B) 1 COPY TO REMAIN WITH EVIDENCE AT ALL TIMES
(C) 1 COPY TO ADMINISTRATIVE FILE 710.101
(D) 1 COPY TO WORK FILE

FINAL
TM

8/15/02

0171

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA    )
                             )
            v.               )        No. 02 CR 0278
                             )        Judge Wayne R. Andersen
DONVILLE JAMES               )

**MOTION FOR NEW TRIAL AND/OR JUDGMENT OF ACQUITTAL**

Defendant, DONVILLE JAMES, by his attorney, Anita Rivkin-Carothers,

pursuant to the provisions of Rule 29 (c)and Rule 33 moves for this Court for a new trial

and/or a judgment of acquittal. In support thereof on the following is offered:

1    The Court erred in denying James' motion to suppress statements and to

suppress evidence where the testimony adduced at hearing showed that at the time the

statement and consent to search were made the agent suggested that James cooperate

and work off this case. This type of discussion supports the argument that James'

statement was not freely and voluntarily given, but rather was given in exchange for a

promise. ~~Mr. James was precluded from presenting his entrapment~~ ~~The Court erred in ruling~~ that James had not made a sufficient pretrial ~~defense where the ruled~~

showing of entrapment to warrant the presentation of jury instructions for the defense of

entrapment.

3.    There was a lack of credible evidence that James possessed or carried a

firearm during or in relation to a crime. Mr. James "confession" does not reference a gun.

The agent went back days after the "confession" and inserted in the middle of his report, a

statement that Mr. James admitted having a gun for protection. The fingerprint examiner

found no prints on the gun, the magazine or the bullets. There are conflicting statements

from witnesses that (1) the gun had to be made safe, although Mr. James was said to have

been cooperative and was outside of the car before the agents recovered a gun; (2) that the

gun was not seen by agents who saw the bag of fake drugs; (3) that the gun was under a

floormat, where no floormat was shown in the photographs taken at the time of arrest; (4)

that the informant had been in James' car and no agent saw him when he got into the car;

(5) there was no testimony that James attempted to use a weapon during the events of

March 25, 2002.

4.    The government failed to prove the all of the elements of Count III where

it failed to prove that James intended to defraud anyone. The informant asked for

counterfeit money; the informant knew the money was counterfeit; James never

concealed the fact that the currency was falsely made, as it was made to the informant's

specific request for counterfeit money. The informant expected nothing of value and he

gave nothing of value.

5.    The evidence presented is insufficient to sustain a conviction and

reasonable minded juror could not find this defendant guilty beyond a reasonable doubt

considering the lack of credibility evidence , particularly regarding the gun.

6.    A motion for judgment of acquittal should be granted where the relevant

evidence is insufficient to prove all elements of the allegations in the indictment. *United

States v. Beck, 615 F. 2d 441 (7th Cir. 1980).*

*2*

0173

WHEREFORE, for all of the foregoing reasons Defendant DONVILLE JAMES

respectfully requests this Court to enter a judgment of acquittal or grant him a new trial.

Respectfully submitted,

_____
Attorney For Donville James

Anita Rivkin-Carothers
33 North LaSalle Street
Suite 3300
Chicago, IL 60602
Tel: (312) 641-2901
Fax: (312) 332-3179

3

0174

RECEIVED

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

OCT 07 2002

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 02 CR 278 |
| v. | ) | Judge Wayne R. Andersen |
| | ) | |
| DONVILLE JAMES | ) | |

## MOTION FOR A NEW TRIAL AND/OR JUDGMENT OF ACQUITTAL

Defendant Donville James, by his attorney, Anita Rivkin-Carothers, pursuant to the provisions of Rule 29 (c) and Rule 33, moves this Court for a new trial and/or for a judgment of acquittal. In support thereof the following is offered:

1. The Court erred in denying Mr. James' motion to suppress statements and evidence, where the testimony adduced at hearing showed that at the time the statement was made and the consent to search were signed, the agent suggested that James cooperate and work off his case. This type of discussion supports the assertion that James' statement was made in exchange for a promise, and was not free and voluntary as anticipated by the constitutional guarantees of the fifth and sixth amendments.

2. Mr. James was affectively precluded from presenting his entrapment defense where the Court ruled pretrial that defendant's proffer was insufficient to support entrapment.

3. The evidence presented that Mr. James possessed or carried a firearm during or in relation to a crime, was insufficient to support a conviction beyond a reasonable doubt where the testimony of law enforcement agents and the fingerprint examiner was contrary to human experience and was unworthy of belief.

First, Agent McKenna testified that during his interview with Mr. James, James

0115

told him that he had the gun for personal protection. This alleged admission of possessing a gun is contained nowhere in Mr. James handwritten and signed statement, even though Agent McKenna testified that Mr. James handwritten statement was consistent with what he had originally written and with what Mr. James told him. The alleged admissions of possessing a gun is contained nowhere in Agent McKenna's first report. See Exhibit A, attached hereto and made a part hereof. According to Agent McKenna, he amended his report a few days after the original report. What is unusual and striking about this amended report is that Agent McKenna does not suggest that the report is amended or supplemented. Instead, there is an unusual addition to the report which places this admission regarding the gun in the middle of the statement. Why would the agent not prepare a supplemental report, or at the very least indicate on his new/ amended report that there were changes or additions to the report and     date of the amendments or additions? Instead, the report is left to appear that it is not a supplemental or amended report at all, but a report prepared all at the same time. of See Exhibit B attached hereto and made a part hereof.

Second, the testimony by the fingerprint examiner that she found "no prints" on the gun, the magazine or the bullets is interesting in light of her written report which states that "No latent prints suitable for identification purposes were present or developed...". No prints suitable for comparison is a very different scenario from the total absence of fingerprints, which is what her testimony was. The fingerprint examiner was then led to testify to reasons that a gun might not have fingerprints. One of the reasons she proposed was that if the gun was kept under a mattress it probably would

O176

have "no prints"...that may be the case for the gun, but human experience tells us that the magazine and the bullets would not be subject to "loss to the mattress" proposition. However, this improbable testimony conveniently set the stage for the testimony by Agent Lucas who told the jury that he found the gun under the car floormats. The rare possibility that a gun found under a floormat would have no fingerprints, still presents the question of why no fingerprints are recovered from the magazine or the bullets. One logical and human experience reason for the gun, the magazine and the bullets to be totally devoid of fingerprints might be that they were carefully wiped away by the agents before they were sent for examination.

Third, there was the suspect testimony of Agent Lucas, piggybacking onto the testimony by the fingerprint examiner, stating that he recovered the gun from underneath the floormat. However, photographs taken at the scene, within minutes of the incident showed no floormats, inside of the car nor outside of the car. This was clearly a rental car, not a luxury vehicle, and there was no credible evidence that floormats were ever present in that car.

Fourth, other agents testified that the gun may not have been handled in a way to preserve fingerprints because the gun had to be made safe. This proposition is nonsensical because Mr. James was already outside of the car and was cooperative in his arrest, before the agent(s) recovered the gun. There was no rational reason to disturb fingerprint evidence which may have been present on that gun.

Fifth, the gun was not seen by agents who went to the car, saw the bag of fake drugs and took photographs of the bag of fake drugs and the gun.

3

O177

Sixth, the gun was removed, presumably by Agent Lucas, then staged for photography as was the bag of fake drugs and the gun. According to the agents' testimony, the fake drugs and the gun were placed where they were found for evidentiary purposes. If that is the case, where was the floormat? Why did the photograph not show a floormat being held by an agent, lifting this floormat to show where the gun was?

Seventh, the informant had been in Mr. James car, but no agent ever saw him enter the car. They saw on the videotape that there were two people in the car and figured out that the person was the informant.

Eighth, there was no testimony or evidence that Mr. James ever attempted to use the gun during the events of March 25, 2002. Although the government alleged in various pleadings that Mr. James made a statement to the effect "I won't have to use my gun" no such statement was preserved on the recorder worn by the informant or by the agent who claims to have failed to activate the transmitter, by accident.

4.    The government failed to prove all of the elements of Count III where it failed to prove that Mr. James intended to defraud anyone. The informant asked for counterfeit money; the informant knew that the money was counterfeit; Mr. James never concealed the fact that the currency was counterfeit, as it was made to the informant's specific request for counterfeit money. The informant expected nothing of value, and he gave nothing of value.

5.    The evidence presented is insufficient to sustain a conviction, and reasonable minded jurors could not find this defendant guilty beyond a reasonable dount considering the lack of credible evidence.

4

6.    A motion for judgment of acquittal should be granted where the relevant evidence is insufficient to prove all elements of the allegations in the indictment. *United States v. Beck. 615 F. 2d 441 (7th Cir. 1980).*

WHEREFORE, for all of the foregoing reasons, and for those reasons argued before trial and during trial, Donville James respectfully requests this Court to enter a judgment of acquittal or grant him a new trial.

Respectfully submitted,
DONVILLE JAMES

By: _____
Attorney For Defendant

Anita Rivkin-Carothers
33 North LaSalle Street
Suite 3300
Chicago, IL 60602
Tel: (312) 641-2901
Fax:(312) 332-3179

5

0179

**RECEIVED**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

OCT 1 8 2002

MICHAEL W. DOBBINS
CLERK, U. S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 02 CR 278 |
| v. | ) | Honorable Wayne R. Andersen |
| | ) | |
| DONVILLE JAMES | ) | |

## NOTICE OF FILING

### BY U.S. MAIL & FACSIMILE

TO:    Anita Rivkin-Carothers
       33 North LaSalle Street
       Chicago, IL 60602

       PLEASE TAKE NOTICE that on Friday, October 18, 2002, I will cause to be filed with the Clerk of this Court the following document in the above captioned case: **GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR A NEW TRIAL AND/OR JUDGMENT OF ACQUITTAL** and service of which is being made upon you.

                         Respectfully submitted

                         PATRICK J. FITZGERALD
                         United States Attorney

              By:   _Valarie Hays_
                         **VALARIE HAYS**
                         Assistant U.S. Attorney
                         219 S. Dearborn Street, 5th floor
                         Chicago, IL 60604
                         (312) 353-5356

## CERTIFICATE OF SERVICE

       I, Valarie Hays, an Assistant United States Attorney, state that on October 18, 2002, I caused a copy of Notice of Filing and **GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR A NEW TRIAL AND/OR JUDGEMENT OF ACQUITTAL,** to be sent by U.S. MAIL & FACSIMILE delivered to the above named individual(s) on said date.

                         _Valarie Hays_
                         **VALARIE HAYS**
                         Assistant United States Attorney

O 180

RECEIVED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

OCT 1 8 2002

MICHAEL W. DOBBINS
CLERK, U S. DISTRICT COURT

UNITED STATES OF AMERICA         )
                                 )    No. 02 CR 278
        v.                       )    Hon. Judge Wayne R. Andersen
                                 )
DONVILLE JAMES                   )

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR A NEW TRIAL AND/OR JUDGMENT OF ACQUITTAL

The UNITED STATES OF AMERICA, through its attorney, PATRICK J. FITZGERALD,

United States Attorney for the Northern District of Illinois, respectfully submits the following

response to defendant Donville James' motion, which seeks a new trial and/or judgment of acquittal[1]

based on the following grounds: (1) the Court's denial of defendant's motion to suppress statements

and evidence; (2) the Court's pre-trial ruling on defendant's proffered entrapment defense; (3)

insufficiency of evidence to support a conviction for possession of a firearm in furtherance of a drug

trafficking crime (Count Two); and (4) insufficient evidence to prove an element of the counterfeit

possession charges (Count Three). Each of these grounds is addressed in turn.

## I.    Factual Background

On September 10, 2002, following a six-day jury trial, defendant James was convicted of

attempted possession and distribution of a controlled substance, namely powder cocaine in excess

of five kilograms, in violation of Title 21, United States Code, Section 846; (2) possession of a

firearm during and in relation to a drug trafficking crime, in violation of Title 18, United States

---

[1]"In considering a motion for judgment of acquittal, a court must view all evidence in the light most favorable to the prosecution." *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999). A court may grant a new trial "if the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice." *Id.*

0181

Code, Section 924(c)(1)(A)(i); and (3) possession of counterfeit notes, in violation of Title 18, United States Code, Section 472. The evidence introduced at trial established the following:

In March 2002, the defendant and a cooperating individual (CI) agreed on doing a narcotics transaction in which the defendant would pay for powder cocaine with counterfeit United States currency. The CI agreed to work with the FBI and Secret Service to do an undercover operation. As part of this operation, the CI told the defendant he knew a cocaine supplier who could provide them with powder cocaine.

Through several phone conversations in March 2002, the defendant and the CI discussed different quantities of powder cocaine to purchase using counterfeit currency. On March 21, 2002, the CI met the defendant and they agreed to purchase 10 kilograms of cocaine for $200,000 in counterfeit currency from the CI's source. The FBI and Secret Service conducted surveillance of this meeting, and the conversation between the defendant and the CI was recorded. On March 24, 2002, during a recorded phone conversation, the CI and the defendant agreed on purchasing 15 kilograms of powder cocaine for $300,000 in counterfeit currency. During this conversation, the defendant advised that he would have $200,000 in counterfeit money for the CI's source and would make it look like $300,000.

On March 25, 2002, the CI and the defendant met in a McDonald's parking lot at the corner of Narragansett Avenue and Diversey Avenue in order to further discuss and conduct the planned transaction. Approximately 20 FBI and Secret Service agents were conducting surveillance of the area that day. In addition, the CI was wearing a hidden transmitter that enabled the agents to hear portions of the conversation between the defendant and the CI. During the meeting, the defendant asked the CI to get into his car so he could take the CI to see the counterfeit currency. The defendant

0182

drove the CI to a Nissan Ultima parked nearby. The car was driven by and registered to the defendant's girlfriend. The defendant showed the CI a bag inside the trunk of the Nissan Ultima that contained a large amount of counterfeit currency.

After the defendant showed the CI the counterfeit currency, the defendant and the CI went back to the CI's vehicle at McDonalds. The CI told the defendant that he spoke with his supplier and the supplier had left the kilograms of cocaine scattered in multiple cars at unspecified nearby locations. He told the defendant he was going to get the first five kilograms of cocaine and that he would return shortly. The CI retrieved a bag containing five kilograms of simulated cocaine from a government vehicle parked nearby and returned to the defendant's car, which the defendant had relocated to a Jewel Foods parking lot across the street from McDonalds. The CI put the five kilograms on the passenger seat of the defendant's car and told the defendant he was going to get the next five kilograms of cocaine.

After the CI left, law enforcement agents pulled up in a car next to the defendant's vehicle. They got out of their car and approached the defendant's car yelling police. At this point, the defendant attempted to flee. A second car with law enforcement officers attempted to stop the defendant's flight by blocking the defendant's path from the front. The defendant did not stop, but rather accelerated and collided with the law enforcement vehicle. After the initial impact, the defendant continued accelerating to free his car. Once his car was freed, the defendant turned his car and took off in the remaining unblocked direction. A third law enforcement car cut him off before he was able to drive out of the parking lot. After ordering the defendant out of his car, FBI and Secret Service agents arrested him. Agent Michael Newberg asked the defendant if he was armed, and the defendant replied that there was a gun in his car. The agents subsequently searched

3

0183

his car. In the front passenger's seat, agents discovered the bag containing the five kilograms of simulated cocaine. On the driver's side floorboard, agents discovered a loaded Smith and Wesson nine millimeter semi-automatic pistol.

Once the defendant was transported to the Secret Service Field Office, he was advised of his rights by Agent William McKenna. Defendant agreed to waive these rights and speak with the agents. He then hand wrote a confession stating that he planned to buy 15 kilograms of powder cocaine with counterfeit currency and that he planned to give some of the drugs to a member of the Gangster Disciples, from whom he had purchased $100,000 of counterfeit currency. He further wrote that he had cut up blank pieces of paper to add to the $100,000 in counterfeit currency that he had purchased. He also confessed verbally that he had the gun agents found in his car for protection. A search of the defendant's girlfriend's car revealed a black bag containing $87,430 in counterfeit currency along with blank pieces of cut paper. Some of the counterfeit currency was one-sided and sandwiched between the two-sided counterfeit currency. Defendant's girlfriend gave a written statement in which she admitted that she saw the defendant making counterfeit money in his apartment at 7535 South Saginaw. She further admitted that the defendant told her he was going to make thousands of dollars by selling the counterfeit bills.

After the agents had interviewed the defendant's girlfriend, they conducted a subsequent interview with the defendant to ask him about the information his girlfriend supplied. At that point, the defendant admitted (after earlier providing 2 Waukegan addresses) that he lived at 7535 South Saginaw and that he had attempted to make additional counterfeit currency to add to the counterfeit currency he had purchased. He further explained that he was having trouble making two-sided counterfeit currency and could only produce front or back images. The defendant consented in

4

O 184

writing to a search of his apartment and supplied the agents with a key. The search of his residence uncovered additional counterfeit currency and various pieces of counterfeit-making equipment, including a computer, two copier/scanners, a pound of rubber bands, and a paper cutter. Some of the counterfeit currency found at the defendant's residence was lined up in a row on the copier/scanners. In addition, some of this counterfeit was marked with the same serial numbers as the counterfeit currency found in the defendant's girlfriend's car. A subsequent search of the defendant's computer revealed images of a $50 bill.

## II.    Government's Response to Defendant's Motion

## A.    Pre-Trial Suppression Rulings

The defendant contends the district court improperly denied his motion to suppress his post-arrest confession and the evidence found during the search of his house because his confession and consent to search was not free and voluntary. Specifically, the defendant contends that he only cooperated because the agents told him he could work off his case. However, the agents' testimony during the suppression hearing established that they merely told the defendant they were interested in his cooperation and that the U.S. Attorney's office would be informed of his cooperation. This was a truthful statement and in no way coercive. There was no testimony presented that the agents promised the defendant that if he cooperated he would work off his case. In fact, three agents testified that no threats or promises were made to the defendant prior to him giving consent to search and signing a written confession. In addition, agents explained the consent to search form to the defendant before he signed it and informed the defendant of his Miranda rights before interviewing him. There was absolutely nothing coercive about the defendant's confession or consent to search.

5

0185

The Court properly found that the defendant's confession and the evidence found at his residence should not be suppressed.

**B.    Pre-Trial Entrapment Rulings**

The defendant further claims he was "affectively precluded from presenting his entrapment defense where the Court ruled pretrial that defendant's proffer was insufficient to support entrapment." Motion at 1. This assertion is a misstatement of the Court's pretrial ruling. The Court in no way precluded defendant's entrapment defense. In fact, the Court explicitly held that all the evidence contained within defendant's entrapment proffer could be introduced. The only restriction was that the word "entrapment" not be used until the defendant presented enough evidence to warrant an entrapment defense. Although the Court noted that the proffer did not appear to provide a sufficient basis for an entrapment defense, the Court held that it would reserve a final ruling until the defendant presented his evidence at trial. The defendant then failed to introduce any of the evidence alleged in his entrapment proffer.[2]

Even if the Court had made a pre-trial ruling precluding the defendant's entrapment defense, there would be no basis for a new trial or an acquittal. In fact, the government argued a pre-trial preclusion was the correct ruling in this case. The Seventh Circuit has held that in cases in which the defendant cannot set forth *prima facie* evidence sufficient to demonstrate a viable entrapment issue, pretrial rulings barring the presentation of the defense are proper. *United States v. Blassingame*, 197 F.3d 271, 279 (7th Cir. 1999); *United States v. Santiago-Godinez*, 12 F.3d 722, 725-29 (7th Cir. 1993); *United States v. Johnson*, 32 F.3d 304, 307-08 (7th Cir. 1994). "As a

---

[2]The proffer itself was unclear, incredible, and in no way established an entrapment defense.

6

prerequisite for presenting the defense of entrapment to the jury, the defendant must produce sufficient evidence upon which a rational jury could have inferred that he was entrapped into committing the crime charged. . . . Only if a defendant meets this threshold burden is he entitled to present the question of entrapment to the jury for resolution." *Santiago-Godinez*, 12 F.3d at 727 (citations omitted); *See United States v. Jones*, 21 F.3d 165, 167 (7th Cir. 1994).

In order to submit the defense of entrapment to the jury, the defendant must produce sufficient evidence as to each of two elements: (1) government inducement of the crime, and (2) a lack of predisposition on the part of the defendant to engage in the criminal conduct. *Santiago-Godinez*, 12 F.3d at 727. "Predisposition . . . focuses upon whether the defendant was an 'unwary innocent,' or instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." *Blassingame*, 197 F.3d at 280-81 (quoting *Mathews v. United States*, 485 U.S. 63 (1988)). "If there is sufficient evidence of Defendant's predisposition to commit the crime, the trial court may reject the entrapment defense and prohibit the defendant 'from raising the . . . defense at trial' without inquiry into the government inducement factor." *Id.* at 281 (citations omitted).

Because the defendant has an evidentiary burden before he is entitled to argue entrapment, courts routinely prohibit defense counsel from arguing entrapment "unless and until sufficient evidence has been presented to create a jury issue as to entrapment." *United States v. Finley*, 708 F.Supp 906, 914 (N.D. Il. 1989); *United States v. Shields*, 1991 WL 236492 at *3 (N.D. Il. 1991); *United States v. Katz*, 1992 WL 137174 at *8 (N.D. Il. 1992).

The defendant clearly could not establish a lack of predisposition. At trial, the government introduced the tape recorded meeting between the defendant and the CI on March 21, 2002. During that conversation, the defendant told the CI that he wanted a kilogram of heroin. After the CI stated

7

0187

he did not know anything about heroin, the defendant explained that a kilogram of heroin sells for "about $100,000." In discussing the details of the planned cocaine-for-counterfeit transaction, the defendant made references to doing the transaction "just like we did last time." At one point, the CI stated, "So I go with the guy with the limo with the kilos and but the other guy is going with you to pick up the bag from you with the money, the ten keys or what." The defendant responded, "[C]ar behind the limo...just like we did it last time." In fact, the defendant gave the CI explicit directions on how the planned transaction was going to occur, what cars were going to be involved, and who was going to have what role. At one point, the defendant stated, "Make sure you see the cocaine and you are ready to put it in the car." The defendant also told the CI where to put the drugs once he got them from his source. Specifically, he said "put em in the car . . . in the passenger seat." When discussing how they would get rid of the cocaine after the deal, the defendant stated, "Yeah, What I'll do, I'll take one of mine and we'll sell it. I come back and buy one from you. I'll sell yours in ten days."

The government also introduced the tape recorded phone conversation between the defendant and the CI on March 24, 2002. During that conversation, the defendant told the CI three times not to be nervous and to just go ahead with the deal. He then gave the CI directions about what the CI should tell his source. The defendant also told the CI that he does not want to talk much over the phone and asked the CI if he could meet with him. Finally, after the CI said he was meeting with his source the next day, the defendant asked the CI if he wanted the defendant to follow his source.

The recorded meeting and phone conversation between the defendant and the CI made it clear that the defendant was an experienced drug dealer. Specifically, the defendant expressed concern about talking over the phone, knew how long it would take to sell one kilogram of cocaine, and gave

8

O188

explicit directions as to when, where, and how the transaction would occur. Furthermore, defendant's knowledge about the price of a kilogram of heroin and his offer to follow the cocaine supplier when the supplier met with the CI is not typical for a first-time drug dealer. What was even more telling was the defendant's repeated references to "just like we did it last time."

Additionally, the March 25th transaction was not the defendant's first run-in with law enforcement, which was further evidence that he was predisposed to commit the crime at issue. Defendant had a prior conviction for criminal trespass to a vehicle. "Although a prior conviction is not determinative of the defendant's character or reputation, it nonetheless establishes that [defendant] was a less than law-abiding citizen." *Santiago-Godinez*, 12 F.3d at 729. In addition, defendant had been arrested on three other occasions. Prior arrests are relevant for determining a defendant's predisposition to commit criminal acts. *See United States v. Olson*, 978 F.2d 1472, 1483 (7th Cir. 1992) (citing defendant's prior drug arrest as evidence of his predisposition). Defendant was arrested for battery in 1994, disorderly conduct in 1995, selling and transporting approximately 1.7 pounds of marijuana in 1997, and aggravated assault in 2001. The drug arrest and the defendant's written confession related to that arrest were particularly relevant based on the charges in this case. Furthermore, defendant committed the current offense while he was on state bond for the aggravated assault charge. Given defendant's criminal history, his in-depth conversation and exploration of every facet of the deal with the CI, his knowledge about the price of drugs and the precautions that drug dealers take, and his recorded admissions about previous dealings, defendant

0189

could not claim that he lacked a predisposition for narcotics trafficking when he engaged in the transaction at issue with the CI.[3]

The CI's testimony rebuttal testimony, had it been necessary, could have provided further evidence of the defendant's predisposition to commit criminal activity. The government expects that the CI would have testified that prior to the March 25th transaction and before he was working for the government, he did three drug deals with the defendant in 2001. Specifically, the defendant bought one kilogram of cocaine from the CI on two different occasions. In the fall of 2001, the defendant bought 98 pounds of marijuana from the CI. For the marijuana transaction, the defendant paid the CI with counterfeit money, without the CI's knowledge.

The defendant also could not have successfully argued that he was induced to commit any crimes. First, the recorded phone conversation between the defendant and the CI revealed that it was actually the defendant who was encouraging the CI to go through with the deal. The defendant repeatedly told the CI not to be nervous and to just do it.

The structure of the planned transaction also did not qualify as an extraordinary inducement. "A person who takes advantage of an ordinary opportunity to commit a criminal act–not an extraordinary opportunity, the sort of thing that might entice an otherwise law-abiding person–is not entrapped. *Blassingame*, 197 F.3d at 281. In the March 24th recorded phone conversation, the defendant and the CI discuss purchasing 15 kilograms of cocaine for $300,000, which is

---

[3]It should also be noted that in defendant's handwritten confession, he named "Dale" as a participant in the drug offense at issue. The government identified the person referenced in defendant's confession as Dale Bragg, who is charged in another criminal case. During an interview with Dale, he admitted brokering a heroin deal in the past between the defendant and another individual. He also admitted that in February or early March 2002 the defendant asked him for $100,000 in counterfeit currency. He further stated that the defendant wanted to use the counterfeit currency to purchase heroin.

0190

approximately $20,000 per kilogram (i.e., $300,000 for 15 kilograms). The government was prepared to introduce testimony that $20,000 per kilogram of powder cocaine was the going rate for the time, was not an extraordinarily low price, and thus was not an "extraordinary inducement" to purchase within the meaning of the applicable case law.

The fact that the defendant planned to purchase the drugs with counterfeit money did not make the deal any more of an inducement. The defendant could not afford or was unwilling to pay the alleged price of the drugs, and thus, chose to risk getting caught buying and creating counterfeit currency in order to proceed with the deal. In fact, he was willing to risk his life by providing the CI's source with counterfeit currency. The level of risk the defendant had to take to purchase the cocaine demonstrates that in no way was the deal an extraordinary inducement.

Consistent with Seventh Circuit law, because the defendant would have been unable to make a *prima facie* showing of the requisite inducement and lack of predisposition, the Court could have properly precluded any suggestion of entrapment, either by argument or evidence, in this case. The fact that the Court did not do this means that the defendant actually got more opportunities than to what he was entitled.

## C. Sufficiency of Firearm Evidence

Defendant contends the evidence that he possessed a firearm during a drug trafficking crime was insufficient to support a conviction. Specifically, the defendant contends the testimony of four Secret Service agents and the fingerprint examiner was "unworthy of belief" and suggests the agents intentionally framed the defendant.[4] However, "[c]redibility questions are rarely so severe as to

---

[4]Agents Dick and Locus testified the gun was found on the floor in front of the driver's seat. Agents Newberg and McKenna testified the defendant confessed the gun belonged to him.

11

O192

require exclusion of witness' testimony, and thus the inclusion of questionable testimony will seldom require a new trial. *Washington*, 184 F.3d at 657. In this case, the testimony of the agents and fingerprint examiner was not even questionable, let alone questionable enough to warrant a new trial or acquittal.

According to the defendant, the agents' testimony was unworthy of belief because: (1) Agent McKenna did not include the defendant's admission in his original report but rather in an amended report that he made a few days later; (2) Agent Locus testified the gun was found under a floormat and no floormats were visible in the photographs taken by the agents on the scene; (3) the gun was not seen by the FBI agents on the scene at the time they saw the drugs in the car[5]; (4) the informant had been in defendant's car but no agent saw the informant enter the car; and (5) there was no evidence the defendant ever attempted to use the gun on March 25, 2002. In regard to Agent McKenna's failure to put the gun admission in his original report, it was a mistake but certainly not grounds for discrediting his entire testimony, especially when his testimony was corroborated by three other law enforcement officers.

In regard to the fact that photographs were not taken of the floormat, whether the gun was found on top of the floormat or underneath the floormat was essentially irrelevant for purposes of the gun charges. Contrary to defendant's assertions, the government never asserted the floormat wiped away the defendant's fingerprints.

The fact that FBI Agent DePodesta did not see the gun at the time he saw the bag of drugs on the passenger's side of the car in no way suggests the Secret Service agents planted the gun.

---

[5] Contrary to defendant's assertion, the FBI agents did not take "photographs of the bag of fake drugs and the gun." Motion at 3.

0193

Agent DePodesta testified that he was not looking on the driver's side floorboard at the time he saw the drugs.

The fact that the agent in the surveillance van who testified at trial did not see the informant enter the defendant's car is also irrelevant. Agents saw the defendant driving the car and saw the informant in the passenger seat of the defendant's car. Furthermore, the defense has no basis for claiming the gun belonged to the informant. Agent Depodesta testified that he searched the informant for guns prior to the meeting. Plus, the eyes of surveillance agents were on the informant the whole time. Their testimony established that the informant was never near the drivers side of the defendant's car.

Finally, the government was not required to prove that the defendant "used" the gun on March 25th. The indictment charges the defendant with carrying a firearm during or in relation to a drug trafficking crime. The government introduced evidence that the defendant carried the gun in his car. "[T]ransporting a gun in a car within reasonable reach constitutes 'carrying' for purposes of § 924(c)(1)." *United States v. Baker*, 78 F.3d 1241, 1247 (7th Cir. 1996).

The defendant suggested the fingerprint examiner's testimony was unworthy of belief because her report allegedly contradicted her testimony at trial. Besides the fact that defendant's claim is inaccurate, it is not clear why the defendant thinks this assertion supports his insufficiency of evidence argument. The examiner testified that the defendant's prints *were not* found on the gun. Furthermore, defendant's suggestion that the agents wiped fingerprints off the gun, magazine, and bullets is ludicrous and completely unsupported by the evidence introduced at trial.

0194

D.    **Sufficiency of Counterfeit Evidence**

Defendant asserts the government failed to meet its burden with respect to Count Three because there was no evidence that the defendant intended to defraud someone. Contrary to defendant's assertions, the government did introduce evidence of this element, namely recorded conversations between the defendant and the CI during which the defendant expressed his intent to defraud the CI's alleged drug source. During their recorded conversation on March 21, 2002, the defendant and the CI discuss putting real money on top of the bag to "make it look real." They also talked about showing the drug source the money "real quick"–so the source would not discover that the money was counterfeit until the defendant had left with the drugs. During their recorded March 24th conversation, the defendant and the CI discuss putting five or ten grand in "good money" on the top of the bag–so if the source did look in the bag, there would be less of a risk that he would notice the counterfeit. There is no doubt the defendant had an intent to defraud.

IV.    **Conclusion**

WHEREFORE, for the above reasons, the government respectfully requests that this Court deny defendant's motion for a new trial and/or judgment of acquittal

Respectfully submitted,

**PATRICK J. FITZGERALD**
United States Attorney

By:    **VALARIE HAYS**
Assistant U.S. Attorney
U.S. Attorney's Office
219 S. Dearborn Street
Chicago, Illinois 60604
(312) 353-5356

14

O195

**ATTORNEY AT LAW**

November 10, 2002
Mrs. Anita R. Carothers,

Dear Counsel,
        Attached you will find a Motion to Supplement the New Trial and/or Judgement of Acquittal.

        As you can see, I'm very concerned about my life, what direction my life is headed in towards the future. Reflecting on the events that took place before trial and after has made me realize the mistakes, and information that played an important part in determining outcome of my innocents or guilt, which led me to investigate, research and put this motion together to expound on the points you briefly touched upon, and to show the court why the entrapment should have been my defense from the onset.

        Mrs. Carothers, it's common knowledge that once you've experienced something and given an opportunity to look back you'll detect and recognize the pros and cons, which explains how I have identified these problems: (1) Failure to expose the case in its entirety prohibited me from putting on my defense to display how this case was initiated. (2) Not calling the witness to cross examine him stopped him from being accountable for his statements. (3) Not allowing me to take the stand also prevented certain details from surfacing. (4) Accepting the "New set of transcribed transcripts" from the tapes without review prior to trial to compare the authenticity was another grave error. (5) Exposing how the C.I. lured me into both crimes by persistently pursuing me after constant rejection of being involved numerous times sets precedence to show I wanted no part of the action. (6) Conflicting statements during the suppression hearing and trial by agent McKenna where he denied his promise to release my girl friend if I cooperated and worked my case off. At trial he changed the story by admitting he promised to drop the charges under oath, which would result in perjury.

        Mrs. Carothers, I am aware you know the law, and rules of the game that several brothers are being engulfed and swept away in. Under your guidance in pursuit of my freedom, I'm in jeopardy of losing my life unless I'm granted a new trial to establish the issues mentioned above. At this point I'm undecided on the avenue I should travel in quest of obtaining a new trial, sentencing entrapment departure, or acquittal.

        I'm consulting with you on this matter because I need your legal experience in devising a strategy to undue the harm that has happen and/or obtain damage control.

        Under the circumstances do you think it would be a wise move to file for Ineffective Assistance of Counsel? If so would you either direct me or put one together and mail it to me so I can file it Pro Se. I'm only trying to save my life.

                                                    By:  Donville James

## ANITA RIVKIN-CAROTHERS & ASSOCIATES

ATTORNEYS AT LAW
33 NORTH LASALLE STREET, SUITE 3300
CHICAGO, ILLINOIS 60602
(312) 641-2901
FAX (312) 332-3179

OF COUNSEL
BRUCE E. ADELMAN

ALSO LICENSED IN MISSOURI
ANITA RIVKIN-CAROTHERS

November 19, 2002

Mr. Donville James
Dodge County Detention Facility
216 West Center Street
Juneau, WI 53039

Dear Donville,

I am in receipt of your letter and proposed supplemental motion for a new trial.

First in addressing the issues raised in your letter I offer the following:

   (1)    Prior to trial and during trial, we discussed the problems in presenting your entrapment defense, namely:

   (a)  had you testified, the government was prepared to call Allan Dubon as a rebuttal witness to testify about other drug dealings he said he had with you, at least one of which may have been corroborated by Blacks;

   (b)  had you testified, the government was also prepared to call Blacks (Dale Braggs) as a rebuttal witness to testify about prior drug dealing in which he said you were involved in a heroin deal;

   (b)  had you testified, the government would have been allowed to present evidence of the marijuana case out of California, in which, like this case, you provided a written confession.

   (2)    I interviewed Allan Dubon, and made a strategic decision not to call him in the defense case, because nothing he said would have helped the defense. In my opinion his testimony would have been devastating and would have assisted nobody but the government in proving that there was no entrapment. We were able to get the agent to testify about the information regarding the Mexican Mafia. Dubon would have explained further that it was your involvement in the previous counterfeit money/drug deal that cause the Mexican Mafia to pursue him.

0197

Page 2.
November 19, 2002

(3)     I made a strong argument to you against taking the stand because I knew that the government's rebuttal evidence was going to be allowed in the form of testimony from Dubon and Braggs, in addition to the evidence of the California case. Lawyers can recommend whether a client should or should not testify. However only the client can waive the right. The Judge questioned you extensively on whether you wanted to waive the right to testify. It was in the end your right and you agreed to waive it. I am still of the opinion that there were no facts that you could have added that would have outweighed the damaging facts the government would have been allowed to pursue.

(4)     I did not accept the final transcripts of the tapes without review prior to trial. I listened to the tapes and read the final transcripts and found the tapes and transcripts compatible. The government is not required to use the draft transcripts. If there was something on the tapes which was so very different, the defense could have submitted our own set of transcripts. That was not the case here. The jury was instructed that the evidence was the tapes, not the transcripts. You have not indicated in your letter what it is that you believe is wrong with the final transcripts, so I cannot address the specifics further.

(5)     The telephone records did not disclose that you were lured . There were hundreds of calls between the two of you...Allan calling you and you calling him over the one year period of time. Allan says some of those calls involved other drug deals, and that is what he would have testified about. As we discussed had you not wanted to be a part of the drug deal, then you could have given him the counterfeit money, without the drugs.

(6)     The judge resolved, prior to trial, the issue of whether your statement was admissible because it was freely and voluntarily given. The judge ruled that it was a free and voluntary statement. The question of whether your motion should have been granted is an appeal issue at this point. Conflicting statements alone does not meet the perjury standard. Perjury requires proof of a knowing false statement on a material issue. At the motion hearing, the judge was aware that the agent discussed cooperation with you. Does this testimony rise to the level of perjury  on a material fact?

Finally, as it relates to the last questions in the letter,  if you wish to raise issues of ineffective assistance of counsel, you will need to either raise them pro se or hire new counsel to do so. Once the issue or issues are raised, I will necessarily file a motion to withdraw as your attorney so that you may pursue those issues unfettered. I need to know if it is your desire to raise issues of ineffective assistance as soon as possible so that I can prepare to withdraw. There is no specified format for making allegations of ineffective assistance other than to clearly state what you believe the issues are and how you believe they affected the outcome of your trial.

Page 3.
November 19, 2002

Moving to the Motion To Supplement Motion For A New Trial, I believe that you should file this motion pro se, or through new counsel, if it is your intention to raise issues of ineffective assistance of trial counsel for the following reasons:

(1)     In the factual background, you are attempting to put into evidence what your testimony might have been had you testified. This is not a proper pleading for a motion for a new trial. Pro Se litigants are given substantial latitude in pleadings, but counsel is held to the standard of knowing what is proper to plead.

(2)     Under Section C, it is not correct that I received the final transcripts on the day of trial. There is nothing inappropriate about the government doing final transcripts after having provided drafts for early review. "Drafts" are used to give the defendant notice of what has been taken from the transcripts on a cursory review. the Final transcripts are usually done when the defendant has decided to go to trial, and the informant and agent then get together to listen and come up with missing or previously misunderstood words. Again, as a pro se litigant you may be given latitude to make this argument, which counsel should know to be inappropriate.

(3)     The entrapment issue has been discussed above. The court did not preclude the defense from proceeding with presenting evidence of entrapment. Instead, the judge ruled that based on the proffer he did not believe there was a sufficient basis to establish entrapment, and that I would not be allowed to argue entrapment in opening statements to the jury. The judge further stated that he did not know how the evidence would come in, and he reserve ruling on the issue of whether entrapment instructions to the jury would be allowed until the defense presented whatever evidence we would present. The defense presented no evidence of entrapment, and consequently we did not receive an entrapment instruction. Without your testifying, there is nothing in the record to establish entrapment. Again, as a pro se litigant, you may be given latitude to make this argument.

I received yesterday, and I assume you also received your copy, of your presentence report. I need to know if you are going to proceed pro se or obtain new counsel, and whether you or new counsel will handle the sentencing issues. The only objection I see relates to the enhancement for obstruction of justice. The based offense for 15 kilograms is 34. The gun requires a consecutive 5 year sentence. Those calculations are pretty straight forward.

Last, if you are still interested in giving a proffer, the government said they would be available to do so on the day set for sentencing. I will make an attorney call to you on Thursday or Friday, November 21 or 22, after you have had the opportunity to review my response, and make a decision on how you would like to proceed.

0199

Page 4.
November 19, 2002

Very truly yours,

Anita Rivkin-Carothers

ARC/mdm

November 24, 2002

Mrs. Carothers,

I'm asking you to withdraw yourself as counsel of my case for the following reasons. I don't think you fully understood the intricacy of this case which led to you not advocating my issues. The roll that the CI played in this case is at the heart of my defense. The motion that you submitted to the Judge for entrapment was very general. I gave you the history of the CI and myself and how this case was initiated, none of which were put in the motion asking for entrapment as a defense. I was told by you that to prevent prosecutor from knowing what kind of evidence we were using at trial this strategy was necessary. In doing so, it has caused the judge not to know or see how I was entrapped. As a consequence the judge didn't allow you to inform the jury in the opening argument about entrapment as a defense.

When we first spoke about this case, we spoke about the roll that the CI played. You informed me that I was not charge with a conspiracy because the CI and I could not conspire. You also told me it was not the CI who was on trial. That I understood, but he was the reason why I was charge of attempting to buy narcotics. At the time we spoke, I was ignorant of the law, and I took your advice. Researching my case, I came to the understanding that it is against the law for officers or their agents to lure people in criminal activities. That is why I felt strongly about getting all my evidence in front of the jury. You advised me at trial that the judge denied the motion for entrapment, because he did not see how I was entrapped. I told you that I wanted to testify on my behalf, which you advised me not to do. We then decided that I would not testify because we would call the CI as a witness on my behalf. The evidence to show that I was entrapped would then enter through the CI. You then made a strategic move not to call the CI, this strategic move has caused me to be found guilty in this case.

I told you that the CI grand jury statement was not true. The tape recording the government played in court did not corroborate his statement. The tapes clearly have the CI telling me he wants the deal to look like I robbed his supplies. He wanted to sell me the cocaine after his suppliers were robbed. A clear understanding of the recordings outline that he came to me and asked me for counterfeit money. He then instigated and furthered other crimes by

concocting a plan for me to help him rob his source and for me to help SELL the cocaine once he got them. This is clear and audible on the Government recordings. It also contradicts his grand jury statement in which he claimed that I called him and "asked to increase the amount of drugs and I would pay him $20,000 to arrange the deal with his suppliers." How is it that I'm supposed to pay him $20,000 to arrange a deal, when he is on tape telling me that he wants his plan to look to his suppliers like I robbed them? If I was planing to buy 15kg of cocaine, why is the CI on tape telling me "I want to do like I tell you, I going to sell you each key of cocaine for $10,000?" If my case was fully understood, these issues would have been scrutinized and advocated.

There are many case laws on officers and their agents furthering criminal activities for the purpose of a more severe sentencing. I asked you to object to the government giving the jury a transcript that did not match what was on the tapes. The parts of the transcripts that were altered are very crucial in this case. The altered parts showed that the CI was the one who wanted me to help him sell his cocaine after he robbed his supplier, and his grand jury statement was a lie.

You are right, I was not charge with conspiracy, so I should not be held responsible for the action of the CI. As I said, a good understanding of the roll the CI played in this case is very important. Analyzing and understanding the government tape recordings would give a clear understanding of what took place in this case. These tapes are conspiratorial conduct by the CI and myself after I was lured by him, who himself was a government agent at the time he came up with the plan for me to help him sell his cocaine. These are all the issues that I asked you to advocate on my behalf. I would not have been found guilty in this case if you had on understanding of the intricacies of this case and advocated them. I can no longer trust your advice, I'm asking you if you would please withdraw yourself as counsel from this case.

Respectfully Submitted,
Donville James

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 02 CR 278 |
| v. | ) | Judge Wayne R. Anderson |
| | ) | |
| DONVILLE JAMES | ) | |

### NOTICE OF FILING

TO: Valarie Hays
Assistant U.S. Attorney
219 South Dearborn Street
Chicago, IL 60604

**PLEASE TAKE NOTICE** that on August 28, 2002, I filed with the Clerk of the United States District, 219 South Dearborn, Chicago, IL the following pleadings, copies of which are attached hereto and hereby served upon you:

1. Defendant's Objection to the Government's "Agreed" Motion To Dismiss the Complaint Without Prejudice
2. Defendant's Reply to the Government's Response to Motion To Produce and Examine the "Failed" Tape Recorder
3. Defendant's Response To the Government's Consolidate Motions In Limine

Anita Rivkin-Carothers
33 North LaSalle Street, Suite 3300
Chicago, IL 60602
(312) 641-2901

### *Certificate of Service*

I, Anita Rivkin-Carothers, certify that I served a copy of the foregoing Notice and Pleadings on the party addressed above by hand delivering in Court on August 28, 2002.

Anita Rivkin-Carothers

0201

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 02 CR 278 |
| v. | ) | Judge Wayne R. Anderson |
| | ) | |
| DONVILLE JAMES | ) | |

## DEFENDANT'S OBJECTION TO THE GOVERNMENT'S "AGREED" MOTION TO DISMISS COMPLAINT WITHOUT PREJUDICE

Defendant Donville James, by his attorney, Anita Rivkin-Carothers, objects to the government's motion to dismiss the complaint without prejudice.  In support thereof the following is offered:

1.      Mr. James was arrested based on a criminal complaint filed on  March 25, 2002, in the captioned matter.

2.      On April 11, 2002, the government obtained a          three count criminal indictment and a forfeiture in the captioned matter.

3.      Counsel for defendant, in response to a call by the government seeking to dismiss the complaint, agreed that there was no objection to dismissing the complaint.

4.      The government's written motion to dismiss the complaint seeks to do so without prejudice.

5.      Defendant is not in agreement to a dismissal without prejudice since there is an indictment in place, and should the government seek to supplement the indictment, it has the ability to do so through a superceding indictment.

WHEREFORE, Mr. James objects to the dismissal of the complaint withour

prejudice, and asks that it be dismissed as a proper proceeding.

Respectfully submitted,

Attorney for Donville James

Anita Rivkin-Carothers
33 North LaSalle Street
Suite 3300
Chicago, IL 60602
Tel:  (312) 641-2901
Fax:  (312) 332-3179

2

0203

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                    )<br>)<br>DONVILLE JAMES                 ) | No. 02 CR 278<br>Judge Wayne R. Anderson |

### DEFENDANT'S REPLY TO THE GOVERNMENT'S RESPONSE TO MOTION TO PRODUCE AND EXAMINE THE "FAILED" TAPE RECORDER

Defendant Donville James, by his attorney, Anita Rivkin-Carothers, replies to the government's response to motion to produce and examine the "failed" tape recorder as follows:

1.    For the first time, in response to Defendant's motion, the government disclosed that the agent(s) did not turn on the equipment; that in testing "they" were turning the equipment off and on and "they" left it off by mistake.. The government claims that there was no mechanical failure.

2.    The government's explanation does not cover whether the recorder the informant wore was working and recording, nor is there an explanation of why that tape is unavailable.

3.    The government's response alleges that turning over the equipment would reveal confidential methods of federal law enforcement. Based on this claim, it is anticipated that the government will take a position at trial, that the jury should not be allowed to see this equipment which the agents "left off by mistake".

4.    It is the Defendant's position that the equipment consisting of a tape recorder and transmitter does not rise to the level of a national secret, thereby threatening

0204

national security.  Tape recorders and transmitters are equipment that everyday people buy from radio shack or other such stores on a daily basis.  This type of equipment is used by children in play.

5.      Further, it is the Defendant's position that the government will seek to introduce the most damaging evidence in the case, that Mr. James allegedly threatened the informant with word to the effect "I won't have to use my  gun then, right?" through the informant who was wearing a recording device at the time, and at a time when agents were listening in.

6.      The Defendant has a right to challenge the credibility of the government witnesses, including the agents. And the jury has a right to judge the  credibility of this alleged threat, by seeing the tape recorder the informant wore, and by seeing the transmitter the agent controlled, in order that they may determine the believability of the explanation as to why this very important evidence is not on tape, and whether the explanation offered by the government witnesses with respect to this missing tape is reasonable under the circumstances.

7.      In the interest of justice and  the due process right to a fair trial, Defendant urges this court to order the production of this equipment for presentation before the jury.

2

WHEREFORE, Mr. James asks that his motion be granted.

Respectfully submitted,

Attorney for Donville James

Anita Rivkin-Carothers
33 North LaSalle Street
Suite 3300
Chicago, IL 60602
Tel: (312) 641-2901
Fax: (312) 332-3179

3

O206

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 02 CR 278 |
| v. | ) | Judge Wayne R. Anderson |
| | ) | |
| DONVILLE JAMES | ) | |

## DEFENDANT'S RESPONSE TO THE
## GOVERNMENT'S CONSOLIDATED MOTIONS IN LIMINE

Defendant Donville James, by his attorney, Anita Rivkin-Carothers, responds to

the government's consolidated motions in limine as follows:

### A. Motion to Exclude an   Entrapment Defense

*Entrapment Defense  Proffer*

Mr. James will seek to present evidence of entrapment.  The facts will show that

Mr. James was born in Jamaica, but came to this country as a teenager.  He served this

county in the United States Army National Guard from 1989 to 1997.  Mr. James met the

informant, Allan Dubon, in the summer of 2001.  During the summer, the informant

located Mr. James complaining that a friend of Mr. James', known to Mr. James as

"Blacks", had bought drugs from the informant and paid for it with counterfeit money.

The informant claimed that he could not find "Blacks", and demanded that Mr. James

locate "Blacks" to get the informant's money.  According to the informant, the Mexican

Mafia was threatening the informant's life and the life of his family, and the informant

was holding Mr. James responsible.

The informant repeatedly called Mr. James demanding that he locate "Blacks" and

threaten Mr. James and his family.  Mr. James told the informant that this matter was

between the informant and "Blacks", and asked the informant to leave him alone. The informant continued to contact Mr. James threatening Mr. James that if the Mexican Mafia harmed the informant's family, that the informant would do the same to Mr. James' family. The informant called repeatedly. Eventually, in August, 2001, Mr. James located "Blacks" and told him of the threats from the informant. "Blacks" gave Mr. James a large sum of counterfeit money to give the informant. Mr. James contacted the informant and told him that he had counterfeit money for him. The informant told Mr. James to meet him at a service station, where he would pick up the counterfeit money. Mr. James did so, and asked the informant to leave him alone. The informant agreed.

To avoid further contact by the informant, Mr. James immediately changed his telephone number. From the fall of 2001 until February, 2002, Mr. James did not speak to the informant. In February, 2002, the informant called Mr. James from a number which Mr. James did not recognize. When Mr. James answered the call, the informant told Mr. James that Mr. James could not get away from him. The informant told Mr. James that he had obtained his new telephone number from a friend who worked at Primeco, and that he also had Mr. James home address and Mr. James girlfriend's address, and the informant insisted that the Mexican Mafia was still pursuing him and threatening his life, and therefore he needed Mr. James to get more counterfeit to buy more drugs so that he could clear up his debt with the Mexican Mafia. The informant again threatened to kill or harm Mr. James' family and girlfriend if Mr. James did not help him.

2

The informant repeatedly called Mr. James. Mr. James continued to try to put the informant off, by saying he needed time to locate the counterfeit money. After a few weeks, the informant threatened to send the Mexican Mafia to visit Mr. James. A few days later, while Mr. James was at his mother's home (the billing address on his phone records) two or three men cam to the door and insisted on coming inside. Mr. James refused to allow them to enter and told them that he would call the police if they did not leave. The men left. Within minutes, the informant called Mr. James and reminded him that he and the Mexican Mafia knew where his mother and girlfriend were, and that if he called the police, they would return and kill whomever was in the house. The informant told Mr. James to get the money so that Mexican Mafia would not hurt him or his family and he would not have to hurt Mr. James and his family.

Mr. James then found "Dale" who agreed to provide counterfeit money. Mr. James went to "Dale's" house to look at the money. "Dale" showed him money that he was going to throw away because the quality was bad. Mr. James took that counterfeit and decided to give it to the informant. The informant contacted Mr. James to set up a time and place to get the counterfeit. Mr. James wanted to give him the money in the same manner as he had in August, 2001, that is he would bring the money to the informant, and the informant's supplier would give the drugs to the informant and Mr. James would not be involved. However, the informant wanted to have Mr. James more involved. When Mr. James saw that the informant may not have been concerned about the Mexican Mafia at all, but rather was going to continue to threaten Mr. James to have a constant source of counterfeit money, Mr. James decided that he would ask the informant

3

0209

for larger and larger quantities of drugs to provide to the counterfeit source, with the hope that the informant would say that he did not want to go through with the deal.

A defendant's initial burden in raising entrapment requires presenting more than a scintilla of evidence, although it need not be so substantial that if uncontroverted a court my fine entrapment as a matter of law. *United States v. Blassingame, 197 F. 3d 271, 280 (7th cir. 1999).* The defendant needs to show that (1) the government induced the crime, and (2) the defendant was not predisposed to commit the crime. In determining predisposition, the court must consider five factors: (1) the defendant's character and reputation; (2) whether the government initially suggested the criminal activity; (3) whether the defendant engaged in the criminal activity for profit; (4) whether the defendant evidenced a reluctance to commit the offense that was overcome by governmental persuasion; and (5) the nature of the inducement or persuasion by the government. *Id. at 281.*

With respect to Mr. James, (1) he has no prior convictions for drug offenses, and he served this country with the national guard for 8 years; (2) there is no controversy that the government agent initiated and suggested the criminal activity; (3) Mr. James did not engage in the activities for profit, but rather to protect his family from death or great bodily harm threatened by the government agent; (4) Mr. James expressed reluctance and attempted to increase the amount drugs requested in hopes that the informant would back out of the deal. The informant continued to call and make threats to continue the deal; (5) the nature of the inducement and persuasion by the government was powerful in the form of threats on the lives of Mr. James, his family and loved one.

4

0210

Based on the foregoing proffer, Mr. James is entitled to present his defense of entrapment and coercion before the jury.

### 2. Mr. James was not predisposed to engage in narcotic trafficking

The government's argument that Mr. James was predisposed to engage in narcotic trafficking is based on all transactions initiated by the informant. The reference to "just like we did last time" refers to conduct which the informant initiated. When the informant induced Mr. James to provide counterfeit money for the informant's drug deal in August, 2001, the informant had already began working off his state case. The law is clear that the test for predisposition is whether the government can prove that the defendant was predisposed *before* the government intervened. *Jacobson v. United States, 112 S.Ct. 1535 (1992).*

The government suggests that predisposition, sufficient to prevent Mr. James from presenting his entrapment defense exists because the government alleges that Mr. James has a prior "felony conviction for criminal trespass to vehicle". This is a misrepresentation as this was not a felony conviction, but a misdemeanor matter. The government states that Mr. James has a prior arrest for selling and transporting 28.5 grams of marijuana. The defense assumes that this referenced arrest was for a matter outside of the state of Illinois. The government has provided no arrest report or federal "rap sheet" for this arrest. However , on information and belief, the case did not involve "selling" marijuana as represented by the government. Finally, the government's claim that Mr. James was predisposed because the informant and another cooperating witness

5

implicates Mr. James in other drug deals, is not sufficient to preclude Mr. James from

presenting his entrapment defense, where it is the defense position that these witnesses

are liars.

### *3. Mr. James was induced to commit the crimes at issue.*

The description of the events which support Mr. James entrapment defense proffer

discusses the extreme inducement of threats of harm and death to Mr. James and his

family and loved one.

Based on all of the foregoing, Mr. James has made a *prima facie* showing of the

requisite elements to present his theory of defense to a jury.

### B. Motion To Preclude Reference to Suppression Issues

The court's ruling on Mr. James motion to suppress statements and evidence

seized pursuant to his consent to search, resolved the issue of whether the statement and

the consent were voluntary, and therefore admissible at trial. The ruling on admissibility

does not and ought not preclude the defense from presenting evidence describing the

circumstances surrounding the statement and the signing of the consent to search. While

the court's ruling allows the government to introduce the statement and the evidence, the

law allows the defendant to present evidence of the circumstances. In fact, the Seventh

Circuit jury instruction on post arrest statements instructs the jury to "consider all

matters in evidence having to do with the statement, including those concerning the

defendant and the circumstances under which the statement was made". The government

has cited no case law which supports an argument that would preclude the defendant from

presenting and developing evidence concerning the circumstances under which the

6

0212

statement was made. Defense counsel will make only those arguments which are appropriate, and it is inappropriate to argue to the jury that the confession and consent are illegal. However, it is appropriate to argue to the jury the circumstances under which the confession was given.

## C. Motion To Preclude Argument or Evidence of "Outrageous Government Conduct"

While the Seventh Circuit has taken the position that there is no such thing as outrageous government conduct. The proposition is recognizable as prosecutorial misconduct, and may precipitate reversible error.

In this case, defendant is unsure of what it is the government seeks to bar. The defense intends to argue and present evidence that the government's informant is a liar. In light of conduct by the government agent of "turning the equipment off an on" an failing to record a critical conversation where the informant states that Mr. James makes reference to using a gun, the defense intends to cross examine and present evidence of the credibility of such conduct and such statements.

On May 9, 2002, the government learned that there are no fingerprints connecting Mr. James to a gun recovered from his car, and there are no purchase/sales reports or other evidence connecting Mr. James to a gun recovered from his car. Consequently, on August 12, 2002, the government provided what it called an amended report by Agent McKenna, which is not a supplemental report, but which merely inserts , between paragraphs one and two of the original report a paragraph stating that Mr. James "claimed ownership of the weapon and stated that he kept with him for his personal

7

0213

protection". This statement is not included in Mr. James handwritten confession, which Agent McKenna's original report tracks.   The defense should be allowed to inquire about this "amended" report, and allow the jury to decide whether the evidence is reliable. The government's case against Mr. James is based on an informant who has a motive and bias based on his deal with the government. The government agents also have a motive and bias to obtain a conviction. The Seventh Circuit has discerned that the gravity of the government's misconduct is relevant as it may shed light on the materiality of the infringement of a defendant's rights, which may support an inference that the government resorted to improper tactics because they were justifiably fearful that without such tactics the defendant might be acquitted. *United States v. Dimas, 3 F 3d 1015,1020 (7th Cir. 1993(per curiam);*

What the government did in terms of investigation, and the impeachment of government witnesses with omissions in their reports is proper truth seeking cross examination, and should be heard by the jury. The defense should be allowed to make reasonable arguments based on the evidence, the lack of evidence, and how the evidence in this investigation was handled, including how the missing evidence reflects on the credibility of the government's case. The government ought not have it both ways, that not only can it leave off the tape "by mistake" on a critical piece of evidence involving Mr. James allegedly threatening the informant with the gun and make an argument that , after learning that nothing connected Mr. James with the gun,  an amended report suddenly show Mr. James admitting to owning the gun and having it for his personal protection. At some point the issue of fairness to the defendant must be explored, and his

9

0214

right to present his defense and his right to cross examine witnesses to show their motive and bias.

## D. Motion To Preclude References to Potential Punishment

Counsel for Mr. James is aware of the law and will make only proper arguments before this jury. Mr. James' punishment or possible punishment will not be raised by the defense.

## E. Motion for Admission of Testimony Regarding Defendant's Uncharged Drug Trafficking.

Evidence of other crimes is not admissible to show a propensity to commit the crime charged. Therefore the other uncharged crimes should not be allowed in general. The government has presented no theory under which it seeks to offer this uncharged evidence.

First and foremost, evidence of other crimes is inadmissible, not because it is not relevant, but because it is too relevant. The court must perform a balancing test to determine whether the probative value of the evidence outweighs the unfair prejudice to the defendant.

If the court determines that it will allow this evidence of other crimes, the Court should then allow the defendant to present his defense of entrapment as an explanation for this "other crimes evidence".

The government's argument that the evidence of other crimes is probative in the context of a "drug conspiracy case" is not persuasive, since this is not a conspiracy case and the government has chosen not to charge Mr. James with a drug conspiracy.

9

0215

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 02 CR 278 |
| v. | ) | Judge Wayne R. Andersen |
| | ) | |
| DONVILLE JAMES | ) | |

## STIPULATION

The defendant Donville James, by his attorneys, Anita Rivkin-Carothers, Joan A.

HillMcClain, and Mabel Taylor, and the United States by Assistant United States

Attorneys Valarie Hays and Patrick Collins, hereby agree and stipulate as follows:

It is stipulated that Allen Dubon used telephone number (773) 255-0485 during

the period from January 1, 2002 to March 25, 2002.

It is stipulated that Donville James used telephone number (847) 409-6737 during

the period from January 1, 2002 to March 25, 2002.

It is stipulated that Defendant Exhibit Telephone Records  (773) 255-0485 are

records prepared and kept in the regular course of business by AT&T Wireless Service.

It is stipulated that Defendant Exhibit Telephone Records (847) 409-6737 are

records prepared and kept in the regular course of business by PrimeCo Communication.

O216

**F.**     **Motion to Interview Witnesses Under Government's Control**

At this point, the government has not decided whether they will call the informant in this case as a witness. The government will make this decision within two weeks of trial. If the government decides to call this witness, the government certainly will not instruct the informant that he should not speak with defense counsel. The informant has been relocated because of his cooperation in another federal investigation. For the safety of the informant and his family, the government cannot disclose his current address. However, if the government decides to call the informant, the government will convey the defendant's request to the informant. If he chooses to speak with defense counsel, the government will arrange a telephone conference or a meeting at the U.S. attorney's office.

**G.**     **Motion for the Government to Provide Copies of All Audiotapes Created in This Case**

The government has just finished copying the tapes related to this case. Defendant's counsel will be receiving those tapes by the end of the week.

**H.**     **Motion for the Government to Produce the March 25, 2002 Audiotape and Tape Recorder Which "Failed" for Examination by Defendant's Tape Expert**

Defendant's request to examine the "tape recorder which failed" should be denied. The "tape recorder" is actually a digital recorder which burns recorded conversations directly onto a CD rom. When the conversations are recorded onto the CD rom, they are automatically erased from the digital recorder, and the CD rom itself becomes the evidence. The audiotapes that will be provided to defense counsel are dubbed from the CD rom. There is no reason to provide the actual recording equipment to the defense counsel because the equipment will provide no additional evidence. The

7

O 217

recorder "failed" at the time of the March 25th transaction at issue because it was not turned on. The agents involved in the case were testing the equipment prior to the transaction. In testing the equipment, they were turning it on and off. After testing the equipment, they left it off by mistake. There is no purpose that would be served by examining the equipment because the government is not claiming that there was a mechanical failure with the equipment. Moreover, turning the equipment over would reveal confidential methods of federal law enforcement investigation. Accordingly, defendant's request should be denied.

I. **Motion to Reset the Trial Date**

Defense counsel incorrectly asserts in the motion to postpone the trial that the trial is currently set for June 17th. The trial is in fact set for June 10, 2002. The conflict defense counsel alleges in the motion, namely another trial, pertains to June 17th. The government and defense counsel agree that this trial should not take longer than a week. Therefore, this trial will not interfere with defense counsel's conflict on June 17th. Defense counsel also mentioned to the government this morning that she has a continuing legal education class during the week of June 10th. Surely the training can be rescheduled more easily and with less adverse consequences than rescheduling the trial.

Under the special circumstances of this case, an extended trial date is not warranted. First, this is not a complicated case. The defendant admitted in writing to attempting to buy 15 kilograms of cocaine with counterfeit money. He further admitted that he had a gun in his car at the time of the transaction. The gun and the artificial cocaine were found in the defendant's car. Counterfeit-making equipment was found in his apartment. Defense counsel has known since at least the first

8

0218

week of May that she was seeking permission to be appointed counsel for defendant. She has been provided with all required discovery material currently within the government's possession. She will be provided with the tapes, fingerprint results, and phone records as soon as the government obtains them, which should be very shortly (as discussed above).

This Court set an early non-negotiable trial date based in part on the government's and its own concerns regarding defendant's danger to the community while released on bond. Defense counsel informed the government that the next trial date this Court has available is in November. This gives the defendant over five more months to commit the same types of offenses for which he is currently charged. The fact that the government does not know of any offenses defendant has committed since he has been released does not alleviate the government's concerns. The government's position has always been that the type of offenses defendant might continue to commit while released on bond, namely drug and counterfeiting offenses, cannot be easily detected by the government and cannot be prevented by electronic surveillance. The government does not have the resources to monitor defendant's phone(s) and conduct surveillance outside his home on a regular basis. Defendant should have never been released based on the fact that he was involved in a 15 kilogram cocaine deal, brought a gun to the transaction, and threatened to use the gun. Defense counsel has more than enough time to prepare for trial and fails to allege any conflict that should be given a higher priority than this trial. The government respectfully requests that this court deny defendant's request for an extension of his trial date. Alternatively, the government requests that if this Court grants defendant's motion to extend the trial date, the defendant be detained pending trial. Defense counsel has indicated that the defendant would be willing to surrender to custody if necessary.

9

0219

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:        _Valarie Hays_

         VALARIE HAYS
         Assistant United States Attorney
         219 South Dearborn Street
         Chicago, Illinois 60604
         (312) 353-5356

10

0220



RECEIVED

MAY 1 7 2002

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA )
)
) No. 02 CR 0278
v. ) Honorable Wayne R. Anderson
)
DONVILLE JAMES )

## NOTICE OF FILING

**BY U.S. MAIL**

TO:    Anita Rivkin-Carothers
       33 North LaSalle Street
       Chicago, Il 60602

PLEASE TAKE NOTICE that on Friday, May 17, 2002, the undersigned filed with the Clerk of this Court the following document in the above captioned case: **GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANT DONVILLE JAMES' PRETRIAL MOTIONS** and service of which is being made upon you.

Respectfully submitted

PATRICK J. FITZGERALD
United States Attorney

By:    _____
       VALARIE HAYS
       Assistant U.S. Attorney

STATE OF ILLINOIS )
) SS
COUNTY OF COOK )

Laconda M. McDade, being first duly sworn on oath deposes and says that she is employed in the Office of the United States Attorney for the Northern District of Illinois; that on the 17th day of May 2002, she placed the foregoing Notice of the above-mentioned **GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANT DONVILLE JAMES' PRETRIAL MOTIONS** to be sent by **U.S. MAIL** delivered to the above named individual(s) on said date.

_____

SUBSCRIBED AND SWORN TO BEFORE ME
this 17th day of May 2002.

_____
NOTARY PUBLIC

"OFFICIAL SEAL"
Barbara J. Sims
Notary Public, State of Illinois
My Commission Exp. 05/21/2005

0221

are sufficient." *United States v. Butler*, No. 93 CR 720, 1994 WL 69387, at *2 (N.D. Ill. Feb. 4, 1994). *See also United States v. Dominguez*, 131 F.R.D. 556, 559 (N.D. Ill. 1990) (same).[1]

### C.     Motion to Produce the Telephone Number of the Informant

Defendant seeks the telephone number used by the informant to contact Mr. James. The informant's cell phone number at all relevant times was (312) 286-5618. The informant's home phone number at all relevant times was (773) 255-0485. The government will subpoena the informant's phone numbers as soon as this Court grants the agreed motion for early return of trial subpoenas. The government will provide defendant with a copy of those records within a day of receiving them.

### D.     Motion to Quash Consent to Search and Suppress Evidence and Motion to Suppress Post-Arrest Statements

Defendant asks this court to suppress the evidence found during the search of his apartment, specifically counterfeit-making equipment and counterfeit currency, and to suppress his post-arrest confession. Defendant claims he signed a consent to search form and made a written confession because he was subjected to "psychological coercion" and "promises of leniency." If this Court grants a suppression hearing to address defendant's contentions, the government will call William McKenna, the agent who took the defendant's confession and obtained the consent to search. Agent McKenna will testify that all of the allegations defendant makes in his suppression motions and supporting affidavit are false. The agent will further testify that no threats or promises were made to the defendant prior to him giving consent to search and signing a written confession. In addition,

---

[1]The government's acknowledgment of its obligations under *Brady* and *Giglio* should not be interpreted as a stipulation to provide defendant all of the materials requested in his motion for exculpatory evidence. Rather, the government will abide by the law in this Circuit and will provide defendant with all materials to which he is entitled.

0222

agents explained the consent to search form to the defendant before he signed it. Agent McKenna will further testify that prior to giving a written confession, defendant was informed of his Miranda rights and he signed a waiver of those rights. There was absolutely nothing coercive about the defendant's confession or consent to search, and his claims to the contrary are merely a desperate attempt to suppress the overwhelming evidence in this case. Government counsel is available for a suppression hearing anytime during the week of June 3rd. If this Court determines a suppression hearing is warranted, the hearing should in no way delay the previously set June 10th trial date.

### E.    Motion for Fingerprint Examination of Evidence

The government has submitted the gun found in defendant's car for fingerprint analysis. The tests have just been completed, and the government will provide a copy of the results to defense counsel by the end of the week.

In regard to defendant's request for fingerprint analysis of the artificial cocaine, the government has no objection. The government will submit the cocaine for fingerprint analysis and will provide the results to defense counsel when they are complete. However, the government does not expect to find defendant's prints on the artificial cocaine. The cocaine was not preserved for fingerprint analysis and has in fact been used in numerous deals since the March 25th transaction at issue. In these subsequent deals, many agents, informants, and suspects have touched the drugs. Nevertheless, the government will submit the drugs for analysis and provide defense counsel with the test results as soon as they are finished.

0223

**F.**    **Motion to Interview Witnesses Under Government's Control**

At this point, the government has not decided whether they will call the informant in this case as a witness. The government will make this decision within two weeks of trial. If the government decides to call this witness, the government certainly will not instruct the informant that he should not speak with defense counsel. The informant has been relocated because of his cooperation in another federal investigation. For the safety of the informant and his family, the government cannot disclose his current address. However, if the government decides to call the informant, the government will convey the defendant's request to the informant. If he chooses to speak with defense counsel, the government will arrange a telephone conference or a meeting at the U.S. attorney's office.

**G.**    **Motion for the Government to Provide Copies of All Audiotapes Created in This Case**

The government has just finished copying the tapes related to this case. Defendant's counsel will be receiving those tapes by the end of the week.

**H.**    **Motion for the Government to Produce the March 25, 2002 Audiotape and Tape Recorder Which "Failed" for Examination by Defendant's Tape Expert**

Defendant's request to examine the "tape recorder which failed" should be denied. The "tape recorder" is actually a digital recorder which burns recorded conversations directly onto a CD rom. When the conversations are recorded onto the CD rom, they are automatically erased from the digital recorder, and the CD rom itself becomes the evidence. The audiotapes that will be provided to defense counsel are dubbed from the CD rom. There is no reason to provide the actual recording equipment to the defense counsel because the equipment will provide no additional evidence. The

7

O224

recorder "failed" at the time of the March 25th transaction at issue because it was not turned on. The agents involved in the case were testing the equipment prior to the transaction. In testing the equipment, they were turning it on and off. After testing the equipment, they left it off by mistake. There is no purpose that would be served by examining the equipment because the government is not claiming that there was a mechanical failure with the equipment. Moreover, turning the equipment over would reveal confidential methods of federal law enforcement investigation. Accordingly, defendant's request should be denied.

### I.   Motion to Reset the Trial Date

Defense counsel incorrectly asserts in the motion to postpone the trial that the trial is currently set for June 17th. The trial is in fact set for June 10, 2002. The conflict defense counsel alleges in the motion, namely another trial, pertains to June 17th. The government and defense counsel agree that this trial should not take longer than a week. Therefore, this trial will not interfere with defense counsel's conflict on June 17th. Defense counsel also mentioned to the government this morning that she has a continuing legal education class during the week of June 10th. Surely the training can be rescheduled more easily and with less adverse consequences than rescheduling the trial.

Under the special circumstances of this case, an extended trial date is not warranted. First, this is not a complicated case. The defendant admitted in writing to attempting to buy 15 kilograms of cocaine with counterfeit money. He further admitted that he had a gun in his car at the time of the transaction. The gun and the artificial cocaine were found in the defendant's car. Counterfeit-making equipment was found in his apartment. Defense counsel has known since at least the first

8

week of May that she was seeking permission to be appointed counsel for defendant. She has been provided with all required discovery material currently within the government's possession. She will be provided with the tapes, fingerprint results, and phone records as soon as the government obtains them, which should be very shortly (as discussed above).

This Court set an early non-negotiable trial date based in part on the government's and its own concerns regarding defendant's danger to the community while released on bond. Defense counsel informed the government that the next trial date this Court has available is in November. This gives the defendant over five more months to commit the same types of offenses for which he is currently charged. The fact that the government does not know of any offenses defendant has committed since he has been released does not alleviate the government's concerns. The government's position has always been that the type of offenses defendant might continue to commit while released on bond, namely drug and counterfeiting offenses, cannot be easily detected by the government and cannot be prevented by electronic surveillance. The government does not have the resources to monitor defendant's phone(s) and conduct surveillance outside his home on a regular basis. Defendant should have never been released based on the fact that he was involved in a 15 kilogram cocaine deal, brought a gun to the transaction, and threatened to use the gun. Defense counsel has more than enough time to prepare for trial and fails to allege any conflict that should be given a higher priority than this trial. The government respectfully requests that this court deny defendant's request for an extension of his trial date. Alternatively, the government requests that if this Court grants defendant's motion to extend the trial date, the defendant be detained pending trial. Defense counsel has indicated that the defendant would be willing to surrender to custody if necessary.

9

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:                          

VALARIE HAYS
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5356

10

1                        DANIEL DICK,

2    having entered the Grand Jury room, was sworn by the

3    Foreperson as follows:

4            THE FOREPERSON:  You do solemnly swear that

5    in the testimony you are about to give before this Grand

6    Jury, you will speak the truth, the whole truth and

7    nothing but the truth, so help you God?

8            THE WITNESS:  I do.

9                        EXAMINATION

10   BY MS. HAYS:

11       Q     Could you please state your full name for the

12   record and spell it.

13       A     Daniel Dick, D-i-c-k.

14       Q     And where are you employed?

15       A     U.S. Secret Service.

16       Q     Where are you currently assigned?

17       A     The Chicago field office, counterfeit squad.

18       Q     How long have you worked as an agent for the

19   Secret Service?

20       A     About one year.

21       Q     Describe your basic duties.

22       A     We investigate the manufacturing, possession

23   and dealing of counterfeit U.S. currency.

24       Q     I want to discuss your familiarity with

25   Donaville James.  You became familiar with this

8

1   individual after your office began investigating him for

2   using counterfeit currency?

3        A    That's correct.

4        Q    And your office was informed by the FBI that

5   Donaville James was planning on purchasing cocaine with

6   counterfeit United States currency, correct?

7        A    Yes.

8        Q    And your agency began working with the FBI in

9   an undercover investigation of Donaville James?

10       A    Correct.

11       Q    You were assigned to this case?

12       A    Yes.

13       Q    And as part of your investigation you spoke

14  with FBI agents who provided background information on

15  the confidential informant, the details of the

16  investigative plan and information the informant

17  provided regarding the investigation?

18       A    Yes.

19       Q    I want to discuss now what you learned as a

20  result of your investigation.

21            In or about February of 2002 Donaville James

22  approached the FBI's confidential informant and asked

23  him if he would arrange a deal where James would buy

24  narcotics from the informant's source?

25       A    Correct.

9

1    Q      And James told the informant that he wanted
2    to pay for the drugs with counterfeit currency?
3    A      Yes.
4    Q      And the informant contacted the FBI and
5    informed then of James' proposal?
6    A      Correct.
7    Q      The informant agreed to work undercover for
8    the FBI in their investigation of James?
9    A      Yes.
10   Q      And acting undercover the informant agreed to
11   set up the deal for James?
12   A      Yes.
13   Q      James contacted the informant several times
14   to discuss the details of the transaction?
15   A      Yes.
16   Q      On March 16th, 2002, James and the informant
17   agreed that James would purchase one kilogram of powder
18   cocaine from the informant's source for 20,000 in
19   counterfeit currency and 10,000 in real currency?
20   A      Correct.
21   Q      On March 21st they agreed to increase the
22   amount of drugs?
23   A      Yes.
24   Q      James wanted to buy 10 kilos from the
25   informant's source for 200,000 in counterfeit currency?

10

1       A       Yes.

2       Q       And their discussions on March 21st were

3    recorded?

4       A       Correct.

5       Q       On March 22nd, 2002, James called the

6    informant and asked him whether his source could get

7    James 20 kilos of cocaine?

8       A       Yes.

9       Q       And the informant said he would have to check

10   with his source?

11      A       Correct.

12      Q       On March 24, 2002, the informant and James

13   agreed that James would buy 15 kilos of cocaine for

14   $300,000?

15      A       Counterfeit currency.

16      Q       Yes.

17      A       Correct.

18      Q       He said he would actually pay $200,000 in

19   counterfeit currency and that he would make it look like

20   300, right?

21      A       Correct.

22      Q       And this conversation was also recorded?

23      A       Yes.

24      Q       Okay.  Now I want to talk about the events of

25   March 25th, 2002.  This was the date that James and the

11

1    informant met to conduct the transaction?

2        A    Correct.

3        Q    And they met in a McDonald's parking lot?

4        A    Yes.

5        Q    And the informant was wearing a transmitter?

6        A    Yes.

7        Q    And FBI agents were able to hear parts of

8    their conversations with this device?

9        A    Yes.

10       Q    When James arrived he told the informant to

11   get in his car so he can take him to the counterfeit

12   currency?

13       A    Yes.

14       Q    And James drove the informant to another car

15   that was parked nearby?

16       A    Yes.

17       Q    And this was a Nissan Ultima?

18       A    Yes.

19       Q    And James opened the trunk of the car and

20   showed the informant a large bag of counterfeit

21   currency?

22       A    Yes.

23       Q    James said 300,000 in counterfeit currency

24   was in the bag?

25       A    Yes.

12

1    Q    After James showed the informant the

2 counterfeit bills, they drove back to McDonald's?

3    A    Yes.

4    Q    And the informant said the 15 kilos was

5 divided up between several cars parked in the area?

6    A    Yes.

7    Q    And the informant said he was going to get

8 the first 5 kilograms?

9    A    Yes.

10    Q    The informant left and went to a nearby

11 government vehicle?

12    A    Yes.

13    Q    He obtained 5 kilograms of what was actually

14 artificial powder cocaine and brought it back to James?

15    A    That's correct.

16    Q    James examined the cocaine and then the

17 informant placed it in his car?

18    A    Correct.

19    Q    Before he placed it in his car James said it

20 looked okay?

21    A    Yes.

22    Q    James told the informant that he would give

23 him the counterfeit currency after James returned with

24 the second five kilos of cocaine?

25    A    Correct.

0233

Dick

13

1    Q    James also stated to the informant something
2    to the effect of I won't have to use my gun then, right?
3    A    Correct.
4    Q    After the informant left to get more cocaine
5    for James, you and the other agents arrested him?
6    A    Correct.
7    Q    The first car of agents pulled up next to
8    James?
9    A    Yes.
10    Q    And you were in the car?
11    A    Yes.
12    Q    And you and the other agents got out of the
13    car yelling police and had your guns raised?
14    A    Yes.
15    Q    And James started to drive away?
16    A    Yes.
17    Q    And the second law enforcement car tried to
18    stop James by actually hitting his car?
19    A    Yes.
20    Q    And this didn't stop James, right?
21    A    No.
22    Q    He actually had to be blocked in by a third
23    law enforcement car?
24    A    Yes.
25    Q    And at this point he was arrested?

0234

14

1      A      Correct.

2      Q      I want to talk now about the details of the

3  arrest.  At the time of his arrest, agents found a

4  loaded Smith & Wesson nine millimeter semiautomatic

5  pistol in his car?

6      A      Correct.

7      Q      And they also found 5 kilograms of artificial

8  cocaine that James tried to purchase on the passenger

9  seat?

10     A      Correct.

11     Q      Agents also searched the Nissan Ultima that

12 James had driven the informant to?

13     A      Correct.

14     Q      And in the trunk of that car agents found

15 $87,430 in counterfeit currency?

16     A      Correct.

17     Q      James signed a consent form for you to search

18 his apartment, true?

19     A      True.

20     Q      Inside of his apartment you found 4,200 in

21 counterfeit currency?

22     A      Yes.

23     Q      And this money had the same serial -- some of

24 the same serial numbers as the 87,430 that was found in

25 the Nissan Ultima?

Dick

15

1    A    Yes.

2    Q    Also found in his apartment was counterfeit

3  making equipment?

4    A    Correct.

5    Q    This included computer?

6    A    Yes.

7    Q    Two machines that do both printing and

8  scanning?

9    A    Yes

10   Q    A paper cutter?

11   A    Yes.

12   Q    Two printer cartridges?

13   A    Yes.

14   Q    Three ink cartridges?

15   A    Yes.

16   Q    And a pound of rubber bands?

17   A    Correct.

18   Q    James also signed a written confession,

19  didn't he?

20   A    Yes.

21   Q    In this confession he admitted trying to buy

22  15 kilos of cocaine with counterfeit currency?

23   A    Yes.

24   Q    He further confessed that he had -- he was

25  going to give at least some of the cocaine to a person

0236

16

1    named Dale?

2        A    Yes.

3        Q    He also admitted that he put blank pieces of

4    paper in the bag of counterfeit currency to make it look

5    more like 300,000?

6        A    Correct.

7        Q    In addition, he confessed orally that the gun

8    found in his car belonged to him?

9        A    Correct.

10        Q    And his girlfriend also gave a written

11    statement?

12        A    Yes.

13        Q    In that statement she admitted driving the

14    Nissan Ultima that contained the counterfeit currency?

15        A    Yes.

16        Q    She further stated that she saw James and

17    another person making counterfeit currency in James'

18    apartment the day before the transaction?

19        A    Yes.

20        Q    She further admitted that James told her that

21    he was going to make thousands of dollars by selling

22    counterfeit currency?

23        A    Yes.

24        Q    Finally, am I correct that you have not

25    narrated everything you know about this investigation

0237

17

1   but have simply responded to the questions that I've

2   asked?

3       A       Yes.

4       Q       You're prepared to answer to the best of your

5   ability any additional questions I am might have or the

6   grand jurors may have?

7       A       Yes.

8           MS. HAYS:  Any questions for Agent Dick?

9   BY A JUROR:

10      Q       About the equipment that was in his

11  apartment, I mean, if you went in my house you would

12  find a computer, a printer, a scanner.

13          MS. HAYS:  Let me ask him one more question.

14  BY MS. HAYS:

15      Q       What was found on the computer?

16      A       When the agents went to the apartment they

17  found the two scanners with actual pattern notes, the

18  bills laying on the scanner and three in a row on each

19  of the machines, how he was printing them off.  So he

20  left them laying on the machine.

21  BY A JUROR:

22      Q       How was the quality of the counterfeit bills?

23  Were they bad or good?

24      A       They're computer generated so to the average

25  person they would look pretty bad, but they were only

Dick

18

1   made for a quick glance.  If you had to hold one and

2   look at it really closely, you'd be able to tell it was

3   pretty bad.

4   BY MS. HAYS:

5       Q     Describe the packaging that the bags were in

6   the trunk of the Nissan Ultima.

7       A     He had rubber banded the notes.  He put

8   counterfeit notes on either side and sandwiched blank

9   paper in between and then put them in stacks in the bags

10  that made it look like it was a lot of money in the bag.

11          MS. HAYS:  Okay.  Any other questions?

12          (No response.)

13          MS. HAYS:  All right.  We'll go ahead and

14  excuse Agent Dick then.

15          (Witness excused.)

16

17

18

19

20

21

22

23

24

25

0239

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) No.  02 CR 278 |
| v. | ) Judge Wayne R. Andersen |
| | ) |
| DONVILLE JAMES | ) |

**NOTICE OF FILING**

TO:  Valarie Hays
     Assistant U.S. Attorney
     219 South Dearborn Street
     Chicago, IL 60604
     Fax No. (312) 353-4322

     **PLEASE TAKE NOTICE**  that on August 30, 2002, I filed with the Clerk of the
United States District, 219 South Dearborn, Chicago, IL Defendant's Corrections To
Entrapment Proffer:

                          Anita Rivkin-Carothers
                          33 North LaSalle Street, Suite 3300
                          Chicago, IL 60602
                          (312) 641-2901

***Certificate of Service***

     I, Anita Rivkin-Carothers, certify that I served a copy of the foregoing Notice and
Pleadings on the party addressed above by facsimile on August 30, 2002.

                          Anita Rivkin-Carothers

0240

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 02 CR 278 |
| v. | ) | Judge Wayne R. Anderson |
| | ) | |
| DONVILLE JAMES | ) | |

### CORRECTIONS TO ENTRAPMENT PROFFER

Defendant Donville James, by his attorney, Anita Rivkin-Carothers makes the

following corrections to the Entrapment Defense Proffer:

Page 2, the first full paragraph should read:

To avoid further contact by the informant, Mr. James immediately

changed his telephone number. In September, 2001, the informant

called Mr. James. When Mr. James answered the call the informant

told Mr. James that he could not get away from him. The informant

told Mr. James that he had obtained his new telephone number from

a friend who worked at PrimeCo, and that he also had Mr. James'

home address and Mr. James' girlfriend's address, and the informant

insisted that the Mexican Mafia was still pursuing him and threatening

his life, and there fore he needed Mr. James to get more counterfeit

money to buy more drugs so that he could clear up his debt with the

Mexican Mafia. The informant again threatened to kill or harm Mr. James'

family and girlfriend if Mr. James did not help him.

0241

Page 3, the first full paragraph should read:

> The informant repeatedly called Mr. James. Mr. James continued to put the informant off by saying he needed time to locate the counterfeit money. After a few weeks, the informant threatened to send the Mexican Mafia to visit Mr. James. In February, 2002, the informant called Mr. James from a telephone number that Mr. James did not recognize. The informant continued to threaten Mr. James when Mr. James told the informant that he still had not located any counterfeit money. A few weeks later, while Mr. James was at his mother's home (the billing address on his phone records) two or three men came to the door and insisted on coming inside. Mr. James refused to allow them to enter and told them that he would call the police if they did not leave. The men left. Within minutes, the informant called Mr. James and reminded him that he and the Mexican Mafia knew where his mother and girlfriend were, and that if he called the police, they would return and kill whomever was in the house. The informant told Mr. James to get the money so that the Mexican Mafia would not hurt him or his family and he would not have to hurt Mr. James and his family.

Respectfully submitted,

Anita Rivkin-Carothers
Attorney for Defendant
33 North LaSalle Street, Suite 3300
Chicago, IL 60602
Tel: (312) 641-2901

2



# Federal Bureau of Investigation

# Freedom of Information / Privacy Acts

# Release

**SUBJECT:** Danville James

05/01/2002

****************** ARREST ******************
SENSITIVE / UNCLASSIFIED

Case Number: 281C-CG-117362          Stat Agent Name:                  Report Date: 05/01/2002
Serial No.: 53                       Stat Agent SOC.:                  Accom Date.: 03/25/2002

                                                                                       b6
Does Accomplishment Involve      Assisting Joint Agencies    Assisting Agents SOC        Subject Name
---------------------------      ------------------------    --------------------     ...........b7C

Drugs . . . . . . . . . . . : Y      USSS    |                                        JAMES, DONVILLE  b2
A Fugitive. . . . . . . . . : N              |                                         b7C
Bankruptcy Fraud. . . . . . : N              |                          |
Computer Fraud/Abuse. . . . : N              |                          |              RA    Squad   Task Force
Corruption of Public Officials: N            |                          |              ----  -----   ----------
Money Laundering. . . . . . : N              |                          |              HQ    D-1

Sub. Invest. Asst by Other FOs:                                 1 = Used, but did not help
                                                                2 = Helped, Minimally
     Investigative Assistance or Technique Used                 3 = Helped, Substantially
     ------------------------------------------                 4 = Absolutely Essential

 FINAN ANALYST    LAB DIV EXAMS    UCO-GROUP I      FT. MON-NRCSC
 AIRCRAFT ASST    LAB FIELD SUP    UCO-GROUP II     FOR LANG ASST
 COMPUTER ASST    PEN REGISTERS    UCO-OTHER        NON FBI LAB EX
 CONSEN MONITR    PHOTO COVERGE    NCAVC/VI-CAP     VICT-WITN COOR
 ELSUR/FISC       POLYGRAPH        CRIM/NS INTEL    IO WANTED FLYR       b7E
 ELSUR/III        SRCH WAR EXEC    CRIS NEG-FED     SARS
 ENG FIELD SUP    SHOW MONEY       CRIS NEG-LOC     CART
 ENG TAPE EXAM    SOG ASST         ERT ASST
 LEGATS ASST.     SWAT TEAM        BUTTE-ITC
 EVIDNCE PURCH    TECH AG/EQUIP    SAVANNAH-ITC
 INFORMANT/CW     TEL TOLL RECS    POC-WRCSC

Arrest is for Federal, Local, or International (F/L/I).. : F
Arrest Subject Priority (A/B/C)........................ : C
Did Subject Resist (Y/N)............................... : N
Was Subject Armed (Y/N)................................: Y


              United States Code Violation
              ============================

         Title      Section      Count
         -----      -------      -----
          21         846          1
          18         924C         1
          18         473          1
          18         471          1

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

              Accomplishment Narrative
              ------------------------


                 SENSITIVE / UNCLASSIFIED

                                                    0244

FD-515 (Rev. 8-1-00)

**Accomplishment Report**
(Accomplishment must be reported and loaded into ISRAA within 30 days from date of accomplishment)

Squad supervisor approval (please initial)

Date Prepared 4/23/02
Date Loaded 5/1/02
Data Loader's Initials gmw

b6
b7C
b7E

| Accomplishment involves: (check all that apply) | | File Number | | Investigative Assistance or Technique Used | | |
|---|---|---|---|---|---|---|
| Drugs | ☒ | 28K-TG-117362 | | 1-Used, but did not help 2-Helped, minimally | 3 - Helped, substantially 4 - Absolutely essential | b2 |
| A Fugitive | ☐ | | | For Sub. Invest. Assist. by other FO (s) indicate A,B,C,D for corresponding FO | | |
| Bankruptcy Fraud | ☐ | Stat Agent Soc. Sec. No. | | | | |
| Computer Fraud/Abuse | ☐ | | | | | |
| Corruption of Public Officials | ☐ | | | | | |
| Money Laundering | ☐ | Stat Agent Name | | | | |
| Sub invest Asst by FO (s) | ☐ | | | | | |

| | Rate FO | IAT | Rate FO | IAT | Rate FO | IAT | Rate FO | IAT |
|---|---|---|---|---|---|---|---|---|
| | | Fin. Analyst | | Lab. Div. Exam | | UCO - Group I | | Ft. Mon. ITC |
| | | Aircraft Asst. | | Lab. Field Sup | | UCO - Group II | | For. Lang Ass |
| | | Computer | | Pen Registers | | UCO - Nat. Back | | Non FBI Lab Ex |
| | | Consen Mon. | | Photo Cover. | | NCAVC / VI - CAP | | Vict-With Coor |
| | | Elsur / FISC | | Polygraph | | Crim/NS Intal Assi | | IO Wanted Flyer |
| | | Elsur / T. III | | Search Warran | | Crisis Neg. - Fed. | | SARs |
| | | Eng. Field Sp | | Show Money | | Crisis Neg. - Local | | CART |
| | | Eng. Tape Ex | | SOG Asst. | | ERT Asst. | | |
| | | Legats Asst. | | Swat Team | | Butte - ITC | | |
| | | Evid Purchase | | Tech. Ag/Equip | | Sav - ITC | | |
| | | Inf/CW Info | | Phone Toll Re | | Poc - ITC | | |

| RA | Squad |
|---|---|
| | D-1 |

Asst. FO(s) _____ A, B, C, D

Task Force

Assisting Agencies × ●
1. USSS
2.

Assisting Agents Soc. Sec. No. ×

Name: _____
2. ● - ●
Name:

---

**A. Complaint / Information / Indictment**
☒ Federal ☐ Local ☐ International
Complaint Date: 3/25/02
Check if Civil Rico Complaint ☐
Information Date: _____
Indictment Date: 4/11/02

**B. Locate / Arrest**
☒ Federal ☐ Local ☐ International
Subject Priority: ☐ A ☐ B ☒ C
Locate Date: _____
Arrest Date: 3/25/02
☐ Subject Resisted Arrest
☒ Subject Arrested was Armed

**C. Summons** Date: _____
☐ Federal ☐ Local

**D. Recovery/Restitution/PELP X**
☐ Federal ☐ Local ☐ International
Recovery Date: _____
Code ● ✓ Amount $ _____
Code ● ✓ Amount $ _____
Restitution Date: _____
☐ Court Ordered ☐ Pretrial Diversion
Code ● ✓ Amount $ _____
PELP Date: _____
Code ● ✓ Amount $ _____

**E. Hostage(s) Released** Date: _____
Released by: ☐ Terrorist ☐ Other
Number of Hostages: _____
Child Located Date: _____

---

**F. Conviction**
☐ Federal ☐ Local ☐ International
Conviction Date: _____
Subject Description Code: ____●(____)●
For 6F, G, H-Include Agency Code
☐ Felony or ☐ Misdemeanor
☐ Plea or ☐ Trial
State: _____ Judicial District: _____

**G. U.S. Code Violation**
Required for sections A,B,F,and J
(Federal Only)

| Title | Section | # Counts |
|---|---|---|
| 21 | 846 | 1 |
| 18 | 924(c) | 1 |
| 18 | 473 | 1 |
| 18 | 471 | 1 |

**H. Sentence** Date: _____
Sentence Type: _____ ●
In Jail: Years_____ Months_____
Suspended: Years_____ Months_____
Probation: Years_____ Months_____
Fines: _____

**I. Disruption/Dismantlement**
Disruption Date: _____
Dismantlement Date: _____
Completion of FD-515a Side 2 Mandatory

---

**J. Civil Rico Matters** Date: _____
Also Complete "Section G"
Other Civil Matters Date: _____
Judgment ____ ____ ____ ____ ●
Judicial Outcome ____ ____ ____ ____ ●x
Amount $ _____
Suspension: Years ____ Months ____

**K. Administrative Sanction** Date: _____
Subject Description Code _____●
Type: Length:
☐ Suspension ☐ Permanent
☐ Debarment or
☐ Injunction Year____ Months ____

**L. Asset Seizure** Date: _____
**Asset Forfeiture** Date: _____
CATS # Mandatory _____
Check one of the three:
☐ Asset Forfeiture - Administrative
☐ Asset Forfeiture - Civil Judicial
☐ Asset Forfeiture - Criminal
Do not indicate $ value in Section D

**M. Acquittal / Dismissal / Pretrial Diversion**
Acquittal Date: _____
Dismissal Date: _____
Pretrial Diversion Date: _____

---

**N. Subject Information** (Required for all Sections excluding Section D (Recovery/PELP), Section E (Hostage), Section I, and Section L).

| Name | Race ● | Sex | Date of Birth | Social Security No. (if available) |
|---|---|---|---|---|
| Donville James | B | M | 11/24/70 | 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 |

For Indictments/Convictions only:
☐ Subject related to an LCN, Asian Organized Crime (AOC), Italian Organized Crime (IOC), Russian/Eastern European, Caribbean, or Nigerian Organized Crime Group - Complete FD-515a, Side 1 Blocks A-E mandatory, F-H as appropriate.
☒ Subject related to an OC/Drug Organization, a VCMO Program National Gang Strategy target group, or a VCMO Program National Priority Initiative target group - Complete FD-515a, Side 1 Blocks A-C only.

x Additional information may be added by attaching another form or a plain sheet of paper for additional entries.
● See codes on reverse side.
✓ Requires that an explanation be attached and loaded into ISRAA for recovery over $1m and PELP over $5m.

Serial No. of FD-515
53

0245