

FILED

MAR 1 0 2008 *aew*
Mar 10, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

No. 02 CR 278

---

UNITED STATES OF AMERICA,

Plaintiff,

v.

DONVILLE JAMES,

Movant.

---

**Appendix Supporting Movant
Motion To Vacate, Set-Aside or Correct
Sentence By Person In Federal Custody**

---

APPENDIX FILLED BY MOVANT, DONVILLE JAMES, PRO SE

08CV 1416
JUDGE ANDERSEN
MAGISTRATE JUDGE SCHENKIER

DONVILLE JAMES
#14388424
FCI Greenville
P.O. Box 5000, H-2B
Greenville, Illinois 62246

UNITED STATES COURT OF APPEALS
For The Seventh Circuit
Chicago Illinois 60606

UNITED STATES OF AMERICA          )
                                  )
              v.                  )          No. 05-3070
                                  )
DONVILLE JAMES                    )

## NOTICE OF FILING

TO: Valarie Hays
    Assistant U.S. Attorney
    219 South Dearborn Street
    Chicago, Illinois 60604

**PLEASE TAKE NOTICE** that on the ⁶24 day of the 3 month of 2006, I filed with the Clerk of the United States Courts of Appeals, 219 South Dearborn, Chicago, IL the following:
        **APPENDIX FOR MOVANT SECTION 2255 MOTION**                    -
and service which is been made upon you.

                         Respectfully Submitted,          3 | 6 | 08
                     By: _____ Date _____
                         Appellant, Donville James, pro-se

### CERTIFICATE OF SERVICE

     I, Donville James, state that on ⁶24 day of the 3 month Of 2008, certify that I served a copy of the foregoing Notice and _____
        **APPENDIX FOR MOVANT SECTION 2255 MOTION**                    ,
on the party addressed above by U.S. MAIL delivered on said date.

                                                          3 | 6 | 08
                         _____ Date _____
                         Appellant, Donville James, pro-se

<u>INDEX</u>

Donville James  vs United States of America
Docket No. 05-3070
District Court No. 02 CR 278

**(PAGES NUMBERED 0001 - 0245)**

Docket Entries

Affidavit of Truth...................................................0001
Evidence attached to Affidavit of Truth
  1.    EXHIBIT,  "CASE TYPE AND SECONDARY CASE TYPE" 1 page....0044
  2.    EXHIBIT,  "MARCH 16, 2002 REPORT" 1 page...............0046
  3.    EXHIBIT,  " COMPLAINT AND COMPLAINT'S AFFIDAVIT" 8
                pages...................................0048
  4.    EXHIBIT,  "PROSECUTERS PREPARED STATEMENT" 1 page.......0057
  5.    EXHIBIT,  "INFORMANT'S GRAND JURY STATEMENT" 4 pages....0059
  6.    EXHIBIT,  "INFORMANT'S PHONE RECORD MARCH 16, 2002" 2
                pages...................................0064
  7.    EXHIBIT,  "DEFENDANT'S PHONE RECORD MARCH 16, 2002" 3
                pages...................................0067
  8.    EXHIBIT,  "MARCH 21, 2002 DISCOVERY TRANSCRIPT" 18
                pages...................................0071
  9.    EXHIBIT,  "MARCH 21, 2002 JURY TRANSCRIPT" 22 pages.....0090
  10.   EXHIBIT,  "MARCH 24, 2002 DISCOVERY TRANSCRIPT" 8 pages.0113
  11.   EXHIBIT,  "MARCH 24, 2002 JURY TRANSCRIPT" 8 pages......0122
  12.   EXHIBIT,  "INFORMANT'S INTERVIEW WITH THE PROSECUTERS"
                8 pages.................................0135
  13.   EXHIBIT,  "MAY 16 2002 F.B.I LETTER TO PROSECUTERS" 2
                pages...................................0144
  14.   EXHIBIT,  "AGENT MCKENNA'S STATEMENT AT THE SUPPRESSION
                HEARING" 1 PAGE.........................0149
  15.   EXHIBIT,  "AGENT NEWBERG STATEMENT AT THE SUPPRESSION
                HEARING" 1 page.........................0151
  16.   EXHIBIT,  "DEFENDANT'S WRITTEN STATEMENT" 4 pages.......0153
  17.   EXHIBIT,  "F.B.I. FD-302 INVESTIGATION ON 3/25/2002" 3
                pages...................................0158
  18.   EXHIBIT,  "DISPOSITION OF EVIDENC, DATED 6/4/02" 1
                page....................................0162
  19.   EXHIBIT,  "CERTIFIED INVENTORY OF EVIDENCE, MARCH 25,
                2002 INFORMANT'S BODY WIRE" 1 page..........0164
  20.   EXHIBIT,  "CERTIFIED INVENTORY OF EVIDENCE, MARCH 25,
                2002 MINI DIGITAL VIDEO" 1 page.............0166
  21.   EXHIBIT,  "CERTIFIED INVENTORY OF EVIDENCE, MARCH 24,
                2002 AUDIO RECORDING" 1 page................0168

22.    EXHIBIT, "CERTIFIED INVENTORY OF EVIDENCE, MARCH 21,

Miscelaneous Motions

23.    EXHIBITS .......................... 0172-0245

# TABLE OF CONTENT

I.   INTRODUCTION _____ 1

II.   FALSE STATEMENT, MATCH 16, 2002 _____ 2

III.   INTENTIONAL MISREPRESENTATION _____ 4

IV.   INTENTIONAL MISREPRESENTATION
MARCH 24, 2002 _____ 7

V.   PROSECUTORIAL INTENTIONAL MISLEADING
THE GRAND JURY _____ 10

VI.   GOVERNMENT INSTIGATION OF NARCOTIC
CRIME _____ 11

VI.   INFORMANT INITIAL CONTACT WITH
AUTHORITIES _____ 14

VII.   INFORMANT ACTION LEADING UP TO
AFFIANT'S ARREST _____ 15

     A.   AUGUST 2001 – JANUARY 2002 _____ 15

     B.   FEBRUARY 2002 TO BEFORE
        MARCH 21, 2002 _____ 17

     C.   MARCH 21, 2002 _____ 19

     D.   MARCH 24, 2002 _____ 21

     E.   MARCH 25, 2002 _____ 22

VIII.   AFTER THE ARREST, MACH 25, 2002 _____ 25

X.   SUPPRESSION OF EVIDENCES _____ 32

     A.   MARCH 25, 2002 AUDIO RECORDING _____ 32

     B.   MARCH 25, 2002 VIDEO RECORDING _____ 34

     C.   MARCH 24, 2002 RECORDED
        CONVERSATION _____ 36

     D.   MARCH 21, 2002 INFORMANT BODY WIRE
        RECORDING _____ 37

ATTACHED EVIDENCES _____ BACK

001

# AFFIDAVIT OF TRUTH
## FOR CASE 02 CR 278

Date: 8/28/08

The State of Illinois   )

                    ) S.S.

The county of Cook   )

I, Donville James am competent to bring forth this Affidavit. This Affidavit of truth is my good faith effort to do so. I, Donville James do declare the following facts to be true, correct, And not misleading, and under penalty of perjury, under the laws of the United States of America (pursuant to Title 28 U.S.C 1746(1)), and do so state:

## I.  INTRODUCTION

1. That your affiant, Donville James has personal knowledge of the facts declared herein, and,

2. That this Affidavit of truth reference the Federal Arrest and Conviction of Donville James, and,

3. That the United States Secret Service were charged with investigating your affiant for matters involving counterfeit United Stated currency, and,

4. That the United States Secret Service case # J-201-735-131941-S charged the United States Secret Service with the investigating your affiant for:

      1.  Primary case type -- Manufacturing United States currency, charge number 735.041.

      2a.  Secondary case type -- Dealing in United states Currency, charge number

1

0002

735.021.

2b.    And Crimes involving use of Emerging Technology.

5.    That agent Daniel Dick of the Secret Service was assigned case agent on February 8, 2002, and

6.    That the three case types are listed in the case synopsis prepared by agent Dick, and,

7.    That case # J-201-735-131941-S was presented to the assistant United States attorney Ms. Valerie Hays, who presented a criminal complaint based on drug conspiracy charges, and,

8.    That the complaint's Affidavit was sworn to by agent Depodesta of the F.B.I, and

9.    That the complaint's Affidavit set forth by agent Depodesta to established probable cause contains false, and misrepresentation of material facts, and,

10.    That the complaint's Affidavit set forth by agent Depodesta to established probable cause contains intentional misrepresentation of the truth, and,

11.    That agent Depodesta of the F.B.I showed a knowing and reckless disregard for the truth.

## II.    False Statement, March 16, 2002

12.    That, F.B.I report on a FD-302 form prepared by agent Depodesta, dated March 18, 2002 states:

> "On March 16, 2002, James… telephonically contact the source (informant), and they discussed a one kilogram cocaine transaction …"

See F.B.I report attached and mark as Exhibit, MARCH 16, 2002 F.B.I REPORT.

2

0003

13.    That paragraph 4 of the complaint's Affidavit state:

> "In March 2002, a cooperating individual (CI) provided the F.B.I with information about on individual known to the CI as "James." The CI explained that James asked if the CI would be willing to arrange a narcotics transaction in which James would pay for powder cocaine with counterfeit money."

See complaint and complaint's Affidavit attached and mark as Exhibit, COMPLAINT, AND COMPLAINT'S AFFIDAVIT.

14.    That the assistant United States attorney prepared a statement for the criminal informant to read before the Grand Jury, and,

15.    That page 4 and 5 of the prepared statement states:

> "On March 16, 2002 James called me (the informant) and we agreed that he (James) would purchase one kilo for $20,000 in counterfeit money and he would give me $10,000 in real currency."

16.    See copy of informant's Grand Jury statement attached and mark as Exhibit, INFORMANT'S GRAND JURY STATEMENT.

17.    That the date of March 16, 2002 is very important in this case, it is the date agent Depodesta implied to the Federal magistrate and the informant told the Federal Grand Jury your affiant initiated the attempted drug purchase from the informant's source. Which your affiant was convicted of, and,

0004

18.    That your affiant had no physical contact with the Government informant since August 30, 2001, almost eight months prior to your affiant's arrest, and

19.    That from August 30, 2001 communication between the informant and your affiant was done solely through the use of cellular telephone, and,

20.    That the informant AT&T cellular phone record for number 773-255-0455 are listed on pages 597 and 598 of the phone record, and,

21.    That your affiant PrimCo cellular phone record for 847-407-6737 for calls made on March 16, 2002 are listed on pages 105-107 of the hone record, and,

22.    That both cellular phone record for March 16, 2002 showed conclusively that no calls were transmitted by either number on March 16, 2002, the alleged day your affiant initiated the drug charge your affiant is convicted of, and,

23.    See attached copy of informant's phone record for March 16, 2002 mark as Exhibit, INFORMANT'S PHONE RECORD, MARCH 16, 2002.

24.    See attached copy of affiant's phone record for March 16, 2002 mark as Exhibit, AFFIANT'S PHONE RECORD, MARCH 16, 2002.

## III.    Intentional Misrepresentation

25.    That paragraph 7 of the complaint Affidavit state:

    "On March 21, 2002... James and the CI agreed to purchase 10 kilograms of cocaine for $200,000 in counterfeit currency from the CI's source."

4

0005

26.   That page five of the informant's Grand Jury statement state:

     "On March 21, 2002, we agreed that James would purchase 10 kilo of cocaine from my (informant) source for $200,000 in counterfeit money."

27.   That agent Depodesta testified that the conversation on March 21, 2002 about the alleged 10 kilograms cocaine purchase was recorded by the F.B.I, and,

28.   That a copy of the recording along with the transcript of the March 21, 2002 conversation were given to affiant as Discovery materials, and,

29.   That there are absolutely no such conversation on March 21, 2002 about your affiant purchasing 10 kilograms of cocaine from the informant's source on March 21, 2002, and,

30.   That the recorded conversation, in fact, showed the Government informant instigating a more sever crime that was not apart of the original investigation charged to the Secret service of the F.B.I as a matter of fact.

31.   That on page 5 of the March 21, 2002 Discovery transcript, the informant said to your affiat:

     "Well like I say I got the... I got the guy set up..."

32.   That on page 12 of the March 21, 2002 Discovery transcript he informant said to your affiat:

     "um he (the informant source) live by um... that was the other thing I was ganna tell you. He lives by the Brickyard. He lives about... about, I don't know exactly his house he's not gonna tell me exactly where it is CAUSE I COULD ROB HIM MYSELF, you know what I'm saying...?"

33.   That on page 15 the informant said to your affiat:

5

"after we (your affiant and the CI) do this one (ROB the buy. See paragraph 32)
CAUSE I WANNA DO THIS ONE TOO"

And he continued to tell your affiant that:

"Yeah both (the guys with the cocaine and the guy with the heroin) are going to
do LIKE YOU FUCK US UP."

34. That the word 'US' paragraph 33 is referring to the informant and his own friends, and

35. That the phrase "YOU FUCK US UP" in paragraph 33 was deleted by the prosecutor in
the transcript they provided to the jury at trial, and,

36. That on page 8 of the March 21, 2002 Discovery transcript the informant said:

"Alright, you help sell em (the cocaine)."

37. that the informant in paragraph 36 is telling your affiant that your affiant must SELL him
sell the cocaine the informant was planning to buy with the counterfeit money, and,

38. That on page 6 of the March 21, 2002 Discovery transcript the informant said:

"...cause I WANNA DO IT LIKE I TOLD you, ten grand ($10,000) I GANNA
SELL YOU each one ten. You make ten, I make ten."

39. That the informant statement in paragraph 38 was manipulated by the Government in the
transcript the gave to the jury at trial even though the paragraph was clear and
unambiguous, and,

40. That the informant continued to say to your affiant on March 21, 2002:

"... I go inside with the kilos and get my share cause I don't wanna leave without
my share you know, I WANNA MAKE THE MONEY AND GET THE FUCK
OUTTA HERE."

And:

"Alright men DON'T FUCK ME UPMEN."

0007

41.  The informant even gave your affiant instructions on March 21, 2002 on how to fix up the counterfeit money so they appears to his friends to look real, and,

42.  That as mention before in paragraph 29, there are absolutely no conversation on March 21, 2002 between the informant and your affiant about your affiant buying narcotics from the informant's source, and,

43.  That the Government own evidence showed that the informant set up his friends the buy narcotics from them using the counterfeit money he asked your affiant to provide him with, and,

44.  That the Government own evidence contradicts what agent Depodesta told the magistrate and the informant told the Grand Jury happened on March 21, 2002, and,

45.  See attach copy of the March 21, 2002 Discovery transcript mark as Exhibit, MARCH 21, 2002 DISCOVERY TRANSCRIPT.

## IV.  Intentional Misrepresentation, March 24, 2002

46.  That paragraph 10 of the complaint's Affidavit states:
"On March 24, 2002, the CI placed a recorded telephone call to Defendant James Donville. They agreed on purchasing 15 kilograms of powder cocaine for $300,000. Defendant James Donville advised that he would have $200,000 in counterfeit money."

47.  That page five of the informant Grand Jury statement states:
"On March 24, 2002, James and I agreed that he will purchasing 15 kilograms of powder cocaine from my source and pay $300,000 in counterfeit currency, he told me he would pay me 20,000 in real currency for arranging that transaction."

48.  That there are absolutely no conversation about your affiant purchasing 15 kilograms

7

0008

of cocaine from the informant's source, and paying the informant $20,000 to arranging the alleged deal on March 24, 2002, and,

49.    That the recorded conversation on March 24, 2002 was a continuation of the March 21, 2002 conversation in which the Government informant solicit your affiant in helping with his plan to ROB narcotics from his own friends, and,

50.    That the Government provided copy of the transcript of the March 24, recorded conversation over to your affiant as Discovery material, and,

51.    That on the March 24, 2002 Discovery transcript the informant said on page 7of14, which is the first page of the transcript:

> "Hey, uh I talk to the guy already, he is on his way back. He said fifteen would be o.k..., I tell him twenty five ...he said if you guys are police, cause I be changing the number and stuff."

52.    That on the March 24, 2002 Discovery transcript your affiant said on page 8of14:

> "I am going to put, I'm going to put a couple of two hundreds ($200,000 in counterfeit money) in there."

53.    The informant said:

> "Two hundred only."

54.    Your affiant replied:

> "Yeah"

55.    On page 9of14 the informant said:

> "It (the bag with the counterfeit money) looks like three ($300,000), because the total comes out to be three, but it looks like three, right?"

56.    And on page 10of14 the informant said:

00 o 9

"But just uh, just make sure for tomorrow (March 25, 2002), just make sure the ( the counterfeit money) look like three ($300,000)."

57.     That in paragraph 58 the informant insisted that your affiant fix up the bag containing the counterfeit currency so it appears to hold $300,000, and

58.     That the 15 kilograms of cocaine agent Depodesta stated in the complaint's Affidavit your affiant was trying to purchase from the informant's source with counterfeit money on March 24, 2002, is the same 15 kilograms of cocaine the informant was trying to ROB from his own friend by paying them with counterfeit money, and,

59.     That the 15 kilograms of cocaine the informant told the Grand Jury your affiant wanted to purchase from his source for $300,000 in counterfeit money on March 24, 2002 and pay him $20,000 to arrange the deal is the same 15 kilograms of cocaine the informant solicited your affiant to help ROB from his own friends, and,

60.     That the recorded conversation totally contradicts what the prosecutor wrote in their prepared statement that the informant read before the Grand Jury, and,

61.     That a copy of the March 24, 2002 Discovery transcript is attached and mark as Exhibit, MARCH 24, 2002 DISCOVERY TRANSCRIPT.

62.     That the March 24, 2002 Discovery transcript are 14 pages in length, and,

63.     That the Government provided your affiant with only the last eight pages on discovery, and,

64.     That the transcript that was given to the jury starts at page 70f14 of the Discovery transcript, but was numbered as page 1 on the transcript the Government gave the jury, and

OO1O

65. That your affiant had a right to the first 6 pages of the March 24, 2002 Discovery Transcript, and,

66. That your affiant had a right to the first six pages of the March 24, 2002 transcript pursuant to Jencks, and Braby v. Maryland, and,

67. That the first six pages of the March 24, 2002 recorded conversation contained exculpatory material.

## V.    Prosecutorial Intentional Misleading the Grand Jury

68. that, as mention in paragraph 14 the prosecutor prepared a statement for the informant to read before the Grand Jury, the statements listed in paragraph 69-74, and,

69. "On March 16, 2002, James (affiant) called me (informant) and we agreed that he (affiant) would purchase 1 kilo of cocaine from my source for $20,000 in counterfeit currency and he would give me (informant)$10,000 in real currency."

70. "On March 21, 2002, we agreed that James would purchase 10 kilos of cocaine from my source for $200,000 in counterfeit money."

71. "On March 22, 2002, James called me and asked whether he could buy 20 kilograms from my source. I told him I will have to see whether my source had 20 kilograms available."

72. "On March 24, 2002, James and I agreed that he will purchase 15 kilograms from my source. He told me he would pay me 20,000 in real currency for arranging that transaction."

"On March 25, 2002, James and I met in McDonald's parking lot to further discuss the conduct of that transaction…"

74.  In the prosecutor's interview with the CI, the day before he went before the Grand Jury, he told them:

*See AVP*
*0143* ———>

"On several occasions James suggested to the CI that he Could supply the CI with counterfeit money, that the CI could use and buy drugs from one dealer, then the CI could sell the drugs for cash to pay off his debt.  Shortly after on November 2001 the CI walked into the F.B.I office 'n Chicago and asked for help."

75.  That the informant never told the prosecutors your affiant was trying to buy narcotics.

76.  That based on Sections II, III, IV, and paragraph 74 the prosecutors had prior knowledge that their statement were misleading and false, and,

77.  That the prosecutors prepared statement formed the basis for the Grand Jury investigation, and,

78.  The false and misleading statements were meant to influence the Grand Jury, and,

79.  That, if the Grand Jury were not influenced by the false and misleading statement, your affiant would not have been indicted and convicted of narcotics charges.

## VI.  Government Instigation Of Narcotic Crime

80.  That on page 196 of the trail transcript agent Depodesto told the jury that he met the informant in November 2001, and,

81.  That on page 199 and 213 agent Depodesta told the jury that two weeks after he met the informant the informant told him about your affiant, and,

82.  That agent Depodesta stated on page 204 of the trial transcript that based on what the informant told him the F.B.I started investigating your affiant, and,

83.  That on page 221 of the trial transcript agent Depodesta stated that he advised the informant to contact your affiant, and,

84.  That agent Depodesta on page 248 of the trial transcript told the jury that he instructed the informant to **engage** your affiant in **drug communication**, and

0012

85.   That on page 220 of the trial transcript agent Depodesta told the jury that after the informant had gone to your affiant and try to contact your affiant on numerous occasions your affiant would not cooperate with the informant to provide him with money, and,

86.   That agent Depodesta stated in paragraph 81 through 83 that the F.B.I started to investigate your affiant in November of 2001, and,

87.   That the F.B.I and the prosecutor provide your affiant with no report of their investigation of your affiant alleged involvement in any drug crimes in November of 2001 trough March 25 2002, and,

88.   That the only report where the informant mention your affiant name was your affiant's alleged suggestion in paragraph 74, and,

89.   That by on alleged suggestion like paragraph 74 the case would automatically move out of the investigative jurisdiction of the F.B.I, and

90.   That on February 8,2002 the United States Secret Service was contacted by agent Sodetz of the F.B.I, and

91.   That the United States Secret Service were charged to investigate your affiant for the case types listed in paragraph 4, and,

92.   That Secret Service case number J-201-735-131941-S was not a joint F.B.I Secret Service case, and,

93.   That the case types investigated in case number J-201-735-13-19-41-S was solely a matter for the United States Secret Service, and,

94.   That the informant was a F.B.I controlled informant and was to be made available to the Secret Service upon request, and,

0013

95. That there are no authorization by the F.B.I making case number J-201-735-131941-S a joint F.B.I, Secret Service case, and,

96. That agent Depodesta was not acting on behalf of the F.B.I when he instructed the informant to engaged your affiant in drug communication, and,

97. That the investigation of your affiant was out of the jurisdiction of the F.B.I, and was unauthorized by the F.B.I. Agent Depodesta was acting as a private citizen conspiring with on acting Government informant to deprive your affiant of his Constitutional Rights guaranteed by the Federal Constitution to equal protection of the law, and,

98. That it is clear from Section III, IV that the informant solicited your affiants to ROB narcotics from his own friends by paying with counterfeit money, then lied that your affiant was the one trying to do the buying, and,

99. That the informant solicited your affiant while acting as a Government agent and was in protective custody relating not to your affiant's case, and,

100. That the informant went in protective custody on December 12, 2001, and,

101. That agent Deposesta monitored the informant conversation with our affiant on March 21,2002 and March 24,2002, and,

102. That agent Depodesta encouraged the informant to engaged your affiant in narcotics communication which he was not charged to investigate, and,

103. That agent Depodesta and the informant cause to create a more sever crime for your affiant that carries a more sever sentencing.

0014

## VI.    Informant Initial Contact With Authorities

104.    That in the informant interview with the prosecutors he stated that shortly after your affiant suggestion of paragraph 74 he walked in the F.B.I office in November 2001 and asked for help, and

105.    That the November 2001 alleged first contacted with the authorities is not true and was used to circumnavigate the informant's actions in August 2001, and,

106.    That F.B.I letter to the prosecutors dated May 16, 2002 states that the informant was arrested by the North brook Police Department on June 29, 2001 while in possession of approximately 125 grams of cocaine, and,

107.    That the above letter paragraph 103 further state that the informant's Illinois criminal case number 01MC220422401 is still pending. See attached letter mark as Exhibit MAY 16,2002 F.B.I LETTER TO PROSECUTORS.

108.    That the informant criminal history report showed that his state case was superceded in July of 2001 and was then stricken on leave in August of 2001, and

109.    That the informant and the Illinois State's attorney made a deal in August 2001 were the informant would cooperate with the F.B.I, and

110.    That the informant state case in the Cook County Circuit Court was dismissed in August 2001 in return for his cooperation with the F.B.I, and

111.    That the litter from the F.B.I to the prosecutor in paragraph 104 is misleading and false, and according to paragraph 111 the informant State case was not pending resolution, but was dismissed in return for the informant's cooperation. See attached copy of the informant criminal history report showing the date is State case was superceded and dismissed.

14

Oo15

## VII.   Informant Actions Leading Up To Affiant's Arrest

### A.   August 2001 – January 2002

112.   That shortly after the informant Illinois State charge were dismissed in the Cook County Circuit Court in August 2001 he approached your affiant to help settle a dispute between him and a third party your affiant known as Blacks, and,

113.   That the informant alleged that Blacks had gotten him in trouble with the Mexican Drug Organization who was threatening to kill his kid if the Organization was not paid their money that he owed them, and,

114.   That the informant had told your affiant that Blacks had paid for marijuana with counterfeit money and the Mexican drug organization was holding him responsible for the debt, and

115.   That the informant asked your affiant to talk to Blacks about paying the money owed to the Drug organization, and

116.   That your affiant met the informant in July 2001 for the first time, and

117.   That your affiant did not know the informant was involved in dealing narcotics until the informant called your affiant looking for Blacks, and

118.   That your affiant was surprised in August 2001 when the informant said he had sold Blacks marijuana, and,

15

0016

119. That the informant and Blacks met each other in July 2001 when all three of us got to gather to go bike riding, and,

120. That Blacks refused to meet with the informant to settle their dispute.

121. The informant instructed your affiant to have Blacks give him more counterfeit money then Blacks could keep the marijuana, and the informant would use the counterfeit money to by more drugs from another dealer, sell it and pay of his debt.

122. On August 30,2001 your affiant got the counterfeit money from Blacks and gave it to the informant, and,

123. That your affiant told Blacks and the informant not to involve him in their business, and

124. That your affiant asked Blacks and the informant not to contact or speak to your affiant anymore.

125. That your affiant called his local phone company and ask them to change your affiant's phone number minutes after your affiant gave the informant the counterfeit money, and,

126. That your affiant phone number was effectively change the next day on August 31,2001.

127. That August 30,2001 was the last time your affiant spoke with Blacks.

128. That on September 8,2001 your affiant was surprised when the informant called your affiant new phone number, and,

129. That after several calls by the informant to your affiant in September 2001 where your affiant did not answer the informant call, the informant left numerous messages on your affiant;s voice mail for your affiant to call him back.

0017

130. That on September 14,2001 your affiant was upset about the amount of messages the informant had left on his phone voice mail, when your affiant called back the informant and inquired who he got your affiant's new phone number, and,

131. That the informant stated to your affiant that he paid one of his friend who worked at primco $1000 to acquire your affiant new phone number, and,

132. That the informant stated to your affiant that the Mexican drug organization was not satisfied with what he had paid them, and they needed more money, he then asked your affiant for more counterfeit money, and,

133. That your affiant told the informant that your affiant could not get any more counterfeit money, and

134. That your affiant asked the informant to stop calling, and,

135. That the informant kept calling your affiant throughout the rest of 2001 for more counterfeit money, and

136. That after September 2001 and the rest of 2001, your affiant stop taking calls form the informant. Your affinat would not answer his cellular phone when the informant's phone number showed up in his caller I.D, and

137. That informant did not try to call your affiant in January 2002.

**B.    February 2002 to before March 21, 2002**

138. That on February 8,2002 the informant called your affiant from a phone number your affiant did not recognized as belonging to the informant, and

17

00\8

139.   The informant again asked your affiant for more counterfeit money.  Stating that if your affiant did not help him he would give the Mexican drug organization your affiant address, and tell them it was your affiant who was the one responsible for the debt, and,

140.   That your affiant again told the informant that he did not know anyone with counterfeit money, and,

141.   That throughout the month of February 2001 and in March 2002 the informant called your affiant constantly with threats to your affiant and your affiant's family's life, and,

142.   That in the middle of March 2002 after several threatening messages from the informant, three individuals appeared by your affiant's resident in Waukegan Illinois, and, pretending to be Jehovah Witnesses.  When your affiant refused their services, one of the individuals said to the others:
        "Lets just kick the door in and finish what we came to do."

143.   That your affiant told them he was calling the police, they left immediately, and,

144.   That shorely after the three individuals left your affiants residence the informant called your and told your affiant that if the police got involved things would get worse, and

145.   That during the conversation after the three individuals left your affiant's residents, your affint finally told the informant that he would try and find someone who could provide him with the counterfeit money he asked for, and,

146.   That your affiant met on individual by the name of Dale who said he could get the counterfeit money, But that it would coast $30,000 in real money for every $100,000 in counterfeit money, and,

147.   That your affiant relayed the coast of the counterfeit money back to the informant, and

0019

148. The informant told your affiant to get the counterfeit money on consignment and he would pay them back with cocaine, and

149. That Dale told your affiant that he would like to get heroin instead of cocaine for his counterfeit money, and,

150. That when your affiant told the informant what Dale had said the informant said he knew some other people with heroine, and,

151. That your affiant told the informant that he should give the counterfeit money to the guy with the heroin instead of the guy with the cocaine, and,

152. In the March 21,2002 Discovery transcript on page 15 your affiant said to the informant,
    "The heroin you can just make it look like I did it (give the guys the counterfeit money)."
    On page 14 the informant said,
    "...After we do this one (pay for the cocaine with the counterfeit), cause I want to do this guy too
    And on page 15 the informant said,
    "Yeah, both of them are going to do like you FUCK 'US' UP."

153. During several other phone conversation the informant discussed other ways that your affiant should go about helping with the informant's planed ROBBERY, and,

## C.    March 21, 2002

154. That on March 21,2002 the informant met your affiant at a Amoco gas station in Chicago to further discussed the way to go about giving his friends the counterfeit money. This conversation is what the Government transcribed for the March 21,2002 Discovery transcript attached as evidence, and,

155.  That starting in the last line of page 14 and at the top of page 15 of the March 21,
      Discovery transcript the informant said to your affiant:

> "...after we do this one ( pay for the cocaine with the counterfeit money)
> cause I want to do this one too."

Then your affiant and him could do the same thing to the guy with the heroin, and
"Yeah, both of them are doing to do like you FUCK 'US' UP"

156.  That this statement proved that your affiant never approached the informant to purchase
      10 kilograms of narcotics from the informant's source on March 21, 2002 as he told the
      Grand Jury, and,

157.  That the informant's statement in paragraph 155 prove that the informant set up a plan to
      buy narcotics from his own friend while acting as a Government agent and asked your
      affiant to partake in his plan for the sole purpose of setting of your affiant to be arrested
      on narcotics charges, and,

158.  That agent Depodesta was monitoring the informant while the informant solicit your
      affiant to partake in a crime that was not a part of the investigation charged to the
      authorities, and,

159.  That Paragraph 155 prove that agent Dopodesta willfully and intentionally lied to the
      Federal magistrate in his Complaint's Affidavit to established probable cause, and,

160.  That paragraph 155 prove that the informant deliberately lied to the Grand Jury about the
      events of March 21,2002, and,

161.  That paragraph 155 prove that the prosecutors deliberately misled the Grand Jury in the
      prepared statement they gave to the informant to read in order to have the Grand Jury
      return on indictment against your affiant on narcotics charges.

0021

### D.    March 24, 2002

162.    That on March 24,2002 the informant called your affiant with instruction of how your affiant should arrange the counterfeit bills so they could pass for real money. The informant states on page 8of14 of the March 24,2002 Discovery transcript:

> "all right, so but you think, well we talk tomorrow morning then, but so you think you can put uh like some so it looks like on top some of the good ones (real money)."

Your affiant said:

> "We'll talk about it, we'll talk about it in the morning."

The informant stated:

> "all right you know, so you can pass the inspection, and so he can look at it real quick and shit."

See page 10of14 March 24,2002 DISCOVERY TRANSCRIPT.

163.    That it is in the March 24,2002 recorded conversation the informant gave your affiant instructions to put $300,000 in counterfeit money in the bag. On page 8of14 the informant sad:

> "O.k, um and um, and so you got, you got set up the bag ready, right? How much is total?"

Your affiant told him:

> "I am going to put, I'm going to put a couple of two hundred in there."

The informant replied:

> "Two hundred only"

21

Your affiant said:

"Yeah"

164.    That on page 10of14 the informant stated:

"But just uh, just make sure for tomorrow (March 25,2002), Just make sure they (the counterfeit money) look like three ($300,000),"

165.    That your affiant absolutely did not asked the informant to purchase 15 kg's of cocaine from the informant's source on March 24,2002, and,

166.    That paragraph 162 through 165 prove that the conversation between your affiant and the informant on March 24,2002 was not about your affiant buying 15 kg's of cocaine from the informant's source, but was about the informant giving your affiant instructions how to fix-up the counterfeit money so they seems real, and,

167.    That there are absolutely nothing in the March 24,2004 recorded conversation about your affiant telling the informant that your affiant would pay the informant $20,000 in real money to arrange the alleged 15 kg's of cocaine transaction on March 24, 2002, and,

168.    That your affiant met with Dale who gave your affiant a bag with $100,000 in counterfeit money, and,

169.    That your affiant took some of the counterfeit money, printed some one sided bills, and cut papers to the size of a regular bill, then Stocked them so they would look like $300,000, just like the informant instructed your affiant.

E.    **March 25, 2002**

22

0023

170.  That on March 25, 2002 your affiant went to meet the informant to give him the counterfeit money, and,

171.  That your affiant asked his girlfriend, Tameka Addison to follow him, and,

172.  That your affiant placed the bag containing the counterfeit money in the trunk of Ms. Addison's car, and,

173.  That your affiant and Ms. Addison drove to the area around the Brick Yard Mall in Chicago where the informant said to meet him, and,

174.  That when your affiant drove in the parking lot of the McDonalds by the Brick Yard Mall the informant walked out of the McDonalds and came in your affiant's car, and,

175.  That the informant said that the guy with the cocaine had them spread out in several deferent cars because he did not want to have so many in one area, and

176.  That the informant said he wanted your affiant to give him the counterfeit money and he would go and get five kilograms and give them to your affiant to hold until he picked up the other 10, and,

177.  That your affiant refused to hold the five kilograms of cocaine, and,

178.  That the informant told your affiant that both him and your affiant must just take the cocaine sell them and split the money and get the "FUCK OUT OF TOWN" without paying the Mexican Drug Organization their money, and,

179.  That your affiant told the informant that your affiant was only doing this because of the alleged threats from the Mexican Drug Organization, and,

23

0024

180. That your affiant told the informant that if he was not going to pay the Mexican Drug Organization their money, your affiant would not give him the counterfeit, and,

181. That your affiant took the informant back to the McDonalds parking lot and asked the informant to get out of his car, and,

182. That when the informant exited your affiant's car your affiant left the area without giving the informant the counterfeit money, and,

183. That a few minutes later the informant called your affiant and plead to your affiant to bring him back the counterfeit money, stating that he would pay the Mexican Drug Organization their money and your affiant would not hear from him again, and,

184. That your affiant went back to the McDonalds parking lot to talk to the informant, while leaving the counterfeit money in a separate location with Ms. Addison, and,

185. That when your affiant got back to the parking lot the informant attempted to enter your affiant's car, your affiant pulled away and call the informant on his cellular phone and told him that your affiant would only speak to him in the Jewel Food Store near by where there are people, and

186. That the informant agreed to meet your affiant in the Jewel Food Store, and,

187. That the informant pulled up next to your affiant car in the parking lot and signal for your affiant to role down his window so he could talk, and

188. That as soon as your affiant rolled down his window, the informant jumped out of his car and toss a black bag in your affiants car and ran away, and,

189. That seconds later your affiant was arrested by secret service agents, who advised your affiant that he was being arrested for manufacturing United States currency.

0025

## VIII. After The Arrest, March 25, 2002

190.  That at about 12:30 on March 25, 2002 your affiant was placed under arrest by agent Micheal Newberg of the United States Secret service, and,

191.  That agent McKenna came along side agent Newberg and informed your affiant that he was with the United States Secret Service and he was arresting your affiant for manufacturing United States Currency, and,

192.  That agent McKenna stated to your affiant that he better cooperate with his investigation else he would guarantee your affiant spend the next 50 to 55 years in prison.

193.  That your affiant was placed in a car and taken to the Secret Service office in Chicago by agent Daniel Dick, agent Micheal Anderson, and agent tuckett, all from the United States Secret service, and,

194.  That agent Daniel Dick placed your affiant in a room.  Your affiant was taken from the room by agent McKenna and brought to a room directly in the room your affiant was first lacked in, and,

195.  That your affiant was placed in a room with two chairs in back and one in front, and,

196.  That agent McKenna instructed your affiant to the single chair, while him and agent Daniel Dick took the chairs in back, and,

197.  That agent Dick introduced himself as the agent in charged, and that agent McKenna was going to ask your affiant a few questions, and it was in your affiant's best interest to answer his questions if your affiant did not want to go to jail, and

25

0026

198. That agent McKenna started the questioning by asking if your affiant every heard about the 'big fish' 'small fish' theory, and,

199. That agent McKenna explained that the 'big fish' 'small fish' theory is when a small person in a crime is busted he could cooperate with the authorities by giving information on the bigger persons in the crime, and his cooperation would allow the smaller person to go free or get a lesser jail time, and,

200. That agent McKenna told your affiant that he knew your affiant was not the 'big fish' and that he wanted your affiant to give him information on the 'big fish', and your affiant and Ms. Addison would not be charged, and,

201. That your affiant asked agent McKenna for a written guarantee that your affiant and Mr. Addison would not be charged if your affiant cooperated by giving a written statement, and,

202. That agent McKenna explained to your affiant that he himself could not give your affiant a written guarantee, anly his supervisor could give such authorization, and,

203. That your affiant asked agent McKenna to get the written guarantee from his supervisor. He left the room to go a speak with his supervisor about the written guarantee not to charge your affiant and Ms. Addison, and,

204. That agent McKenna returned to the room about five minutes later and told your affiant that his supervisor would give your affiant a written guarantee when your affiant showed them what your affiant had to say by writing it down and they get a chance to review the statement, and,

205. Your affiant agreed to write a written statement, but told agent McKenna that your affiant not sigh the statement until your affiant was given a written promised that he and Ms . Addison would not be charged, and,

0027

206.   That after about fifty minutes of questioning by agent McKenna, agent Dick gave your
       affiant papers to write the statement on, and,

207.   That just before your affiant began to write the statement, agent Dick Gave your affiant a
       miranda statement to sign, and,

208.   That during the questioning by agent McKenna, he informed your affiant that your affiant
       was not arrested for narcotics violations, and that the United States Secret Service does
       not investigate cases that involves narcotics, and,

209.   That agent McKenna informed you affiant that the D.E.A or the F.B.I has jurisdictions to
       investigate narcotics, and,

210.   That during the evidence suppression hearing, see page 43 - line 16-22 of the trial
       transcripts – your affiant attorney asked agent McKenna:

       "Did you ask him (affiant) questions regarding the question of cocaine?"

Agent McKenna responded:

       "No, Ma,am ... I told him (affiant) the purpose of my interview was to find out
       where the counterfeit came from or who gave him the counterfeit or how it was
       manufactured."

See attached statement mark as Exhibit, MCKENNA SUPPRESSION HEARING
STATEMENT.

211.   That agent Newberg told the court at the suppression hearing that the United States Secret
       Service does not have jurisdiction to investigate narcotics,

0028

"Our main concentration is counterfeit. That is what O am assigned to, is counterfeit. But any type of crimes that accurs also, we do take concern of that and we advice the appropriate agencies that are involved with that jurisdiction."

See attached statement mark as Exhibit, AGENT NEWBERG SUPPRESSION HEARING STATEMENT.

212.  That your affiant never came in contact with any members of the F.B.I, and,

213.  That the F.B.I never try to interview your affiant, and,

214.  That the only person ever interview or question your affiant was agent McKenna of the Secret service, and only on matters relating to counterfeiting.

215.  That while agent McKenna was interviewing your affiant, agent Micheal Anderson came in the room and asked your affiant about on apartment at 7535 S Sagnaw in Chicago. Agent Anderson said he learned about the apartment from Ms. Addison. Your affiant informed agent Anderson that the apartment belongs to your affiant, and,

216.  That agent Anderson told your affiant that if your affiant was going to get the written promise from his supervisor your affiant would have to give them permission to search the apartment, and,

217.  That agent Anderson informed your affiant that they needed to search the apartment to make sure your affiant was being truthful, and that they needed to see if the apartment was being used as a lab for manufacturing counterfeit money, and,

218.  That your affiant stop writing the statement for agent McKenna and signed the consent to search for agent Anderson provided to your affiant, and,

0029

219.   That when agent Anderson left the room with the consent to search form your affiant continued to write the statement for Agent McKenna, and,

220.   The consent to search form was signed before your affiant finished the statement for agent Mckenna, and,

221.   That agent McKenna lied when he said that he learned about the apartment after he finished questioning your affiant and went and sit in on the interview with Ms. Addison, and,

222.   That Ms. Addison interview was complete before your affiant's interview, and,

223.   That after your affiant's interview was completed, your affiant was brought out of the room where your affiant was put with Ms. Addison to be booked and taken to court. The consent to search the apartment was already given to agent Anderson, and.

224.   That your affiant gave agent McKenna the written statement without a signature and told him that your affiant would not put is name in the space that said "no promise or threats were made to you", and,

225.   That you affiant told agent McKenna that your affiant would not sign the written statement until your affiant was provided with the written promised that was promised to your affiant, and,

226.   That Agent McKenna took the statement without a signature and left the room saying that he was going to let his supervisor review the statement, and

227.   That agent McKenna returned and said that your affiant needed to write a conclusion, and,

Oo30

228. That agent McKenna began to dictate what he wanted your affiant to write for the conclusion, and,

229. That your affiant did what he was told to do by agent McKenna hoping that agent McKenna would keep his promised not to charge your affiant and Ms. Addison, and

230. That agent McKenna took the written statement out of the room and never returned, and,

231. That your affiant asked agent Dick about the promise not to charge your affiant, which he replied by stating that agent McKenna is talking to his supervisor about it, and,

232. That agent Dick then took your affiant to booking, which was just out side the room your affiant was in, and

233. That when agent McKenna did not return your affiant told agent Dick that he your affiant needed more papers to write down the problems your affiant was having with the informant, and,

234. That agent Dick told your affiant not to worry about the informant, because the Secret Service already knew about the informant and your affiant past problems and since your affiant had decided to cooperate then it was not necessary for your affiant to write the history down, and

235. That agent Dick told your affiant not to write anything else, because if what your affiant wrote down differ from what he put in the report the prosecutor would say that your affiant was not cooperating, and

236. That while your affiant was being finger printed, agent McKenna approached your affiant with your affiant written statement and asked your affiant to sign it, and,

0031

237.  That your affiant again asked for the written promise that agent McKenna told your affiant he would give your affiant for his cooperation, and,

238.  That agent McKenna replied by saying:

> "Look you better sign the statement because it does not matter. We will still use it in court and if your signature is not on the statement I will just let the prosecutor know that you refused to cooperate and charge you and your girl friend (Ms. Addison)."

239.  That agent Micheal Anderson came over and explained to your affiant that it was in your affiant's best interest to sign the statement, and,

240.  That your affiant told agent Anderson that your affiant would not sign the part that said:

> "No promises or threats were made to me."

241.  That your affiant did not put his name in the pace that said no "no promises or threats were made to me."

242.  That either agent McKenna or agent Dick filled in the space that said "no promises or threats were made to me."

243.  That agent McKenna in the presence of agent Dick did promise not to charge your affiant and Ms. Addison in return for your affiant cooperation, in which your affiant gave the written statement to agent McKenna, and a consented to the search of your affiant's apartment.

244.  That, your affiant did not admitted to buying drugs from the informant. What your affiant was trying to tell agent McKenna was that in the written statement was that your affiant went to the McDonalds to meet the informant to give him the counterfeit money

0032

so he could give the counterfeit money to his friends for their drugs. Which was the informant's plan that he told your affiant that was the only way he could get the cash to pay his debt with the Mexican drug organization.

245. See attached statement mark as Exhibit, DEFENDANT WRITTEN STATEMENT

## X.    Suppression Of Evidence

### A.    March 25, 2002 Audio Recording

246. That your affiant requested all from the Government all audio's and video's in a motion for Discovery materials.

247. That the recorded conversation mention for march 25, 2002 was suppressed by the prosecutors, and,

248. That in reply to your affiant's request for the March 25, 2002 recorded conversation, the prosecutors responded by stating that the conversation was not recorded because the agents were testing the equipment and forgot to turn the recorder on, and,

249. That at trial agent Depodesta stated that he was the one that tested the recording equipment's, and

250. That he Stated that when he put the equipment on the informant the equipment was working, and

251. That he stated that he could physically see if the recording device was on or off.

252. That in a F.B.I report compiled by agent Depodesta he state that he activated and deactivated the recording and transmitting devises on March 25, 2002, and,

0033

253.  That according to agent Depodesta report attached and mark as Exhibit, F.B.I FORM FD-302 INVESTIGATION ON 3/25/2002, agent Depodesta activated the recording device and transmitting device on the informant at approximately 11:06 a.m on March 25, 2002, and,

254.  That according to the same report, agent Depodesta deactivated the recording device and transmitting device on the informant at approximately 12:30 p.m on March 25, 2002, and

255.  That it also states in the Disposition of evidence, Contraband, and Personal Property list dated 6/4/02 at 3:57 by agent Daniel Dick that:

> "One (1) compact disc, containing a recording of the body wire placed on the criminal informant by the Federal Bureau of Investigation on 3/25/02 (the same day affiant was arrested), has been inventoried on SSF 1544 with serial number 201-2002-CE-000442."

256.  See attached list mark as Exhibit, DISPOSITION OF EVIDENCE, DATED 6/4/02 AT 3:57, and,

257.  That the same March 25, 2002 recorded conversation was also inventoried and listed in a certified inventory of evidence, and,

258.  That on the certified inventory of evidence form list the March 25, 2002 recording with serial number 201-2002-CE-000442, which is the same serial number as the serial number in paragraph 255, and,

259.  That Description of evidence section of the certified inventory of evidence report described the recording as:

> "The below listed item was recovered from agent Depodesta of the Federal Bureau of Investigation on 2/25/02."

0034

"Marked for identification: "DD 3/25/02 (SA Daniel Dick)."

"Compact disc, approximately 41 minutes in length, compact disc is contained in a Jewel case."

260. The March 25, 2002 informant body wired conversation was 41 minutes in length and was inventoried by agent Daniel A. Dick, witness by agent Micheal J. Newberg, and supervised by Glenn R. Westlund on March 25, 2002.

261. That the prosecutors deliberately suppressed the March 25, 2002 body wire recorded conversation because it contained exculpatory material, and,

262. That your affiant was denied the right to have his jury hear evidence that would have proved his innocence., and,

263. That the Government suppression of the March 25, 2002 recorded conversation they violate their duty under Brady and Jencks which is a violation of your affiant substantial rights guaranteed by the Federal Constitution of America, and,

264. See attached evidence mark as Exhibit, CERTIFIED INVENTORY OF EVIDENCE, MARCH 25, 2002 INFORMANT BODY WIRE.

B.     March 25, 2002 video recording

265. That your affiant was provided with a copy of what was to be the video recording of the arrest of your affiant on March 25, 2002, and

266. That the VHS tape that was given to your affiant of the March 25, 2002 arrest of your affiant was manipulated and tampered with, and,

0035

267. That the VHS that was given as Brady material contained the recording of two different events. One of which does not relate to your affiant's case. The first part of the video recording is of a class given by a professor from Depaul University that was totally unrelated to your affiant's case. The second event is about a thirty second recording that showed your affiant driving up in a McDonald parking lot, and,

268. That the video recording that the prosecutors played for the jury at trial was not the same video they gave your affiant as Brady material, and,

269. That the video the Government played for the jury at trial was manipulated and tampered with. The Government made on addition at the end of the video they played for the jury that was not on the video they provided to your affiant, and,

270. That the manipulated addition to the video showed your affiant driving to on adjacent parking lot next to the McDonalds, and,

271. That the Government edited the part of the video that showed the informant in your affiant's car, and,

272. That the Government edited the part of the video that showed the informant tossing a black bag in your affiant's car and running away, and,

273. That the manipulated video recording the Government played at trial showed a 'jump' at the exact spot where the addition is made, and was video with a separate camera, and,

274. That a copy of the certified inventory of evidence log the March 25, 2002 video as serial number 201-2002-CE-000454, and,

275. That the Description of evidence box states:

0036

"The below listed item was provided by an F.B.I SA on 3/25/02 during a surveillance/arrest operation. This item was transported to SA ROBYN of the USSS Chicago field office on 2/24/02."

"Marked for identification: DD 3/25/02 (SA DICK).""

"Maxwell mini digital video cassette in case labeled "James reverse Buy/Bust 3/25/02"

Inventoried by Micheal J. Newberg, witnessed by Daniel A. Dick, and supervised by Glenn R. Westlund, and,

276.   That the mini digital video cassette labeled "James reverse Buy/ Bust 3/25/02 was not given to your affiant on Discovery. And the copy that was given by the prosecutors as discovery material was not a complete copy of the mini digital video cassette that was recorded on March 25, 2002, and,

277.   See copy of evidence attached and mark as Exhibit, CERTIFIED INVENTORY OF EVIDENCE, MARCH 25, 2002 MINI DIGITAL VIDEO, and,

278.   That the prosecutors deliberately suppressed the March 25, 2002 video recording that contained exculpatory material that contradicts their case, and,

279.   That your affiant was denied the right to have his jury view the March 25, 2002 recording in its entirety, and,

280.   The suppression of the March 25, 2002 video recording by the government is in violation of Brady and Jencks, which violates your affiant's right to a fair trial, which is a violation of your affiant's substantial rights guaranteed by the Federal Constitution.

C.   <u>March 24, 2002 recorded conversation</u>

36

0037

281. That paragraph 61 through 65 described the manipulation and suppression of 6 pages of the March 24, 2002 recorded conversation between to informant and your affiant, and,

282. That the certified inventory of evidence log the March 24, 2002 recorded conversation with serial number 201-2002-CE-000443, and,

283. That the Description of evidence box states:

> "The below listed item was recovered from agent Depodesta of the Federal Bureau of Investigation on 3/25/02."

> "Marked for identification: DD 3/25/02" (SA Daniel Dick).

> "Cassette tape maxwell C45, A side labeled "3/25/02 James Donville, 6:03 p.m-6:13 p.m cooperating witness," B side labeled "case #201-735-131941-S"

284. That the March 24, 2002 recorded conversation was inventoried by agent Daniel A. Dick, witness by Micheal J. Newberg, and supervised by Glenn R. westlund on March 25, 2002, and,

285. That the prosecutors deliberately suppressed parts of the March 24, 2002 recorded conversation that contained exculpatory evidence that does not support their case, and,

286. See copy of the evidence attached and mark as Exhibit, CERTIFIED INVENTORY OF EVIDENCE, March, 2002 audio recording, and,

**D.** <u>March 21, 2002 Informant Body Wire Recording</u>

287. That a copy of what was supposed to be the recorded conversation of the body wire worn by the informant on March 21, 2002 was given to your affiant as Discovery material.

0038

The accompanying transcript of the conversation was also provided as a Discovery transcript, and

288.    That the day at trial the defense was presented with a manipulated version of the transcript of the conversation on March 21, 2002 between your affiant and the informant, and,

289.    That the March 21, 2002 recorded conversation was also manipulated and tampered with, and,

290.    that the version that the Government played at trial is deferent from the copy they provided your affiant as Discovery material, and,

291.    That the Government combined two separate conversation from two different days to make up the recording they played for the jury at trial, and,

292.    That the two conversations where taken out of context to mislead your affiant's jury, and

293.    That the transcript that the Government gave your affiant as discovery material does not contain the manipulated portion of the conversation from March 21, 2002, and,

294.    That the transcript that the Prosecutors gave to the jury does not reflect what is on the March 21, 2002 recording, and,

295.    That page 6 of the Discovery transcript states:

> "Cause I WANN DO IT LIKE I TELL YOU. ten grand, I GANNA SELL YOU EACH ONE TEN. you make ten, I make ten. But I do not got that much people to sell it. you know...?"

0039

296.  That the statement in paragraph 295 was manipulated and changed in the transcript the Government gave to the jury to:

> "Cause I WANNA DO LIKE I TELL YOU, you know, ten grand, I WANNA TELL YOU EACH ONE YOU SELL, you make ten, I make ten. But , I don't got that much people to sell it, you know."

297.  See page 4 line 3 through 7 of the March 21, 2002 jury transcript attached and mark as Exhibit MARCH 21, 2002 JURY TRANSCRIPT, and,

298.  That even though paragraph 295 in clear and unambiguous the prosecutors deliberately manipulated the paragraph for the sole purpose of misleading the jury, and

299.  That paragraph 295 makes it clear that it was the informant offering to SELL the drugs and not his source, and the drugs he is offering to SELL is the same drugs he wanted to buy with the counterfeit money he asked your affiant to provide him with, and,

300.  That in the March 21, 2002 recording conversation, and in the Discovery transcript for the March 21, 2002 conversation on page four the informant state:

301.  "yeah, both of them are going to do like you know, you fuck 'US' up with."

302.  That in the transcript the jury got the phrase was manipulated and edited out completely, and,

303.  That  page 17 line 5 and 6 of the jury transcript states:

> Yeah, but, both of them are ganna do like, you, you know, with the…"

304.  That the importance of the phrased "you fuck us up" is described in Section VIII, and,

0040

305. That the phrase "do like you fuck us up" described exactly what the informant told your affiant your affiant's role would be in the whole affair, which was for your affiant to play a role. It is clear from this statement that your affiant did not approached the informant to buy any form of narcotics what so ever, and,

306. That the informant set up the attempted drug purchase with the counterfeit money so it would "do like YOU (your affiant) fuck US (the informant and his friends) up" for the sole purpose of having your affiant arrested on drug charges. The informant doing this while working as a Government agent and was in protective custody.  When his plan did not work he then lie to the Federal Grand Jury to get your affiant indicted on drug charges anyway, and,

307. That your affiant is not a drug dealer, and ,

308. that your affiant was never a drug dealer, and was never involved in any drug deals in the past with the informant, and,

309. The informant claimed that your affiant purchased drugs from him in the past with counterfeit money and that is the reason why he was in debt with the Mexican drug organization. He claimed that the counterfeit money that your affiant gave him for the marijuana was ceased by the Chicago Police Department in July of 2001 along with a large portion of drugs, and

310. That this claim by the informant is absolutely a lie, and,

311. That your affiant asked the Government for the record of the evidence that was ceased by the Chicago Police Department at the address on Avers in Chicago in July of 2001, and,

312. That they replied that it was a consensual search and no record was available, and,

0041

313. That if the Chicago police had taken evidence from a address in Chicago where drugs and counterfeit money were founded, and people went to jail, there should be a chain of custody for the evidence ceased, and,

314. That there are no records of the chain of custody for any evidence ceased at the address on Avers in Chicago by the Chicago Police Department in July 2001. The Chicago police did not ceased any evidence from that address in July 2001, because your affiant did not buy any marijuana form the informant in July 2001 with real or counterfeit money, and,

315. That in the recorded conversations with the informant, when your affiant said "we should do it like we did last time" this is making reference to when your affiant fist gave the informant the counterfeit money on August 30, 2001 and asked the informant not to contact and leave your affiant out of his affairs, and,

316. That on August 30, 2001 your affiant met the informant at a gas station in Chicago to give him the money he asked your affiant for, your affiant pulled up behind the informant's car and the informant send someone to come and get the bag with the counterfeit money, and,

317. This is the way your affiant wanted to give the counterfeit money to the informant, but the informant kept insisting that your affiant do more, and he the informant would fix things so it "do like you fuck us up", and,

318. That the March 21, 2002 recorded conversation was logged in evidence on a Certified Inventory of Evidence with serial number 201-2002-CE-000446, and

319. That the Description of evidence box states:

> "The below listed item was recovered from agent Depodesta of the Federal Bureau of Investigation on March 21, 2002."

0042

"Mark for identification: "DD 03/21/02" (SA Dick)."

"Compact disc, White in color, labeled with "case # 201-735-131941-S", Dated 03/21/01 contained in a Jewel case."

220.    That the March 21, 2001 recorded conversation was inventoried by agent Daniel A. Dick, witnessed by Miheal J. Newberg, and supervised by Glenn R. westlund, and,

221.    That this disc was not provided to your affiant in it original form for Discovery material which violates <u>Brady</u>, and <u>Jencks</u>, and,

222.    That the suppression of the original disc, and the manipulation of the copy given on Discovery is a violation of your affiant substantial rights guaranteed by the Federal Constitution of America, and,

223.    See copy of evidence attached and mark as Exhibit, CERTIFIED INVENTORY OF EVIDENCE, MARCH 21, 2002 INFORMANT BODY WIRE.


FURTHER AFFIANT SAYETH NOT

_____ 8/28/04
Donville James, affiant

Sworn and Subscribed before me this _28th_ day of _August_ , 2004.
State of Wisconsin
County of Dodge

Notary public _Rick Gempeler, Supervisor_
My commission expire on _April 22, 2007_

0043

"**EXHIBIT**, <u>CASE TYPE AND SECONDARY CASE TYPES</u>"
"1 PAGE"

**Subject: CT: 735.041 (J-201-735-131941-S) DONVILLE JAMES/SURVEILLANCE REPORT**
**Date:** Wed, 17 Apr 2002 08:35:28 -0500
**From:** chi <chi@officialmail.usss.treas.gov>
**Organization:** United States Secret Service
**To:** cfl@officialmail.usss.treas.gov
**CC:** isd@officialmail.usss.treas.gov, chi@officialmail.usss.treas.gov

**ORIGINAL**

```
OFFICE              :    CHICAGO          CASE:    J-201-735-131941-S
ORIGIN              :    FIELD

TYPE OF CASE        :    MANUFACTURING CFT CURRENCY (735.041)

SECONDARY CASE TYPE :    DEALING IN COUNTERFEIT CURRENCY (735.021)

                         CRIMES INVOLVING USE OF EMERGING TECHNOLOGY
                         (848.930)

STATUS              :    CONTINUED

TITLE OR CAPTION    :    DONVILLE JAMES/SURVEILLANCE REPORT

INVESTIGATION MADE AT :  CHICAGO, IL

INVESTIGATION MADE BY :  SA DANIEL DICK

REPORT MADE BY      :    SA DANIEL DICK

PERIOD COVERED      :    3/21/02

DATE OF REPORT      :    4/2/02

APPROVED BY         :    SAIC ARNETTE F. HEINTZE

DISTRIBUTION        :    CHICAGO     -     ORIGINAL & 1CC
                         CFT         -     1CC
                         ISD         -     1CC
```

SYNOPSIS:

ON 3/21/02, AGENTS OF THE CHICAGO FIELD OFFICE AND FBI CONDUCTED A
SURVEILLANCE OPERATION ON DONVILLE JAMES AND A FBI CONTROLLED CI. THE
FOLLOWING AGENTS PARTICIPATED IN THE OPERATION:  SA DEPODESTA AND SA
VOETTINER OF THE FBI, SA NEWBERG, MYSELF, SA FIELD, SA ANDERSEN,
SA KALDIS, SA BLISICK, SA ECK, AND SA STUTE.


INTRODUCTION:

REFERENCE IS MADE TO THE NOTIFICATION OF PLANT SUPPRESSION/ FEDERAL ARREST
OF JAMES AND ADDISON TELETYPE DATED 3/28/02.


DETAILS OF INVESTIGATION:

| DATE | TIME | ACTIVITY |
|---|---|---|
| 3/21/02 | 1300 | SECRET SERVICE AND FBI AGENTS MEET AT A PARKING LOT LOCATED AT LAKE ST. AND HALSTED ST. FOR OPERATION BRIEFING.  SA'S ARE INTRODUCED TO CI. |

0045

"**EXHIBIT**, <u>MARCH 16, 2002 REPORT</u>"
"1 page"

0046

FD-302 (Rev. 10-6-95)

- 1 -

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription    03/28/2002

     A source, who is in the position to testify, provided the following information:

     On March 16, 2002, JAMES Last Name Unknown (LNU), described as a Jamaican male, approximately mid-thirties, 5'7" tall, one hundred fifty pounds, black hair, telephonically contacted the source, and they discussed a one kilogram cocaine transaction they were planning. In this conversation, JAMES LNU said he was going to have approximately $20,000.00 in fake money. JAMES LNU said he would also have $10,000.00 in real money to pay for half the kilograms of cocaine.

     At approximately 9:15 p.m., JAMES LNU again telephonically contacted the source and told the source that the individual supplying JAMES LNU with counterfeit money has more, now $200,000.00. In this conversation, JAMES LNU told the source he now wants to purchase ten kilograms of cocaine. Once the kilograms of cocaine are delivered to JAMES LNU from the source, JAMES LNU would supply the source with real money to pay for part of the kilograms. JAMES LNU also told the source that he wants to go with the source when the source obtains the kilograms of cocaine because he (JAMES LNU) now has more money he is responsible for. JAMES LNU asked the source if he could meet the following day at approximately 9:00 a.m. or 10:00 a.m. to discuss this further.

Investigation on    3/18/2002    at Chicago, Illinois    (telephonically)

File #    270F-CG-117142-A; 281C-CG-117362-BC1    Date dictated    3/25/2002

by    SA FRANK L. DEPODESTA:mkc

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

0047

"**EXHIBIT**, <u>COMPLAINT AND COMPLAINT'S</u>
<u>AFFIDAVIT</u>"
"8 PAGES"

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

      v.

**JAMES DONVILLE**

**CRIMINAL COMPLAINT**

CASE NUMBER:

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.  On or about March 25, 2002 in <u>Cook</u> County, in the <u>Northern</u> District of <u>Illinois</u> defendant did

> knowingly attempt to possess with intent to distribute approximately 15 kilograms of cocaine, a Schedule II narcotic drug controlled substance,

in violation of Title <u>21</u> United States Code, <u>Section 846</u>.

I further state that I am a <u>Special Agent of the United States Federal Bureau of Investigation</u> and that this complaint is based on the following facts:

**See attached affidavit**

Continued on the attached sheet and made a part hereof:  <u>X</u> Yes ___ No

_____

Signature of Complainant

Sworn to before me and subscribed in my presence,

<u>March 25, 2002</u>                    at    <u>Chicago, Illinois</u>

Date                                          City and State

*Sidney I. Schenkier*

<u>SIDNEY I. SCHENKIER, MAGISTRATE JUDGE</u>        _____

Name & Title of Judicial Officer               Signature of Judicial Officer

0049

STATE OF ILLINOIS        )
                         )    SS
COUNTY OF COOK           )

## AFFIDAVIT

I, Frank DePodesta, being duly sworn under oath, state as follows:

1.    I am a Special Agent (S/A) of the United States Federal Bureau of Investigation. I have been employed as a FBI agent since July 1995. As part of my regular duties, I have investigated many drug trafficking organizations, arrested narcotics violators, managed the activities of confidential informants(CI), and seized narcotics and the proceeds from illegal narcotic sales. In connection with this assignment, I am charged with, among other things, investigating violations of the Controlled Substances Act, Title 21, United States Code.

2.    I have participated in the investigation of the offense described below and have briefed other law enforcement officers on the progress thereof. As a result, I am familiar with many aspects of the investigation, although I did not personally participate in every aspect. I have also relied upon information related to me by other law enforcement officers, including officers from the United States Secret Service. On the basis of this information, I allege the facts contained herein to show there is probable cause to believe JAMES DONVILLE

1

did knowingly attempt to possess with intent to distribute
approximately 15 kilograms of cocaine, a Schedule II narcotic
drug controlled substance, in violation of 21 U.S.C. § 846.

3.   These matters are set forth for the purpose of
establishing probable cause with respect to the charge described
in the attached criminal complaint.  Accordingly, this
information is in summary form and does not represent all of the
information of which I am aware relating to this investigation.

4.   In March 2002, a cooperating individual (CI) provided
the FBI with information about an individual known to the CI as
"James."  The CI explained that James asked if the CI would be
willing to arrange a narcotics transaction in which James would
pay for powder cocaine with counterfeit United States currency.

5.   The CI agreed to work with the FBI and Secret Service
to do an undercover operation.  As part of this operation, the
CI told James he knew a cocaine supplier who could provide them
with powder cocaine.

6.   Through several phone conversations in March 2002,
James and the CI discussed different quantities of powder
cocaine to purchase using counterfeit currency.

2

0051

7.    On March 21, 2002, the CI met James at an Amoco gas station located on West North Avenue and North Elston Avenue in Chicago.  James was driving a 2002 red Monte Carlo Enterprise rental car.  In this conversation, James and the CI agreed to purchase 10 kilograms of cocaine for $200,000 in counterfeit currency from the CI's source.  The CI was equipped with a concealed recording device and a transmitting device allowing the surveillance agents to monitor their conversation.

8.    By checking with Enterprise Rent-A-Car, the Secret Service determined defendant JAMES DONVILLE was listed as an additional driver on the car.

9.    On March 22, 2002, Defendant JAMES DONVILLE asked the CI if he could obtain 20 kilograms of powder cocaine.  The CI said he would call his supplier and see if 20 kilograms were available.

10.    On March 24, 2002, the CI placed a recorded telephone call to Defendant JAMES DONVILLE.  They agreed on purchasing 15 kilograms of powder cocaine for $300,000.  Defendant JAMES DONVILLE advised that he would have $200,000 in counterfeit money.

3

0052

11.   On March 25, 2002, the CI and Jones had several telephone conversations in which they agreed to meet at the McDonalds restaurant in the Brick Yard Mall, at the corner of Diversey and Narragansett, in order to further discuss and conduct the transaction. At the meeting, the CI was equipped with a concealed recording device and a transmitting device allowing the surveillance agents to monitor their conversation.

12.   At approximately 11:00 am, the CI arrived at McDonalds.  Defendant JAMES DONVILLE arrived shortly after the CI arrived.  Defendant JAMES DONVILLE asked the CI to get into his car and told the CI he was going to take him to show him the counterfeit currency.

13.   Defendant JAMES DONVILLE drove the CI to a vehicle parked on North Narragansett near the McDonalds restaurant.   The CI and Defendant DONVILLE got out of James' vehicle and looked in the trunk of a Nissan Ultima driven by and registered to Tameka Addison.

14.   Defendant JAMES DONVILLE showed the CI a bag which contained a large amount of what appeared to be United States currency.  Donville said he paid $40,000 in real currency for

4

0053

the counterfeit currency and told the CI it was $300,000 in counterfeit currency.

15. Defendant JAMES DONVILLE and the CI went back to the CI's vehicle at McDonalds. The CI told Donville that he spoke with his supplier and the supplier had left the kilograms of cocaine scattered in multiple cars at unspecified nearby locations. He told Donville he was going to get the first five kilograms of cocaine and that he would return shortly.

16. When the CI was going to get the five kilograms, defendant DONVILLE called him on his cellular phone and said the CI could trust him with the five kilograms of cocaine.

17. The CI retrieved a bag containing five fake kilograms from a government vehicle and returned to McDonalds.

18. Defendant DONVILLE pulled behind the CI's vehicle, so the CI could put the cocaine in the trunk. DONVILLE then pulled away from the CI's vehicle prior to the CI putting the cocaine in his trunk. DONVILLE then called the CI on the telephone and said there was a white van in the parking lot that looked suspicious. DONVILLE asked the CI to come to an adjacent parking lot and give him the cocaine.

5

0054

19.  The CI drove to the adjacent parking lot, pulled up near DONVILLE'S car, exited his vehicle with the five kilograms of fake cocaine, and brought the cocaine to DONVILLE.  The CI took one kilogram of cocaine out of the bag and handed it to him.  DONVILLE said it looked OK and gave it back to the CI to put in the bag.  The CI then put the five kilograms on the passenger seat of DONVILLE'S car.

20.  DONVILLE retrieved another kilogram of cocaine from the bag, examined it, and placed it back in the bag.  DONVILLE then told the CI that when the CI gets another five kilograms of cocaine he would give him the fake currency.

21.  DONVILLE also stated, "I don't have to use my gun then, right?"  The CI responded, "No" and walked away.

22.  After the CI left, FBI and Secret Service agents pulled up behind the defendant's vehicle and he attempted to drive away before being stopped by another government vehicle.

23.  At this point, DONVILLE was arrested.  His car was searched.  In the front passenger's seat, agents discovered the bag containing the five fake kilograms of cocaine.  On the

6

0055

driver's side floorboard, agents discovered a loaded Smith and Wesson nine millimeter semi-automatic pistol.

24.  Defendant DONVILLE was advised of his rights by United States Secret Service agents.  He agreed to waive these rights and speak with the agents.  He confessed to his involvement in the crime discussed above.  He stated he planned to buy 15 kilograms of powder cocaine with counterfeit currency, keep some of the drugs himself, give some to the CI, and use the rest of the drugs to pay Gangster Disciples for the counterfeit currency that they provided to him.

25.  Based upon my experience and training, I believe that the aforementioned facts constitute probable cause to charge JAMES DONVILLE with violations of federal law, specifically including violations of Title 21, United States Code, Section 846.

FURTHER AFFIANT SAYETH NOT

_____
Special Agent Frank DePodesta, Applicant
US Federal Bureau of Investigation

Sworn and Subscribed before me this 25th day of March, 2002.

Sidney I. Schenkier

7

0056

**EXHIBIT "PROSECUTOR'S PREPARED STATEMENT"**
"1 page"

EXHIBIT "A"

I agreed to help the FBI in undercover investigations. In or around February 2001, several weeks after I placed my last call to James asking him to pay me back, he called me. He said he had a way for me to make back some of the money I needed. He said he would pay me if I would arrange for him to buy narcotics from my source, using counterfeit money. I provided the FBI with this information and agreed to work undercover in an investigation of James. I told James I was interested in his offer. He then called me numerous times and continued to increase the amount of drugs he wanted and the amount of counterfeit money he would provide. On March 16, 2001, James called me and we agreed that he would purchase 1 kilogram of cocaine from my source for $20,000 in counterfeit currency and $10,000 in real currency. On March 21, 2002, we agreed that James would purchase 10 kilograms of cocaine from my source for $200,000 in counterfeit currency. On March 22, 2001, James called me and asked whether he could buy 20 kilograms from my source. I told him I would have to see whether my source had 20 kilograms available. On March 24, 2002, James and I agreed that he would purchase 15 kilograms from my source and pay $300,000 in counterfeit currency. He told me he would pay me $20,000 in real currency for arranging the transaction.

On March 25, 2002, James and I met in a McDonald's parking lot to further discuss and conduct the transaction. When James arrived, he told me to get in his car so he could drive me to where he was keeping the counterfeit money. We drove to a Nissan Ultima parked nearby. James opened the trunk and showed me a bag of counterfeit money. He said $300,000 was inside the bag. We then drove back to McDonalds. I told him the 15 kilograms of cocaine was scattered in several nearby parked cars and that I was going to get the first 5 kilograms of cocaine. When I returned with what was actually the FBI's artificial cocaine, James told me he would give me the counterfeit money once I brought him the second five kilograms of cocaine. He also said to me something to the effect of "I won't have to use my gun then, right?" I responded "No" and left to get the second five kilograms of cocaine. After I left, James was arrested.

0658

**"EXHIBIT**, <u>INFORMANT'S GRAND JURY STATEMENT</u>"
"4 PAGES"

3

1                        ALLAN DUBON,

2    having entered the Grand Jury room, was sworn by the

3    Foreperson as follows:

4              THE FOREPERSON:  You do solemnly swear that

5    in the testimony you are about to give before this Grand

6    Jury you will speak the truth, the whole truth and

7    nothing but the truth, so help you God.

8              THE WITNESS:  Yes.

9              THE FOREPERSON:  Please be seated

10                      EXAMINATION

11   BY MS. HAYS:

12        Q     Could you state your name and spell your

13   first and last name for the record.

14        A     Allan Dubon, A-l-l-a-n, D-u-b-o-n.

15        Q     Allan, did you meet with me yesterday and

16   give me a statement regarding the circumstances

17   surrounding the investigation of Donaville James?

18        A     Yes.

19        Q     And did you meet with me again today before

20   we came in here?

21        A     Yes.

22        Q     And did I give you a statement that reflected

23   what you told me the day before?

24        A     Yes.

25        Q     And did you read that statement carefully?

4

1    A    Yes.

2    Q    And is everything in that statement true and

3    correct and based on what you told me?

4    A    Yes.

5    Q    Could you read the statement.

6    A              "I agreed to help the FBI in an

7              undercover investigation in around February

8              2001 several weeks after I placed my last

9              call to James asking him to pay me back.  He

10             called me.  He had a way for me to make back

11             some of my money I needed.  He say he would

12             pay me if I would arrange for him to buy

13             narcotics from my source using counterfeit

14             money.    *Where is FBI Report to Feb*

15             "I provided the FBI with this

16             information and I agreed to work undercover

17             in the investigation of James.  I told James

18             I was interested in his offer.  He then

19             called me numerous times and continued to

20             increase the amount of drugs he wanted and

21             the amount of counterfeit money he will

22             provide.

23             "On March 16, 2001, James called me

24             and we agreed that he would purchase 1 kilo

25             of cocaine from my source for $20,000 in

0061

5

counterfeit currency and he would give me
$10,000 in real currency.

"On March 21, 2002, we agreed that
James would purchase 10 kilos of cocaine from
my source for $200,000 in counterfeit money.
On March 22nd, 2002, James called me and
asked whether he could buy 20 kilograms
from my source.  I told him I will have to
see whether my source had 20 kilograms
available.

"On March 24, 2002, James and I
agreed that he will purchase 15 kilograms
from my source and pay 300,000 in counterfeit
currency.  He told me he would pay me 20,000
in real currency for arranging that
transaction.

"On March 25th, 2002, James and I
met in McDonald's parking lot to further
discuss the conduct of that transaction.
When James arrived he told me to get in his
car so he could drive me to an open -- drive
me to where he was keeping the counterfeit
money.  He drove to a park nearby.  James
opened the trunk and showed me a bag of
counterfeit money.  He said 300,000 was

1          inside the bag.

2                    "We then drove back from McDonald's.

3          I told him the 15 kilograms of cocaine was

4          scattered in several nearby parked cars and

5          that I was going to get the first 5 kilograms

6          of cocaine.  When I returned with what was

7          actually that FBI's artificial cocaine, James

8          told me he would give me the counterfeit

9          money once I brought him the second 5

10         kilograms of cocaine.

11                   "He also said to me something to the

12         effect of, 'I won't have to use my gun then,

13         right?'  I responded, `no.'  I left to get

14         the second 5 kilograms of cocaine.  After I

15         left James was arrested."

16         MS. HAYS:  All right.  Any questions before

17   we call the agent in to give you more background and

18   details about the case?

19                   (No response.)

20         MS. HAYS:  Okay.

21                   (Witness excused.)

22

23

24

25

"**EXHIBIT**, INFORMANT'S PHONE RECORD MARCH 16, 2002"
"2 PAGES"

```
PCE-3                                                                          PAGE    597
RUN DATE: 04/06/02
RUN TIME: 11:46:05                          M A C R O  /  C E L L
ACCOUNT:                                    BILLED USAGE
RCID: BUFFG0100          15428698?                                             CHICAGO PCS
```

| MOBILE | ESN | RATE PLAN DESCRIPTION | CALLED LOC | CALLED USAGE | CALLED PHONE | CDATE | CTIME | DUR | AIR | LAND | TOTAL | RSYS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 773/202-7998 | | 03/14 | 7:47:51A | 2.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | | INCOMING | | 03/14 | 9:15:52A | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | | INCOMING | | 03/14 | 9:15:52A | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | | 773/230-9619 | | 03/14 | 9:56:27A | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | INCOMING | | 03/14 | 10:00:07A | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | IL 773/534-3795 | INCOMING | | 03/14 | 10:02:51A | 2.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | NORTHBROEK | IL 847/405-6337 | | 03/14 | 10:20:03A | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 773/736-0992 | | 03/14 | 1:26:29P | 2.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 773/736-0992 | | 03/14 | 6:39:33P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | ARLNGHTCEL | IL 847/452-4564 | | 03/14 | 8:24:01P | 26.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 847/452-4564 | | 03/14 | 8:49:16P | 17.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | | INCOMING | | 03/14 | 9:06:09P | 16.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | | INCOMING | | 03/14 | 9:16:30P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | | INCOMING | | 03/14 | 9:24:46P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | ARLNGHTCEL | IL 847/452-4564 | | 03/14 | 9:46:01P | 6.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | | INCOMING | | 03/15 | 10:04:12P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | NACN | INCOMING | | 03/15 | 10:52:12P | 2.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 773/862-9942 | | 03/15 | 10:19:15A | 6.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 773/862-9942 | | 03/15 | 12:25:42P | 3.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | | INCOMING | | 03/15 | 12:43:01P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 773/282-3849 | | 03/15 | 12:44:26P | 2.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 773/282-3849 | | 03/15 | 12:44:41P | 2.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 773/725-3478 | | 03/15 | 3:04:40P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | INCOMING | | 03/15 | 3:23:03P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 773/202-2845 | | 03/15 | 3:54:47P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 773/282-3849 | | 03/15 | 1:59:57P | 2.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 773/202-2845 | | 03/15 | 4:38:12P | 2.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 773/202-2845 | | 03/15 | 4:40:01P | 2.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 773/862-9942 | | 03/15 | 5:25:59P | 4.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 773/202-2845 | | 03/15 | 5:52:13P | 8.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | | INCOMING | | 03/15 | 6:10:42P | 4.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | | INCOMING | | 03/15 | 7:00:33P | 4.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 773/736-0992 | | 03/15 | 7:09:48P | 8.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | | INCOMING | | 03/15 | 7:11:39P | 3.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 0830075249? | AT&T DIGITAL ADVANTAGE-S3 | NACN | INCOMING | | 03/15 | 7:24:07P | 2.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | | INCOMING | | 03/15 | 7:32:05P | 3.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | | INCOMING | | 03/15 | 8:03:27P | 2.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 773/416-8009 | | 03/15 | 8:05:10P | 3.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | | INCOMING | | 03/15 | 8:24:43P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 773/416-8009 | | 03/15 | 9:05:51P | 2.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 773/202-1998 | | 03/15 | 9:17:27P | 2.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 773/202-1998 | | 03/15 | 9:19:32P | 6.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 773/282-3849 | | 03/15 | 9:25:12P | 2.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 773/725-3478 | | 03/15 | 10:05:43P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 773/416-8009 | | 03/15 | 10:15:18P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | IL 773/202-1998 | | 03/15 | 10:56:11P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | INCOMING | | 03/16 | 11:07:43P | 4.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | INCOMING | | 03/16 | 9:00:14A | 2.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 5308787I | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | INCOMING | | 03/16 | 9:02:34A | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |

```

PCE-3

RUN DATE: 04/06/02
RUN TIME: 11:46:05
ACCOUNT:
REF: BUPP0100
MOBILE: 154286983

CYCLE: 02VC

MACRO/CELL
BILLED USAGE

CHICAGO PCS

PAGE 598

| MOBILE | ESN | RATE PLAN DESCRIPTION | CALLED LOC | CALLED PHONE | CDATE | CTIME | DUR | AIR | LAND | TOTAL | RSYS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | 773/255-4067 | 03/16 | 9:25:36A | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | 773/255-4067 | 03/16 | 9:26:25A | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | 773/255-4067 | 03/16 | 9:27:15A | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | 773/255-4067 | 03/16 | 9:27:57A | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | 773/255-4067 | 03/16 | 9:29:04A | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | 773/255-4067 | 03/16 | 9:30:55A | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | 773/255-4067 | 03/16 | 10:36:34A | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | 773/255-8009 | 03/16 | 10:37:10A | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | INCOMING | 03/16 | 10:38:22A | 2.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | 773/255-4067 | 03/16 | 10:39:36A | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | 773/255-4067 | 03/16 | 10:35:31A | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | 773/725-3478 | 03/16 | 10:35:56A | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | 773/282-1849 | 03/16 | 11:36:31A | 4.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | 773/416-8009 | 03/16 | 2:07:05P | 5.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | 773/255-4067 | 03/16 | 4:02:02P | 2.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | INCOMING | 03/16 | 4:06:52P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | 773/230-4619 | 03/16 | 4:09:03P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | INCOMING | 03/16 | 5:12:47P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | 773/230-4619 | 03/16 | 5:14:47P | 2.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | 773/230-5619 | 03/16 | 5:16:15P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | INCOMING | 03/16 | 5:33:29P | 4.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | INCOMING | 03/17 | 1:41:06P | 4.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | 773/416-9147 | 03/17 | 1:41:20P | 2.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | 773/736-0992 | 03/17 | 1:59:46P | 16.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | 773/736-0992 | 03/17 | 2:18:22P | 25.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | 773/202-7998 | 03/17 | 2:54:11P | 7.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | 773/736-0992 | 03/17 | 3:01:23P | 13.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | 847/452-4564 | 03/17 | 3:37:28P | 3.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | 773/736-0992 | 03/17 | 3:40:11P | 2.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | 773/906-6262 | 03/17 | 4:46:42P | 8.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 0830075Z497 | AT&T DIGITAL ADVANTAGE-S3 | ARLNGHTCEL | INCOMING | 03/17 | 7:00:05P | 2.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 0830075Z497 | AT&T DIGITAL ADVANTAGE-S3 | NACN | 773/202-7998 | 03/17 | 7:09:42P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 0830075Z497 | AT&T DIGITAL ADVANTAGE-S3 | NACN | INCOMING | 03/17 | 7:34:39P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 0830075Z497 | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | 773/202-7998 | 03/17 | 5:06:17P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | INCOMING | 03/17 | 5:06:52P | 4.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | 773/736-0992 | 03/17 | 5:07:45P | 4.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | 847/452-4564 | 03/17 | 4:43:52P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | CHICAGO | 773/736-0992 | 03/17 | 4:40:09P | 6.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | 847/452-4564 | 03/17 | 10:54:47P | 2.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | INCOMING | 03/17 | 10:53:56P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | INCOMING | 03/17 | 10:54:18P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | INCOMING | 03/17 | 10:54:51P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | INCOMING | 03/17 | 10:55:21P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | INCOMING | 03/17 | 10:56:01P | 1.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | INCOMING | 03/17 | 10:57:55P | 2.0 | 0.00 | 0.00 | 0.00 | 4111 |
| 773/255-0485 | 530BTB71 | AT&T DIGITAL ADVANTAGE-S3 | MOBILE | INCOMING | 03/17 | 10:59:16P | 3.0 | 0.00 | 0.00 | 0.00 | 4111 |

0034

"**EXHIBIT**, <u>DEFENDANT PHONE RECORD MARCH 16,</u>
<u>2002</u>"
"3 pages"

| Mkt Id | Sbscrp Id | Call Start Dt | Call End Dt | Call Origin Phn Nbr | Call Recip Phn Nbr |
|--------|-----------|---------------|-------------|---------------------|--------------------|
| CHICAGO | 24281098 | 03/14/2002 07:15PM | 03/14/2002 07:16PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/14/2002 07:28PM | 03/14/2002 07:29PM | 8474096737 | 7735013528 |
| CHICAGO | 24281098 | 03/14/2002 07:38PM | 03/14/2002 07:38PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/14/2002 07:55PM | 03/14/2002 07:59PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/14/2002 08:10PM | 03/14/2002 08:10PM | 8474096737 | 4044936137 |
| CHICAGO | 24281098 | 03/14/2002 08:10PM | 03/14/2002 08:11PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/14/2002 08:23PM | 03/14/2002 08:23PM | 8474096737 | 3122599296 |
| CHICAGO | 24281098 | 03/14/2002 08:30PM | 03/14/2002 08:32PM | 8474096737 | 3122599296 |
| CHICAGO | 24281098 | 03/14/2002 08:38PM | 03/14/2002 08:44PM | 8474096737 | 6785710165 |
| CHICAGO | 24281098 | 03/14/2002 08:40PM | 03/14/2002 08:40PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/14/2002 08:47PM | 03/14/2002 08:53PM | 8474096737 | 4044936137 |
| CHICAGO | 24281098 | 03/14/2002 11:42PM | 03/14/2002 11:44PM | 8474096737 | 4044936137 |
| CHICAGO | 24281098 | 03/14/2002 11:44PM | 03/14/2002 11:45PM | 8474096737 | 6785710165 |
| CHICAGO | 24281098 | 03/14/2002 11:45PM | 03/14/2002 11:47PM | 8474096737 | 6785710165 |
| CHICAGO | 24281098 | 03/15/2002 12:07AM | 03/15/2002 12:09AM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/15/2002 12:10AM | 03/15/2002 12:10AM | 8474096737 | 6785710165 |
| CHICAGO | 24281098 | 03/15/2002 12:11AM | 03/15/2002 12:12AM | 8474096737 | 4044936137 |
| CHICAGO | 24281098 | 03/15/2002 12:13AM | 03/15/2002 12:13AM | 8474096737 | 4044936137 |
| CHICAGO | 24281098 | 03/15/2002 10:45AM | 03/15/2002 10:46AM | 8474096737 | 6785710165 |
| CHICAGO | 24281098 | 03/15/2002 10:47AM | 03/15/2002 10:47AM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/15/2002 10:47AM | 03/15/2002 10:48AM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/15/2002 10:48AM | 03/15/2002 10:51AM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/15/2002 11:12AM | 03/15/2002 11:14AM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/15/2002 11:25AM | 03/15/2002 11:29AM | 8474096737 | 3122599296 |
| CHICAGO | 24281098 | 03/15/2002 12:30PM | 03/15/2002 12:30PM | 8474096737 | 7738412564 |
| CHICAGO | 24281098 | 03/15/2002 12:45PM | 03/15/2002 12:47PM | 8474096737 | 7082963446 |
| CHICAGO | 24281098 | 03/15/2002 12:53PM | 03/15/2002 12:53PM | 8474096737 | 7082963446 |
| CHICAGO | 24281098 | 03/15/2002 01:22PM | 03/15/2002 01:23PM | 8474096737 | 7082963446 |
| CHICAGO | 24281098 | 03/15/2002 01:29PM | 03/15/2002 01:29PM | 8474096737 | 7082963446 |
| CHICAGO | 24281098 | 03/15/2002 01:50PM | 03/15/2002 01:51PM | 8474096737 | 4044936137 |
| CHICAGO | 24281098 | 03/15/2002 02:32PM | 03/15/2002 02:33PM | 8474096737 | 4044936137 |
| CHICAGO | 24281098 | 03/15/2002 02:33PM | 03/15/2002 02:34PM | 8474096737 | 7708381207 |
| CHICAGO | 24281098 | 03/15/2002 02:43PM | 03/15/2002 02:52PM | 8474096737 | 4806102831 |
| CHICAGO | 24281098 | 03/15/2002 02:57PM | 03/15/2002 02:57PM | 8474096737 | 8472033000 |
| CHICAGO | 24281098 | 03/15/2002 02:59PM | 03/15/2002 03:00PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/15/2002 03:12PM | 03/15/2002 03:17PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/15/2002 04:17PM | 03/15/2002 04:18PM | 8474096737 | 3122599296 |
| CHICAGO | 24281098 | 03/15/2002 04:44PM | 03/15/2002 04:47PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/15/2002 05:34PM | 03/15/2002 05:35PM | 8474096737 | 7735013528 |
| CHICAGO | 24281098 | 03/15/2002 06:11PM | 03/15/2002 06:14PM | 8474096737 | 4044936137 |
| CHICAGO | 24281098 | 03/15/2002 06:34PM | 03/15/2002 06:40PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/15/2002 06:37PM | 03/15/2002 06:37PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/15/2002 06:43PM | 03/15/2002 06:43PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/15/2002 07:09PM | 03/15/2002 07:12PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/15/2002 08:41PM | 03/15/2002 08:42PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/15/2002 08:58PM | 03/15/2002 08:58PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/15/2002 10:31PM | 03/15/2002 10:32PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/15/2002 10:33PM | 03/15/2002 10:34PM | 8474096737 | 3122599296 |
| CHICAGO | 24281098 | 03/15/2002 10:56PM | 03/15/2002 10:56PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/15/2002 10:56PM | 03/15/2002 10:56PM | 8474096737 | 7735013528 |
| CHICAGO | 24281098 | 03/15/2002 11:42PM | 03/15/2002 11:43PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/15/2002 11:58PM | 03/15/2002 11:59PM | 8474096737 | 7703152904 |
| CHICAGO | 24281098 | 03/16/2002 12:30AM | 03/16/2002 12:31AM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/16/2002 12:50AM | 03/16/2002 12:50AM | 8474096737 | 8474096737 |

bchicago5-20-02.txt

0068

| Mkt Id | Sbscrp Id | Call Start Dt | Call End Dt | Call Origin Phn Nbr | Call Recip Phn Nbr |
|---|---|---|---|---|---|
| CHICAGO | 24281098 | 03/16/2002 01:03AM | 03/16/2002 01:04AM | 8474096737 | 7734124513 |
| CHICAGO | 24281098 | 03/16/2002 01:19AM | 03/16/2002 01:19AM | 8474096737 | 7735013528 |
| CHICAGO | 24281098 | 03/16/2002 01:20AM | 03/16/2002 01:25AM | 8474096737 | 3122599296 |
| CHICAGO | 24281098 | 03/16/2002 01:27AM | 03/16/2002 01:32AM | 8474096737 | 8476726305 |
| CHICAGO | 24281098 | 03/16/2002 01:31AM | 03/16/2002 01:31AM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/16/2002 12:07PM | 03/16/2002 12:09PM | 8474096737 | 6785710165 |
| CHICAGO | 24281098 | 03/16/2002 12:12PM | 03/16/2002 12:13PM | 8474096737 | 4046597777 |
| CHICAGO | 24281098 | 03/16/2002 12:14PM | 03/16/2002 12:14PM | 8474096737 | 6785710165 |
| CHICAGO | 24281098 | 03/16/2002 12:14PM | 03/16/2002 12:15PM | 8474096737 | 6785710165 |
| CHICAGO | 24281098 | 03/16/2002 12:16PM | 03/16/2002 12:20PM | 8474096737 | 3122599296 |
| CHICAGO | 24281098 | 03/16/2002 12:21PM | 03/16/2002 12:21PM | 8474096737 | 3126174894 |
| CHICAGO | 24281098 | 03/16/2002 12:22PM | 03/16/2002 12:22PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/16/2002 01:10PM | 03/16/2002 01:11PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/16/2002 01:11PM | 03/16/2002 01:15PM | 8474096737 | 3122599296 |
| CHICAGO | 24281098 | 03/16/2002 01:37PM | 03/16/2002 01:38PM | 8474096737 | 8474141937 |
| CHICAGO | 24281098 | 03/16/2002 01:41PM | 03/16/2002 01:41PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/16/2002 02:03PM | 03/16/2002 02:03PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/16/2002 03:00PM | 03/16/2002 03:00PM | 8474096737 | 3122599296 |
| CHICAGO | 24281098 | 03/16/2002 03:01PM | 03/16/2002 03:02PM | 8474096737 | 8002478726 |
| CHICAGO | 24281098 | 03/16/2002 03:02PM | 03/16/2002 03:05PM | 8474096737 | 8002478726 |
| CHICAGO | 24281098 | 03/16/2002 03:22PM | 03/16/2002 03:29PM | 8474096737 | 8002478726 |
| CHICAGO | 24281098 | 03/16/2002 03:32PM | 03/16/2002 03:42PM | 8474096737 | 8002478726 |
| CHICAGO | 24281098 | 03/16/2002 03:43PM | 03/16/2002 03:45PM | 8474096737 | 4044936137 |
| CHICAGO | 24281098 | 03/16/2002 03:48PM | 03/16/2002 03:51PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/16/2002 03:53PM | 03/16/2002 03:54PM | 8474096737 | 4044936137 |
| CHICAGO | 24281098 | 03/16/2002 04:02PM | 03/16/2002 04:03PM | 8474096737 | 7739947324 |
| CHICAGO | 24281098 | 03/16/2002 04:05PM | 03/16/2002 04:06PM | 8474096737 | 7734124513 |
| CHICAGO | 24281098 | 03/16/2002 04:13PM | 03/16/2002 04:15PM | 8474096737 | 3126174894 |
| CHICAGO | 24281098 | 03/16/2002 04:30PM | 03/16/2002 04:31PM | 8474096737 | 7082963446 |
| CHICAGO | 24281098 | 03/16/2002 04:35PM | 03/16/2002 04:36PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/16/2002 04:46PM | 03/16/2002 04:47PM | 8474096737 | 3126174894 |
| CHICAGO | 24281098 | 03/16/2002 05:11PM | 03/16/2002 05:14PM | 8474096737 | 4044936137 |
| CHICAGO | 24281098 | 03/16/2002 05:46PM | 03/16/2002 05:47PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/16/2002 05:47PM | 03/16/2002 05:47PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/16/2002 05:52PM | 03/16/2002 05:52PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/16/2002 06:07PM | 03/16/2002 06:07PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/16/2002 06:12PM | 03/16/2002 06:13PM | 8474096737 | 3122599296 |
| CHICAGO | 24281098 | 03/16/2002 06:13PM | 03/16/2002 06:14PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/16/2002 09:01PM | 03/16/2002 09:02PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/16/2002 09:13PM | 03/16/2002 09:14PM | 8474096737 | 3126174894 |
| CHICAGO | 24281098 | 03/16/2002 09:14PM | 03/16/2002 09:15PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/16/2002 09:21PM | 03/16/2002 09:23PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/16/2002 09:27PM | 03/16/2002 09:27PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/16/2002 09:33PM | 03/16/2002 09:34PM | 8474096737 | 3126174894 |
| CHICAGO | 24281098 | 03/16/2002 09:40PM | 03/16/2002 09:41PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/16/2002 09:44PM | 03/16/2002 09:44PM | 8474096737 | 3126174894 |
| CHICAGO | 24281098 | 03/16/2002 09:49PM | 03/16/2002 09:50PM | 8474096737 | 8474770582 |
| CHICAGO | 24281098 | 03/16/2002 10:14PM | 03/16/2002 10:15PM | 8474096737 | 7735618562 |
| CHICAGO | 24281098 | 03/16/2002 10:15PM | 03/16/2002 10:16PM | 8474096737 | 7732621756 |
| CHICAGO | 24281098 | 03/16/2002 10:30PM | 03/16/2002 10:31PM | 8474096737 | 7735618562 |
| CHICAGO | 24281098 | 03/16/2002 10:33PM | 03/16/2002 10:40PM | 8474096737 | 8476721703 |
| CHICAGO | 24281098 | 03/16/2002 10:40PM | 03/16/2002 10:41PM | 8474096737 | 8479624751 |
| CHICAGO | 24281098 | 03/16/2002 10:42PM | 03/16/2002 10:42PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/16/2002 10:42PM | 03/16/2002 10:44PM | 8474096737 | 8474096737 |

| Mkt Id | Sbscrp Id | Call Start Dt | Call End Dt | Call Origin Phn Nbr | Call Recip Phn Nbr |
|--------|-----------|---------------|-------------|---------------------|--------------------|
| CHICAGO | 24281098 | 03/16/2002 11:07PM | 03/16/2002 11:09PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/16/2002 11:11PM | 03/16/2002 11:13PM | 8474096737 | 7739947324 |
| CHICAGO | 24281098 | 03/16/2002 11:32PM | 03/16/2002 11:47PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 12:33AM | 03/17/2002 12:36AM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 01:14AM | 03/17/2002 01:16AM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 01:57AM | 03/17/2002 01:58AM | 8474096737 | 7087906357 |
| CHICAGO | 24281098 | 03/17/2002 02:12AM | 03/17/2002 02:13AM | 8474096737 | 7082963446 |
| CHICAGO | 24281098 | 03/17/2002 02:19AM | 03/17/2002 02:20AM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 08:03AM | 03/17/2002 08:03AM | 8474096737 | 3126174894 |
| CHICAGO | 24281098 | 03/17/2002 08:03AM | 03/17/2002 08:04AM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 09:03AM | 03/17/2002 09:03AM | 8474096737 | 3126174894 |
| CHICAGO | 24281098 | 03/17/2002 09:04AM | 03/17/2002 09:05AM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 09:05AM | 03/17/2002 09:05AM | 8474096737 | 3126174894 |
| CHICAGO | 24281098 | 03/17/2002 09:21AM | 03/17/2002 09:21AM | 8474096737 | 8472033000 |
| CHICAGO | 24281098 | 03/17/2002 09:40AM | 03/17/2002 09:42AM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 09:47AM | 03/17/2002 09:48AM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 09:52AM | 03/17/2002 09:57AM | 8474096737 | 8477691892 |
| CHICAGO | 24281098 | 03/17/2002 10:19AM | 03/17/2002 10:19AM | 8474096737 | 8474458068 |
| CHICAGO | 24281098 | 03/17/2002 10:22AM | 03/17/2002 10:23AM | 8474096737 | 8474770582 |
| CHICAGO | 24281098 | 03/17/2002 10:23AM | 03/17/2002 10:23AM | 8474096737 | 8472033000 |
| CHICAGO | 24281098 | 03/17/2002 10:24AM | 03/17/2002 10:24AM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 10:34AM | 03/17/2002 10:34AM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 10:39AM | 03/17/2002 10:55AM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 10:56AM | 03/17/2002 10:56AM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 11:11AM | 03/17/2002 11:12AM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 11:16AM | 03/17/2002 11:18AM | 8474096737 | 8476721703 |
| CHICAGO | 24281098 | 03/17/2002 11:21AM | 03/17/2002 11:23AM | 8474096737 | 8477029384 |
| CHICAGO | 24281098 | 03/17/2002 11:28AM | 03/17/2002 11:29AM | 8474096737 | 8476721703 |
| CHICAGO | 24281098 | 03/17/2002 11:36AM | 03/17/2002 11:36AM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 11:51AM | 03/17/2002 11:51AM | 8474096737 | 8474096739 |
| CHICAGO | 24281098 | 03/17/2002 12:14PM | 03/17/2002 12:15PM | 8474096737 | 8472079483 |
| CHICAGO | 24281098 | 03/17/2002 12:17PM | 03/17/2002 12:18PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 12:24PM | 03/17/2002 12:25PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 12:39PM | 03/17/2002 12:46PM | 8474096737 | 8472079483 |
| CHICAGO | 24281098 | 03/17/2002 12:47PM | 03/17/2002 12:48PM | 8474096737 | 8472079483 |
| CHICAGO | 24281098 | 03/17/2002 12:49PM | 03/17/2002 12:50PM | 8474096737 | 8474770582 |
| CHICAGO | 24281098 | 03/17/2002 12:50PM | 03/17/2002 12:50PM | 8474096737 | 8472033000 |
| CHICAGO | 24281098 | 03/17/2002 12:53PM | 03/17/2002 12:54PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 12:55PM | 03/17/2002 12:56PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 01:06PM | 03/17/2002 01:08PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 01:07PM | 03/17/2002 01:07PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 01:27PM | 03/17/2002 01:29PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 01:32PM | 03/17/2002 01:33PM | 8474096737 | 8476721703 |
| CHICAGO | 24281098 | 03/17/2002 01:45PM | 03/17/2002 01:46PM | 8474096737 | 8472493028 |
| CHICAGO | 24281098 | 03/17/2002 02:03PM | 03/17/2002 02:03PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 03:38PM | 03/17/2002 03:40PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 03:42PM | 03/17/2002 03:42PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 04:05PM | 03/17/2002 04:06PM | 8474096737 | 8472493028 |
| CHICAGO | 24281098 | 03/17/2002 04:14PM | 03/17/2002 04:15PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 04:34PM | 03/17/2002 04:34PM | 8474096737 | 8474770582 |
| CHICAGO | 24281098 | 03/17/2002 04:44PM | 03/17/2002 04:44PM | 8474096737 | 8474458068 |
| CHICAGO | 24281098 | 03/17/2002 04:52PM | 03/17/2002 04:53PM | 8474096737 | 8474096737 |
| CHICAGO | 24281098 | 03/17/2002 05:01PM | 03/17/2002 05:01PM | 8474096737 | 8472033000 |
| CHICAGO | 24281098 | 03/17/2002 05:05PM | 03/17/2002 05:06PM | 8474096737 | 8474096737 |

"**EXHIBIT**, MARCH 21, 2002 DISCOVERY TRANSCRIPT"
"18 PAGES"

EXHIBIT G

TRANSCRIPTION OF CONCEALED RECORDER PLACED ON FBI CI
ON 3/21/02.

SUBJECTS:           **SPECIAL AGENT FRANK DEPODESTA**
                    **FBI CI**
                    **JAMES- AKA DONVILLE JAMES**

DURATION OF TAPE:   **41 MIN 42 SEC/ 2:25PM-3:06 PM**


FRANK:    TESTING, TESTING, TESTING TESTING, THIS IS SPECIAL AGENT
          FRANK DEPODESTA WITH THE FBI ALONG WITH SPECIAL
          AGENTS DAN DICK AND MIKE NEWBERG WITH THE US
          SECRET SERVICE. THE DATE IS 3/21/02. THE TIME IS
          APPROXIMATELY 2:25 PM. AT THIS TIME WE ARE ACTIVATING
          AND PLACING A CONCEALED RECORDING DEVICE ON A
          COOPERATING WITNESS WHO IS GOING TO MEET WITH AN
          INDIVIDUAL WHO IS ONLY KNOWN AS 'JAMES'.

(CI RECEVIES CELL PHONE CALL FROM JAMES, CANNOT HEAR JAMES ON
PHONE)

CI:       THAT'S HIM.

CI:       HELLO?

CI:       AH, RIGHT HERE AT NORTH AND ASHLAND, I WAS RIGHT
          HERE AT HOME DEPOT BUT ILL BE THERE SHORTLY, IT'S A
          LITTLE TRAFFIC.

CI:       ASHLAND..BY ASHLAND ....YEAH

CI:       I'M... I'M GOING TO BE IN MY WHITE CAR.

CI:       HELLO?

CI:       ALRIGHT....YOU WANT ME TO CALL YOU WHEN I AM CLOSER
          THERE?  SO THERES KIND OF A LITTLE TRAFFIC.
          YOU WANT TO DRIVE AROUND? YOU WANT DRIVE AROUND
          OR.... OR WHEN I GET THERE OR SOMETHING?

CI:       ALRIGHT......LET ME TURN BACK THEN.

CI:       HOME DEPOT?

0072

CI;      WHAT?

CI:      YEAH.....ALRIGHT.

(CI ENDS CALL WITH JAMES)

(SA DEPODESTA CALLS CI)

CI:      HEY, HE WANNA COME BACK, HE WANNA COME FROM THE HOME DEPOT ON NORTH ..NORTH AND HALSTED.

CI:      YEAH, HE'S....HE'S GOING TO LEAVE FROM THERE NOW. HE'S GOING TO COME TO HOME DEPOT.

CI:      YEAH TELL HIM, OKAY. I'M GOING, I'M GOING TO TURN BACK TO GO TO HOME DEPOT AGAIN.

CI:      HE SAID HOME DEPOT RIGHT? THERE IS A HOME DEPOT RIGHT THERE?

CI:      OK.....

CI:      OK.......

CI:      OK....

CI:      I 'M GOING...I'M GOING, I GONNA PARK SOMEWHERE IN THE PARKING LOT AND HE'S GONNA UM...HE'S GONNA CALL ME WHEN HE IS AROUND THERE SO I CAN TELL HIM WHERE I AM AT....

CI:      OK.....

CI:      ALRIGHT...

CI:      ALRIGHT...

(CALL ENDS WITH SA DEPODESTA)

(RECEIVES CALL FROM SA DEPODESTA)

CI:      WHERE AT? WHERE AT? UM WHERE AT UM....
RIGHT HERE BY THE FENCE. UM....
YOU JUST GOING PAST ME NOW.

(DURING CONVERSATION CI RECEIVES INCOMING CALL FROM JAMES)

2

CI:          THAT'S HIM ON THE OTHER LINE....

(CALL ENDS WITH SA DEPODESTA, CLICKS OVER TO CALL WITH JAMES)

CI:          HELLO?
CI:          I'M RIGHT HERE AT THE HOME DEPOT.
CI:          WHICH ONE?
CI:          CAUSE I'M ALL THE WAY.......WHERE THE GREEN....UH..NO..

CI:          I'M INSIDE THE STORE IN THE SOUTH SIDE OF THE HOME
             DEPOT THING.. SOUTH BUILDING.

CI:          YEAH...

CI:          I'M YEAH, I COMPLETELY....LEAVE THIS PARKING
             LOT...SHIT..

CI:          YEAH..UM

CI:          ELSTON AND UM...

CI:          WHERE'S THE GAS STATION YOU TALKING ABOUT?

CI:          ON THE HIGHWAY?

CI:          UH HUH, ALRIGHT

CI:          EL....ELSTON AND NORTH AVE, THERE IS A GAS STATION?

CI:          UH IN CLYBOURN?

CI:          WHAT IS THE OTHER STREET?

CI:          ALRIGHT. LET ME GET, OKAY ELSTON AND NORTH...

CI:          OKAY LET ME GET ON NORTH AND THEN TURN RIGHT ON
             NORTH AND GO TO THE GAS STATION RIGHT?

CI:          BY THE EXPRESSWAY?

CI:          ALRIGHT.....

CI:          ALRIGHT.

(CALL ENDS WITH JAMES)

0074

(CI CALLS SA DEPODESTA)

CI:     HEY FRANK?

CI:     HEY FRANK, HE WANNA GO BY NORTH AND ELSTON, THERE IS
        A GAS STATION THERE.

CI:     YEAH

CI:     HEY HE WANNA, HE WANNA MEET AT THE GAS STATION AT
        NORTH AND ELSTON.

CI:     I'M GOING OUT OF THE PARKING LOT NOW.

CI:     YEAH,

CI:     YEAH

CI:     WE HAVE TO GO WHERE HE SAYS OR WE ARE NOT GOING TO
        BE ABLE TO GET HIM HERE.

CI:     AMOCO

CI:     UH, WELL I THINK HE SAID AN AMOCO IS RIGHT ON THE
        CORNER OF NORTH AND ELSTON.

CI:     OKAY

CI:     OKAY

CI:     ALRIGHT HERE'S AN AMOCO

CI:     ALRIGHT

CI:     ·YEAH I THINK I SEE......I MEET HIM ONE TIME BEFORE.

CI:     ALRIGHT

CI:     BYE.

(ENDS CALL WITH SA DEPODESTA)

CI:     Y547594

(CI IS HEARD EXITING VEHICLE)

4

(CI ENTERS VEHICLE)

(CI CALLS JAMES ON CELL PHONE)

CI:        WHERE YOU AT?

CI:        THE WHAT?

CI:        CLEANERS.....

CI:        OKAY....

CI:        OKAY......

(CALL ENDS)

CI:        HE'S IN THE GRAY..... IN THE RED CAR.... Y65.....06.....

(CAR WINDOW IS HEARD ROLLING NOW)

CI:        WHAT'S UP MAN?

JAMES:     NOTHIN MUCH.

CI:        SO WHAT'S UP?

JAMES:

CI:        WELL LIKE I SAY I GOT THE...I GOT THE GUY SET UP. WE SHOW HIM THE MONEY, SOME MONEY, FAKE MONEY ON TOP OF THE ONES LIKE WE DID LAST TIME.  WE CAN DO THE, WE CAN DO THE TEN OR THE SEVEN.  I MENTIONED TO HIM BETWEEN SEVEN AND TEN.  SO IT DEPENDS HOW MUCH...YOU KNOW, THE BAG IT LOOKS LIKE.

JAMES:     THE MONEY ALL .....UM.......$300,000.......$200,0000

CI:        OKAY

JAMES:

CI:        OK

CI:        IT WOULD BE BETTER. HOW WE GONNA SPLIT IT OR WHAT?

0076

CAUSE I WANNA DO IT LIKE I TELL YOU. TEN GRAND I GONNA SELL YOU EACH ONE TEN. YOU MAKE TEN, I MAKE TEN BUT I DO NOT GOT THAT MUCH PEOPLE TO SELL IT. YOU KNOW..

JAMES:     WHAT I'LL DO, ONCE WE SPLIT IT, YOU TAKE YOURS, I TAKE MINE...AND I 'LL GO THROUGH ONE OF MINE...OK...

THEN I'LL BRING MY MONEY BACK........

I DON'T HAVE NO MONEY RIGHT NOW YOU KNOW....

I GOT ABOUT.....

CI:        WHAT ABOUT THE HEROIN YOU WERE TALKING ABOUT?

JAMES:     YEAH

CI:        WELL AFTER WE DO THAT THE OTHER GUY I TALKED TO, HE SAID HE HAD SOME HEROIN.

JAMES:     ...HOW MUCH HE GOT.....

CI:        HE GET A LOT OF QUANTITY, BUT I NEVER FUCKED WITH THAT BEFORE, SO I DON'T KNOW HOW MUCH IT SELL......IF IT SELL BY AN OUNCE OR WHATEVER.

JAMES:     I WANT LIKE A KILO

CI:        A KILO? I DO NOT KNOW HOW THE THAT SHIT WORKS, I HAVE NEVER DONE THAT BEFORE THOUGH.

JAMES:     ABOUT $100,000.00

CI:        ·$100,000.00 FOR ONE KEY? OR SOMETHING?

JAMES:     YEAH

CI:        OK

CI:        NO CAUSE, HE...THE OTHER GUY I WAS TALKING TO HE HE SAID IF I HAD SOMEONE TO BUY A LITTLE HEROIN SHIT YOU KNOW

JAMES:     OH YEAH?

6

CI:     BUT UM YOU HAVE THE PAPERS READY? CAUSE THE GUY MAYBE LEAVES SATURDAY TOO OR SUNDAY. SO WE HAVE TO DO THIS EITHER THIS FRIDAY.....

JAMES:  THIS FRIDAY IN THE EVENING TIME OR SATURDAY IN THE AFTERNOON.

CI:     IN THE AFTERNOON OR MORNING WOULD BE BETTER CAUSE THERE'S A LOT OF YOU KNOW WE JUST EXCHANGE THE BAG LIKE WE DID LAST TIME.

JAMES:  ALRIGHT.

CI:     YOU BRING THE GUY WITH CAR?

CI:     WE PUT THE KEY IN THE....I PUT IT IN THERE OR THEN YOU JUST....BUT SEE THAT'S THE PROBLEM, CAUSE I WANNA HAVE THE BAG WITH THE MONEY WHEN I GIVE YOU THE STUFF TO.

JAMES:  WE DO IT THE SAME WAY...
        I GIVE YOU THE MONEY.

        I LOCK THE CAR WITH THE MONEY.
        YOU SNED THE GUY...... CHECK THE MONEY
        I LEAVE THE CAR WITH MONEY.

        JUST LIKE WE DID LAST TIME.

CI:     BUT THEN HOW AM I GOING TO GET THE ..MY THREE KILOS FROM YOU, YOU KNOW WHAT I AM SAYING.

JAMES:  YOU TALKING ABOUT THE LIMO OR THE GUY?

CI:     GONNA BE THE SAME GUY....BEEMER.....OR YEAH OKAY ALRIGHT FUCK IT.... YOU WANNA DO IT.... YOU GOT THE MONEY READY OR EVERYTHING SET UP?

JAMES:  I DON'T HAVE IT READY....I JUST CALLED HIM ..HE'S MAKING IT RIGHT NOW.

CI:     HOW LONG IS IT GONNA TAKE HIM?

JAMES:  ACTUALLY UM

0078

TOMMORROW EVENING....PICK UP

SATURDAY MORNING

CI:         OK LET ME CALL THIS GUY TOO, I NEED TO TELL WHEN
            EXACTLY WHEN WE READY TO DO THIS AND SHIT.

JAMES:      ALRIGHT, JUST TELL HIM TEN THEN CAUSE UM....

            PAY OUT THE MONEY...

            I TELL THE GUY....

            I LEAVE HIM A.....

CI:         UH HUH

JAMES:

CI:         ALRIGHT YOU HELP SELL EM.

JAMES:      YEAH  WHAT I'LL DO I'LL TAKE ONE OF MINE AND WE'LL
            SELL IT. I COME BACK AND BUY ONE FROM YOU. I'LL SELL
            YOURS IN TEN DAYS.

CI:         ALRIGHT

CI:         SO I GO WITH THE GUY WITH THE LIMO WITH THE KILOS AND
            BUT THE OTHER GUY IS GOING WITH YOU TO PICK UP THE
            BAG FROM YOU WITH THE MONEY, THE TEN KEYS OR WHAT.

JAMES:      ......CAR BEHIND THE LIMO.....JUST LIKE WE DID IT LAST
            TIME.

CI:         OH

JAMES:

CI:         CAUSE I CAN PROBABLY DO THE TEN KEYS, CARRY THE SHIT
            FOR UM I CAN PROBABLY DO THE TEN KEYS, CARRY THE BAG
            AND PUT IT IN...OR GO INSIDE THERE....BUT MAKE SURE YOU
            UM. WELL I CAN TAKE A LOOK AT IT BEFORE WE DO IT
            ANYWAYS...SEE HOW REAL IT LOOKS SO THE GUY CAN BUY
            IT, YOU KNOW WHAT I'M SAYING....I DON'T WANNA SEEM
            UH...HE DON'T KNOW WHERE I LIVE YOU KNOW BUT....

0079

JAMES:    YOU SEE THAT IS WHY I WANT TO DO IT IN THE EVENING TIME.

CI:    NOT TOO BAD THOUGH

JAMES:    NOT TOO DARK LIKE ABOUT 6 O'CLOCK...........

CI:    YEAH

CI:    IN THE MORNING IS FINE I MEAN, IN THE AFTERNOON OR THE MORNING IS FINE YOU KNOW. ITS JUST AS LONG AS IT LOOKS KIND OF REAL. LIKE THE OTHER ONE, I BOUGHT IT FOR IT, YOU KNOW I WENT FOR IT, IT WAS UNTIL I GOT IT TO HOME.

JAMES:    ALRIGHT,..UM

CI:    BUT TELL ME WHEN YOU KNOW YOU'RE READY, YOU, YOU STACK EM UP AND PUT REAL MONEY ON TOP, AT LEAST ONE TWENTY OR SOME SHIT LIKE THAT AND MAKE IT SEEM REAL.

JAMES:    I'LL PUT REAL MONEY ON UM TOP AND THE BOTTOM OF THE....

CI:    IF NOT, IF I'M WITH HIM INSIDE THE HOUSE, I'M GOING TO TRY SEPARATE THREE KILOS IN ONE BAG. SO I'M BE READY TO GET OUT FROM THE LIMO AND YOU GUYS GO WITH YOUR SIX.

JAMES:

CI:    WELL WHY DON'T YOU GUYS COME WITH ME AND LOOK AT THE KILOS WHATEVER.

JAMES:

CI:

JAMES:    ......I'M NOT GONNA...... PARK TO THE SIDE

CI:    THAT'S WHY I WANT TO DO IT TO GET THE FUCK OUTTA HERE YOU KNOW

CI:    I WANNA TAKE THAT CHANCE AND GO AND LEAVE.

JAMES:    JUST PARK YOUR CAR SOMEWHERE AND THE LIMO DRIVER WILL DROP YOU OFF. I GOT MINE AND YOU GOT YOURS.

0080

THEN DROP YOU OFF.  PARK CLOSE BY. THEN THE LIMO DRIVER WILL JUST TAKE YOU THERE.  I AM GONNA HAVE TWO CARS FOLLING HIM TOO. YOU KNOW SO.......YOU KNOW.......

CI:        ALRIGHT

JAMES:     WHY DON'T YOU PUT EM IN THE CAR, JUST YOU AND THEM IN THE SEAT, DON'T PUT THEM IN THE TRUNK. PUT EM IN THE PASSENGER SEAT. THEN YOU CAN SEPARATE THEM IN THE (BACK?) SEAT.

CI:        OK

CI:        YOU GONNA BRING THE MONEY

JAMES:     YEAH

CI:        OR SOMEBODY ELSE?

JAMES:     SOMEBODY ELSE IS GONNA BRING THE MONEY, THEY'RE GONNA BE IN THE (?) CAR JUST LIKE LAST TIME. SOMEBODY YOU KNOW.

CI:        I DON'T WANT TOO MUCH CARS MAN, I DON'T KNOW..

JAMES:     THEY'RE ONLY BE TWO CARS, THE LIMO AND ANOTHER CAR.

CI:        DID YOU AND ONE GO....TAKE THE.... YOU BRING THE MONEY..

CI:        I PUT THE STUFF IN THE LIMO

JAMES:     I'M NOT GOING TO BE THERE ....I'LL BE SOMEWHERE WATCHING...ALRIGHT.

CI:        OK

CI:        ALRIGHT

CI:        CAUSE THEN I HAVE TO GIVE THE MONEY TO THE GUY THAT'S THE THING I HAVE TO SHOW HIM WE CAN DO THE EXCHANGE WITH THE KILOS SOMETHING LIKE THAT. SO I CAN SHOW HIM THE MONEY WHEN I GET OUT.

0081

JAMES:      YOU ARE GOING TO SHOW HIM THE MONEY IN THE BACK
            RIGHT?

CI:         YES

CI:         HE'S NOT EVEN GONNA CHECK ALL OF IT HES JUST GONNA
            YOU KNOW, 'LOOK HERE'S THE MONEY RIGHT HERE', SO...

JAMES:      SO WHY......LIKE LAST TIME.....

CI:         I HAD THE EXCHANGE THING

JAMES:

CI:         ALRIGHT

JAMES:      GO AND TELL HIM.........THAT YOU KNOW......

CI:         BUT HE'S GONNA ASK ME TO SEE THE MONEY TOO THAT'S
            THE PROBLEM.

JAMES:

CI:         THAT'S WHY AT THE SAME TIME WOULD BE GOOD TOO
            CAUSE HES NOT GONNA WANT TO DO OKAY  THAT MUCH IT
            ONLY BE ONE DEAL WITH HIM AND ONE DELIVERY YOU
            KNOW SO I CAN KIND OF SHOW HIM THE MONEY AT THE
            SAME TIME AND PUT THE KEY AND FINALLY WE CAN SHOW
            HIM AND WHEN WE SHOW HIM THE MONEY I THROW THE BAG
            AND JUMP IN THE LIMO. WHICH IS GREAT AND........LEAVES US
            FOLLOWING US  WHATEVER. THAT TOO AND LEAVE HIM THE
            BAG WITH THE MONEY SOME SHIT.

CI:         ALRIGHT, THAT TOO.

CI:         MAKE SURE I GO INSIDE WITH THE KILOS AND GET MY SHARE
            CAUSE I DON'T WANNA LEAVE WITHOUT MY SHAR YOU
            KNOW I WANNA MAKE THE MONEY AND GET THE FUCK
            OUTTA HERE.

JAMES:      ALRIGHT UM THIS IS WHAT WE'RE GONNA DO....

CI:         SO

JAMES:      I GIVE YOU THE CAR WITH THE MONEY....

11

0082

DIFFERENT CAR WITH THE MONEY OKAY THEN YOU GO WITH THE DRIVER TO MEET THE GUY AND YOU COME AND GET THE MONEY AND TAKE IT TO THE GUY OKAY.

CI:        UM HE LIVE BY UM...THAT WAS THE OTHER THING I WAS GONNA TELL YOU. HE LIVES BY THE BRICKYARD. HE LIVES ABOUT...ABOUT, I DON'T KNOW EXACTLY HIS HOUSE HE'S NOT GONNA TELL ME EXACTLY WHERE IT IS CAUSE I COULD ROB HIM MYSELF YOU KNOW WHAT IM SAYING SO HE LIVES, HE LIVES AROUND 3.....3.....2...BLOCKS AWAY FROM THE BRICKYARD AND THREE HOUSES YOU KNOW CLOSE TO THE CORNER YOU KNOW AT THE BRICKYARDMALL AT NARAGANSETT AND DIVERSEY IN THE PARKING LOT. WE CAN DO THAT IN THE PARKING LOT. HE HE HE TOLD ME WE WE CAN GO BY THE PARKING LOT.

JAMES:     YOU DON'T WANT TO DO IT IN THE PARKING LOT CAUSE YOU DON'T GIVE HIM ENOUGH TIME TO GET HIM.

CI:        OR THAT ONE WAY STREET AND YOU KNOW WHERE THAT STREET IS WHEN THE GUY PULL UP. I GET OUT OF THE HOUSE SOMETHING LIKE THAT TOO. BUT HE DON'T WANNA SHOW ME HIS HOUSE EXACTLY THAT'S WHY.

JAMES:     ALRIGHT UM I MEAN WE SHOULD DO IT LIKE THE WAY WE DID IT LAST TIME.

CI:        ALRIGHT

JAMES:     THE ONLY DIFFERENCE IS YOU WILL BE IN THE CAR WITH THE GUY.

CI:        BUT I HAVE TO GIVE HIM THE BAG WITH THE MONEY

JAMES:     JUST COME AND GET IT FROM HIM.

CI:        OKAY

JAMES:     JUST TELL HIM YOU KNOW YOU SAW THE MONEY AND ITS READY IN THE MONEY CAR.

CI:        OKAY

JAMES:     I GIVE YOU ENOUGH TIME TO PUT THE STUFF IN THE CAR.

0083

CI:         CAUSE I WANT YOU TO KNOW WHEN I ....YEAH..THAT'S
            TRUE...

CI:         ALRIGHT...OK

JAMES:      YOU ARE GOING TO BE WITH HIM RIGHT.

CI:         YEAH I AM GOING TO BE WITH HIM.

JAMES:      OK. WHEN HE COME THERE...I GIVE HIM THE BAG WITH THE
            MONEY. WHILE YOU GO BACK AND PUT THE STUFF IN THE
            CAR AND WHAT YOU DO IS YOU LOOK AROUND AT HIM AND
            THROW THE BAG OUT AND WALK AWAY.............

CI:         ARE YOU GOING TO SHOW HIM THE MONEY REAL QUICK
            LITTLE BIT AND THEN CLOSE THE BAG LET HIM TAKE BAG
            THE CLOSED.

JAMES:      YEAH...YEAH.

CI:         SO THAT WE CAN DO, YOU CAN BRING THE BAG WITH YOU.

JAMES:      YEAH

CI:         SHOW HIM THE MONEY, LOOK LOOK AT IT AND MEANWHILE
            I'M JUMPING IN THE IN THE LIMO.

JAMES:      YEAH

CI:         AND JUST YOU ZIP IT UP AND GIVE IT TO HIM

JAMES:      YEAH

CI:         BUT I BE WATCHING HIM THOUGH.

JAMES:      I JUST DROP THE BAG OVER HERE.     ZIP IT UP AND GIVE IT
            TO HIM.  LET HIM KNOW YOU ARE GOING WITH THE LIMO
            GUY.

JAMES:      ALRIGHT

CI:         YOU KNOW JUST UM HOW ARE YOU GOING TO GET THERE.

JAMES:      JUST UM

0084

CI:     WELL I AM GOING TO GO IN MY CAR CLOSE BY HIS HOUSE CAUSE WHEREVER HE WANT TO DO, THAT'S THE PROBLEM I HAVE TO TALK TO HIM  HOW WE WANT TO DO IT BY HIS HOUSE, CAUSE HE DON'T WANT TO SHOW ME HIS HOUSE.

JAMES:     I PICK YOU UP BY UM THE BRICKYARD MALL

CI:     OK I CAN PARK MY CAR AT THE BRICKYARD.

JAMES:     I CAN CALL HIM AND HAVE HIM PICK YOU UP THERE AND I CAN CALL HIM AND TELL HIM I AM ON MY WAY.

CI:     ALRIGHT.

JAMES:     AND THEN YOU UM, ONCE YOU'RE WITH US WHEN YOU GET THERE.

CI:     YOU FOLLOW ME? YOU GUYS FOLLOW ME WHATEVER.

JAMES:     I BE WATCHING I PICK YOU UP PARKED GIVE HIM FIVE OR TEN MINUTES AND UH TELL HIM TO COME GET THE MONEY FROM ME AND SHOW HIM THE BAG.  WHILE YOU ARE GOING TO THE CAR AT THE SAME TIME.

CI:     OKAY

CI:     SO HOW MANY?....TEN?

JAMES:     YEAH

CI:     TEN

CI:     ALRIGHT MAN DON'T FUCK ME UP MAN.

JAMES:     ·ALRIGHT MAN

CI:     MAKE SURE THERE IS GOING TO BE THREE SEPARATE CAUSE HOPEFULLY I GO WITH HIM AND SEPARATE THEM ALL.

JAMES:     WE CAN DO IT TO A NYBODY YOU WANT TO HEROIN...

CI:     YEAH THE OTHER GUY TOLD ME THAT'S WHY I TELL YOU THE OTHER GUY, BUT AFTER WE DO THIS ONE CAUSE I WANT TO

0085

DO THIS GUY TOO, AND THEN WE CAN...( CELL PHONE STARTS RINGING)

CI:        MY BEEPER

JAMES:     THIS GUY KNOW WHERE.....

CI:        HE GOT AN IDEA WHERE I LIVE

CI:        BUT THIS GUY....NO

JAMES:     THE GUY WITH THE HEROIN......

CI:        NO THE ONE WE GOING TO DO TOMMORROW...
           FUCK IT..

JAMES:     THE HEROIN YOU CAN JUST MAKE IT LOOK LIKE I DID IT YOU
           KNOW.

CI:        YEAH BOTH OF THEM ARE GOING TO DO LIKE YOU KNOW,
           YOU FUCK US UP WITH , BUT I AM GOING TO GO WITH THE
           LIMO MAKE SURE I GET MY THREE KILOS WHATEVER.

JAMES:     ALRIGHT, ALRIGHT SO LET ME GO THROUGH IT AGAIN...LET
           ME DO THIS...

CI:        OK

CI:        SO WE GO IN THE PARKING LOT RIGHT? UM WE GO TO THE
           PARKING LOT, I AM GONNA CALL YOU THAT WE ARE READY
           THERE WAITING FOR YOU ONE OF YOU GUYS TO COME
           WHATEVER WITH THE MONEY, HE IS GOING TO FOLLOW ME
           BY THE HOUSE.

JAMES:     TELL HIM THAT I AM COMING WITH THE MONEY.

CI:        OK YOU ARE COMING WITH MONEY.

CI:        OK WE ARE GOING TO MEET THERE AT THE ....

CI:        WE GONNA...

CI:        YEAH YEAH CAUSE HE GONNA PICK BY HIS HOUSE.

JAMES:     OK ONCE WE GET THERE.

0086

JAMES:     YOU KNOW, MAKE SURE YOU SEE THE COCAINE AND YOU ARE READY TO PUT IT IN THE CAR

CI:        YEAH

CI:        I WANT TO SEE, I GONNA GO BY MYSELF TO SEE THE MONEY LOOKS OKAY SO HE CAN BUY IT TOO.

JAMES:     OK

CI:        ALRIGHT

CI:        YOU WHEN YOU WANNA EXACTLY WANNA DO IT TOMMORROW? IN THE.......BECAUSE I THINK HE MIGHT LEAVE SATURDAY. I DON'T KNOW.

JAMES:     HE AIN'T GONNA LEAVE WHILE SOMEBODY TRYING TO BUY

CI:        NO, BUT HE HAS OTHER PEOPLE TO SELL TO, YOU KNOW IT IS NOT ONLY US.

JAMES:     YEAH

CI:        YOU KNOW WHAT I'M SAYING.

JAMES:     ALRIGHT JUST TELL HIM....UH

CI:        SEE WHEN HE CAN BE READY SO I CAN TELL YOU EXACTLY TIME HE WANT IT AND I JUST GO FROM THERE TOO CAUSE I JUST GO BE ABLE WHEN HE IS ABLE TO DO IT TO, YOU KNOW.

JAMES:     ALRIGHT

JAMES:     OKAY WELL I AM GOING TO SEE HOW FAR THE GUY IS NOW RIGHT NOW SEE HOW MUCH HE HAS PRINT UP, SO ONCE YOU GOT ALL THAT DONE, CALL ME AND LET ME KNOW WHAT THE GUY HAS SET UP.

CI:        SO WE CAN ORDER IT, BUT WE CAN ORDER THE TEN ANYWAYS, IT IS GOING TO BE A BIG BAG ANYWAYS WITH WHATEVER. SO WHEN YOU SHOW HIM BECAUSE HE IS GOING TO BE WATCHING ME TOO WHEN I....BEFORE I PUT THE BAG, THE BAG WITH THE KILOS....HE'S GOING TO WATCH HE GOES WHEN HE GOES TO THE CAR WITH THE MONEY. HE IS GOING TO SAY 'OK PUT IT IN ..." HE IS GONNA GRAB THE BAG..

JAMES:     I'M NOT GONNA GIVE HIM THE BAG UNTIL IT IS IN THE CAR.

16

CI:        YEAH THAT IS WHAT I AM SAYING

JAMES:     LET HIM KNOW I GAVE HIM THE MONEY AND EVERYTHING IS
           STRAIGHT AND YOU KNOW TELL HIM THAT I AM NOT GONNA
           GIVE MY MONEY UNTIL THE STUFF IS IN THE CAR.

CI:        OF COURSE NO CAUSE WE DON'T WANT TO LOSE
           YOUR....THE...WHATEVER YOU PAY FOR THE .......

CI:        ALRIGHT

JAMES:     ALRIGHT MAN

JAMES:     LATER MAN

(JAMES LEAVES)

CI:        Y65.......HE DRIVING A RED MONTE CARLO.

CI:        HE'S GOING EAST ON NORTH.

CI:        I AM WEST ON NORTH

(CI RECEIVES CALL FROM SA DEPODESTA)

CI:        OK HE TAKE, HE GONNA GO RIGHT NOW TO THE GUY MAKING
           THE MONEY RIGHT NOW.

CI:        ALRIGHT

CI:        ALRIGHT

CI:        I'LL SEE YOU OVER THERE.

CI:        ·ALRIGHT

(CALL ENDS)

CI:        WHAT'S UP

CI:        WHAT YOU SAY?

17

OO 88

SA DEPODESTA:   THIS IS SPECIAL AGENT DEPODESTA THE TIME IS
APPROXIMATELY 3:06 PM AT THIS TIME WE ARE
TAKING POSSESSION OF AND DEACTIVATING A
RECORDING DEVICE.

-END OF TAPE

0089

"**EXHIBIT**, MARCH 21, 2002 JURY TRANSCRIPT"
"22 PAGES"

Exhibit R

| | | |
|---|---|---|
| 1 | DATE: | 03/21/02 |
| 2 | TIME: | 2:25PM |

| | | |
|---|---|---|
| 3 | SPEAKERS: | CW:     ALLAN DUBON |
| 4 | | JAMES:  DONVILLE JAMES |
| 5 | | AGENT:  FBI SA FRANK DEPODESTA |

| | | |
|---|---|---|
| 6 | AGENT: | |
| 7 | | TESTING, TESTING.    TESTING, TESTING.    THIS IS |
| 8 | | SPECIAL AGENT FRANK DEPODESTA WITH THE FBI, |
| 9 | | ALONG WITH SPECIAL AGENTS DAN DICK AND MIKE |
| 10 | | NEWBERG WITH THE UNITED STATES SECRET |
| 11 | | SERVICE. THE DATE IS MARCH 21, 2002. THE TIME IS |
| 12 | | APPROXIMATELY 2:25 P.M.    AT THIS TIME WE'RE |
| 13 | | ACTIVATING    AND    PLACING    A    CONCEALED |
| 14 | | RECORDING DEVICE ON A COOPERATING WITNESS |
| 15 | | WHO'S GOING TO MEET WITH INDIVIDUAL KNOWN |
| 16 | | ONLY AS JAMES. |

| | | |
|---|---|---|
| 17 | CW        : | (COUGHS) |

| | |
|---|---|
| 18 | (CAR DOOR OPENS / CLOSES) |

| | |
|---|---|
| 19 | (DRIVING / TRAFFIC SOUNDS) |

| | |
|---|---|
| 20 | (SHUFFLING SOUNDS) |

| | |
|---|---|
| 21 | (CELL PHONE RINGING) |

| | | |
|---|---|---|
| 22 | CW        : | THAT'S HIM.  HELLO?  UM, RIGHT HERE ON NORTH |
| 23 | | AND ASHLAND.  'CAUSE I WAS RIGHT HERE IN THE |
| 24 | | HOME DEPOT, BUT, UH, I'LL BE THERE SHORTLY. |
| 25 | | THERE'S A LITTLE TRAFFIC.  ASHLAND, BY ASHLAND. |
| 26 | | YEAH.  I'M IN, I'M, I'M GONNA BE IN MY WHITE CAR. |
| 27 | | HELLO?  ALRIGHT.  OH, YOU WANT ME TO CALL YOU |
| 28 | | WHEN I'M GETTING CLOSER THERE?  SO, 'CAUSE |
| 29 | | THERE'S KINDA LIKE A LITTLE TRAFFIC.  YOU WANNA |
| 30 | | DRIVE AR- YOU WANNA DRIVE AROUND, OR, OR, |
| 31 | | WHEN I GET THERE, OR SOMETHING?  ALRIGHT, LET |
| 32 | | ME TURN BACK, THEN.  HOME DEPOT?  WHAT?  YEAH. |
| 33 | | ALRIGHT. |

0091

1    (END OF CELL PHONE CONVERSATION)

2    CW        :    HEY. (CLEARS THROAT) HE WANNA COME, HE WANNA
3              COME FROM THE HOME DEPOT NOW, ON NORTH, ON
4              NORTH AND HALSTEAD.  YEAH, HE'S, HE'S GON- HE,
5              HE'S GONNA MEET THEM THERE, NOW.  HE'S GONNA
6              COME TO HOME DEPOT.  YEAH, TELL THEM OKAY.  I'M
7              G- I'M GONNA TURN BACK TO GO TO HOME DEPOT,
8              AGAIN.  HE SAID THE HOME DEPOT, RIGHT?  IT'S A
9              HOME DEPOT RIGHT THERE?  OKAY.  OKAY.  OKAY.
10             MM-HMM. UM, WE, I'M GONNA PARK IN THE, IN THE,
11             I'M GONNA PARK SOMEWHERE IN THE PARKING LOT
12             AND HE'S GONNA, UM, HE'S GONNA, HE'S GONNA
13             CALL ME WHEN HE'S AROUND THERE, SO I CAN TELL
14             HIM WHERE I'M AT.  OKAY.  MM-HMM.  ALRIGHT.  MM-
15             HMM.  ALRIGHT.

16   (END OF CELL PHONE CONVERSATION)

17   (DRIVING / TRAFFIC SOUNDS)

18   CW        :    WHERE AT?  UM, WHERE AT?  WE'RE AT, UM - RIGHT
19             HERE BY THE FENCE?  UM, UH, HE JUST GONNA PASS
20             ME RIGHT NOW.  OKAY, THAT'S HIM IN THE OTHER
21             LANE.  HELLO?  I'M RIGHT HERE IN THE HOME DEPOT.
22             WHICH ONE?  'CAUSE I'M IN, ALL THE WAY WHERE
23             THE GREEN, UH - NO, I'M INSIDE THE STORE IN THE
24             SOUTH  SIDE  OF  THE  HOME  DEPOT,  THE  SOUTH
25             BUILDING, BUT - YEAH, UM, YEAH I GOT COMPLETELY
26             THIS PARKING LOT (INAUDIBLE).   YEAH, IT'S, UM,
27             ELSTON AND, UM- WHERE'S THE GAS STATION YOU'RE
28             TALKING  ABOUT?    ON  THE  HIGHWAY,  UH-HUH.
29             ALRIGHT.  YEAH?  ELSTON AND NORTH AVENUE IS A
30             GAS STATION?  OH, AND CLYBOURN?  WHAT IS THE
31             OTHER STREET?  ALRIGHT.  LET ME GET, LOOK, OKAY.
32             ELSTON AND NORTH.  OKAY, LET ME GO ON NORTH
33             AND THEN TURN RIGHT ON NORTH AND GO TO THE
34             GAS  STATION,  RIGHT?    BY  THE  EXPRESSWAY?
35             ALRIGHT. ALRIGHT.

36   (END OF CELL PHONE CONVERSATION)

2

0092

| | | | |
|---|---|---|---|
| 1 | CW | : | YEAH, FRANK? HEY FRANK, HE WANNA GO BY, BY, |
| 2 | | | UM, NORTH AND, AND ELSTON.    THERE'S A GAS |
| 3 | | | STATION THERE. YEAH. HEY, HE WANNA, HE WANNA |
| 4 | | | MEET AT THE GAS STATION RIGHT HERE ON NORTH |
| 5 | | | AND ELSTON. THAT'S WHERE I'M GOING. I'M OUTTA, |
| 6 | | | I'M GOING OUT OF THE PARKING LOT RIGHT NOW. |
| 7 | | | YEAH, YOU HAVE TO GO WHERE HE SAYS, OR I'M NOT |
| 8 | | | GONNA BE ABLE TO GET HIM HERE. OKAY. AMOCO. |
| 9 | | | UH, WELL, I THINK IT'S AN AM- AN AMOCO IT'S RIGHT |
| 10 | | | ON, ON THE CORNER OF EL- OF NORTH AND ELSTON. |
| 11 | | | OKAY.  OKAY.  ALRIGHT, IT'S RIGHT HERE IT'S AN |
| 12 | | | AMOCO. ALRIGHT. YEAH, I THINK I SEE HE, I, I MEET |
| 13 | | | HIM ONE TIME BEFORE. ALRIGHT. BYE. |

14      (END OF CELL PHONE CONVERSATION)

15      CW        :        Y, Y-5-4-7, 5-4-4.

16      (CAR DOOR OPENS / CLOSES)

17      (CAR ENGINE STARTING)

| | | | |
|---|---|---|---|
| 18 | CW | : | WHERE YOU AT?  THE WHAT?  CLEANERS?  OKAY. |
| 19 | | | OKAY.  HE'S IN THE RED, IN THE RED CAR.  Y-65-0-6 |
| 20 | | | WHAT'S UP MAN? NOTHING MUCH. SO, WHAT'S UP? |

21      (CAR DOOR OPENS / CLOSES)

22      JAMES     :        (INAUDIBLE) -

| | | | |
|---|---|---|---|
| 23 | CW | : | WELL, LIKE I SAY, YOU KNOW, I GOT THE, I GOT THE |
| 24 | | | GUY SET UP WITH THE - YOU KNOW WE SHOW HIM |
| 25 | | | THE MONEY, SOME MONEY, FAKE MONEY ON TOP OF |
| 26 | | | THE ONE, LIKE WE DID LAST TIME.  WE COULD DO |
| 27 | | | THE, WE COULD DO THE TEN, OR SEVEN. I MENTIONED |
| 28 | | | TO HIM BETWEEN SEVEN AND TEN.  SO, DEPENDS ON |
| 29 | | | HOW MUCH, YOU KNOW, THE BAG, IT LOOK LIKE. |

| | | | |
|---|---|---|---|
| 30 | JAMES | : | BUT,  THE  MONEY,  (INAUDIBLE)  UH,  TWENTY |
| 31 | | | THOUSAND DOLLARS, THOUGH. |

32      CW        :        OKAY.

3

| | | | |
|---|---|---|---|
| 1 | JAMES | : | UM, TWENTY THOUSAND? |
| 2 | CW | : | OKAY.  BUT, IT'D BE BETTER THEN - HOW WE GONNA |
| 3 | | | SPLIT IT, OR WHAT?  'CAUSE I WANNA DO LIKE I TELL |
| 4 | | | YOU, YOU KNOW, TEN GRAND.  ~~I WANNA TELL YOU~~ |
| 5 | | | ~~EACH ONE YOU SELL~~, YOU MAKE TEN, I MAKE TEN. |
| 6 | | | BUT, I DON'T GOT THAT MUCH PEOPLE TO SELL IT, |
| 7 | | 15:46:22 | YOU KNOW?  I gonna sell you each one ten. |
| 8 | JAMES | : | WELL, WHAT I'LL DO, WHEN I SELL IT TO THEM, YOU |
| 9 | | | TAKE YOURS, I'LL TAKE MINE.  AND I'LL GO SELL ONE |
| 10 | | | OF MINE. |
| 11 | CW | : | OKAY. |
| 12 | JAMES | : | AND THEN, I'LL BRING THAT MONEY BACK TO YOU |
| 13 | | | (INAUDIBLE)- I'LL CUT YOUR WHEN I CUT MINE.  BUT, I |
| 14 | | | DON'T HAVE NO MONEY RIGHT NOW 'CAUSE, YOU |
| 15 | | | KNOW. |
| 16 | CW | : | MM-HMM. |
| 17 | JAMES | : | (INAUDIBLE) - |
| 18 | CW | : | OKAY. |
| 19 | JAMES | : | I MEAN, I GOT A LOT OF PEOPLE JUST WAITING ~~FOR~~ |
| 20 | | | ~~THEIR (INAUDIBLE)~~ - to help you  15:46:30 |
| 21 | CW | : | AND WHAT ABOUT THE HEROIN YOU'RE TALKING |
| 22 | | | ABOUT? |
| 23 | JAMES | : | YEAH. |
| 24 | CW | : | WELL, AFTER WE DID THAT, THE OTHER GUY I |
| 25 | | | TALKED TO? |
| 26 | JAMES | : | YEAH. |
| 27 | CW | : | HE SAY HE HAD SOME HEROIN. |
| 28 | JAMES | : | ...HOW MUCH HE GOT?..DID HE SAY? |

4

| | | | |
|---|---|---|---|
| 1<br>2<br>3 | CW | : | HE GET A LOT OF QUANTITY BUT I NEVER FUCKED WITH THAT BEFORE.  SO, I DON'T KNOW HOW MUCH IS THAT.  IF IT GO BY AN OUNCE, OR WHATEVER. |
| 4 | JAMES | : | WELL I WANT LIKE A KEY.. |
| 5<br>6 | CW | : | A KILO?  I DON'T KNOW HOW THAT SHIT WORKS.  I NEVER DONE THAT BEFORE, THOUGH. |
| 7 | JAMES | : | ABOUT A HUNDRED THOUSAND DOLLARS. |
| 8<br>9 | CW | : | A HUNDRED THOUSAND DOLLARS FOR ONE KEY, OR SOMETHING? |
| 10 | JAMES | : | YEAH. |
| 11<br>12<br>13 | CW | : | OKAY.  NO, 'CAUSE HE, THE OTHER GUY I WAS TALKING TO, HE, HE SAID HE FOUND OUT SOMEBODY TO BUY LITTLE HEROIN AND SHIT, YOU KNOW? |
| 14 | JAMES | : | OH YEAH? |
| 15<br>16<br>17<br>18 | CW | : | BUT UM, BUT YOU HAVE THE PAPERS READY? 'CAUSE THE GUY MAYBE LEAVE SATURDAY TOO, AND, OR, SUNDAY.  SO, WE ONLY CAN DO IT EITHER THIS FRIDAY? |
| 19<br>20 | JAMES | : | YOU MEAN FRIDAY IN THE NOON TIME, OR SATURDAY IN THE AFTERNOON? |
| 21<br>22<br>23 | CW | : | IN THE AFTERNOON, OR MORNING WOULD BE BETTER 'CAUSE THERE'S A LOT OF, YOU KNOW.  WE COULD EXCHANGE THE BAG LIKE WE DID LAST TIME. |
| 24 | JAMES | : | (INAUDIBLE) |
| 25<br>26 | CW | : | YOU BRING THE GUY WITH THE CAR?  YOU PUT THE THING IN THE, I PUT IT IN THERE - |
| 27 | JAMES | : | (INAUDIBLE) - |

5

0095

| 1<br>2<br>3<br>4 | CW | : | AND THEN YOU TOOK - WELL SEE, THAT'S THE PROBLEM. YOU KNOW, I WANT HELP, UH, BAG A LITTLE OF THE MONEY, SO WHEN I GIVE YOU THE STUFF, TOO - |
| 5<br>6<br>7<br>8<br>9 | JAMES | : | WE DO IT THE SAME WAY. I'LL GIVE YOU THE MONEY, YOU KNOW, I'LL HAVE SOMEBODY IN THE CAR (INAUDIBLE). SEND THE GUY SOME FAKE MONEY, PUT A COUPLE OF THOSE IN THE CAR. JUST LIKE WE DID IT LAST TIME. |
| 10<br>11 | CW | : | BUT THEN, HOW AM I GONNA GET MY, THE THREE KILO'S FROM YOU? YOU KNOW WHAT I'M SAYING? |
| 12 | JAMES | : | YOU TALKING ABOUT THE LIMO OR THE GUY? |
| 13 | CW | : | HMM? |
| 14 | JAMES | : | (INAUDIBLE) |
| 15<br>16 | CW | : | IT GONNA BE THE SAME GUY...BEEMER..OR YEAH OKAY ALRIGHT, OKAY. FUCK IT. |
| 17 | JAMES | : | (INAUDIBLE) - |
| 18<br>19 | CW | : | YOU WANNA DO IT, YOU GOT THAT MONEY READY, OR EVERYTHING SET UP? |
| 20<br>21<br>22 | JAMES | : | I DON'T HAVE IT READY, MAN. I JUST CALLED HIM...HE'S MAKING IT RIGHT NOW. THAT'S WHY I'M (INAUDIBLE) MY GUY. |
| 23 | CW | : | HOW LONG YOU THINK IT'LL TAKE HIM? |
| 24<br>25 | JAMES | : | UM, MAYBE TOMORROW IN THE AFTERNOON, OR SATURDAY MORNING, FOR SURE. |
| 26<br>27<br>28 | CW | : | OKAY WELL, LET ME CALL THIS GUY, TOO. 'CAUSE THEN YOU COULD TELL THEM WHEN, EXACTLY WHEN WE READY TO DO THIS SHIT. |

6

0096

| | | | |
|---|---|---|---|
| 1<br>2<br>3 | JAMES | : | ALRIGHT, TELL HIM TEN, THEN, BECAUSE UM, (INAUDIBLE) PAY OUT THE MONEY. (INAUDIBLE) I'LL TELL THE GUY I'LL GIVE HIM A, UM, A (INAUDIBLE)? |
| 4 | CW | : | UH-HUH. |
| 5<br>6 | JAMES | : | FOR THE MONEY. IT'S SOMETHING I HAVE TO DO (INAUDIBLE)- |
| 7 | CW | : | ALRIGHT. YOU'LL HELP ME SELL THEM? |
| 8<br>9 | JAMES | : | YEAH, BUT I WILL, I'LL TAKE, I'LL TAKE ONE OF MINE AND WE'LL SELL IT. |
| 10 | CW | : | UH-HUH. |
| 11<br>12 | JAMES | : | YOU KNOW, SOMEBODY CAN BUY ONE FROM ME. I'LL SELL YOURS WITHIN TWO DAYS. |
| 13 | CW | : | ALRIGHT - |
| 14 | JAMES | : | ✗ IN TWO DAYS, I'LL CUT HIM OFF. |
| 15<br>16<br>17<br>18 | CW | : | SO, I GO WITH THE GUY WITH THE LIMO, WITH THE KILOS, BUT, THE OTHER GUY GONNA GO PICK UP THE BAG FROM YOU FOR THE MONEY, THE SAME THING, OR WHAT? |
| 19<br>20 | JAMES | : | NO, THEY'RE GONNA PARK BEHIND THE LIMO, JUST LIKE WE DID THE LAST TIME. |
| 21 | CW | : | OH. |
| 22<br>23 | JAMES | : | ✗ YOU GONNA SEND THE GUY TO, SEND THE GUY ON THE BIKE TO GO PICK UP THE MONEY? |
| 24<br>25 | CW | : | 'CAUSE I, I COULD PROBABLY DO THE SAME THING, CARRY THE SHIT FOR HIM. |
| 26 | JAMES | : | WHAT? |
| 27<br>28 | CW | : | I PROBABLY COULD DO THE SAME THING. CARRY THE BAG? AND PUT IT IN - GO INSIDE THERE, AND MAKE |

7

| 1<br>2<br>3<br>4<br>5 | | | SURE YOU, UM, WELL, I, I'LL TAKE A LOOK AT IT BEFORE WE DO IT, ANYWAY.   SEE HOW REAL IT LOOKS, SO THE GUY CAN BUY IT, YOU KNOW WHAT I'M SAYING?  'CAUSE I DON'T WANNA, SEE, MY, WELL, HE DON'T KNOW WHERE I LIVE, BUT - |
| 6<br>7 | JAMES | : | THAT'S WHY I WANNA DO IT IN THE EVENING TIME, WHEN IT'S A LITTLE BIT, YOU KNOW - |
| 8 | CW | : | NOT TOO DARK, THOUGH. |
| 9<br>10 | JAMES | : | NOT TOO DARK, LIKE ABOUT SIX O'CLOCK.  THAT'S WHEN IT GETS A LITTLE BIT DARK? |
| 11<br>12<br>13<br>14<br>15 | CW | : | YEAH.  THEN, THE MORNING'S FINE.  THE AFTERNOON OR THE MORNING'S FINE, YOU KNOW.  AS LONG AS, IT LOOKS KINDA REAL.  LIKE THE OTHER ONE, I BOUGHT FOR IT, YOU KNOW, I WENT FOR IT.  SO, IT WAS, UNTIL I GOT IT HOME. |
| 16 | JAMES | : | ALRIGHT, UM - |
| 17<br>18<br>19<br>20 | CW | : | BUT, TELL ME WHEN YOU'RE READY.  YOU KNOW, YOU, YOU TAKE THEM OUT, AND PUT REAL MONEY ON TOP.  AT LEAST TWEN- ONE TWENTY, OR SOME SHIT LIKE THAT.  MAKE IT SEEM REAL. |
| 21<br>22 | JAMES | : | YOU PUT REAL MONEY ON THE, UM, TOP AND THE BOTTOM. |
| 23<br>24<br>25<br>26 | CW | : | IF NOT, IF I'M WITH HIM INSIDE THE HOUSE, I'M GONNA TRY TO SEPARATE THREE KILOS IN ONE BAG, SO I'LL BE READY TO GET UP IN THE LIMO, AND YOU GUYS GO WITH YOUR SIX. |
| 27<br>28 | JAMES | : | WELL, HOW WILL I KNOW THAT THERE BE SIX IN THE BAG? |
| 29<br>30 | CW | : | WELL, ONE OF YOU GUYS CAN COME WITH ME, AND LOOK AT THE KILOS, WHATEVER. |
| 31 | JAMES | : | (INAUDIBLE) - |

8

| | | | |
|---|---|---|---|
| 1 | CW | : | OH. |
| 2 3 | JAMES | : | (INAUDIBLE) DO IT, MAN.  THE GUY WITH THE TRUCK, AND I'M NOT GONNA (INAUDIBLE) BECAUSE - |
| 4 5 | CW | : | WELL, I, THAT'S WHAT I WANNA DO SO I CAN GET THE FUCK OUT OF HERE, YOU KNOW? |
| 6 | JAMES | : | UM - |
| 7 | CW | : | I WANNA TAKE THAT CHANCE AND GO, AND LEAVE. |
| 8 9 10 11 12 | JAMES | : | JUST PARK YOUR CAR SOMEWHERE AND THE LIMO DRIVER WILL DROP HIM OFF HERE.  WHY DON'T YOU HAVE, YOU KNOW, I GOT MINE AND YOU GOT YOURS, AND DROP YOU OFF AT HOME?  JUST PARK, PARK THE CAR CLOSE BY. |
| 13 | CW | : | OKAY. |
| 14 15 16 17 | JAMES | : | AND THEN, THE LIMO DRIVER IS GONNA TAKE YOU THERE.  BUT, I'M GONNA HAVE TWO CARS FOLLOW HIM, TOO.  YOU KNOW, THERE'S NO FUNNY BUSINESS YOU KNOW. |
| 18 | CW | : | ALRIGHT. |
| 19 20 21 | JAMES | : | WHY DON'T YOU PUT EM IN THE CAR?, JUST PUT THEM IN THE SEAT.  DON'T PUT THEM IN THE TRUNK.  PUT THEM IN THE BACK SEAT. |
| 22 | CW | : | OKAY. |
| 23 24 | JAMES | : | OKAY?  THEN YOU SEPARATE THEM IN THE BACK SEAT. |
| 25 | CW | : | AND, YOU'RE GONNA BRING THE MONEY? |
| 26 | JAMES | : | YEAH. |
| 27 | CW | : | OR SOMEBODY ELSE? |

9

0099

| | | | |
|---|---|---|---|
| 1<br>2<br>3 | JAMES | : | SOMEBODY ELSE GONNA BRING THE MONEY. THEY'RE GONNA BE IN THE CAR AND, JUST LIKE LAST TIME, SOMEBODY, YOU KNOW - |
| 4<br>5 | CW | : | NO, I DON'T WANT TOO MUCH TIME, MAN, I DON'T KNOW - |
| 6<br>7 | JAMES | : | JUST TWO GUYS, THE GUY INSIDE THE LIMO, AND THE LIMO DRIVER. |
| 8<br>9 | CW | : | THEN YOU AND ME GO, TAKE THE, BRING (INAUDIBLE) THE MONEY AND I PUT THE STUFF IN THE LIMO. |
| 10<br>11 | JAMES | : | I'M NOT GONNA BE THERE PERIOD.   I'LL BE SOMEWHERE WATCHING. |
| 12<br>13<br>14<br>15<br>16<br>17 | CW | : | OKAY. WELL, ALRIGHT. 'CAUSE THEN I'LL HAVE TO GIVE THE MONEY TO THE GUY. THAT'S THE THING, I HAVE TO SHOW HIM KIND OF THE, YOU KNOW, WE CAN DO THE EXCHANGE WITH THE KILOS, SOMETHING LIKE THAT. SO I CAN SHOW HIM THE MONEY WHEN I GET OUT. |
| 18<br>19 | JAMES | : | YOU'RE GONNA HAVE THE MONEY IN THE BAG, RIGHT? |
| 20<br>21<br>22<br>23 | CW | : | YES. LIKE THAT. HE'S NOT EVEN GONNA, HE'S NOT EVEN GONNA CHECK ALL OF IT, YOU KNOW.  LIKE HE'S GONNA LOOK, LOOK HERE'S THE MONEY, RIGHT HERE. SO... |
| 24<br>25 | JAMES | : | SO WHY... WHY CAN'T WE DO IT LIKE WE DID IT THE LAST TIME? I MEAN... |
| 26 | CW | : | WE GOTTA EXCHANGE THINGS. |
| 27<br>28<br>29<br>30 | JAMES | : | JUST TELL THE GUY THROUGH THE CAR WINDOW (INAUDIBLE).  GET THE BAG. I'LL GIVE HIM THE BAG. YOU PUT THE STUFF IN, YOU KNOW.  ONCE I SEE THE STUFF IN THE CAR, I GIVE HIM THE BAG. |
| 31 | CW | : | ALRIGHT. |

10

0100

| | | | |
|---|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8 | JAMES | : | JUST GO AND TELL HIM THAT, YOU KNOW, YOU CHECKED THE MONEY, AND EVERYTHING IS OK. YEAH. YOU KNOW, YOU GO ON AND PUT THE STUFF IN THE CAR (INAUDIBLE). YOU KNOW, TELL HIM THIS. WHEN YOU TELL HIM, TELL HIM THAT WHEN YOU SEE THE MONEY, OKAY, AND THE DRIVER NEEDS TO SEE THE COCAINE. (INAUDIBLE) PUT THE STUFF IN THE CAR. |
| 9<br>10 | CW | : | BUT, HE'S GONNA ASK ME TO SEE, DO YOU WANNA SEE THE MONEY, TOO? THAT'S THE PROBLEM. |
| 11<br>12 | JAMES | : | TELL HIM THAT IF I CANT (INAUDIBLE) THE MONEY, I CANT SEE NO COCAINE MAN. |
| 13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23 | CW | : | THAT'S WHY, AT THE SAME TIME, WOULD BE GOOD, TOO. 'CAUSE IF HE DON'T, HE'S NOT GONNA WANT TO DO OKAY THAT MUCH IT ONLY BE ONE DEAL WITH HIM AND ONE DELIVERY, YOU KNOW? SO, I HAVE TO KIND OF SHOW HIM THE MONEY, AT THE SAME TIME. AND, PUT THE 'KEY' AND FINALLY WHEN WE SHOW HIM, WHEN WE SHOW HIM THE MONEY, I'LL THROW THE BAG, AND I JUMP IN, IN THE, IN THE LIMO, AND WHICH IS GREAT AND MAYBE THEY'RE FOLLOWING US, OR WHATEVER, THAT TOO. OR, OR LEAVE HIM THE BAG WITH THE MONEY, SOME SHIT. |
| 24 | JAMES | : | ALRIGHT. |
| 25 | CW | : | THAT TOO. |
| 26 | JAMES | : | WE CAN DO THAT. |
| 27<br>28 | CW | : | BUT, I'LL MAKE SURE I GONNA GO INSIDE WITH THE, WITH THE KILO SO I CAN GET MY SHARE. |
| 29 | JAMES | : | YEAH. |
| 30<br>31<br>32 | CW | : | 'CAUSE I DON'T WANNA BE, WITH MY SHARE, YOU KNOW, I WANNA MAKE THE MONEY AND GET THE FUCK OUTTA HERE. |

11

0101

| | | | |
|---|---|---|---|
| 1 | JAMES | : | ALRIGHT, UM, HERE'S WHAT WE'RE GONNA DO. |
| 2 | CW | : | SO - |
| 3 4 5 6 7 | JAMES | : | I'LL GIVE YOU, THE CAR IS GONNA BE WITH THE MONEY. WHEN YOU GET IN THE CAR, THE MONEY'S GONNA BE THERE.    OKAY?    ONCE THE DRIVER (INAUDIBLE) THE GUY, OKAY? AND, YOU COME AND (INAUDIBLE) THE GUY WITH THE MONEY? |
| 8 | CW | : | MM-HMM. |
| 9 10 | JAMES | : | I'LL TAKE YOU TO THE CAR.  I'LL PUT THE MONEY IN THE TRUNK OF THE CAR.  (INAUDIBLE). |
| 11 | CW | : | OKAY. |
| 12 | JAMES | : | (INAUDIBLE) |
| 13 14 15 16 17 18 19 | CW | : | UM, HE LIVE BY, UM, THAT'S THE OTHER THING I WAS GONNA  TELL  YOU.    HE  LIVE  BY  UM,  BY  THE BRICKYARD?    HE  LIVES  ABOUT,  I  DON'T  KNOW EXACTLY HIS HOUSE, 'CAUSE HE, HE, THIS FUCKER'S NOT GONNA TELL ME EXACTLY WHERE IT IS, 'CAUSE I COULD  ROB  HIM  MYSELF,  YOU  KNOW  WHAT  I'M SAYING? |
| 20 | JAMES | : | RIGHT. |
| 21 22 23 24 25 | CW | : | SO, HE LIVES, HE, HE LIVES AROUND THREE, THREE, TWO  BLOCK  AWAY  FROM  THE  BRICKYARD  AND THREE  HOUSES,  UH,  YOU  KNOW,  CLOSE  TO  THE CORNER, IN THE BRICKYARD MALL.  YOU KNOW, AT NARRAGANSETT AND DIVERSEY? |
| 26 | JAMES | : | YEAH. |
| 27 28 29 | CW | : | IN  THE  PARKING  LOT,  WE  CAN  DO  THAT  IN  THE PARKING LOT.  HE, HE, HE TOLD ME WE CAN GO BY THE PARKING LOT. |

12

| 1 2 3 | JAMES | : | YOU DON'T WANNA DO IT IN THE PARKING LOT, BECAUSE YOU WANNA GIVE HIM ENOUGH TIME TO GET TO THE - |
| 4 | CW | : | OR, IN THE STREET. THAT ONE-WAY STREET IS? |
| 5 | JAMES | : | ALRIGHT, IN THE STREET. |
| 6 7 | CW | : | YOU KNOW, WHEN THAT GUY PULL UP, I'LL GET OUT FROM THE HOUSE - |
| 8 | JAMES | : | OKAY. |
| 9 10 11 | CW | : | SOMETHING LIKE THAT. BUT, HE DON'T WANT, HE'S NOT, HE DON'T WANNA SHOW ME HIS HOUSE EXACTLY, THAT'S WHY. |
| 12 13 | JAMES | : | I DON'T KNOW, I THINK WE SHOULD DO IT LIKE THE WAY WE DID IT LAST TIME. |
| 14 | CW | : | ALRIGHT. |
| 15 16 | JAMES | : | THE ONLY DIFFERENCE. YOU JUST SIT IN THE CAR WITH THE GUY. |
| 17 | CW | : | BUT, I HAVE TO GIVE HIM THE BAG WITH THE MONEY. |
| 18 | JAMES | : | HAVE HIM COME AND GET IT FROM YOU. |
| 19 | CW | : | OKAY. |
| 20 21 | JAMES | : | JUST TELL HIM THAT, YOU KNOW, THAT YOU HAVE THE MONEY AND YOU HAVE IT IN THE CAR |
| 22 | CW | : | OKAY. |
| 23 24 | JAMES | : | THAT'LL GIVE YOU ENOUGH TIME TO PUT THE STUFF IN THE CAR. |
| 25 26 | CW | : | 'CAUSE I WANT, YOU KNOW, WHEN I PUT, YEAH, THAT'S TRUE. ALRIGHT, OKAY. |

13

0103

| | | | |
|---|---|---|---|
| 1 | JAMES | : | YOU'RE GONNA BE WITH HIM, RIGHT? |
| 2 | CW | : | YEAH, I'M GONNA BE WITH HIM. |
| 3 | JAMES | : | OKAY, WHEN HE, WHEN HE COMES OUT THERE - |
| 4 | CW | : | MM-HMM. |
| 5 | JAMES | : | AND YOU DEAL WITH HIM? |
| 6 | CW | : | MM-HMM. |
| 7 8 9 10 | JAMES | : | TELL HIM TO COME AND GET THE MONEY FROM ME. AND I'LL GIVE HIM THE BAG WITH THE MONEY. WHILE, WHILE, WHILE HE'S (INAUDIBLE) THE BAG, YOU PUT THAT STUFF IN THE CAR. |
| 11 | CW | : | OKAY. |
| 12 13 14 15 | JAMES | : | OKAY? AND YOU PUT, WHAT YOU DO IS YOU PUT THE (INAUDIBLE) HIM, AND YOU CLOSE THE BAG OUT, AND WALK AWAY. (INAUDIBLE) TAKE OFF REAL FAST. YOU KNOW, IF YOU GO IN THE CAR - |
| 16 17 18 | CW | : | ARE YOU GONNA SHOW HIM THE MONEY, OR, REAL QUICK, A LITTLE BIT, AND THEN CLOSE THE BAG, AND LET HIM TAKE THE BAG CLOSED OUT. |
| 19 | JAMES | : | YEAH. YEAH. |
| 20 21 | CW | : | SO, THAT WHAT YOU CAN DO. YOU KNOW, YOU CAN BRING THE BAG WITH YOU - |
| 22 | JAMES | : | YEAH. |
| 23 24 25 | CW | : | SHOW HIM THE MONEY. LOOK, LOOK AT IT, AND MEANWHILE, I'M JUMPING IN, IN THE, IN THE, UM, LIMO. |
| 26 | JAMES | : | YEAH. |
| 27 | CW | : | AND THEN, IT JUST ZIP IT UP AND GIVE IT TO HIM. |

14

0104

| | | | |
|---|---|---|---|
| 1 | JAMES | : | YEAH. |
| 2 | CW | : | BUT, I'LL BE WATCHING HIM, THOUGH. |
| 3 4 5 6 | JAMES | : | I COULD DROP THE BAG OVER THERE AND GET THE (INAUDIBLE) ZIP IT UP, AND GIVE IT TO HIM.  AND YOU COULD (INAUDIBLE).  LET HIM KNOW YOU ARE GOING WITH THE LIMO GUY. |
| 7 | CW | : | ALRIGHT. |
| 8 | JAMES | : | YOU KNOW, IF, UM, SO, HOW YOU WANNA GET THERE? |
| 9 10 11 12 13 | CW | : | WELL, I CAN, I'M GONNA GO, I'M GONNA GO WITH MY CAR BY, CLOSE BY HIS HOUSE, OR WHERE, WHEREVER HE WANNA DO.  SEE, THAT'S THE PART I HAVE TO TALK TO HIM HOW HE WANNA DO IT BY HIS HOUSE. 'CAUSE HE DON'T WANNA SHOW ME HIS HOUSE.  SO - |
| 14 15 | JAMES | : | WE COULD DO IT OVER BY, UM, BRICKYARD MALL, (INAUDIBLE). |
| 16 | CW | : | OKAY, I CAN PARK MY CAR AT THE BRICKYARD. |
| 17 18 | JAMES | : | JUST HAVE HIM PICK YOU UP OVER THERE.  TELL HIM I'M, I'M ON MY WAY. |
| 19 | CW | : | ALRIGHT. |
| 20 21 | JAMES | : | OKAY?   AND THEN YOU, UM, ONCE, ONCE, ONCE YOU'RE WITH HIM, WHEN YOU GET THERE - |
| 22 23 | CW | : | YOU FOLLOW ME?   YOU GUYS FOLLOW ME, WHATEVER? |
| 24 25 26 27 28 | JAMES | : | WELL, I'M GONNA BE WATCHING WHEN, UH, WHEN THE LIMO PICK YOU UP.  YOU KNOW, YOU'RE GONNA TELL ME WHERE YOU PARKED, GIVE ME ABOUT FIVE OR TEN MINUTES, AND, UH, I'M GONNA TELL HIM TO COME AND GET THE MONEY FROM ME.  (INAUDIBLE) |

15

0105

|   |   |   |   |
|---|---|---|---|
| 1 |   |   | AND I'LL SHOW HIM THE BAG. AND WHILE YOU'RE |
| 2 |   |   | GOING TO THE CAR, I'LL TAKE OFF. |
| 3 | CW | : | OKAY. UM, HOW MANY, TEN? |
| 4 | JAMES | : | XTEN. |
| 5 | CW | : | TEN? ALRIGHT, MAN. DON'T FUCK ME UP MAN. |
| 6 | JAMES | : | ALRIGHT, MAN. |
| 7 | CW | : | I'LL MAKE SURE THAT THEY GONNA BE THREE |
| 8 |   |   | SEPARATE, 'CAUSE, HOPEFULLY, I GO WITH HIM AND |
| 9 |   |   | SEPARATE THEM OUT. |
| 10 | JAMES | : | X (INAUDIBLE) YOU CAN GIVE IT TO ANYBODY YOU |
| 11 |   |   | WANT TO, THEN. HEROIN (INAUDIBLE) A LOT BUT |
| 12 |   |   | YOU KNOW, BUT I CAN SELL THAT REAL FAST. |
| 13 | CW | : | YEAH, THE OTHER GUY TOLD ME. THAT'S WHAT I |
| 14 |   |   | WAS TELLING THE OTHER GUY. BUT, AFTER WE DO |
| 15 |   |   | THIS ONE, BECAUSE I WANNA DO THIS GUY, |
| 16 |   |   | TOO...(CELL PHONE RINGS)....MY BEEPER... |
| 17 | JAMES | : | THAT GUY WITH THE HEROIN KNOW WHERE YOU |
| 18 |   |   | LIVE? |
| 19 | CW | : | AND THEN - |
| 20 | (CELL PHONE RINGING) |   |   |
| 21 | CW | : | HELLO? (INAUDIBLE) UH-HUH? |
| 22 | JAMES | : | DOES THE GUY WITH THE HEROIN KNOW WHERE YOU |
| 23 |   |   | LIVE? |
| 24 | CW | : | HE, HE GOT AN IDEA WHERE I LIVE. BUT, THIS GUY, |
| 25 |   |   | NO. |
| 26 | JAMES | : | BUT, THE GUY WITH THE HEROIN, THE OTHER GUY |
| 27 |   |   | KNOW WHERE YOU LIVE, RIGHT? |

16

| | | | |
|---|---|---|---|
| 1<br>2 | CW | : | NO, THE ONE WE'RE GONNA DO TOMORROW?  HOLD ON, THIS MIGHT BE HIM.  OKAY.  MM-HMM. |
| 3<br>4 | JAMES | : | IF YOU WANT SOME HEROIN, YOU CAN JUST MAKE IT LOOK LIKE I DID IT, YOU KNOW? |
| 5<br>6<br>7<br>8 | CW | : | YEAH, BUT, BOTH OF THEM ARE GONNA DO LIKE, YOU, YOU KNOW, WITH THE, NO, BUT ARE GONNA GO WITH THE LIMO, MAKE SURE LIKE I GET MY THREE KILO'S, WHATEVER. |
| 9 | JAMES | : | ALRIGHT.  ALRIGHT, WELL, (INAUDIBLE) - |
| 10<br>11 | CW | : | OKAY.   WELL, WHEN WE GO IN THE PARKING LOT, RIGHT? |
| 12 | (CELL PHONE BEEPS) | | |
| 13<br>14<br>15<br>16<br>17 | CW | : | UM, WE GO TO THE PARKING LOT, I'M GONNA CALL YOU THAT WE ALREADY WAITING THERE FOR YOU GUYS TO, YOU, ONE OF YOUR GUYS COME, WHATEVER, TO, WITH THE MONEY.   THEN, YOU'RE GONNA FOLLOW ME BY THE HOUSE. |
| 18<br>19 | JAMES | : | WELL, TELL HIM THAT, I'M COMING WITH THE MONEY (INAUDIBLE) - |
| 20 | CW | : | OKAY.  YOU'RE COMING WITH THE MONEY? |
| 21 | JAMES | : | (INAUDIBLE) |
| 22 | CW | : | OKAY.  YOU'RE COMING WITH THE MONEY. |
| 23 | JAMES | : | (INAUDIBLE) - |
| 24<br>25 | CW | : | WE'RE GONNA MEET THERE?   AT THE, WE'RE GONNA - |
| 26 | JAMES | : | (INAUDIBLE) |
| 27<br>28 | CW | : | RIGHT, YEAH.   'CAUSE HE'S GONNA PEEK BY HIS HOUSE AND MAKE THE DEAL. |

17

| 1 2 3 | JAMES | : | ALRIGHT, AND ONCE YOU GET THERE, YOU KNOW, MAKE SURE YOU SEE THE COCAINE AND YOU'RE READY TO PUT IT IN THE CAR. |
| 4 5 6 | CW | : | YEAH. BUT, LET ME SEE IF THE, YOU KNOW, I WANNA SEE, I'M GONNA GO BY MYSELF TO, TO, UM, SEE IF THE MONEY LOOKS OKAY SO HE CAN BUY IT TOO. |
| 7 | JAMES | : | OKAY. |
| 8 | CW | : | ALRIGHT? |
| 9 | JAMES | : | YEAH. |
| 10 11 12 13 | CW | : | ALRIGHT.  SO, WHEN YOU WANNA, YOU WANNA EXACTLY WANNA DO IT TOMORROW IN THE AF-BECAUSE I THINK HE MIGHT LEAVE SATURDAY, I DON'T KNOW. |
| 14 15 | JAMES | : | HE AIN'T GONNA LEAVE WHILE SOMEBODY'S TRYING TO BUY SHIT - |
| 16 17 | CW | : | OH, NO.  'CAUSE HE'S GOT OTHER PEOPLE TO SELL, TOO. YOU KNOW, IT'S NOT ONLY US. |
| 18 | JAMES | : | YEAH. |
| 19 | CW | : | YOU KNOW WHAT I'M SAYING? |
| 20 | JAMES | : | UM, JUST TELL HIM UH.. |
| 21 22 23 24 25 26 | CW | : | LET'S SEE WHEN HE CAN BE READY, TOO, EXACTLY, SO YOU, I CAN TELL YOU WHAT EXACTLY TIME HE WANTED, AND I JUST, WE GO FROM THERE, TOO. BECAUSE HE, HE'S SOMEONE WHO GOT, WHO'S GONNA BE ABLE, WHENEVER HE'S ABLE TO DO IT, TOO, YOU KNOW? |
| 27 28 29 30 | JAMES | : | ALRIGHT.  WELL, I'M GONNA GO SEE HOW FAR THE GUY IS NOW, RIGHT NOW.  SEE HOW MUCH HE HAS PRINT UP. (INAUDIBLE) - OKAY? I'M GONNA GO SEE (INAUDIBLE) - SO, ONCE YOU GOT ALL THAT DONE |

18

0108

| | | | |
|---|---|---|---|
| 1<br>2 | | : | JUST CALL ME AND LET ME KNOW WHAT THE GUY HAS UP, AND I'LL HAVE THE LIMO SET UP, TOO. |
| 3<br>4<br>5 | CW | : | OKAY, SO WE CAN ORDER, WELL, WE CAN ORDER THE TEN ANYWAY.  IT'S GONNA BE A BIG BAG WITH, WHATEVER. JUST MAKE IT, UH, THAT IS VERY GOOD. |
| 6 | JAMES | : | YEAH. |
| 7<br>8<br>9<br>10<br>11<br>12 | CW | : | SO, WHEN YOU SHOW HIM, BECAUSE HE'S GONNA BE WATCHING ME, TOO, WHEN I, BEFORE I PUT THE BAG INTO, THE BAG WITH THE KILO, HE'S GONNA WATCH ME.  BECAUSE WHEN HE GOES TO THE CAR WITH THE MONEY, HE'S GONNA SAY, OKAY, PUT IT IN, THEN, HE'S GONNA GRAB THE BAG. |
| 13 | JAMES | : | I'M NOT GONNA GIVE HIM THE BAG - |
| 14 | CW | : | NO, UNTIL - |
| 15 | JAMES | : | NOT UNTIL IT IS IN THE CAR. |
| 16<br>17 | CW | : | YEAH. |
| 18 | JAMES | : | UNTIL IT'S IN THE CAR. |
| 19 | CW | : | YEAH, THAT'S WHAT I'M SAYING. |
| 20<br>21<br>22<br>23 | JAMES | : | LET HIM KNOW WHEN I SEE THE MONEY, AND EVERYTHING IS STRAIGHT, AND YOU KNOW, TELL HIM THAT I'M NOT GONNA GIVE HIM MY MONEY UNLESS IT'S IN THE CAR. |
| 24<br>25<br>26 | CW | : | OF COURSE, NO.  'CAUSE WE DON'T WANNA LOSE YOUR, UH, WHATEVER YOU PAID FOR THAT SHIT, YEAH. ALRIGHT. |
| 27 | JAMES | : | ALRIGHT. LATER MAN. |

Page 17
51003

19

0109

| | | | |
|---|---|---|---|
| 1<br>2<br>3 | CW | : | Y-SIXTY-FIVE. HE'S DRIVING A RED MONTE CARLO. HE'S GOING EAST ON NORTH, UH, WEST ON NORTH AVENUE. |
| 4 | (DRIVING / TRAFFIC SOUNDS) | | |
| 5<br>6<br>7<br>8<br>9 | CW | : | OKAY, HEY, HE SAY HE'S TAKING (INAUDIBLE) GO RIGHT NOW TO SEE THE GUY WITH THE (INAUDIBLE) TO SEE IF HE ALREADY FINISHED MAKING THE MONEY. ALRIGHT. ALRIGHT. I'LL SEE YOU OVER THERE. ALRIGHT. BYE. ALRIGHT. |
| 10 | (CELL PHONE RINGING) | | |
| 11 | CW | : | WHAT'S HAPPENING? WHAT'S UP? WHAT'D YOU SAY? |
| 12 | JAMES | : | (INAUDIBLE) THE GUY. (INAUDIBLE) |
| 13 | CW | : | OKAY. |
| 14 | (SHUFFLING SOUNDS) | | |
| 15<br>16 | CW | : | OKAY, SO I GONNA, UH, AT THE, AT THE, AT THE BRICKYARD MALL, RIGHT? |
| 17 | JAMES | : | YEAH. |
| 18 | CW | : | HE'S GONNA PICK ME UP? |
| 19<br>20 | JAMES | : | YEAH, MY DRIVER'S GONNA PICK YOU UP TO GO MEET THE GUY. |
| 21 | CW | : | OKAY. |
| 22 | JAMES | : | ALRIGHT? |
| 23<br>24 | CW | : | AND UM, MEET THE GUY FIRST WITH THE STUFF, OR BE READY? |
| 25 | JAMES | : | HUH? |

20

| 1<br>2<br>3 | CW | : | BUT THEN, THEN THE CAR, THE CAR WITH, UH, WITH THE STUFF OF YOURS IS GONNA BE BEHIND ME, RIGHT? |
| 4<br>5<br>6 | JAMES | : | YEAH, YEAH. SO, THE ONLY CHANGE IS THAT YOU'RE NOT GONNA NEED YOUR CAR 'CAUSE THE LIMO DRIVER IS GONNA PICK YOU UP. |
| 7 | CW | : | OKAY. |
| 8 | JAMES | : | BUT WE'LL, WE'LL DO EVERYTHING THE SAME WAY. |
| 9 | CW | : | OKAY. |
| 10 | JAMES | : | ALRIGHT? |
| 11<br>12 | CW | : | AND I'M JUST GONNA, UH, TEN, TEN. OKAY, I GONNA GO FOR SEVEN, OR TEN. THE BETTER - |
| 13 | JAMES | : | NO, GET TEN, MAN. |
| 14 | CW | : | OKAY. |
| 15 | JAMES | : | ALRIGHT? |
| 16 | CW | : | ALRIGHT, THEN. |
| 17 | JAMES | : | OKAY, MAN. |
| 18<br>19 | CW | : | SO, I JUST GONNA, HEY, I'M GONNA CALL THEM SEE WHEN HE CAN BE READY TOO, OKAY? |
| 20 | JAMES | : | YEAH, ALRIGHT. |
| 21 | CW | : | ALRIGHT. TALK TO YOU LATER. |
| 22 | JAMES | : | ALRIGHT. |
| 23 | (END OF CELL PHONE CONVERSATION) | | |
| 24 | (CAR DOOR OPENS / CLOSES) | | |

21

O111

1    AGENT    :    GOOD JOB.

2    AGENT    :    THIS IS S.A. DEPODESTA.   THE TIME IS
3                    APPROXIMATELY 3:06 P.M.   AT THIS TIME, WE'RE
4                    TAKING POSSESSION OF, AND DEACTIVATING THE
5                    RECORDING DEVICE.

22