UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,           )
    *Plaintiff-Respondent,*           )
                    )          No.  08 C 1416
            v.           )              02 CR 278
                    )
DONVILLE JAMES,                     )          Hon. Wayne R. Andersen
    *Defendant-Petitioner.*           )

**GOVERNMENT'S MOTION FOR LEAVE TO FILE *INSTANTER* THE
GOVERNMENT'S RESPONSE TO DEFENDANT JAMES'S 28 U.S.C. § 2255 PETITION**

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD, United States

Attorney for the Northern District of Illinois, respectfully moves the court for leave to file *instanter*

the *Government's Response to Defendant James's 28 U.S.C. § 2255 Petition*, a copy of which is

attached hereto.  In support of this motion the government states as follows:

    1.     On March 13, 2008, this Court entered a briefing schedule on Defendant Donville

James's 28 U.S.C. § 2255 motion.  This schedule set as the government's filing deadline April11,

2008.

    2.     On March 17, 2008, the undersigned entered his appearance on behalf of the

government  in this matter.

    3.     The undersigned, not having previously been assigned to this case, had not yet

received notice of the Court's scheduling order.

    4.     After discovering the briefing schedule, the undersigned contacted this Court's

deputy to advise the Court of the preceding and to informally request an extension until April 18,

2008.

    5.     The government now formally seeks leave to file its response and does not object to

Petitioner receiving additional time to file his reply.

WHEREFORE, the government respectfully requests that the Court grant the instant motion

for leave to file *instanter*.

DATED: April 18, 2008

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:    /s/ Erik Hogstrom 6283098
Erik A. Hogstrom
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *Plaintiff-Respondent,* | ) | |
| | ) | No.  08 C 1416 |
| v. | ) | 02 CR 278 |
| | ) | |
| DONVILLE JAMES, | ) | Hon. Wayne R. Andersen |
| *Defendant-Petitioner.* | ) | |
| | ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S 28 U.S.C. § 2255 PETITION

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD, United States

Attorney for the Northern District of Illinois, responds to *pro se* petitioner Donville James's motion

under 28 U.S.C. § 2255 ("the petition") to vacate, set aside, or correct his sentence.

## INTRODUCTION

In this motion to vacate, set-aside, or correct sentence pursuant to 28 U.S.C. § 2255,

Petitioner asserts twenty-one claims challenging the conviction and sentence that this Court

entered and imposed in Case No. 02 CR 278.  This court should dismiss the motion because

Petitioner's claims fall into two fatally deficient categories: (1) claims forfeited because

Petitioner did not raise them on direct appeal, and (2) ineffective assistance of counsel claims

that raise specious challenges to counsel's strategic decisions and fail to account for the

overwhelming evidence of Petitioner's guilt.

## STATEMENT OF THE CASE

A grand jury charged Petitioner Donville James in a three-count indictment with

knowingly attempting to possess with intent to distribute a controlled substance, namely powder

cocaine in excess of five kilograms, in violation of 21 U.S.C. § 846 (Count One); carrying and

possessing a firearm during and in relation to and in furtherance of a drug trafficking crime, in

violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Two); and possessing and concealing, with

intent to defraud, falsely made, forged, and counterfeited obligations of the United States,

namely Federal Reserve notes, totaling $87,430, in violation of 18 U.S.C. § 472 (Count Three).

R. 18.[1]

      Following a five-day trial, a jury found Petitioner guilty of all three counts in the

indictment on September 10, 2002.  R. 56-60.  This Court entered the jury's verdict on the docket

on the same day.  R. 61-63.

      On May 31, 2005, this Court sentenced James to 151 months on Counts One and Three,

to run concurrently, and 60 months on Count Two, to run consecutively to Counts One and

Three.  R. 130.  The sentencing order was entered on the docket on June 20, 2005.  R. 130.  On

July 15, 2005, this Court issued an amended sentencing judgment to clarify that Petitioner was to

be sentenced to a total of 211 months.  R. 143.  The sentencing order was entered on the docket

on July 22, 2005.  R. 143.

      Petitioner appealed on July 14, 2005, and the Seventh Circuit affirmed his conviction

and sentence in *United States v. James*, 487 F.3d 518 (7th Cir. 2007).  Petitioner now seeks

collateral relief.

---

[1]Citations to the trial court record are designated "R." followed by the docket entry number in 02 CR 278.  Citations to the trial transcript appear as "Tr." followed by the page number.  Citations to Petitioner's brief are designated "Pet. Br." followed by the page number. Citations to Petitioner's Appendix appear as "Pet. Appx." followed by the page number.

## STATEMENT OF FACTS

The evidence at Petitioner's trial established that in March 2002, Petitioner engaged in a narcotics transaction with a FBI cooperating informant ("CI") named Allan Dubon, who was working in an undercover capacity. Tr. 37-50, 109. Over the course of several recorded conversations, the CI and Petitioner agreed that Petitioner would provide the CI's alleged cocaine source with counterfeit United States currency in return for powder cocaine. Tr. 17-18, 41, 587. Under heavy law enforcement surveillance, Petitioner met the CI in a parking lot to carry out the deal. Tr. 53-61. After Petitioner showed the CI a bag of counterfeit money, the CI delivered to Petitioner a quantity of simulated cocaine. Tr. 62-64. Agents then arrested Petitioner, and he provided a detailed written confession of the plan to acquire cocaine from the CI's source in exchange for counterfeit money, Tr. 65, 273-278; Pet. Appx. 154-157.

The jury heard numerous incriminating recordings of Petitioner planning and carrying out the plan. Specifically, the jury heard recordings of the CI's and Petitioner's March 21, 2002, meeting in which the CI stated that he would either get seven or ten kilograms of cocaine, and Petitioner stated that he wanted ten. Tr. 580-581; R. 54, Attachment 2 at 5, 8; Pet. Appx. 76-79. The jury then heard Petitioner agree to provide $200,000 in counterfeit currency in return for the cocaine. Tr. 41-42; R. 54, Attachment 2 at 5; Pet. Appx. 76. The recordings further capture Petitioner giving the CI explicit directions on how he and the CI would do the deal and what the CI should tell his source. Tr. 580, 591-592; R. 54, Attachment 2 at 11-14; Pet. Appx. 82-85.[2]

---

[2]At the time of this recorded conversation, James planned to send someone to pick up the cocaine for him and bring the counterfeit money while James watched the transaction from a distance. R. 54, Attachment 2 at 10. The plan eventually changed such that James would be actually participating in the transaction.

On the recording, Petitioner also tells the CI that he would sell his kilograms of cocaine and then would be able to sell the CI's share of the cocaine within ten days.  Tr. 582; R. 54, Attachment 2 at 8; Pet. Appx. 79.  The jury additionally heard Petitioner tell the CI that Petitioner wanted a kilogram of heroin from the CI's alleged heroin source.  Tr. 592; R. 54, Attachment 2 at 6; Pet. Appx. 77.   Several times on the recording Petitioner can be heard telling the CI that he wanted to do the deal "just like we did last time."  Tr. 592; R. 54, Attachment 2 at 7, 11, 12; Pet. Appx. 78, 82, 83.

The jury also heard a March 24, 2002, phone recording in which the CI and Petitioner discussed their final agreement, namely that James would purchase 15 kilograms of powder cocaine for $300,000 in counterfeit currency.  Tr. 53, 162-163; R. 54, Attachment 1 at 1; Pet. Appx. 114.  James advised the CI that he would have $200,000 in counterfeit money for the CI's alleged source and would make it look like $300,000 in genuine currency.  Tr. 53; R. 54, Attachment 1 at 2-3; Pet. Appx. 115-116.  James also was heard on tape asking the CI if the CI wanted James to follow the CI's drug source to watch him.  Tr. 591; R. 54, Attachment 1 at 3, 7; Pet. Appx. 116-120.  During this conversation, James told the CI three separate times not to be nervous and to just go ahead with the deal. Tr. 591; R. 54, Attachment 1 at 5; Pet. Appx. 118. James again told the CI that they should do the deal like they did it the last time.  Tr. 592; R. 54, Attachment 1 at 5; Pet. Appx. 118.

Testimonial evidence from several FBI and Secret Service agents established what transpired when the CI and Petitioner met at a McDonald's parking lot on March 25, 2002, to conduct the planned drug transaction.  Tr. 53, 55, 60.  After the CI and James met in the parking lot, Petitioner drove the CI to a nearby parked car that  was driven by and registered to

4

Petitioner's girlfriend.  Tr. 61-62.; 276, 316.  There, Petitioner showed the CI a bag inside the trunk of the vehicle that contained a large amount of counterfeit currency.  Tr. 62, 421, 424-425. Petitioner and the CI then drove back to the CI's vehicle at McDonald's.  Tr. 62, 179.  The CI then briefly left Petitioner to retrieve a bag containing five kilograms of simulated cocaine from a government vehicle parked nearby.  Tr. 180.  The CI returned to Petitioner's vehicle and  put the five kilograms on the passenger seat.  Tr. 64, 68.   At this point, law enforcement agents approached and, after Petitioner unsuccessfully tried to flee, they arrested him.  Tr. 65.  After Petitioner indicated that he had a gun in his car, the agents searched it and discovered both the simulated cocaine and a loaded Smith and Wesson nine millimeter semi-automatic pistol. Tr. 67-71.

The jury also heard testimony regarding Petitioner's post-arrest statement, which was entered into evidence.  Petitioner's handwritten statement explained that he planned to buy 15 kilograms of powder cocaine with counterfeit currency and that he planned to give some of the drugs to a member of the Gangster Disciples from whom he had purchased $100,000 of counterfeit currency.  Tr. 273-276; Pet. Appx. 154-157.  Petitioner further wrote that he had cut up blank pieces of paper to add to the $100,000 in counterfeit currency that he had purchased to make it look like it was $300,000.  Tr. 275-276; Pet. Appx. 156-157.  Petitioner also later made an oral admission to agents that he had attempted to make additional counterfeit currency to add to the counterfeit currency he had purchased.  Tr. 281-282.  He further explained that he was having trouble making two-sided counterfeit currency and could only produce front or back images.  Tr. 282.

The government also presented evidence regarding additional materials uncovered in

post-arrest searches.  Based on Petitioner's oral statement, agents obtained his consent to search

his apartment, where they uncovered additional counterfeit currency and various pieces of

counterfeit-making equipment, including a computer, two scanners, rubber bands, and a paper

cutter.  Tr. 283.  Tr. 313-314.  Some of the counterfeit currency found at Petitioner's residence

was lined up in rows on the scanners.  Tr. 316, 318-319.  In addition, some of these counterfeit

bills were marked with the same serial numbers as the counterfeit currency found in James'

girlfriend's car.  Tr. 430-431.  A subsequent search of James' computer revealed images of a $50

bill.  Tr. 348.  Agents additionally recovered from Petitioner's girlfriend's car, which was

present at the attempted transaction, a black bag containing $87,430 in counterfeit currency

along with blank pieces of cut paper.  Tr. 421, 424-425.

## ARGUMENT

None of Petitioner's twenty-one suggested bases for vacating his conviction and sentence

presents a viable claim.  First, several of Petitioner's claims are procedurally barred because he

failed to raise them on appeal.  Second, Petitioner's ineffective assistance claims, for their part,

fail to even approach *Strickland v. Washington*'s stringent standards of (1) objectively

unreasonable performance by counsel and (2) actual prejudice to the outcome of Petitioner's

case from such performance.  Instead, these claims primarily evidence Petitioner's disagreement

with one of his six attorneys' strategic decisions, and they fail to address the overwhelming

evidence of his guilt.

### I. PROCEDURALLY BARRED CLAIMS (Claims 3, 5, 11, 14, 15, and 17)

It is well settled that a Section 2255 petition is not a substitute for a direct appeal, *see,*

*e.g., Olmstead v. United States*, 55 F.3d 316, 319 (7th Cir. 1995), and certain types of claims are

barred in Section 2255 petitions if not raised on appeal. First, a defendant is flatly barred from

raising "nonconstitutional issues that could have been but were not raised on direct appeal."

*Belford v. United States*, 975 F.2d 310, 313 (7th Cir. 1992), *overruled on other grounds,*

*Castellanos v. United States*, 26 F.3d 717, 720 (7th Cir. 1994). Petitioner's "Claim

Fourteen,"*see* Pet. Br. 108, raises a nonconstitutional issue – that the government violated a

statutory requirement to preserve original recordings for ten years – that Petitioner did not raise

on appeal. Claim 14 is therefore barred.

Second, constitutional issues not raised on direct appeal are also barred in a Section 2255

petition unless the petitioner "demonstrates (1) good cause for failing to raise the error and (2)

that the alleged error was actually prejudicial." *Wright v. United States*, 139 F.3d 551, 551 (7th

Cir. 1998) (internal quotation marks omitted). Petitioner's "Claim Three," *see* Pet. Br. 49,

"Claim Five," *see* Pet. Br. 58, "Claim Eleven," *see* Pet. Br. 86, "Claim Fifteen," *see* Pet. Br. 112,

and "Claim Seventeen," *see* Pet. Br. 127, each raise constitutional issues that Petitioner did not

raise on appeal. Petitioner has likewise failed to even acknowledge that he did not raise these

issues on appeal, let alone give good cause for such failure.[3] Nor has Petitioner explained,

beyond mere conclusory statements, how any of these issues could have affected the outcome of

his trial despite the overwhelming evidence of his guilt, which included: (1) Petitioner's written

confession; (2) recorded conversations in which Petitioner and the CI planned to acquire cocaine

with Petitioner's counterfeit currency; (3) testimony from government agents who surveilled

---

[3]Although ineffective assistance of counsel ordinarily can satisfy this test, *see, e.g.,*
*United States v. Taglia*, 922 F.2d 413, 418 (7th Cir. 1991), Petitioner freely acknowledges that
his allegedly ineffective trial counsel did not represent him on appeal, and Petitioner has not
alleged that his appellate representation was ineffective.

Petitioner's meeting with the CI in which Petitioner showed the CI a bag of counterfeit money, and the CI retrieved cocaine and brought it to Petitioner's car; (4) $87,000 in counterfeit currency recovered from a bag in Petitioner's girlfriend's car; and (5) substantial counterfeiting equipment and counterfeit currency recovered from Petitioner's apartment.  Claims 3, 5, 11, 15, and 17 are therefore barred.

## II.    INEFFECTIVE ASSISTANCE CLAIMS

All of Petitioner's non-barred claims (Claims 1, 2, 4, 6-10, 12-13, 16, and 18-21) assert violations of Petitioner's Sixth Amendment right to the effective assistance of counsel.[4]  Each of these claims fails on its merits.

### A.  Legal Standards

In order to prevail on his ineffective assistance of counsel arguments, Petitioner must establish both that his attorneys' representation fell below an objective standard of reasonableness, and that but for his attorneys' errors, there is a reasonable probability that the result of the proceedings would have been different.  *Strickland v. Washington*, 466 U.S. 668, 694-95 (1984).  Both components of the test must be satisfied or the claim must be denied. *Eddmonds v. Peters*, 93 F.3d 1307, 1313 (7th Cir. 1996).  In *United States v. Meyer*, 234 F.3d 319 (7th Cir. 2000), the Seventh Circuit summarized the requirements for reviewing a claim of ineffective assistance of counsel in a Section 2255 proceeding:

---

[4]Although Petitioner now proceeds *pro se*, he has been represented by six attorneys over the course of this case, including at trial, where three attorneys represented him.  With few exceptions, in his petition, Petitioner fails to identify which of these attorneys was responsible for each purported instance of ineffective assistance.  At times it is possible to deduce this necessary information, but where it is not, the government assumes that Petitioner believes each of his attorneys was constitutionally ineffective.

> [R]eview of a trial attorney's performance is "highly deferential." *Strickland v.
> Washington*, 466 U.S. 668, 689 (1984); *see also, e.g., Lowery v. Anderson*, 225
> F.3d 833, 843 (7th Cir. 2000). Our analysis begins with the "strong presumption"
> that the defendant's attorney rendered adequate representation of his client.
> *Kimmelman v. Morrison*, 477 U.S. 365, 381, 106 S.Ct. 2574, 2586, 91 L.Ed.2d
> 305 (1986); *Strickland,* 466 U.S. at 689. Moreover, as the Supreme Court has
> emphasized, the range of attorney performance that will satisfy the Sixth
> Amendment's guarantee of counsel is wide. *Kimmelman*, 477 U.S. at 381;
> *Strickland,* 466 U.S. at 689.

*Meyer*, 234 F.3d at 324-25. *See also United States v. Moya-Gomez*, 860 F.2d 706, 763-64 (7th

Cir. 1988). In short, Petitioner must demonstrate that his counsel made "errors so serious that

counsel was not functioning as 'counsel' guaranteed defendant by the Sixth Amendment."

*Strickland*, 466 U.S. at 687.

        *Strickland*'s mandate breaks down into two requirements: that (1) counsel's actions were

"beyond the realm of reasonable professional judgment within the context of the case, at the time

that counsel acted" (the "performance prong") and (2) counsel's "ineffectiveness prejudiced him,

rendering the proceeding fundamentally unfair and the result unreliable" (the "prejudice prong").

*Mason*, 97 F.3d at 893. As to the performance prong, the question is whether counsel's

decisions and judgments "under all the circumstances of [the] case, . . . were made outside the

wide range of professionally competent assistance." *Menzer*, 200 F.3d at 1003. Reasonable

strategic decisions fall within this range. *Id.* at 1004. It is not the Court's role to "grade

counsel's performance" or to "take up the role of Monday morning quarterback." *Strickland*,

466 U.S. at 697 (1984); *Harris v. Reed*, 894 F.2d 871, 877 (7th Cir. 1990). Every indulgence is

given "to the possibility that a seeming lapse or error by defense counsel was in fact a tactical

move, flawed only in hindsight," *Taglia*, 922 F.2d at 417-418, and so "strategic choices made

after thorough investigation of law and facts relevant to plausible options are virtually

unchallengeable." *Strickland*, 466 U.S. at 690.

As to the prejudice prong, if the record supports a finding of substandard performance, the Court must then determine whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *United States v. Starnes,* 14 F.3d 1207, 1209-10 (7th Cir. 1994). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In considering the prejudice prong, the Court must apply not simply an outcome determinative test, but also must assess whether the deficient performance deprived defendant of a fair trial. *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993). Thus, with regard to the prejudice prong, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693.

### B.  Application of Legal Standards

Applying these standards to the instant motion, it is evident that Petitioner has no valid claim of ineffective assistance of counsel. Instead, Petitioner's claims simply catalogue his *post hoc* disagreement with the judgments and strategic decisions of his lawyers at every stage of his case. Each of Petitioner's claims falls well short of overcoming *Strickland*'s strong presumption that an attorney's performance is reasonable. What is more, Petitioner scarcely even attempts to establish, beyond conclusory statements, any probability that the outcome of his trial would have been different absent the purported deficient performance.

The government will address each of Petitioner's ineffective assistance claims in the order in which they appear in Petitioner's brief, which is as follows:  Claims 1, 2, 4, 6-10, 12-13, 16, and 18-21.

### ***Petitioner's "Claim One" (failure to object to transcripts, see Pet. Br. 27)***

Petitioner's first ineffective assistance claim derives from what he characterizes as "manipulation" by the government of transcripts of incriminating phone calls that were played for the jury at trial. James contends that his counsel should have objected because the final transcripts of the calls were not identical to the early draft transcripts the government provided defense counsel well in advance of trial so that Petitioners' attorneys could begin preparing his defense.

Petitioner fails to establish that his attorneys' decision not to object to the purported differences between the draft and final transcripts ran afoul of *Strickland*'s performance prong. A post-trial letter exchange between Petitioner and one of his trial attorneys specifically addressed this issue. Counsel wrote to Petitioner:

> I did not accept the final transcripts of the tapes without review prior to trial. I listened to the tapes and read the final transcripts and found the tapes and transcripts compatible. The government is not required to use the draft transcripts. If there was something on the tapes which was so very different, the defense could have submitted our own set of transcripts. That was not the case here. The jury was instructed that the evidence was the tapes, not the transcripts.

Pet. Appx. 198.

In sum, trial counsel reviewed all the pertinent materials and made the affirmative judgment that there was no basis for objection. Petitioner, for his part, simply disagrees with his attorneys' professional judgment. But as noted above, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690.

Counsel's letter also highlights Petitioner's failure under *Strickland*'s prejudice prong.

11

As counsel pointed out to Petitioner, even assuming some material difference between the draft and final transcripts, the only evidence before the jury was the recordings themselves, not the transcripts. The jury was entitled to make its own judgment regarding whether the recordings supported the charges against Petitioner, irrespective of how either the government or the defense transcribed the conversations they recorded. What is more, Petitioner fails to account for the overwhelming evidence of his guilt, which in addition to the recorded conversations, included Petitioner's written confession, testimony from numerous government agents who surveilled Petitioner's meeting with the CI, $87,000 in counterfeit currency found in a bag in Petitioner's girlfriend's car, and substantial counterfeiting equipment and counterfeit currency recovered from Petitioner's apartment.

### *Petitioner's "Claim Two" (failure to move to quash indictment, see Pet. Br. 36)*

This ineffective assistance claim derives from the fact that none of Petitioner's attorneys moved to quash the indictment on the basis that the government suborned perjury before the grand jury. Petitioner appears to support this claim exclusively by presenting his own strained interpretation of certain of the recorded conversations between him and the CI. According to Petitioner's reading of the recordings, the CI was planning to rob a cocaine supplier, split the proceeds with James, and have James sell some of the stolen cocaine. Petitioner reasons under this scenario that, since Petitioner was not planning to **buy** cocaine from CI's source but was instead only planning to take part in the proceeds of the **robbery** of the CI's source, prosecutors suborned perjury when the CI told the grand jury that the plan was for Petitioner to buy cocaine from the CI's source.

This claim fails *Strickland*'s performance prong because Petitioner does not even attempt

12

to show how his lawyers' failure to file a motion to quash the indictment was legally unreasonable; Petitioner merely explains why he disagrees with the decision. Especially given that Petitioner told the agent who arrested him, "[w]e were to make an exchange for 15 keys [kilograms] of cocaine for the counterfeit," Pet. Appx. 154, it was not unreasonable for counsel to have concluded that the CI's grand jury testimony, which said the same thing, was not false.

Petitioner likewise fails *Strickland*'s prejudice prong because a motion to quash the indictment on the grounds that it was based on perjured testimony did not have a reasonable probability of succeeding. As noted above, the evidence supported the CI's grand jury testimony. It is also worth noting that whether Petitioner planned to acquire the cocaine via purchase or robbery is immaterial, as the charge only required proof of attempting to ***possess*** the cocaine with the intent of distributing it. *See Seventh Circuit Pattern Criminal Jury Instructions, 21 U.S.C. § 841(a)(1).*

### Petitioner's "Claim Four" (failure to move to quash indictment, see Pet. Br. 54)

This claim is substantively identical to Petitioner's "Claim Two." It therefore fails for the reasons stated in that discussion.

### Petitioner's "Claim Six" (failure to request entrapment instruction, see Pet. Br. 63)

This claim repackages as ineffective assistance a claim that this Court has already twice rejected. Both before trial and after, Petitioner argued for an entrapment defense based on his assertions that the CI pressured him to obtain counterfeit money and that the FBI "instructed" the CI to engage Petitioner in a drug transaction. *See* R. 55, 71. This Court rejected these arguments both times Petitioner made them. *See* R. 53, 73. Petitioner now contends that trial counsel was ineffective for not requesting an entrapment jury instruction.

13

Counsel's failure to request an entrapment instruction was not unreasonable because the evidence failed to create even a *prima facie* case of entrapment. As this Court has noted, a defendant seeking to argue entrapment must overcome an initial evidentiary burden of producing sufficient evidence that (1) the government induced the crime and (2) the defendant was not predisposed to commit the crime. *U.S. v. James*, 2002 WL 31749174, at *4 (N.D. Ill. Dec. 3, 2002) (Andersen, J.). In denying Petitioner's post-trial motion, this Court, in part, analyzed the application of this standard to Petitioner's case as follows:

> In this case, the defendant clearly could not establish a lack of predisposition. At trial, the government introduced the tape recorded meeting between the defendant and the CI on March 21, 2002. During that conversation, the defendant told the CI that he wanted a kilogram of heroin. After the CI stated he did not know anything about heroin, the defendant explained that a kilogram of heroin sells for "about $100,000." In discussing the details of the planned cocaine-for-counterfeit transaction, the defendant made references to doing the transaction "just like we did last time." At one point, the CI stated, "so I go with the guy with the limo with the kilos and but the other guy is going with you to pick up the bag from you with the money, the ten keys or what." The defendant responded, "car behind the limo ... just like we did it last time."
>
> * * * * *
>
> The defendant also could not have successfully argued that he was induced to commit any crimes. First, the recorded phone conversation between the defendant and the CI revealed that it was actually the defendant who was encouraging the CI to go through with the deal. The defendant repeatedly told the CI not to be nervous and to just do it.
>
> The structure of the planned transaction also did not qualify as an extraordinary inducement. "A person who takes advantage of an ordinary opportunity to commit a criminal act-not an extraordinary opportunity, the sort of thing that might entice an otherwise law-abiding person-is not entrapped. *Blassingame*, 197 F.3d at 281. In the March 24th recorded phone conversation, the defendant and the CI discuss purchasing 15 kilograms of cocaine for $300,000, which is approximately $20,000 per kilogram. According to the government, it was prepared to introduce testimony that $20,000 per kilogram of powder cocaine was the going rate for the time, was not an extraordinarily low price, and thus was not an "extraordinary inducement" to purchase within the meaning of the applicable

case law.

*Id.* at *4-*6.

This Court's previous rulings thus foreclose Petitioner's entrapment-based ineffective assistance claim. To begin with, counsel's decision not to request an entrapment instruction was wholly reasonable in light of this Court's overt rejection of the proffered entrapment defense. What is more, reasonable or not, counsel's failure to request an entrapment instruction could not have prejudiced Petitioner because, based on this Court's ruling, it is clear that this Court would not have allowed the instruction.

### Claim Seven (failure to present entrapment evidence, *see* Pet. Br. 68)

This claim is a slightly modified version of Claim Six. Petitioner contends that trial counsel was ineffective in failing to present evidence supporting Petitioner's pretrial entrapment proffer, which this Court ruled insufficient to allow Petitioner explicitly to invoke the entrapment defense. According to Petitioner, trial counsel mistakenly believed that this Court had precluded the entrapment defense, and so it constituted ineffective assistance to abandon the previously planned strategy of presenting entrapment evidence.

First, this claim fails *Strickland*'s performance prong because trial counsel was in fact not mistaken about the Court's ruling on the entrapment proffer. In her post-trial letter to Petitioner, counsel explained, "[t]he court did not preclude the defense from proceeding with presenting evidence of entrapment. Instead, the judge ruled that based on the proffer he did not believe there was a sufficient basis to establish entrapment, and that I would not be allowed to argue entrapment in opening statements to the jury." Pet. Appx. 199. Additionally, before trial this Court "noted that the proffer did not appear to provide a sufficient basis for an entrapment

defense." *See James*, 2002 WL 31749174, at *3. Counsel apparently made the strategic decision that presenting the evidence in the proffer would have gained Petitioner little and at the same time would have presented risks, such as opening the door to testimony about the CI's prior transaction involving drugs and counterfeit currency with Petitioner. *See* Pet. Appx. 197.

Additionally, the Court's post-trial ruling that Petitioner failed to make a *prima facie* showing of entrapment means that, even if counsel had introduced entrapment evidence, it was not reasonably probable that the outcome of the trial would have been different. This is especially so when one considers the point counsel herself made to Petitioner, referenced in the preceding paragraph, that putting on the CI would have opened the door to very damaging testimony for Petitioner. This claim thus fails *Strickland*'s prejudice prong.

### *Claim Eight (failure to call Petitioner in support of entrapment defense, see Pet. Br. 72)*

This claim is yet a third variant on Claim Six. Essentially, Petitioner contends that counsel was ineffective for failing to call Petitioner as a witness to support the entrapment defense. This claim fails for the same reasons as Claims Six and Seven, namely that this Court's pre- and post-trial rulings on entrapment meant that counsel's decision not to pursue the defense was reasonable and did not prejudice Petitioner.

This particular version of the claim suffers from additional defects, however, that counsel herself explained in her post-trial letter exchange with Petitioner:

> I made a strong argument to you against taking the stand because I knew the government's rebuttal evidence was going to be allowed in the form of testimony from Dubon [the CI] and Braggs, in addition to the California case. Lawyers can recommend whether a client should or should not testify. However only the client can waive the right. The Judge questioned you extensively on whether you wanted to waive the right to testify. It was in the end your right and you agreed to waive it. I am still of the opinion that there were no facts that you could have added that would have outweighed the damaging facts the government would

16

have been allowed to pursue.

Pet. Appx. 198.

Counsel's letter demonstrates, first, that she only recommended he not testify and that it was ultimately Petitioner's decision not to. Secondly, the letter makes clear that counsel's recommendation constituted a strategic decision that the risks of Petitioner testifying greatly outweighed any potential benefit. Such a decision is "virtually unchallengeable." *Strickland*, 466 U.S. at 690 (1984).

Nor is Petitioner's claim helped by his contention that he only relinquished his right not to testify because one of his three trial lawyers "promised" to call the CI but then did not. To begin with, as Petitioner himself notes, counsel's failure to call the CI owed not to trickery or poor judgment, but rather to the fact that the CI intended to invoke his Fifth Amendment privilege against self-incrimination if called. Tr. 467, 474. Second, the decision not to call the CI because of the Fifth Amendment issue occurred during the defense case-in-chief when Petitioner still could have testified, and the Court specifically admonished Petitioner that Petitioner's decision not to testify was his own and could be withdrawn at any time. Tr. 499. Moreover, Petitioner cannot show prejudice because, as trial counsel noted in her letter to Petitioner, the CI's testimony could have harmed Petitioner's defense in significant ways. Pet. Appx. 198.

### *Claim Nine (failure to call CI as a witness, see Pet. Br. 79)*

This claim is yet another iteration of Claims Six through Eight, this time arguing that counsel should have presented the entrapment defense through testimony from the CI. This

claim fails for the same reasons that Claims Six through Eight fail.

### Claim Ten (misleading Petitioner about entrapment strategy, see Pet. Br. 83)

This claim again repeats the complaints underlying Claims Six through Nine. Petitioner contends that counsel misled him into believing she would pursue an entrapment defense. This claim fails for the same reasons that Claims Six through Nine fail. Petitioner is again attempting to challenge counsel's strategic decision in light of the Court's adverse pre-trial entrapment ruling that the entrapment defense was not a viable on the proffered facts.

### Claim Twelve (failure to move to quash the indictment based on perjury, see Pet. Br. 97)

In this claim, Petitioner argues that his counsel was ineffective for failing to move to quash the indictment because the agent perjured himself in his affidavit in support of the complaint. This claim is substantively identical to Claims Two and Four. The only difference is that, rather than contending that the purportedly perjurous statements were presented to the grand jury, Petitioner contends that the statements were made to the Magistrate Judge who signed the complaint. This claim fails *Strickland*'s performance and prejudice prongs for the same reasons that Claims Two and Four fail.

### Claim Thirteen (failure to request CI's consent-to-record form, see Pet. Br. 103)

In this claim, Petitioner contends that counsel was ineffective because she did not request a copy of the form the CI signed authorizing law enforcement to record his conversations with Petitioner. Petitioner appears to reason that the CI's consent to the FBI was invalid because, after a certain point, the investigation belonged exclusively to the Secret Service and not to the FBI.

This claim is frivolous. Petitioner provides no legal support for his contentions that (1)

18

an agency's investigative jurisdiction expires when another agency becomes involved, (2) that

valid Title III consent becomes invalid if one of multiple agencies investigating a case loses

jurisdiction, or (3) that Title III consent must be in writing.  The provisions of Title III cited by

Petitioner, 18 U.S.C. § 2511(c) and (d), do not support – and indeed are silent on – these points.

Nor does Petitioner provide any factual support for this claim.  He does not even allege,

for example, that officers did not obtain consent from the CI before recording his conversations

with Petitioner.  To the contrary, Petitioner freely admits that the CI gave such consent.  What is

more, Petitioner does not even attempt to explain how his counsel requesting a copy of a signed

consent form might have altered the outcome of his trial.

### Claim Sixteen (stipulation regarding inspection of recording device, see Pet. Br. 120)

In this claim, Petitioner contends that trial counsel was ineffective in acceding to a

stipulation regarding defense inspection of one of the government's recording devices.  First, this

claim fails because Petitioner agreed to the stipulation and so, as the Seventh Circuit noted, he

knowingly waived his claim to inspect the device, *see U.S. v. James*, 487 F.3d 518, 526-527 (7th

Cir. 2007).  Petitioner has not explained how it could constitute unreasonable performance for an

attorney to agree to a stipulation that the client has agreed to.  Just as with Petitioner's decision

not to testify, he, as the client, made the ultimate decision on the stipulation.

Second, Petitioner has shown no prejudice.  As the stipulation noted, the Court deemed

valid the government's assertion of privilege against disclosure of the recording device.  Pet. Br.

121.  Consequently, Petitioner would not have been allowed to inspect the device in any event.

Moreover, in light of the overwhelming evidence of guilt, Petitioner has failed to show that even

if he had been able to inspect the device, there is a reasonable probability that the outcome of the

trial would have been different.

### Claim Eighteen (failure to provide meaningful adversarial testing, see Pet. Br. 134)

In this claim, Petitioner contends that trial counsel was ineffective because she did not subject the government's case to "meaningful adversarial testing." Even a cursory review of the record refutes this claim. First, as noted above, Petitioner was represented at trial by three attorneys who rigorously cross-examined each of the government's witnesses and presented two witnesses during Petitioner's case-in-chief. Petitioner nevertheless argues that his attorneys' performance was inadequate because they did not pursue his entrapment defense at trial, at least not as thoroughly as Petitioner believes they should have. But as explained above in response to several of Petitioner's claims, it was not unreasonable for counsel to relinquish a legal position (i.e., the entrapment defense) that this Court had rejected. Nor do Petitioner's suggestions of specific questions his lawyers should have asked different witness in cross examination provide a basis for constitutionally deficient representation. *See Strickland*, 466 U.S. at 697 (1984) (noting that review for ineffective assistance does not involve "tak[ing] up the role of Monday morning quarterback"). Finally, this claim fails because Petitioner has provided no explanation of how the failure to pursue a legally doomed defense and pose certain specific questions to the government's witnesses would have affected the outcome of the trial, especially in light of the overwhelming evidence against Petitioner.

### Claim Nineteen (failure to move to dismiss Count Two, see Pet. Br. 139)

In this claim, Petitioner argues that trial counsel was ineffective in failing to move to dismiss Count Two of the indictment, which charged a violation of 18 U.S.C. § 924(c), on the grounds that Section 924(c) is not an "offense," but rather a "penalty enhancement." This claim

20

fails because making such a motion would have bordered on frivolous. It is well settled that Section 924(c), which provides a five-year minimum sentence for using, carrying, or possessing a firearm in furtherance of a drug crime, establishes a separate offense and is properly chargeable in an indictment as such. *U.S. v. Rodriguez*, 792 F. Supp. 1113, 1116 (N.D. Ill. 1992) (citing *United States v. Dixon*, 558 F.2d 919, 921 (9th Cir.1977) (collecting cases)). An attorney's failure to file a motion with no valid basis in law cannot reasonably form the basis for an ineffective assistance finding.

### Claim Twenty (failure to challenge legality of 924(c) sentence, see Pet. Br. 141)

In this claim, Petitioner contends that sentencing counsel was ineffective for failing to argue that it would violate "U.S. laws" to impose a sixty-month consecutive sentence based on Petitioner's conviction under 18 U.S.C. § 924(c). This claim fails because such an argument would have been frivolous. The statute expressly requires a five-year minimum sentence and also provides that "no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried, or possessed." 18 U.S.C. § 924(c)(1)(A)(i) & (c)(1)(D)(ii). The statute's only exception is for the situation when some other statutory provision requires an even higher minimum sentence than that articulated in 924(c). 18 U.S.C. § 924(c)(1)(A)(i). Sentencing counsel's failure to make a frivolous argument does not constitute ineffective assistance.

### Claim Twenty-One (failure to seek "sentencing entrapment" departure, see Pet. Br. 143)

In this claim, Petitioner contends that sentencing counsel was ineffective for failing for

move for a downward departure based on "sentencing entrapment," in which the government entraps a person already predisposed to commit a crime into committing a more serious one. This claim fails both the performance and prejudice prongs because of this Court's ruling, discussed above, that Petitioner failed to make a *prima facie* showing of entrapment on either the inducement or predisposition elements. Since at the time of sentencing, this Court had already indicated that it did not believe Petitioner was induced to commit any crimes, it was neither unreasonable, nor did it prejudice Petitioner, for sentencing counsel to elect not to move for the downward departure.

## **CONCLUSION**

This Court should deny Petitioner Donville James's motion under 28 U.S.C. § 2255 because Claims 3, 5, 11, 14, 15, and 17 are procedurally barred, and Claims 1, 2, 4, 6-10, 12-13, 16, and 18-21 fail on the merits.

Respectfully Submitted,

PATRICK J. FITZGERALD
United States Attorney

By:    /s/ Erik Hogstrom 6283098
ERIK A. HOGSTROM
Assistant U.S. Attorney
219 South Dearborn, Rm. 500
Chicago, Illinois 60604
(312) 353-5300