*Ctt*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

F I L E D

MAY 1 2 2008

May 12 2008 *MB*

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA,
    Plaintiff-Respondent,

    v.

Donville James,
    Defendant-Petitioner.

)
)
)
)
)
)
)
)
)

No. 08 C 1416
02 CR 278
Hon. Wayne R. Anderson

## PETITIONER'S REPLY TO THE GOVERNMENT'S RESPONSE
## TO DEFENDANT JAMES' 28 U.S.C. § 2255 PETITION

The Petitioner, Donville James, by himself, pro-se, replies to the Government's response to Petitioner's 28 U.S.C. § 2255 Petition to vacate, set aside, or correct his sentence.

### INTRODUCTION

Petitioner in his motion to vacate, set-aside, or correct sentence pursuant to 28 U.S.C. §2255 asserts Twenty-One claims challenging the conviction and sentence that the Court entered and imposed in the Government's case against him. The Government responded and moved the Court to dismiss the motion because Petitioner's claims fall into two deficient categories: (1) Claims forfeited because Petitioner did not raise them on direct appeal, and (2) ineffective assistance of counsel claims that specious challenges to COunsel's strategic decisions and fail to account for the overwhelming evidence of Petitioner's guilt.

1

This Court should grant Petitioner's motion because: (1) Petitioner did not forfeit any of his claims on direct appeal, and (2) the evidence in Petitioner's Appendix proved the substance and facts in all of Petitioner's claims of ineffective assistance of Counsel and contradicts the Government's entire case against Petitioner.

## PROCEDURAL HISTORY, FACTUAL BASIS

The Procedural History and the Factual Basis are the same as the original motion. See Section I, and II, of original motion respectively.

## ARGUMENT

All of Petitioner's Twenty-One bases for vacating his conviction and sentence are viable claims. First, the Government suggested that six (6) of Petitioner's claims should be barred, mainly claims: 3, 5, 11, 14, 15, and 17, because Petitioner failed to raise them on direct appeal. Second, "Petitioner's ineffective assistance claims, for their part, fail to approach **Strickland v. Washington**'s stringent standards of (1) objectively unreasonable performance by Counsel and (2) actual prejudice to the outcome of Petitioner's case from such performance".

### I. PROCEDURALLY BARRED CLAIMS (Claims 3, 5, 11, 14, 15, and 17)

1. The Government claimed that Petitioner's claim 14 is a nonconstitutional issue and that since Petitioner did not raise this issue on direct appeal that this claim should be barred in Petitioner's §2255 petition.

This claim is indeed a constitutional claim. The Government missed the gist of this claim. In this claim, Petitioner is not challenging the fact that the Government violated 18 U.S.C. 2518(8)(a), 2517(1), (2) and (3), and 2511(2)(c) of Chapter 119.

Petitioner submitted to the Court that the Government destroyed the "original" copies of all the recordings in Petitioner's case, and as a result, Petitioner was denied the right to a fair trial, which is a Constitutional issue.

The Government specifically stated that:

> "Defendant's request to examine the 'tape recorder which failed' should be denied. The 'tape recorder' is actually a digital recorder which burns recorded conversations directly onto a CD-ROM. When the conversations are recorded onto the CD-ROM, they are automatically erased from the digital recorder, and the CD-ROM itself becomes the evidence".

> "The audiotapes that will be provided to defense Counsel are dubbed from the CD-ROM." App. 0224 at 11.

Here the Government admitted that they "erased" all the "original" recorded conversations in Petitioner's case and provided Petitioner with copies that they dubbed from the CD-ROM that they created. With the "originals" being erased, Petitioner has no way in which to check for editing or other alterations.

The statutes that govern the procedures in which oral communications are intercepted and recorded specifically states:

> "The contents of any wire, oral, or electronic communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape, wire, or other comparable device ... the recording ... shall be done in such a way to protect the recording from editing or other alterations ... they shall not be destroyed ... and in any event shall be kept for ten years ..." U.S.C. §2518(8)(a).

3

Petitioner has submitted evidence to the Court that the
Government edited, altered, and completely refused to disclose
the March 25, 2002 recording which was recorded by the same piece
of equipment that recorded the other conversations in Petitioner's
case. The Government claimed that this March 25, 2002 recorded
conversation was not recorded because they "left" the recording
device "off by mistake". However, the evidence submitted by
Petitioner in his Appendix showed this claim by the Government not
to be true. This particular piece of evidence was recorded, logged
into evidence, witnessed, and supervised into evidence. The
recorded conversation was 41 minutes in length and came from the
body wire placed on the Government's criminal informant. See
Appendix 0165. Yet, the Government refused to disclose the recording
and chose to misrepresent the truth about the existence of this
recording to the Court.

One thing is clear. The U.S.S.S. has inventoried the March 25,
2002 recorded conversation in Secret Service File 1544 with Serial
Number 201-2002-CE-000442, which is 41 minutes in length and is
the body wire conversation between Petitioner and the criminal
informant. The Prosecutors made their duplicate copy from this
piece of evidence and made sure that the duplicate was blank, while
the Secret Service placed the "original" copy back in SSF 1544 to
be maintained for ten years as the statute required.

With this type of gamesmanship and total lack of respect for
the Court and the Law, the Government cannot be trusted to say

4

that they used a "digital recorder" to record the conversation in
the memory of the recorder, then "burns" the "recorded conversations
directly onto the CD-ROM". Then after the conversations are
recorded onto the CD-ROM, the "original" conversations are then
"automatically erased" from the memory of the "digital recorder,
and the CD-ROM itself becomes the evidence". Which is totally in
violation of the statutes governing the procedure for intercepting
oral or electronic communications.

Since all the recordings that the Government used in Petitioner's
case were - according to the Government, dubbed from CD-ROMs which
were not the "original" copies and that the Government "erased"
(destroyed) the "original" copies, petitioner did not get a fair
trial. Which is the Constitutional Claim Petitioner raised in
Claim 14 of his §2255 petition.

2. The Government also claimed that Petitioner's Constitutional
Claim should also be barred in his §2255 petition. This would also
include Claim 14, since this claim is a Constitutional Claim along
with Claims 3, 5, 11, 15, and 17.

Those claims should not be barred in petitioner's §2255 petition
because Petitioner's Appellate Counsel was Constitutionally
Ineffective in not raising these claims on direct appeal when
Petitioner instructed Counsel to do so.

Petitioner was notified by the Court on December 2, 2005 that
Counsel Ruskusky was appointed to represent him on his direct
appeal. Petitioner immediately wrote a seven page typed letter to

Counsel detailing the issues that were important to him and instructed Counsel to appeal these issues on direct appeal. See EXHIBIT "Z".

After Counsel received Petitioner's letter, Petitioner spoke to Counsel on February 9, 2006 in a collect call placed by Petitioner. During this telephone conversation, Counsel explained what he called "the differences between direct appeal and habeas appeal". Counsel explained that direct appeal deals only with the records that went before the jury.

Petitioner then wrote a second letter to counsel, a copy of which is attached as EXHIBIT "Y". Petitioner again went through the facts of the case and begged Counsel to raise his issues before the Appellate Court.

Petitioner and Counsel spoke several times prior to the filing of Petitioner's Brief. Counsel sighted what he called "legal and procedural reasons that Appellant's additional arguments were not included in the opening brief", and explained that "Appellant's arguments were not left out of the opening brief because they contradicted the issues that were raised in Appellant's Opening Brief, but for other reasons (including Local Rule 51 and Section 2255 issues)".

After Counsel filed the opening brief that did not include Petitioner's additional issues, Petitioner filed two motions with the Appellate Court seeking to file suppmental brief pro-se. On July 25, 2006 and August 16, 2006, the Appellate Court denied Petitioner's motion to file Supplemental  Brief pro-se.

6

On August 31, 2006, Petitioner again spoke to Counsel and insisted that COunsel raise his additional issues that were identified in his pro-se brief. Counsel informed Petitioner that he would not raise the issues. As a result, Petitioner instructed Counsel not to file a Reply Brief so that he could continue to seek to raise his additional issues pro-se. The Appellate Court denied an additional motion filed by Petitioner to proceed pro-se on September 1, 2006. See EXHIBIT "X".

On September 11, 2006, Petitioner submitted a pleading that demanded that Counsel: (a) withdraw as Counsel for Petitioner's appeal; and (b) file an **Anders** brief on behalf of Petitioner. On September 22, 2006, the Appellate Court denied Petitioner's September 11, 2006 pleading. As a result, Counsel's appointment as Petitioner's Counsel remained in place, in which Counsel refused to raise Petitioner's additional issues on direct appeal. See EXHIBIT "V" for Counsel's motions and affidavits regarding this matter before the Appellate Court. Also see EXHIBIT "U" for the statement of the issues from Petitioner's pro-se brief that Counsel refused to raise before the Appellate Court. See issues 8, 7, 6, 10, 12(a). Those are the issues that the Government now moves this Court to be barred in Petitioner's § 2255 Petition.

Petitioner requested that Counsel file an **Anders** brief if he thought that Petitioner's claims were frivolous. Counsel did not file the **Anders** brief as requested. Counsel stated to the Appellate

Court that Petitioner's additional issues were not included in his Opening Brief because one of the reasons Counsel cited was that they were §2255 issues. Counsel did not make clear to the Court which of Petitioner's issues were Local Rule 51 issues and which were not. The Appellate Court by it's ruling in denying Petitioner's pleading for Counsel to file an **Anders** brief and withdraw as Petitioner's Appellate Counsel agreed with Counsel's reasons that Petitioner's additional issues would be best raised in §2255 petition.

The District Court also had it's input on those issues. Petitioner filed several pro-se motions before sentencing praying that the Court address those issues. The Court denied Petitioner's pro-se motions without prejudice. Before the Court ruled on Petitioner's pro-se motion, the Government argued that the Court should not make a ruling on Petitioner's pro-se motions because a ruling on Petitioner's motion could be harmful to Petitioner's post-conviction appeal to include Section "2255" petition. Those are the issues the Government seeks to be barred from the Court now that the evidence to support Petitioner's claims are fully developed in Petitioner's Appendix and affidavit of truth submitted with Petitioner's §2255 motion. Evidence that contradicts the entire Government's case against Petitioner. Evidence which was never a part of the trial record.

3. The Government also stated that Petitioner's constitutional claims should be barred because Petitioner has not explained beyond

8

mere conclusory statements how any of these issues could have affected the outcome of his trial despite the overwhelming evidence of his guilt, which included: (1) Petitioner's written confession; (2) recorded conversations in which Petitioner and the CI phoned to acquire cocaine with Petitioner's counterfeit currency; (3) testimony from government agents who surveilled Petitioner's meeting with the CI in which Petitioner showed the CI a bag of counterfeit money, and the CI retrieved cocaine (simulated) and brought it to Petitioner's car; (4) $87,000 in counterfeit currency recovered from a bag in Petitioner's girlfriend's car; and (5) substantial counterfeiting equipment and counterfeit currency recovered from Petitioner's apartment.

Petitioner has submitted an Appendix accompanying his 2255 petition which contains evidence that completely contradicts the Government's entire case against Petitioner. The Government response was muted to the evidence in Petitioner's Appendix. Petitioner will show that the evidence against Petitioner is not overwhelming.

Dealing with the first of the five pieces of evidence the Government cited as overwhelming against Petitioner, which was (1) what the Government classed as a "written confession".

Taking Petitioner's written statement in the full context of the evidence in Petitioner's §2255 Appendix, it is clear that this written statement was never a confession of Petitioner agreeing to purchase drugs from the criminal informant's source.

9

In fact, Petitioner had no agreement with the criminal informant to purchase drugs from the informant's source. It is clear from the "draft transcript" in Petitioner's Appendix that the criminal informant set up a plan to rip-off cocaine from one of his suppliers then pursued Petitioner to aide him in carrying out his plan, all in the hopes of entrapping Petitioner into a drug crime which is a more severe crime. This was not apparent to the Court and the Jury because the Government altered and tampered with the tapes and the transcripts they played for the Court and the Jury.

When Petitioner was arrested, Petitioner gave a written statement which summarized why he went to the parking lot at Naragonsett and Diversey to meet with the CI. Petitioner wrote, "we were to make an exchange for 15 kilograms of cocaine for the counterfeit." App 0154-55. The Government then takes this as a confession even though their own evidence showed that this was not the case.

Putting the CI's conversation with Petitioner in context about Petitioner coming to the parking lot, on March 21, 2002 the CI said to Petitioner:

1. "Well like I say, I got the guy set up, I mentioned to him between seven and ten (kilograms of cocaine)." App 0076, para 15.

2. "He (the guy the CI set up) lives by ... I don't know exactly his house, he is not gonna tell me exactly where it is, cause I could 'rob' him myself ... at Naragansett and Diversey in the parking lot, we can do that (rob the guy) in the parking lot". App 0083, para 2.

The CI continued to say to Petitioner:

    **3.** "I wanna do (rob the guy) this guy ..."
       App 0085, last line, 0086, first line.

And that the robbery was:

    **4.** "gonna do like you (Petitioner) fuck us
       (the CI and his supplier) up."
       App 0086, para 9.

The Government failed in their response to explain how is it that they had evidence in their possession that the informant said he wanted to set up some guy in the parking lot at Naragonsett and Diversey to "rob" and arrange the robbery to "do like you (Petitioner) fuck us (the informant and his supplier) up".

What is even more startling is that a closer look at the evidence even reveal more of the sinistism the Government employed by calling Petitioner's written statement a confession to purchasing cocaine from the CI's source.

The CI said to Petitioner - speaking about the cocaine the informant said he wanted to "rob" from the "guy" he "set up" in the parking lot where Petitioner was arrested:

    "It would be better, how we gonna split it (the stolen
    cocaine) or what?" App 0076, last line.

This creates a controversy that the Government never answered. How was it that Petitioner was charged with attempting to purchase drugs from the CI's source when it was the CI who wanted to rip off cocaine from his own source and arrange this rip off to look like Petitioner was responsible for the rip off? And if it was Petitioner who was attempting to purchase the drugs, why was it

that it was the CI who was offering to "split" his stolen
cocaine with Petitioner.

A further controversy is created when the CI said to Petition:

> "Cause I wanna do it like I tell you, ten grand
> ($10,000), I (CI) gonna "sell" you each one
> (the stolen cocaine) ten. You make ten, I make
> ten, but I do not got much people to "sell" it
> (the stolen cocaine)."  App 0077, para 1.

Here the Government had evidence in their possession that
clearly showed that the CI was the one that offered to "sell" the
cocaine he was planning to "rob" from the guy he "set up" in the
parking lot. The CI offered to "sell" the stolen cocaine for
$10,000 per kilogram if Petitioner would "help sell em (them)".
App 0079, para 10. There was never a mysterious source that
Petitioner was to purchase cocaine from. The CI was the only one
offering to "sell" his planned stolen cocaine for $10,000 per
kilogram.

Even if the Government misconstrued Petitioner's written
statement as a confession, the evidence in their possession showed
the contrary. And if a person confesses to a crime that they did
not commit and the evidence showed that person did not commit that
crime, that person cannot be convicted of that crime. Just a
simple cursary review of the March 21, and 24, 2002 Government's
recorded evidence showed that Petitioner did not go to the parking
lot to purchase cocaine from the CI's source. So the Government
cannot ignore these tapes and in turn call Petitioner's written
summary of what occured in the parking lot at Naragansett and
Diversey a written confession.

12

The second piece of evidence the Government cited as over-whelming is (2) the recorded conversations. The Government stated that Petitioner and the CI planned to acquire cocaine with Petitioner's counterfeit currency. This is exactly the point Petitioner is attempting to make. The Government stated that "Petitioner and the CI planned to acquire cocaine with Petitioner's counterfeit currency". First of all, the CI asked Petitioner to provide him with counterfeit currency so he could use them to pay for cocaine to get cash to pay off his dept he had with the Mexican Mafia. The CI said to Petitioner:

> "Make sure for tomorrow (March 25, 2002, the day
> Petitioner was arrested) ... they (counterfeit
> money) look like three ($300,000)".
> App 0130, 21-24.

These are from the March 24, 2002 recorded conversations.

The other recorded conversation, the March 21, 2002 conversation as previously discussed showed that the CI:

1. Wanted to "rob" cocaine from a "guy" he "set up" in a "parking lot at Naragansett and Diversey".

2. That the informant wanted to arrange his planned robbery to appear like it was Petitioner who was responsible for the robbery.

3. That the informant was the one who said he wanted to "split" his stolen cocaine with Petitioner.

4. That it was the informant who was the one offering to "sell" his stolen cocaine for $10,000 per kilogram and not some mysterious source.

13

5. That it was the informant who said Petitioner should
   help him "sell" his stolen cocaine.

These recorded conversations when viewed in light of
Petitioner's 2255 Appendix, especially the "draft" transcripts,
App 0071 and App 0113, that contains the exact words that are on
the recorded conversations as opposed to the "final" transcript
which the Government altered to hide the CI's activities in
Petitioner's case, showed that Petitioner did not go to the
parking lot to purchase cocaine from the CI's source and that
Petitioner's written statement was not a confession to attempt the
purchase of cocaine from the CI's source.

The Government's third, fourth and fifth example of over-
whelming evidence is due only to the activities of their own CI
and are not substantial at all. Petitioner was at the parking lot
at Naragansett and Diversey where the informant told him that they
could "rob" the cocaine from the "guy" the informant "set up" by
paying for the cocaine with the counterfeit money the CI asked
Petitioner to provide him with.

When it became obvious that Petitioner would not help the
CI with his plan, the CI tossed a bag containing 5 kilograms of
fake cocaine in Petitioner's car and ran away. Petitioner was then
arrested.

Petitioner's girlfriend who was sent away by Petitioner with
the counterfeit money in her car because Petitioner refused to
help the CI with his plan was picked up and arrested on her way
away from the location. $87,000 in counterfeit money was then

14

retrieved from her car.

The CI insisted that Petitioner find someone who could provide him with counterfeit money. Because Petitioner could not find a source of counterfeit money for the CI, Petitioner proceeded to use his own computer and printers to photo copy U.S. currency so they would "look" like "real" money and fool the guy the CI set up to rip off. Just like the CI instructed Petitioner to do.

The fact that Petitioner photo copied U.S. currency and brought them to the parking lot to give to the CI does not mean that it was Petitioner who was the one attempting to purchase drugs. And as the evidence clearly showed, Petitioner was not the one attempting to purchase drugs from the informant's source.

4. The Constitutional issues that the Government wants barred are very significant because without these constitutional violations Petitioner would not have been found guilty of the crimes charged against him.

a) In claim 3, the Government clearly soborned perjury. Before the CI went before the grand jury to testify, the day before he met with the Prosecutors and gave them a statement about the circumstances surrounding the investigation of Petitioner. The only thing the CI told  them about Petitioner that was relevant to what Petitioner was arrested for was that:

> On several occasions, Petitioner suggested that he could provide the CI with counterfeit money, that the CI could use and buy drugs from a dealer, and the CI could "sell" the drugs for cash to pay off his debt.    App 0143, para 2.

The next day, just before the CI was to testify before the
grand jury, the prosecutors gave him a prepared statement for him
to read before the grand jury as his testimony. The prosecutor's
prepared statement was a blatant lie and reflected nothing that the
CI told them in his interview with them the day before. See App 0135
to App 0143. Compare with App 0057-58, and App 0059-0063.

    There would not have neen neither an indictment or a trial if
the prosecutors did not suborn perjury. The prosecutors created a
chain of causation with their "prepared statement", which resulted
in the conviction and a sentence of 211 months imprisonment. The
prosecutors contrived a conviction through the pretense of a trial
in which in truth was used as a means to deprive Petitioner of his
liberty through a deliberate deception of the Grand Jury, the Court,
and trial Jury by the presentation of testimony known to be false.

    b). Claim 5 carries the same argument as argued in the last
section. The only difference here is that the CI and SSSA Daniel
Dick knew that the prosecution provided them with false and mis-
leading statements known to them to be false, and they chose to
read it as their testimony of the circumstances surrounding the
investigation of Petitioner.

    The false statements before the Grand Jury formed the basis
for the Grand Jury returning an indictment against Petitioner.
The Grand Jury inquiry was based entirely on SSSA Dick's and the
CI's testimony. Without their perjured testimony, there could have
been no indictment and no evidence to carry the case to the Jury.

    c). Claim 11 would have made the difference between

Petitioner's not being found guilty. This claim raised a serious
Constitutional violation which showed Petitioner was entrapped in
criminal activities by the Government's agents and if it was not
due to their entrapment of Petitioner into criminal activities,
Petitioner would not have been convicted.

d). Claim 14 was addressed in Section 1. Petitioner's evidence
cited in his Appendix supports this claim. The Government completely
ignored Petitioner's Appendix in their response to his §2255
petition. Petitioner showed that all recorded evidence in Petitioner's
case was done according to the statute governing the procedure for
collecting oral or electronic communication. That all the "original"
copies are stored away in SSF 1544 with their respective serial
numbers. See App 0165. App 0163, para 4. App 0169, App 0163, para 3,
App 0171, App 0163, para 5, App 0167.

The outcome of Petitioner's verdict would have been different
if the Government had disclosed the "original" copies. The
manipulated versions of the recordings supports Petitioner's
innocense. The "original" unaltered versions would have cleared up
all doubts.

e). Claim 15. See part d above.

f). Claim 17 stands on it's own face. The evidence cited in
the claim from Petitioner's Appendix support this claim and showed
that the Government does not have any overwhelming evidence to
support the charges they brought against Petitioner.

17

## II. INEFFECTIVE ASSISTANCE CLAIMS

In the introduction section of the Government's response to Petitioner's 2255 Petition, the Government stated that Petitioner's ineffective assistance of Counsel claims raised "specious challenges to Counsel's strategic decisions and fail to account for the overwhelming evidence of Petitioner's guilt". By using the word "specious" the Government is admitting that Petitioner's claims are true, or correct, but some how, Petitioner's claims are deceptive.

The Government is again attempting to hoodwink the Court by claiming that the evidence against Petitioner was overwhelming, while at the same time, not refuting the overwhelming evidence Petitioner submitted in his §2255 Appendix which contradicts the entire Government's case against Petitioner, which includes:

1. The Government in the more serious charge against Petitioner, charged Petitioner with attempting to purchase cocaine from the informant's source, Count 1. And possessing a fire arm while attempting to possess cocaine, Count 2. The Government stated that Petitioner "called" their criminal informant on "March 16, 2002" to initiate the drug transaction. The phone records for both the CI and Petitioner in the §2255 Appendix on pages 0064 and 0067 respectively showed that Petitioner did not call the informant on March 16, 2002, nor did the CI call Petitioner on March 16, 2002. It is impossible for Petitioner to have initiated a crime on March 16, 2002 if he did not speak to the Government's criminal informant. The Government was mute on this piece of evidence in their response.

18

2. The CI told the Government that the only thing Petitioner did in the circumstances surrounding the investigation of Petitioner was to "suggested" that Petitioner could provide the CI with counterfeit money. See App 0143, paragraph 2. The next day before the CI went before the Grand Jury to testify, the Government gave the CI a prepared statement to read as his testimony before the Grand Jury which did not reflect what the CI had told the Government the day before. See Exhibit in Appendix on pages 0057, 0059. The Government was mute on these pieces of evidence also.

3. The informant attempted to pull Petitioner deeper into criminal activities by following FBI agent DePodesta's instruction to "engage" Petitioner in "drug communication" when Petitioner was only being investigated for counterfeiting matters. The "drug communication" which FBI agent Depodesta "instructed" the CI to "engage" Petitioner in was recorded on March 21, 2002 by the Government. The CI told Petitioner clearly in this recorded conversation that:

    a)  "Well, like I say, I got the guy set up, I mentioned to him between seven and ten (kilograms of cocaine)." App 0076, paragraph 15.

    b).  "He (the guy the CI set up) lives by ... I don't know exactly his house, he is not gonna tell me exactly where it is, 'cause I could 'rob' him myself ... at Naragansett and Diversey in the parking lot, we can do that (rob the guy) in the parking lot". App 0083, paragraph 2.

    c).  "... I wanna do (rob the guy) this guy... " App 0085, last line, 0086, first line.

And the robbery is:

d). "Gonna do like you (Petitioner) fuck us up (responsible for ripping off the informant and the informant's source by paying for the cocaine with counterfeit money)". App 0086, paragraph 9.

The Government has yet to answer how is it that Petitioner was charged with attempting to purchase cocaine from the informant's source using counterfeit money when it was the informant who "set up" his own source to rip him off by paying for their cocaine with the counterfeit money the informant asked Petitioner to provide him with and then arrange for his rip off of his own source to make it appear that it was Petitioner who "fuck" them "up".

The Government has yet to answer why they felt it was necessary for them to edit out the phrase "like you fuck us up" from the final transcript they provided to the Jury. App 0107, paragraph 3. Compare to App 0086, paragraph 9.

4. The informant in the "drug" communication that he was "instructed" by FBI agent DePodesta to "engage" Petitioner in stated that:

"It would be better, how we gonna split it (the CI's planned stolen cocaine) or what?" App 0076, last line.

This phrase showed exactly how drugs was infused by the Government in a counterfeiting case. The CI offered to split his planned stolen cocaine with Petitioner. This phrase showed two things, (1) that as noted above, the CI infused drugs in a counterfeiting case by offering to split his stolen cocaine. (2) it was the CI who offered to split his planned stolen cocaine, which in turn proved that Petitioner never attempted to purchase cocaine

20

from the informant's source. The Government are also mute in their response to this phrase.

5. The CI also told Petitioner in the "drug communication" that he "engaged" Petitioner in that:

> "Cause I wanna do it like I tell you, ten grand ($10,000), I (CI) gonna "sell" you each one (the CI's planned stolen cocaine) ten. You make ten, I make ten, but I do not got much people to "sell" it (the stolen cocaine)". App 0077, paragraph 1.

The Government has yet to answer how was it that they charged Petitioner with attempting to purchase cocaine from the informant's sources when they had in their possession evidence in the informant's own words offering to "sell" his planned stolen cocaine himself.

Also the Government has yet to answer why they felt it necessary to alter the true meaning of this phrase in their "final" transcript that they provided to the Jury. See App 0094, lines 2-5. Compare to App 0076, last line. App 0077, paragraph 1.

6. The CI continued to tell Petitioner:

> "You (Petitioner) help 'sell' them (the CI's planned stolen cocaine)." App 0079, paragraph 10.

The Government has yet to answer why the CI is the one telling Petitioner that Petitioner should help "sell" the CI stolen cocaine, if Petitioner was attempting to purchase drugs from the CI's sources.

### A. Legal Standard

The legal standard for ineffective assistance of Counsel are the same as in Petitioner's §2255 petition.

### B. Application of legal standards

Petitioner claims of ineffective assistance of Counsel are valid and meet the two prong standard of **Strickland v. Washington**,

466 U.S. 668, 694-95 (1984). The Government's response to
Petitioner's §2255 petition stated that "Petitioner's claim of
ineffective assistance of counsel are simply a catalogue of his
post hoc disagreement with the judgement and strategic decisions
of his lawyers at every stage of his case". The law is well settled
that "strategic choices made after thorough investigation of law
and facts relevant to plausible options are virtually unchallengable".
**Strickland**, 466 U.S. at 690.

In Petitioner's case, Counsel made blunder after blunder that
was not based on thorough investigation of the law and facts relevant
to plausible options in Petitioner's case.

1. Petitioner asserts that Counsel was ineffective when Counsel
failed to object to the Government's use of manipulated transcripts
against Petitioner. In this claim, Petitioner stated that,
"Petitioner could not have been found guilty for attempting the
purchase of cocaine from the informant's source if Counsel would
have objected to the editing and manipulation the Government made
to the 'final' transcript and _explained_ to the jury what it was that
they heard on the recording."

Counsel stood by and allowed the Government to pull one of
the oldest tricks in the books. It is well known that human beings
retain and understand better when they read something then when
they hear the same thing.

The two phases that Counsel allowed the Government to alter in
the final transcripts and failed to explain the true meaning was

22

the crux of Petitioner's defense. The Government could not allow
the Jury to understand that it was their own criminal informant
who was offering to "sell" his planned stolen cocaine, so they
altered the phrase from:

> "Cause I wanna do it like 'I' (CI) tell you,
> (Petitioner), ten grand ($10,000). 'I' (CI)
> gonna 'sell' you (Petitioner) each one (the
> CI's stolen cocaine) ten. You make ten, I
> make ten." App 0076, last line, 0077, para 1.

To read:

> "Cause I wanna do it like I tell you, you
> know, ten grand, I wanna tell you each one
> you sell, you make ten, I make ten". App 0094,
> lines 2-5.

The Government could not allow the Jury to understand that
it was their own criminal informant who said he would "rob" the guy
he set up by himself if he knew where the guy lived. Then he would
do his planned robbery to:

> "do like you (Petitioner) fuck us up. (rip off the
> guy the CI set up". App 0086, paragraph 9.

So the Government edited and altered the phrase to read:

> "yeah, but both of them are gonna do like, you, you
> know ... " App 0107, para 3.

The phrase "like you fuck us up" is completely missing.

Counsel did not object to the Government's manipulation of
the transcript and did not take the time to explain the true
meaning of what the informant was saying to Petitioner, because
Counsel "listened to the tapes and read the 'final' transcripts
and found the tapes and transcripts compatible", which they were
obviously not.

23

A simple verbal objection to the recording when they reached the point where the transcript was manipulated would have sufficed to show the Jury that what they were reading was not the same thing they were hearing. Counsel did nothing and allowed the Government not to have to account for their criminal informant's actions in creating a new crime.

Counsel's decision not to object to the Government's manipulation verbally or written was not a strategic choice made after thorough investigation of laws and facts relevant to plausible options, but because of another blunder made because Counsel failed to realize that the "final" transcripts and the tapes were not compatible. Counsel's performance fell below an objective standard of reasonableness laid out by **Strickland**, supra.

2. Petitioner asserted in Claim 2 that Counsel was ineffective where Counsel failed in her obligation to file motion-in-limine to quash indictment after discovery evidence in Counsel's possession showed that the prosecutors suburned perjury.

The Government stated that Petitioner appears to support this claim exclusively by presenting his own strained  interpretation of certain of the recorded conversations between him and the CI. There is absolutely nothing strained about the facts of the conversation on the recordings. It was the CI who said to Petitioner:

24

1. "Well like I say, I got the guy set up, I mentioned to him between seven and ten". App 0076, para 15.

2. "I don't know exactly his house, he is not gonna tell me exactly where it is, cause I could 'rob' him 'myself'... at Naragansett and Diversey in the parking lot, we can do that in the parking lot". App 0083, para 2.

3. "... I wanna do this guy ..." App 0085, last line, 0086, first line.

4. "Yeah, both of them are gonna do like you fuck us up", App 0086, para 9.

5. "It would be better, how we gonna split it, or what?" App 0076, last line.

6. "Cause 'I' wanna do it like 'I' tell you, ten grand, 'I' gonna 'sell' you each one ten. You make ten, I make ten, but I do not got much people to 'sell' it". App 0077, para 1.

7. "You help sell them". App 0079, para 10.

Even though these facts mentioned above help to support Petitioner's claim, Petitioner based his claim on the fact that during the CI's Grand Jury testimony which the CI read from a prosecutor's prepared statement, the Prosecutor questioned the CI:

Q.  "Allen, did you meet with me yesterday and gave me a statement regarding the circumstances surrounding the investigation of Donville James?"

A.  "Yes."

Q.  "And did you meet with me again today before we came in here?"

A.  "Yes."

Q.  "And did I give you a statement that reflected what you told me the day before?"

A.  "Yes."

Q.  "And did you read that statement carefully?"

A.  "Yes."

Q.  "And is everything in that statement true and
    correct and based on what you told me?"

A.  "Yes."

Q.  "Could you read the statement."

See Appendix 0060, 14-25, 0061, 1-5.

The informant then went on to read the prosecutor's prepared
statement before the Grand Jury as his testimony of the 'circumstances
surrounding the investigation' of Petitioner. See Appendix 0058 for
a copy of the prosecutor's prepared statement, and Exhibit 0061 –
0063 for the complete CI's Grand Jury testimony.

There was only one problem with what the informant told the
prosecutors the day before. The only thing the informant told the
prosecutor the day before was:

> "On several occasions, James (Petitioner) suggested
> that he could provide the source (informant) with
> counterfeit money that the source could use and
> rip off drugs from a dealer, then the source could
> sell the drugs for cash to pay off his debt (with
> the Mexican Mafia)." App 0143, para 2.

See Appendix 0136-0143 for the entire statement the informant
gave to the Prosecutors "regarding the circumstances surrounding
the investigation" of Petitioner. Nothing in the informant's
statement reflected what the prosecutors wrote in their prepared
statement.

Counsel had the informant's statement in her possession that
clearly contradicts the prosecutor's prepared statement. It is

unconsciable for Counsel not to have filed a motion-in-limine to quash the indictment based on this overwhelming piece of evidence showing that the prosecutors procured the CI and SSSA Daniel Dick to testify falsely before the Federal Grand Jury.

3. Counsel did not sumbit none of the evidence in Petitioner's 2255 Appendix. The Government continues to act as if the evidence in Petitioner's Appendix does not exist. The Government failed to refute any of this evidence that clearly contradicts their case against Petitioner, which created a controversy  as to the facts of the Government's version of the case.

Petitioner submits to the Court that the remaining claims of ineffective assistance of counsel are supported by the evidence in his 2255 Appendix and all claims met the standard laid out in **Strickland**, supra. It is clear from the evidence submitted in Petitioner's Appendix that the only thing in this matter that is specious is the Government's case against Petitioner. The Government would like the Court to believe that Petitioner's claims are too fantastic and the Government would not involve themselves in the kind of conduct Petitioner accused the Government of. Petitioner's evidence in his §2255 Appendix refuted the Government's case against Petitioner in it's entirety, which showed that the Government contrived Petitioner's conviction through a deliberate deception of the Grand Jury, Trial Jury, and the Court through knowingly suborning perjury, perjury, suppression of evidence, manipulation of evidence, and many constitutional violations of Petitioner's rights, to include entrapment.

27

## CONCLUSION

WHEREFORE Petitioner prays that this Honorable Court grant his 28 U.S.C. §2255 motion, or any relief the Court deems just and appropriate.

Respectfully Submitted,

By: _____

Donville James, pro-se

Date: ___May 9, 2008___

Donville James #14388-424
Federal Correctional Inst.
P.O. Box 5000, 2-B
Greenville, IL 62246

28

EXHIBIT "Z"

To:  Attorney T. Ruskusky, Ungraretti and Harris
     70 W. Madison Street, Suite 3500
     Chicago, IL 60602

Dear Sir,

     I received a notice from the United States Court of Appeals
on December 2nd, 2005 informing me that your office was appointed
to represent me in my appeal of the district Court's decision in my
case. I am not a lawyer and don't pretend to be one. However, I've
had four years to research my case and how I was convicted. First of
all, I feel like if I had a lawyer with my best interest at hand I
would not have been convicted. Since trial I've been trying to have
my new attorneys present my issues to the Court. They always start
by telling me my issues were substantive only later, with no
explanation refused to present them to the Court. My brief are due
on or before March 1, 2006. I will list a number of issues that I
think are the most important to me that must be included in my brief
for review. If you think any of the issues I raised are not
meritious and does not deserve review please provide me with a
detail explanation and with the authority that you relied on.

     My first issue is the audio recordings. I've submitted a 43
page long sworn Affidavit of Truth to the court with almost two
hundred pages of evidence in support of my claims. I've also
submitted Pro-Se Motion to have tape expert examine all audio and
video recording. I've also submitted Pro-Se motion for acquittal and
motion to amend motion for acquittal due to government violation of
defendant Substantial Rights, two motions dealing with the recorded
evidence the government disclosed and/or did not disclosed. When I

-1-

wrote these motions I did not have access to the trial transcript, however, every thing that I wrote are accurate. One important thing that happen at trial that I did not include in my motion is the testimony of Agent DePodesta. Part of his testimony dealing with the audio recorded conversation is that the conversations were recorded in the memory of the recording device, the contents were then transfer over to a compact disc and the original recordings were then erase from the memory of the recording device. When I first read this in the trial transcript I did some research on the issue. I found that the law strictly forbids what Agent DePodesta testified that he did in the collection and preservation of recorded evidence.

Chapter 119, Title 18, Section 2518 governs the procedure in which oral communication are intercepted and recorded. Under Title 18 U.S.C. 2518 "the contents of any wire, oral, or electronic communication must be recorded on tape, or wire, or comparable device. The recording shall be done in such a way as to protect against editing or other alterations. The <u>original recordings shall not be destroyed, and in any event shall be kept for ten years</u>."

Agent DePodesta's testimony before the court was a lie and was meant to denied me access to the original copies of the recorded conversations. This is so the Jury would believe the manipulated versions of the tape the government played for them.

Even if Agent Depodesta testimony was the truth, his action violate Title 18 U.S.C. 2518 and the use of the manipulated recordings by the government at trial denies me a right to a fair trial.

One more thing relating to the original recording especially

-2-

the March 25, 2002 recording of me being arrested. I've shown in my
Affidavit of Truth that the original recordings were inventoried in
to evidence by the Secret Service with specific serial number. There
were alot of contention at trial about the presence of a recorded
conversation the day I was arrested (March 25, 2002). The government
claimed that the agents "just forgot to turn the equipment on". Two
pieces of evidences in my Affidavit of Truth shows that the
informant was wearing a body wire on March 25, 2002, and that he
record a conversation between me and him. This conversation was 41
minutes in length,      was inventoried in evidence, witness and
supervised by two other agent. See my Affidavit of Truth Section X.

My second issue is the issue of entrapment. Trial Counsel
submitted a proffer to satisfied my burden of production for the
defense of entrapment. She misunderstood the judges ruling on the
proffer and abandoned the defense. This I will cover in my
ineffective assistence of counsel issue. Please see my Pro-Se
"motion to address the issue of entrapment." Even though my attorney
abandoned the entrapment defense and did not present my evidence,
the tesimony by Agent DePodesta at trial establish an entrapment
issue and the Judge should have issue a Jury instruction for
entrapment.

The informant never told the prosecutors in his interview that
I ever asked him to buy drugs from anyone. The prosecutor gave the
criminal informant a statement to read before the grand jury which
he never told them. I have a copy of Agent Sodetz report of the
informant interview with the prosecutors. My fourth issue is the
perjury statement made by the criminal informant before the grand

-3-

jury. This issue I address in my motion to address perjury statement
purusant to 18 U.S.C. 1623(a), which was a Pro-Se motion also. The
motion were supported by the evidence attached to my Affidavit of
Truth. The Judge did not hold a hearing as required by the Seven
Circuit and the Supreme Court to address the perjury statement. In
denying my motions the Judge relied on his personal opinions of the
U.S. Attorneys office stating that he doesn't think any of the
attorneys working in the U.S. Attorneys' office would support
perjury instead of relying on the facts and evidence I presented to
him in my Affidavit of Truth and my motion.

On a relating topic is my fifth issue and it is the prosecutor
suborning perjury. This issue I also addressed in a Pro-Se "motion
for acquittal due to prosecutorial suborning perjury." Again the
Judges ruling relied not on the facts that I presented to him but by
his personal opinions of the prosecutors office. I think in denying
my motions without a hearing to address each specific points of
perjury and suborning perjury amounts to an abuse of disgression and
warrant review by the Appellate Court.

The sixth issue I would like to have reveiw is the
ineffectiveness of trial counsel. I also filed a Pro-Se "motion for
new trial pursuant to Federal Rule of Criminal Procedure Rule 33
base on newly discovered evidence." Please pay particular attention
to part B of this motion. I have sent you as proof trial counsels
own motion "motion for new tiral and/or judgement of acquittal." In
this rough draft copy while discussing with me her understanding of
the Judges ruling, in her own hand writing, counsel wrote "Mr. James
was precluded from presenting his entrapment defense where the court

-4-

ruled...." See paragraph 2 of the rough draft motion. Counsel
originally wrote "The court erred in ruling that James had not made
a sufficient pretrial showing of entrapment to warrant the
presentation of jury instruction for the defense of entrapment.
Counsel in the fianl motion admonished the Court for stoping me from
presenting my entrapment defense when she wrote "Mr. James was
precluded from presenting his entrapment defense where the court
ruled that James had not made a sufficient pretrial showing of
entrapment to warrant the presentation of jury instruction for the
defense of entrapment."

As I pointed out in my pro-se Rule 33 motion part B the court
made no such ruling and the prosecutor in their response motion
wrote that counsel's "assertion is a misstatement of the Court's
ruling by trail counsel led her to abandoned the entrapment
defense. By doing so she refuse to call the criminal informant to
testified as she promised she would. She also stop calling witnesses
to testify on my behalf, and she did not follow up on questioning
Agent DePodesta when he gave testimony that I was indeed entrapped
not just in a drug crime but in criminal activities period.

I would like for the court's ruling in my suppression hearing
to be reviewed. Agent Mckenna testified that a promise was made to
me in returned for my hand written statement, yet the Judge ruled in
favor of the Government.

Those seven issues concluded the pre, and trial issues I would
like to have the Appellant Court review. Trial counsel in her post
trial motion for new trial and/or judgement of acquittal list
several issues that I think also amount to an abuse of discression.

-5-

I would like for the Appellate Court to also review them also.

I had execptional differences with my sentencing attorney. He refused to read or do any thing I gave to him or asked of him to do after I hired him. He submitted a motion objecting to the sentencing guideline calculations inwhich he correctly pointed out that "Count One did not allege a specific, nor did the jury, by its verdict find a specific amount (of drugs)". Yet he continued to asked for a level 32 for the base level calculation. This motion I attempt to withdraw when I tried to represent myself at sentencing. I submitted my own Pro-Se "motion for various relief based upon Blakely v. Washington." This motion pointed out that since count-one did not allege a specific amount of drugs, nor did the jury, by its verdict find a specific amount the base offense level should be a base level 12. I would like to have all the remedies that I was seeking in this motion to be reviewed by the Appellate Court.

I filed a Rule 35(a) motion challenging my sentence within the seven days required. The Judge did not rule on this motion. I did not received any notification on what ever decision the court made on this motion. I would like for this motion to be reviewed for abuse of decression also.

During one of my pretrial hearing at the end of the suppression hearing the judge asked the prosecutors what I was charged with. Ms. Hays, one of the prosecutors told the Judge I was charged with 841 and 846. No where in the indictment did the grand jury return an indictment for 841. 841(a) and 841(b) supposed to be the substantive crime I was to be charged with. In the prosecutor's charging instrument that were filed with the court they wrote in it that I

-6-

attempted to possess in excess of 5kg's of cocaine. It's my right to be charged with crimes based only on what the grand jury indicted me on. The grand jury did not return an indictment against me for violating 841(a) and 841(b). By simply writing in the charging instrument that I attempted to possess in excess of 5kg's of cocaine does not fulfill the grand jury requirement to indict me.

I submitted a Ex Parte Pro-Se motion challenging the court's jurisdiction in this case. I never heard from the court on this matter either. I would also like this motion to be reviewd by the Appellate Court.

Sincerely,

Donville James

EXHIBIT "Y"

To:  Attorney T. Ruskusky,
     70 W. Madison Street, Suite 3500,
     Chicago, Illinois 60602.


Dear sir,

Thanks for explaining the differences between direct appeal and habius appeal
in our phone conversation on February 9, 2006. I've been trying to get my story
told since I was arrested. You explained that Direct Appeal deals with the records
that went before the jury. In my case the audio recorded conversations are the
evidence, not the transcripts as clarified by the Seventh circuit.

In Count one of my indictment i was charged and convicted of 21 U.S.C. 846,
attemp to posses in excess of 5kg's of cocaine. First, the government used their
manipulated versions of the revorded conversation to show that I was predisposed to
purchase in excess of five kilograms of cocaine. The lawrequires however, for the
government to show that I was predosposed before I came in contact with their
criminal informant.

Second, 846 is a cocaine conspirecy statute and requires someone other than the
government informant. Listening to the tape recordings which are the evidence in the
case, you will find that there is no other person other than the fovernment informant.
I will fo through the evidence that went before the jury and show you not just that the
other person was only the criminal informant, but also how the record shows how I was
entrapped in a drug crime.  I went over this information in detail in my Affidavit
Of Thruth, and also in my sentencing memorandum with case laws.

From the record the informant was corporating with the Government because of a
State drug case from June of 2001. This state case (this is not in the record) were
dismissed by the Cook CountyCircuit Court in July of 2001. I should note here that in
did not meet the informant until July of 2001. On page 196 of the trial transcript
agent Depodesta testified that "I first met the criminal informant in November of 2001".

On page 196 and 213 agent Depodesta testified that "the criminal informant told me about the defendant about two weeks after we met." This showed that I was not the primary reason for the informant going to the F.B.I. Then on page 204 agent Depodesta testified that "based on what the criminal informant told me, the F.B.I started investigating the defendant."

On February 8, 2002 with no evidence that I was involved in any illegal drug activities the primary handler for the criminal informant, F.B.I. agent Sodetz contacted the Secret Service and turned the investigation over to them. The secret sevice were charged to investigate me for matters dealing only with couterfeiting. F.B.I agent Depodesta who was the informant secondary handler testified on page 109 of the trial transcript that "the first time I participate in any law enforcement activities involving the defendant was on March 21, 2002. "This is a month and a half since the F.B.I turned the case over to the Secret Service. On page 221 of the trial transcript agent Depodesta testified that he "advised the criminal informant to contact Mr. James." This would be on or after March 21, 2002 since that date was the first time agent Depodesta participated in any law enforcement activities involving me. Agent Depodesta continued to testified on page 220 of the trial transcript that "after the criminal informant had gone to Ms. James and tried to contacted him on numerous occsions, Mr. James would not corporate with him..." Through a question and answer on page 248 of the trial transcript agent Depodesta testified that he then instructed the criminal informant to "engage" me "in drug communications." Again this had to be on or after March 21, 2002 for the same reason mentioned before.

The drug communication agent Depodesta instructed the criminal informant to engage me in was captured on the March 21, 2002 body wire recording the government played for the jury. Even though the version of the recording that were played for the jury were manipulated and tampered with, it still captured the instruction that were given to the ciminal informant to engage me in drug communications by agent Depodesta. The

first thing the criminal informant said to me was on the March 21, 2002 audio recording
was that " well lik K say, I got the guy setup. " This is on page five of the draft
transcript. Speaking of the guy the informant said he had "setup" he said to me on
the tape and on page 12 of the draft transcript "don't know exactly his house, he's
not gonna tell me exactly where it is, cause I could ROB him myself." The informant
continued to say "at the corner of Marragansett and Diversey in the parking lot, we
can do that (rob the guy he set up) in the parking lot." On page 15 of the draft
transcript the informant said "I want to do this (rob the same guy he setup) guy too.
Right here the informant told me that he want to rob some guy he setup in the parking
lot at Marragansett and Deversey, and what was to be my role? On page 15 of the draft
transcript the informant told me " yeah, both of them (speaking of his planned robberies)
ARE GONNA DO LIKE YOU KNOW, YOU FUCK US UP (like I was the one who were responsible for
buying the cocaine wuth counterfeit money)." The "US"the informant mention included
himself and the guy he setup to rob in the parking lot. I should also not that the
goverment completely edited out this phrase from the version of the transcipt they
provided to the jury.

  I was charged and convicted of attempting to purchase cocaine from some misterious
person for $300,000 in counterfeit money. This manipulated tape evidence showed other-
wise. I am keeping in mind that the tapes ate the evidence and not the transripts,
because even though the tapes where the informant was talking were clear and unambi-
guous the prosecutors altered the transcript that they presented to the jury. I'm
using the draft transcripts to tell you exactly whats on the tapes.

  The cocaine that the informant wanted me to help him rob in the parking lot at
Narregansett and Diversey is the same cocaine I was charged and convicted of attempting
to purchase fron some misteruos source. Speaking of the cocaine the informant wanted
me to help him rob he said to me on the MArch 21, 2002 tape recorded conversation, "It
would be better, how we gonna split it or what? cause I wanna do it like I tell you,
ten grand, I 'm gonna sell you each one ten. You make ten, I make ten." See page 5 and

6 of the transcript.On page 8 the informant said to me "alright man, you help sell them." Over on page 11 he said tome "I wanna make the money and het the fuck out of town."

As you can see from the evidence there was no other person involved in this case but me and the informant.  It was the informant who was offering to sell the drugs he was planning to "rob" from his own friend that he setup in the parking lot.  Which was all a hoax created by agent Depodesta and was meant to lure me into a drug crime, for which I was not being investigated for and that they did not have probable cause to investigate.  When their plan to to lure me in this drug crime failed, they got me to the parking lot, have the informant tossed a bag in my car that contain 5kg's of artificial cocaine then ran away.  They then crash, my car.  Had me arrested at gun point.  Said they did not video tape the scean, even though they had two video recorder going.  Said they forgot to turn the audio recorder on, even though they inventoried the CD containing the conversation which was 41 minutes in length. They then had their informant lied before the grand jury. Testifing that I came to the parking lot at Narregansett and Diversey to purchase 15kg's of cocaine for $300,000in counterfeit money from some misteriois source.

Mr. Ruskusky, you told me that you think the trial records are fearly complete. I said alot of incriminating things on those tapes.  Heard in the context that they played sounds very incriminating.  Thats the reason why the government altered and manipulated all the recording and refused to disclose the March 25, 2002 informant body wired conversation. The day I was arrested I did not give the informant the coun-terfeit money.  When it was obvious to agent Depodesta that I was not going to help the informant with his plan to rob cocaine from the informants own friends he had the informant toss the artificial cocaine in my car.  He then had me arrested not by the F.B.I but by the Secret Service.  Agent Depodesta then set out to make a drug case agaist me in the prosecutors office.  When I was arrested on March 25, 2002 I would've

gotten my degree in electrical engineering from the Univesity of Illinois at Chicago in just another two more months. I was never a grud dealer. I met the criminal informant in July of 2001. We never engage in any drug dealings. The information that he told to the F.B.I that we did drug transactions from the summer of 2000 to to summer of 2001 is a lie and this can easily be shown to be a lie by just looking at our phone records. I agreed tohelp the informantybecause I thought that his life and members of his families life were in danger. When it became clear to me that he wantd to profit from the situation and suggested that I should also profit I told him I would not help him in no friendly terms. This is the reason why the government does't want or I should say cannot give me the informant body wire recording of the day I was arrested. Again I should mention that the Secret Service certified inventory record showed that the conversation between the criminal informant and myself on March 25, 2002 was 41 minutes in length.

Since appealing my sentencing is apart of the direct appeal process, and I submitted my affidavit of truth as mitigating evidence to show why I should not get the maximum sentence, these mitigating evidences are permitted by the sentencing guid lines and the judge should have taken them in consideration before imposing sentence. These mitigating evidences are the core to my case especially my entrapment issue.

I am begging you sir to please use the testimony of agent Depodesta to show that it was the government agent who instructed the informant to "engage" me "in drug communication." And please use the manipulated taped conversation that the government played for the jury to show that the drug communication the agent instructed the informant to engage me in was for the informant to setup a hoax plan to rob cocaine from his own source and for the the informant to lure me into his plan to help with his planned robbery by making the robbery look like I was the one that "fuck" then "up." This is the truth of what happened and it is the only chance I have to go home to my two kids. Thank you very much.

Sincerely,

Donville James.

**EXHIBIT "X"**

UNITED STATES COURT OF APPEALS

for the Seventh Circuit
Chicago, Illinois 60604


United States of America,
          Plaintiff-Appellee,


                    vs.                         No. 05-3070


Donville James,
          Appellant.


## MOTION FOR AUTOMATIC RECONSIDERATION FOR APPELLANT MOTION TO PROCEED "PRO-SE" PURSUANT TO THE SEVENTH CIRCUIT OPERATING PROCEDURE SECTION 1(c)(5)

Appellant Donville James, by himself, Pro-Se, pursuant to the provisions of Seventh Circuit Operating Procedure Section 1(C)(5), moves this Court to reconsider Appellant Pro-Se motion to proceed Pro-Se. In support thereof the following is offered:


Counsel noted in his "Response to Defendant Appellant's Motion to proceed Pro-Se" filed on June 30, 2006 that he reiterated the legal and procedural reasons that Appellant's additional arguments were not included in the Opening Brief, and explained that Appellants' arguments were not left out of the Opening Brief because they contradicted the issues that were raised in Appellant's Opening Brief, but for other reasons (including Local Rule 51 and Section 2255 issues).


-1-

Appellant disagreed with Counsel's advice and informed Counsel that he wanted his issues raised before the Appellate Court. Counsel informed Appellant that he would not raise the issues but would facilitate the filing of the brief prepared by Appellant if ordered to do so.

At the conclusion of trial, counsel who represented Appellant during the trial proceedings submitted a "Motion for new trial and/or Judgement of Acquittal (Appellants present counsel is not the same attorney who represented Appellant during the trial proceedings). In the "Motion for a new trial and/or Judgement of acquittal trial counsel raised six issues where she felt that the District Court erred. See Motion attached. In a letter to counsel from Appellant, Appellant specifically asked counsel to include these issues along with a few others in his main brief. Appellant strongly believes these six issues should be at least the very minimum included in his appeal.

Also, in a second letter following a phone conversation on February 9, 2006 between Appellant and counsel, Appellant detailed the evidence on the record and "begged" counsel to use the evidence in the case, and on the record to support Appellant issues that were preserved for appeal. These issues are not frivilous and are not 2255 issues. They are issues for the Appellate Court to review. Both letters from Appellant to counsel are attached.

Counsel has already mentioned to Appellant that he would not raise Appellants' issues. As is evident by the brief counsel has already submitted. Appellant has prepared a brief with the issues that he would like this Court to review. The statements of issues

-2-

presented, copied from Appellant's Pro-Se Brief are attached. The first two issues are two issues that counsel raised in his opening brief. These two issues were incorporated in Appellants Pro-Se Brief because these are the only two issues Appellant and Counsel agreed on.

Counsel and Appellant differ significantly as to the sentencing entrapment and the base level Appellant should have been sentenced at. Counsel's position contradicts Appellant's Pro-Se Motion for Various Reflief based upon Blakely v. Washington and Appellant's Pro-Se Sentencing Memorandum that were submitted in the District Court.

During the June 30, 2006 phone call between Appellant and Counsel, Appellant agreed to have Counsel continue as his appointed counsel for the issues raised in the Opening Brief on the assumption that Appellant would be able to suppliment the brief prepared by Counsel. Counsel has informed this Court in his motion filed on June 30, 2006 that "Notwithstanding these conversations and Counsel's advice, Mr. James (Appellant) informed Counsel this morning that he wants to present additional arguments that were not raised in his Opening Brief, and that he has prepared a brief that contains these additional arguments."

Since Appellants' issues are not frivolous and are not 2255 issues, and counsel refused to raise these critical issues before this Court for review, Appellant respectfully requests counsel be granted leave to withdraw pursuant to Local Rule 51(b).

WHEREFORE, Appellant Donville James, pro-se, moves this Honorable Court to reconsider Appellant Pro-Se "Motion to Proceed

Pro-Se" in his appeal to this Court, pursuant to the provisions of

the Seventh Circuit Operating Procedure Section 1(c)(5).


Respectfully Submitted,

Donville James, Appellant


31-7-06
Date


Donville James
#14388-424
FCI Greenville
P.O. Box 5000, H-2B
Greenville, Illinois 62246

EXHIBIT "W"

Donville James                                Re:   Case No.   05-3070
c/o FCI GREENVILLE
POB 5000
Greenville IL 62246-5000


State of Illinois      )
                       ) ss:
County of Bond         )


### Affidavit of Reply to Attorney John T Ruskusky

### "Motion Regarding Filing of Reply Brief."

Court:          UNITED STATES COURT OF APPEALS
                219 S Dearborn St
                Chicago, Illinois 60604

Judge:          HONORABLE Michael S. Kanne, Circuit Judge

Lawyer:         John T. Ruskusky

Prosecutor:     Valeri Hays


   I, Donville James, hereinafter Affiant and the Undersigned hereby solemnly swear,
declare, and deposes the following:

1.    Affiant attest that, I am competent to state the matters set forth herein;
      That I Have personal knowledge of the facts herein, and that all of the facts
      stated herein are true, correct, and certain, and admissible as evidence, and
      if called upon as a witness, I will testify to the veracity.

2.    Affiant attest that, on August 31, 2006 Mr. Ruskusky caused to be filed a "Motion
      Regarding Filing of Reply Brief." In support of this motion, Mr. Ruskusky
      attached as Exhibit A His Affidavit.

3.    Affiant attest that, Mr. Ruskusky wrote in his motion at paragraph [3], and in
      his supporting affidavit at paragraph [4] that Affiant (Mr. James) has not taken
      issue with the arguments Mr. Ruskusky raised in the Opening Brief.

Page 1

4.   Affiant attest that, Mr. Ruskusky's assertion simply is not true.

5.   Affiant attest that, In the Opening Brief submitted, Mr Ruskusky, on behalf of
     Mr. James, Mr. Ruskusky wrote:

          "James stated that he wanted to present the argument
          Of Guidelines calculations himself - Sent. Tr. 54
          The Court allowed him to do so, but also allowed Mr.
          James' counsel to provide his own, contradictory
          Guidelines Calculations. See pg 10 Opening Brief. "

6.   Affiant attest that, Mr. Ruskusky is now submitting the same contradictory
     argument for review that was argued at sentencing by Affiant 'standby'
     counsel at sentencing.

7.   Affiant attest that, at the sentencing hearing, Affiant submitted a pro se
     motion "Defendant's Motion for Various Relief Based upon Blakely v. Washington."

8.   Affiant attest that, he argued in his pro se motion that a factual finding of
     the amount Of drugs reasonably foreseeable to him were not made by the Jury.

9.   Affiant attest that, he should be sentenced at  a base level 12; that is the
     level that would apply when there is no legal determination of the factual
     issue of How much drugs applied to him. Sent. Tr. 54, 64, 77-78.

10.  Affiant attest that, counsel pointed out at sentencing that there was no jury
     finding as to 15 kilograms (nor to any specific amount) that the Indictment
     and jury instructions only alleged five kilograms, and therefore 32 was the
     proper base number. Sent. tr. 56-57.

11.  Affiant attest that, a level 32 is the base level Mr. Ruskusky is arguing for in
     Mr. james appeal. See page 23 Opening brief.

12.  Affiant attest that, to support this argument, Mr. Ruskusky incorrectly wrote:

          "The government also, submitted an agreed to jury
          instructions that were limited to on attempt to
          possess five kilograms Of cocaine." See pg 23 Opening Brief.

13.  Affiant attest that, the jury instruction was that the:

          "Defendant is charged with attempting to possess
          with intent to distribute over 5 kilograms of
          powder cocaine," see Record on Appeal 65.

14.  Affiant attest that, no limit On the amount of drugs that were involved in
     Affiant's case was agreed to and the government Offered no evidence that
     Affiant attempted to possess five nor fifteen kilograms of cocaine.

---

15. Affiant attest that, in fact, If Mr. Ruskusky would only bring to light the contents of the government's own recorded evidence played at trial it would show that it was impossible for Affiant to be guilty of attempting to possess any amount of drugs in violation of Title 18 U.S.C. § 846

16. Affiant aatest that, to be guilty of violating 18 U.S.C. § 846, attempt or conspiracy, the co-conspirator must be some one other than a confidential informant, in accord with <u>U S  v.  Duff</u>,76 F 3d 122, 125 (7th Cir. 1996) a the circuit rule and law.

17. Affiant attest that, the contents of the government's own recorded evidence, the March 21, 2002 recording showed that there was no other person(s) involved inthe case but the criminal informant.

18. Affiant attest that, this is the same piece of evidence also showed that Affiant did not try to purchase any amount of drugs from the criminal informant source nor from any other person.

19. Affiant attest that, starting at 15:46:22 (fifteen minutes, forty six second, and twenty two hundreth of a second) Counter Mark on the March 21, 2002 government recorded tape.(The criminal informant said to affiant:)

    "It would be better, how we gonna split it or what?"

20. Affiant attest that, the "It" the informant wanted to split with Affiant is the seven to ten kilograms of cocaine the informant also mentioned later on in this same recording that he (the informant), wanted to "rob" from a guy that he set up to rob in the parking lot at the Narragansett and Divorsey in Chicago.

21. Affiant attest that he (the informant) would arrange his planned robbery to appear to the guy who was to get 'robbed' that it was Affiant who:

    "Fuck us (the informant and the guy he set up to rob) up."

22. Affiant attest that, at about 15:49 Counter Mark, the informant continued to say to Affiant:

    "Cause I wanna do it like I tell you, ten grand ($10,000),"
    "I gonna **sell** you Aone (the cocaine that was to come from the informant planned Robbery) ten ($10,000)."

    "You make ten, I make ten but I do not got that much people to sell it (the stolen cocaine). you know.

23. Affiant attest that, here on the government's own tape that was played at trial as the 'negotiation' for Affiant to purchase drugs from some mysterious source, It was the Government informant who was offering to do the selling of cocaine Affiant never did request to purchase in the first place.

---

Affidavit of Reply to Attorney John T Ruskusky            Donville James, Affiant
Page 3

24. Affiant attest that, the criminal informant clearly stated in the March 21, 2002 that if he knew where the guy lived he could 'rob' the guy himself.

25. Affiant attest that, the guy who the informant set up to 'rob' mentioned to him that he could go to the parking lot at Narragansett and Deversy."

26. Affiant attest that, informant stated that he and Affiant "could do that (rob the guy) in the parking lot;" by giving the guy counterfeit money for his cocaine.

27. Affiant attest that, informant stated that he (informant) would arrange the planned robbery to:

    "Do like you (Affiant) fuck us (the informant and the guy) up."

28. Affiant attest that, this is the same cocaine the informant told Affiant on the March 21, 2002 recording:

    "You help sell them."

29. Affiant attest that, and as  mentioned inparagraph 19-23 is the same cocaine the informant said to Affiant:

    "It would be better,how we gonna split it or what?"

    "Cause I wanna do it like I tell you, Ten Grand, I gonna sell
        you each one (cocaine) ten."

    "You make ten, I make ten but I do not got that much people
        to sell it, you know."

30. Affiant attest that, Affiant has strong issues with what Mr. Ruskusky has submitted for appeal on behalf of Affiant in the Opening Brief.

31. Affiant attest that, Mr. Ruskusky requested a sentencing of a base level 32 is in strong conflict in what the true evidence suggested and conflict with Affiant request for a base level "12".

32. Affiant attest that, Mr. Ruskusky has ignored the sufficiency of the evidence test to uphold a conviction.

33. Affiant attest that, Mr. Ruskusky has ignored Affiant's "Entrapment Argument."

34. Affiant attest that, Agent McKenna testified that Affiant told them that he possessed a gun only for his personal protection. Tr. transcript 278

Affidavit of Reply to Attorney John T Ruskusky          Donville James, Affiant
Page 4

35. Affiant attest that, Mr. Ruskusky has ignored this testimony and allowed the government not to have to prove the "In Relation to" prong of 924(c) as out lined in Smith v. U.S. , 508 U.S. _____ (1993).

36. Stating, thus to sustain a conviction under the "use" prong of ß 924(c)(1), the government must show that the defendant actively employed the firearm "during" and "in relation to" the predicate crime.

37. and Affiant attest that, "it does not include mere placement of a firearm for protection at or near the site of a drug crime..."

38. Affiant attest that, by ignoring those issues, Mr. Ruskusky is helping the government case against Affiant, and is helping the government to bury Affiant deeper in a non-existent conspiracy and in complete conflict of interest principles.

39. Affiant attest that, he has a statutory right under 28 U S C § 1654 to represent himself in any court in our Union.

40. Affiant attest that, Mr. Ruskusky is being a partner to the government in digging the grave for Affiant and not the adversary to the government as required by the legal standards of American jurisprudence.

41. Affiant attest that, he again demands that Mr. Ruskusky files a Anders Brief and wit||draw from Affiant's case as counsel on appeal.

**42.** And that the Appellate court grant Affiant his due Right Under 28 U S C 1654 to represent himself in his appeal and hear the issues Affiant raised in his pro se brief.

Further Affiant Says not.

Executed on this ___6th___ day of September, 2006.

Without Prejudice

9/6/06

Donville James, Affiant

SWORN AND SUBSCRIBED to before me this ___6th___ Day of September, 2006 in the State of Illinois at Bond County. My Commission expires ___9-12-07___.

Notary Public

OFFICIAL SEAL
MARILYN A. WARREN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES SEPT. 12, 2007

Affidavit of Reply to Attorney JohnT Ruskusky          Donville James, Affiant
Page 6 of 6 End

EXHIBIT "V"

U.S.C.A. – 7th Circuit
R E C E I V E D

JUN 3 0 2006 AJB

GINO J. AGNELLO
CLERK

In the
UNITED STATES COURT OF APPEALS
For the Seventh Circuit

No. 05-3070

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Appeal from the United |
| | ) | States District Court for |
| Plaintiff-Appellee, | ) | the Northern District of |
| | ) | Illinois. |
| vs. | ) | |
| | ) | No. 02-CR-000278 |
| DONVILLE JAMES, | ) | |
| Defendant-Appellant. | ) | Wayne R Andersen, Judge. |

## RESPONSE TO DEFENDANT-APPELLANT'S MOTION TO PROCEED PRO SE

In compliance with the Court's Order dated June 14, 2006, appointed counsel for Defendant-Appellant Donville James states as follows:

1.      John T. Ruskusky was appointed as counsel ("Counsel") under the Criminal Justice Act to represent Mr. James for his direct appeal of his trial disposition.

2.      Counsel spoke to Mr. James several times prior to the filing of his Brief on May 31, 2006 (the "Opening Brief"). Subject to and without waiving the attorney-client privilege, Counsel generally states that Mr. James' reference to our telephone conferences in the Motion to Proceed Pro Se (the "Motion") is incorrect and/or mistaken.

3.      In a June 30, 2006 legal phone call, and during collect calls from Mr. James on June 26 and June 27, 2006, Counsel spoke to Mr. James concerning his Motion and the additional arguments that he wanted to raise. Counsel reiterated the legal and procedural reasons that Mr. James' additional arguments were not included in the Opening Brief, and explained that Mr. James' arguments were not left out of the Opening Brief because they contradicted the issues

that were raised in Mr. James' Opening Brief, but for other reasons (including Local Rule 51 and section 2255 issues).

4. Notwithstanding these conversations and Counsel's advice, Mr. James informed Counsel this morning that he wants to present additional arguments that were not raised in his Opening Brief, and that he has prepared a brief that contains these additional arguments.

5. Counsel has not received a copy of the brief prepared by Mr. James containing his additional arguments. If asked to do so by this Court, Counsel will facilitate the filing of the brief prepared by Mr. James.

6. If the Court orders that Counsel facilitate the filing of the brief prepared by Mr. James, or other equivalent alternative relief, Counsel respectfully seeks leave to do so without seeking leave to withdraw pursuant to Local Rule 51(b). During this morning's phone call, Counsel informed Mr. James that he remains willing to continue as Mr. James' appointed counsel for the issues raised in Mr. James' Opening Brief, which was agreeable to Mr. James.

**WHEREFORE**, counsel for Defendant-Appellant Donville James submits this Response to Mr. James' Motion to Proceed Pro Se, and requests that the Court offer any further and just relief as this Court deems appropriate.

Dated: June 30, 2006

Respectfully submitted,

John T. Ruskusky, Attorney for
Defendant-Appellant Donville James

Dean J. Polales
John T. Ruskusky
UNGARETTI & HARRIS
3500 Three First National Plaza
Chicago, Illinois 60602
(312) 977-4400
Firm I.D. 34355

749978-1

## CERTIFICATE OF SERVICE

The undersigned, an attorney, states that he caused the foregoing **Response to**

**Defendant-Appellant's Motion to Proceed Pro Se** by serving a copy of same to:

Ms. Valarie Hays                                  Greenville Correctional Center
Assistant United States Attorney         Attn: Mr. Donville James (#14388-424)
Office of the United States Attorney     P.O. Box 5000
Northern District of Illinois                   Greenville, IL 62246
219 S. Dearborn, 5th Floor
Chicago, IL 60604

by depositing same in the U.S. Mail at 3500 Three First National Plaza, Chicago, Illinois by 5:00

p.m. on June 30, 2006, in a sealed envelope with proper postage pre-paid.

_____
John T. Kuskusky


UNGARETTI & HARRIS LLP
3500 Three First National Plaza
Chicago, Illinois 60602
(312) 977-4400
Firm I.D. 34355

U.S.C.A. – 7th Circuit
RECEIVED

OCT 0 4 2006   SK

GINO J. AGNELLO
CLERK

In the
UNITED STATES COURT OF APPEALS
For the Seventh Circuit

No. 05-3070

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Appeal from the United |
| | ) | States District Court for |
| Plaintiff-Appellee, | ) | the Northern District of |
| | ) | Illinois. |
| vs. | ) | |
| | ) | No. 02-CR-000278 |
| DONVILLE JAMES, | ) | |
| Defendant-Appellant. | ) | Wayne R Andersen, Judge. |

## MOTION REGARDING FILING OF REPLY BRIEF

Counsel for Defendant-Appellant Donville James ("James") hereby moves this Court for an Order either: (a) directing counsel to file the completed Reply Brief for Mr. James; or (b) granting counsel leave not to file the Reply Brief that he has prepared. In support of this Motion, counsel attaches as Exhibit A his Affidavit, and states as follows:

1.    Defendant-Appellant is represented by counsel John T. Ruskusky of the law firm of Ungaretti & Harris, who has been appointed as counsel under the Criminal Justice Act ("Counsel").

2.    Mr. James' Opening Brief was filed on May 31, 2006.

3.    After the filing of the Opening Brief, Defendant-Appellant filed two motions seeking to file supplemental briefs *pro se* in this matter.

4.    On July 25, 2006 and August 16, 2006, this Court denied Mr. James' motions to file supplemental briefs *pro se*.

5.    Mr. James' reply brief was due on August 31, 2006. Prior to August 31, Counsel completed a 20-page Reply Brief on behalf of Mr. James. As required, the Reply Brief is limited to issues that were raised in Mr. James' Opening Brief or in the Government's Brief.

6.    On August 31, 2006, counsel spoke to Mr. James. Mr. James again insisted that counsel raise certain issues that are identified in his *pro se* motions. Counsel informed Mr. James that these issues would not be included in the Reply Brief. In response, Mr. James instructed counsel not to file a Reply Brief so that he could continue to seek to raise these issues *pro se*.

7.    On August 31, counsel filed a Motion Regarding Filing of Reply Brief. This Motion has not been ruled upon.

8.    Subsequently, on September 1, this Court denied an additional motion filed by Mr. James to proceed *pro se*.

9.    On or about September 11, 2006, Mr. James submitted a pleading that demanded that Counsel: (a) withdraw as counsel for Mr. James on appeal; and (b) file an Anders brief on behalf of Mr. James. On September 22, 2006, this Court denied Mr. James' September 11, 2006 pleading.

10.    On October 2, 2006, Counsel spoke with Pro Se Clerk #1 with the Seventh Circuit. Pro Se Clerk #1 confirmed that due to the Court's denials of Mr. James' motions, that Counsel's appointment as Mr. James' counsel remained in place, and that Counsel was expected to present oral argument on behalf of Mr. James on the scheduled date of October 16, 2006 at 9:30 a.m.

11.    Prior to oral argument, Counsel seeks clarification on the filing of the Reply Brief that Counsel has prepared on behalf of Mr. James.  Counsel believes the Reply Brief contains arguments and information that would assist the Court in its resolution of Mr. James' appeal.

**WHEREFORE**, Counsel respectfully requests that this Court enter an order either: (a) directing Counsel to file and serve the completed Reply Brief on behalf of Mr. James; or (b) granting Counsel leave not to file the Reply Brief that he has prepared.

Dated:  October 4, 2006

Respectfully submitted,

Attorney for Defendant-Appellant
Donville James

Dean J. Polales
John T. Ruskusky
UNGARETTI & HARRIS
3500 Three First National Plaza
Chicago, Illinois 60602
(312) 977-4400
Firm I.D. 34355

763761-1

7.     On August 31, 2006, I spoke to Mr. James. Mr. James insisted that the reply brief raise certain issues that are identified in his *pro se* motions. I informed Mr. James that these issues would not be included in the Reply Brief. In response, Mr. James instructed me not to file a Reply Brief so that he could continue to seek to raise these issues *pro se*.

8.     On August 31, I filed a Motion Regarding Filing of Reply Brief. This Motion has not been ruled upon.

9.     Subsequently, on September 1, this Court denied an additional motion filed by Mr. James to proceed *pro se*.

10.    On or about September 11, 2006, Mr. James submitted a pleading that demanded that I: (a) withdraw as his counsel; and (b) file an Anders brief on his behalf. On September 22, 2006, this Court denied Mr. James' September 11, 2006 pleading.

11.    On October 2, 2006, I spoke with Pro Se Clerk #1 with the Seventh Circuit. Pro Se Clerk #1 confirmed that due to the Court's denials of Mr. James' motions, that my appointment as Mr. James' counsel remained in place, and that I was expected to present oral argument on behalf of Mr. James on the scheduled date of October 16, 2006 at 9:30 a.m.

FURTHER AFFIANT SAYETH NOT.

_____
John T. Ruskusky

SUBSCRIBED and SWORN to
before me this 4th day of
October, 2006

_____
Notary Public

OFFICIAL SEAL
MARLA K WALSH
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:12/06/08

764055-1

In the
UNITED STATES COURT OF APPEALS
For the Seventh Circuit

No. 05-3070

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Appeal from the United States District Court for the Northern District of Illinois. |
| Plaintiff-Appellee, | ) ) ) | |
| vs. | ) ) | No. 02-CR-000278 |
| DONVILLE JAMES, | ) | |
| Defendant-Appellant. | ) | Wayne R Andersen, Judge. |

## NOTICE OF MOTION AND FILING

To:   Ms. Valarie Hays                        Greenville Correctional Center
Assistant United States Attorney          Attn: Mr. Donville James (#14388-424)
Office of the United States Attorney      P.O. Box 5000
Northern District of Illinois             Greenville, IL 62246
219 S. Dearborn, 5th Floor
Chicago, IL 60604

**PLEASE TAKE NOTICE** that on the 4th day of October 2006, we caused to be filed

with the Clerk of the United States Court of Appeals for the Seventh Circuit, the **MOTION**

**REGARDING FILING OF REPLY BRIEF**, a copy of which is attached hereto.

Dated: October 4, 2006

_____
Dean J. Polales
John T. Ruskusky
UNGARETTI & HARRIS LLP
3500 Three First National Plaza
Chicago, Illinois 60602
(312) 977-4400
Firm I.D. 34355

## CERTIFICATE OF SERVICE

The undersigned, an attorney, states that he caused the foregoing **MOTION**

**REGARDING FILING OF REPLY BRIEF** by serving a copy of same to:

### By Hand-Delivery

Ms. Valarie Hays
Assistant United States Attorney
Office of the United States Attorney
Northern District of Illinois
219 S. Dearborn, 5th Floor
Chicago, IL 60604

### By Regular Mail

Greenville Correctional Center
Attn: Mr. Donville James (#14388-424)
P.O. Box 5000
Greenville, IL 62246

by the means specified above on October 4, 2006.

John T. Ruskusky

731953-1

**EXHIBIT "U"**

3.   James timely filed his Notice of Appeal on July 14th, 2005.
ROA 137

**D.   APPEAL IS FROM FINAL JUDGMENT**

### STATEMENT OF ISSUES PRESENTED

1.   Whether the District Court erred when it allowed the
government to withhold inspection of material evidence (a recording
device) that it used to make incomplete recordings with James that
it introduced into evidence during it's case-in-chief in
contravention of the requirements of Federal Rules of Criminal
Procedure 16(a)(1)(D)(i)?

2.   Whether the District Court erred when it allowed a
government agent to testify regarding hearsay statements by a
confidential informant who did not testify at trial to the effect
that James participated in "uncharged drug trafficking" on the
ground(s) that:

        a.   Such testimony was inadmissible hearsay.

        b.   The delarant (the criminal informant) was not
           subjected to cross-examination.

        c.   The testimony was used by the government as
           improper propensity evidence and in an
           unfairly prejudicial manner?

3.   Whether Mr. James's case should be remanded for dismissal
of Count I due to insufficiency of the evidence to prove him guilty
beyond a reasonable doubt for attempting to possess cocaine with the
intent to distribute it?

4.   Whether Mr. James's case should be remanded for dismissal
of Count II because the government failed to prove the "in relation

-2-

to" requirement of 924(c)?

5. Whether Mr. James case should be remanded for dismissal of Count III because the government failed to prove all of the elements where it failed to prove that Mr. James intended to defraud anyone?

6. Whether the District Court erred in denying Mr. James his pro-se "motion to address the issue of Entrapment", where Mr. James brought the facts to the Court's attention that he was entrapped in a drug crime by the criminal informant and agent Depodesta of the FBI?

7. Whether the District Court erred in denying Mr. James his pro-se "motion to address perjured statements pursuant to 18 U.S.C. 1263(a), where "the trial judge failed to make an independent finding establishing perjury"?

8. Whether the District Court erred in denying Mr. James his pro-se "motion for acquittal due to prosecutor suborning perjury"?

9. Whether the District Court erred in denying Mr. James his pro-se "motion for acquittal due to government violation of defendant's substantial rights"?

10. Whether Mr. James' case should be remanded for dismissal of the Indictment due to the government's violation of Mr. James's Due Process Right to a fair trial, where the government admitted to destroying exculpatory materials, in violation of 18 U.S.C. 2518, and 18 U.S.C. 2517 (1) and (2)?

11. Whether the District Court erred at sentencing in denying Mr. James' pro-se motion, "Defendant's motion for various relief based upon Blakely v. Washington, where the Court made improper

-3-

factual finding contrary to United States v. Booker?

12. Whether the District Court erred in denying Mr. James'
pro-se "Sentencing Memorandum" when it:

     a.    Failed to consider the legal impossibility and
           legal incapability of Mr. James's case.

     b.    Failed to depart downward due to sentencing
           entrapment?

EXHIBIT "Pro-Se Brief"

No. 05-3070

---

UNITED STATES OF AMERICA,

Plaintiff- Appelle,

v.

DONVILLE JAMES,

Defendant- Appllant.

---

Appeal from the United States District Court
For the Northern District of Illinois
No. 02 CR 278
The Honorable Wayne R. Andersen Presiding

OPENING BRIEF OF DEFENDANT - APPELLANT DONVILLE JAMES

---

BRIEF FILE BY APPELLANT, DONVILLE JAMES, PRO-SE

Donville James
#14388-424
FCI Greenville
P.O. Box 5000, H-2B
Greenville, Illinois 62246

ORAL ARGUMENT REQUESTED

UNITED STATES COURT OF APPEALS
For The Seventh Circuit
Chicago Illinois 60606

UNITED STATES OF AMERICA      )
                                )
           v.              )       No. 05-3070
                                )
DONVILLE JAMES             )

### NOTICE OF FILING

TO: Valarie Hays
       Assistant U.S. Attorney
       219 South Dearborn Street
       Chicago, Illinois 60604

     **PLEASE TAKE NOTICE** that on the_____day of the_____month of
2006, I filed with the Clerk of the United States Courts of Appeals,
219 South Dearborn, Chicago, IL the following:_____
                 **OPENING BRIEF OF DEFENDANT-APPELLANT**_____
and service which is been made upon you.

                           Respectfully Submitted,

                   By:_____Date_____
                     Appellant, Donville James, pro-se

### CERTIFICATE OF SERVICE

     I, Donville James, state that on_____day of the_____month Of 2006,
certify that I served a copy of the foregoing Notice and _____
                 **OPENING BRIEF OF DEFENDANT-APPELLANT**_____,
on the party addressed above by U.S. MAIL delivered on said date.

                           _____Date_____
                     Appellant, Donville James, pro-se

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.......................................iv

JURISDICTIONAL STATEMENT....................................1

    A.   DISTRICT COURT JURISDICTION..........................1

    B.   APPELLATE COURT JURISDICTION.........................1

    C.   APPEAL IS TIMELY....................................1

    D.   APPEAL IS FROM FINAL JUDGMENT.......................2

STATEMENT OF ISSUES PRESENTED...............................2

STATEMENT OF THE CASE.......................................4

STATEMENT OF FACTS..........................................6

    1.   EVENTS PRIOR TO MR. JAMES ARREST AND THE ARREST......6

        A.   Prior to the Arrest.............................6

        B.   The Arrest.....................................8

    2.   POST ARREST INTEROGATION AND INVESTIGATION AND
        EVIDENTIARY MOTION AT TRIAL.........................12

        A.   Post Arrest Interogation and Investigation.....12

        B.   Evidentiary Motion at Trial....................13

    3.   TESTIMONY AND EVIDENCE AT TRIAL.....................17

        A.   TRIAL TRANSCRIPT...............................17

        B.   AUDIO RECORDINGS...............................17

            B1.  The March 21st, 2002 Recorded
                Conversation...........................18

            B2.  Infussion of a Drug Crime..............19

            B3.  The March 24th, 2002 Recorded Phone
                Conversation...........................20

        C.   MR. JAMES' HAND WRITTEN STATEMENT..............20

    4.   COMPLAINT AFFIDAVIT.................................21

    5.   PROSECUTOR'S PREPAID STATEMENT......................22

6.   GRAND JURY TESTIMONY................................23

7.   SUPPRESSION OF EVIDENCE............................23

    A.   MARCH 25TH, 2002 AUDIO RECORDING EQUIPMENT.....23

    B.   MARCH 21ST, 2002 RECORDED WIRED CONVERSATION...25

    C.   MARCH 24th, 2002 RECORDED PHONE CONVERSATION...26

8.   ALTERATION OF THE MARCH 21ST, 2002 TRANSCRIPT.......26

SUMMARY OF THE ARGUMENT.....................................27

ARGUMENT...................................................37

I.   MR. JAMES IS ENTITLED TO A NEW TRIAL................37

    A.   THE GOVERNMENT WAS OBLIGATED TO PRODUCE THE
       RECORDING DEVICE...............................37

II.  THE COURT ERRED IN ALLOWING HEARSAY TESTIMONY BY
    GOVERNMENT AGENTS THAT THE INFORMANT TOLD THEM
    ABOUT OTHER DRUG DEALS INVOLVING MR. JAMES.........41

    1.   Agent DePodesta's Testimony Was Inadmissable
       Hearsay........................................43

    2.   This Hearsay Testimony Violated Mr. James'
       Confrontation Clause Rights....................45

    3.   This Hearsay Testimony and Argument Violated
       Fed. R. Evid. 403 and 404......................47

III. INSUFFICIENCY OF THE EVIDENCE TO PROVE COUNT ONE....49

    1.   Specific Intent................................50

    2.   Substantial Step...............................51

IV.  THE GOVERNMENT FAILED TO PROVE THE "IN RELATION TO"
    OF 924(c)..........................................52

    1.   "In Relation To" Prong.........................53

    2.   "Use"..........................................54

V.   THE GOVERNMENT FAILED TO PROVE MR. JAMES INTENDED
    TO DEFRAUD ANYONE..................................56

VI.  MR. JAMES WAS ENTRAPPED INTO CRIMINAL ACTIVITIES....58

VII. THE DISTRICT COURT FAILED TO ADDRESS THE
    SUBORNATION OF PERJURY.............................63

VIII. THE TRIAL JUDGE FAILED TO MAKE AN INDEPENDENT
FINDING ESTABLISHING PERJURY.........................66

IX.   MR. JAMES' RIGHT TO A FAIR TRIAL WAS SUBSTANTIALLY
VIOLATED...............................................70

X.    MR. JAMES DUE PROCESS RIGHT WAS VIOLATED...........71

XI.   MR. JAMES' RIGHT TO BE SENTENCED ONLY ON FACTS
PROVEN TO THE JURY'S SATISFACTION WAS VIOLATED......74

XII.  MR. JAMES SHOULD HAVE BEEN SENTENCED IN ACCORDANCE
WITH HIS "SENTENCING MEMORANDUM"....................77

      A.    Legal Impossibility and Legal Incapability.....77

      B.    Sentencing Entrapment.........................79

CONCLUSION.................................................81

RULE 30(d) CERTIFICATE OF COMPLIANCE........................viii

SHOUT APPENDIX WITH ADDITIONAL MATERIALS.....................ix

# TABLE OF AUTHORITIES

**Cases:**                                                    **Pages**

Apprendi v. New Jersey,
    530 U.S 466 (2000)................................75

Blakely v. Washinton,
    204 WL 1402967.............................74,75,77

Crawford v. Washington,
    541 U.S. 26 (2004)...............................45

Dunnigan,
    507 113 S.Ct. 1117............................66,69,70

Gaudin,
    508. S.Ct. 2313..................................69

Grant,
    119 F.3d at 539..................................69

Mooney v. Holohan,
    294 U.S. 791 (1935)............................62,65

Obrian v. U.S,
    51 F.2d 674 (7th Cir. 1931)......................62

Pyle v. Kansan,
    214 (1995).................................66,70,71

Robb v. Connolly,
    111 U.S..........................................63

Sherman v. U.S,
    356 U.S. S.Ct. 819...........................58,61,62

Smith v. U.S,
    508 U.S._(1993)..................................54

U,S v, Agurs,
    427 U.S. 97 (1979)............................63,65

U.S v. Adkins,
    247 F.3d 444 (7th Cir. 20001).....................53

U.S v, Barns,
    230 F.3d 311 (7th Cir. 2000).....................50,52

U.S v. Beasley,
    809 F.2d 273 (7th Cir. 1987).....................48

U.S v. Beck,
    615 F.2d 441 (7th Cir. 1980)....................56,58

U.S v. Bolin,
    35 F.3d 306 (7th Cir. 1994).........................57

U.S v. Booker,
    200 WL 50108...................................74,75,76,77

U.S v. Brown,
    767 F.2d 1078 (4th Cir. 1985)......................38,44

U.S v. Cafaro,
    480 F.Supp 511 (S.D.N.Y. 1979).....................50

U.S v. Cea,
    914 F.2d 881 (7th Cir. 1990).......................31,49,50,51,52

U.S v. Cotts,
    14 F.3d 300 (7th Cir. 1994)........................62

U.S v. Country Side Farm, Inc.,
    428 F.Supp. 1150 (D.Utah 1977).....................38

U.S. v. Cramer,
    389 F.3d 662 (6th Cir. 2004).......................46

U.S. v. Dominquez,
    992 F.2d 678 (7th Cir.1993)........................66,69,70

U.S. v. Estrada,
    256 F.3d 466 (7th Cir. 2001).......................52

U.S. v. Gellene,
    182 F.3d 578 (7th Cir. 1998).......................69

U.S. v. Hernandez,
    750 f.2d 1256 (5th Cir. 1985)......................48

U.S. v. Isa,
    413 F.2d 244 (7th Cir. 1967).......................41

U.S. v. Kinter,
    235 F.3d 192 (4th Cir. 2000).......................77

U.S. v. Liquid Suger, Inc,
    158 F.R.D. 466 (E.D. Cal. 1994)....................39

U.S v. Loyd,
    992 F.2d 348 (D.C. Cir. 1993)......................39

U.S. v. Mancillas,
    580 F.2d 1302 (7th Cir. 1978)......................44

U.S v. Mathues,
    22. F.2d 979 (D.C.E.D. Pa. 1929)...................61

U.S v. manillas,
    183 F.3d 707 (7th Cir. 1999).......................53

U.S. v. Metz,
    840 F.2d 315 (6th Cir. 1988)..........................

U.S v. Nance,
    236 F.3d 820 (6th Cir. 2000)........................75

U.S v. Owens,
    424 F.3d 649 (7th Cir. 2005)........................43

U.S v. Resenberg,
    299 F. Supp. 1241 (S.D.N.Y. 1968)...................38

U.S v. Rovetuso,
    768 F.2d 809 (7th Cir. 1985)........................49

U.S. v. Shamblin,
    (S.D.W.Va 2004).....................................76

U.S v. Sherman,
    150 F.3d 310 (3rd Cir. 1999)........................69

U.S v. Silva,
    380 F3d 1018 (7th Cir. 1982)........................46

U.S. v. Snow,
    670 F.3d 249 (7th Cir. 1982)........................57

U.S. v. Staufer,
    38 F.3d 1103 (9th Cir. 1994)........................80

U.S. v. Statt,
    245 F.3d 890 (7th Cir. 2001)........................53

U.S. v. Tanner,
    279 F.Supp. 457 (N.D. ILL. 1967....................38

U.S. v. Taylor,
    31 F.3d 459 (7th Cir. 1994)..................52,53,56

U.S. v. Tucker,
    820 F.2d 234 (7th Cir. 1987)........................57

U.S. v. J. Williams,
    133 F.3d 1048 (7th Cir. 1998)....................44,48

U.S. v. L. Williams,
    739 F.2d 297 (7th Cir. 1984)........................48

U.S v. Williams,
    704 F.2d 315 (6th Cir. 1983).....................50,78

U.S v. Yee,
    129 F.R.D. 629 (N.D. Ohio 1990)....................38

-vi-

**STATUTES:**

18 U.S.C. 2511(2)(C)...................................72

18 U.S.C. 2517.....................................72,74

18 U.S.C. 2518..................................72,73,74

U.S.S.G. §1B1.1.......................................80

U.S.S.G. §2D1.1.......................................80

U.S.S.G, Note 13......................................80

**RULES:**

Rule 16, Fed.R.Crim.P..............................37,39

Fed.R.Evid 404........................................42

5 ILL.Crim. Prac. & Pro § 9:15........................38

## JURISDICTIONAL STATEMENT

### A.   DISTRICT COURT JURISDICTION

The District Court's jurisdiction over this matter was pursuant to 18 U.S.C Section 3231 because Donville James (James) was charged with violating Title 21, United States Code Section 846, Title 18, United States Code, Section 924(c)(1)(A)(i), and Title 18, United States Code, Section 472.

### B.   APPELLATE COURT JURISDICTION

James's appeal is as of right under Federal Rule of Appellate Procedure 4(b), and this Court has jurisdiction over it pursuant to 28 U.S.C. §§ 1291 and 1294, as well as 18 U.S.C. § 3742(a).

### C.   APPEAL IS TIMELY

1.   The Court docketed it's judgement in a criminal case, which sentenced James to two hundred and eleven (211) months imprisonment (one hundred and fifty one (151) months to Count I and Count III, to be served concurrently; and sixty (60) months on Count II to run consecutive to Count I and III), on June 20th, 2005. ROA*  The Court filed an amended judgement in a criminal case on July 22nd, 2005, which again sentenced James to two hundred and eleven (211) months of imprisonment. ROA 143

2.   On July 8th, 2005, within the time permitted by law, the Court granted James's motion to file his notice of appeal until July 19th, 2005.

*ROA (Docket Entry No.) is used as the abbreviation for the two-volume record on appeal.
Tr (page No) abbreviation for Trial Transcript.

-1-

3.   James timely filed his Notice of Appeal on July 14th, 2005.
ROA 137

**D.   APPEAL IS FROM FINAL JUDGMENT**

## STATEMENT OF ISSUES PRESENTED

1.   Whether the District Court erred when it allowed the
government to withhold inspection of material evidence (a recording
device) that it used to make incomplete recordings with James that
it introduced into evidence during it's case-in-chief in
contravention of the requirements of Federal Rules of Criminal
Procedure 16(a)(1)(D)(i)?

2.   Whether the District Court erred when it allowed a
government agent to testify regarding hearsay statements by a
confidential informant who did not testify at trial to the effect
that James participated in "uncharged drug trafficking" on the
ground(s) that:

     a.   Such testimony was inadmissible hearsay.

     b.   The delarant (the criminal informant) was not
        subjected to cross-examination.

     c.   The testimony was used by the government as
        improper propensity evidence and in an
        unfairly prejudicial manner?

3.   Whether Mr. James's case should be remanded for dismissal
of Count I due to insufficiency of the evidence to prove him guilty
beyond a reasonable doubt for attempting to possess cocaine with the
intent to distribute it?

4.   Whether Mr. James's case should be remanded for dismissal
of Count II because the government failed to prove the "in relation

-2-

to" requirement of 924(c)?

5.  Whether Mr. James case should be remanded for dismissal of Count III because the government failed to prove all of the elements where it failed to prove that Mr. James intended to defraud anyone?

6.  Whether the District Court erred in denying Mr. James his pro-se "motion to address the issue of Entrapment", where Mr. James brought the facts to the Court's attention that he was entrapped in a drug crime by the criminal informant and agent Depodesta of the FBI?

7.  Whether the District Court erred in denying Mr. James his pro-se "motion to address perjured statements pursuant to 18 U.S.C. 1263(a), where "the trial judge failed to make an independent finding establishing perjury"?

8.  Whether the District Court erred in denying Mr. James his pro-se "motion for acquittal due to prosecutor suborning perjury"?

9.  Whether the District Court erred in denying Mr. James his pro-se "motion for acquittal due to government violation of defendant's substantial rights"?

10. Whether Mr. James' case should be remanded for dismissal of the Indictment due to the government's violation of Mr. James's Due Process Right to a fair trial, where the government admitted to destroying exculpatory materials, in violation of 18 U.S.C. 2518, and 18 U.S.C. 2517 (1) and (2)?

11. Whether the District Court erred at sentencing in denying Mr. James' pro-se motion, "Defendant's motion for various relief based upon Blakely v. Washington, where the Court made improper

-3-

factual finding contrary to United States v. Booker?

12. Whether the District Court erred in denying Mr. James'
pro-se "Sentencing Memorandum" when it:

    a.  Failed to consider the legal impossibility and
        legal incapability of Mr. James's case.

    b.  Failed to depart downward due to sentencing
        entrapment?

### STATEMENT OF THE CASE

On April 11th, 2002, a special Grand Jury charged Donville
James with three criminal counts:

    1.  Attempt to possess with intent to distribute
        cocaine in excess of five kilograms in
        violation of Title 21, United States Code,
        Section 846.

    2.  Possession of a firearm during and in relation
        to a drug trafficking crime in violation of
        18, United States Code, Section 924.

    3.  Possession of $87,430 in counterfeit
        obligations in violation of Title 18, United
        States Code, Section 472. ROA 18

On September 10th, 2002, following a three day trial, Mr. James
was found guilty of all three counts. See ROA 61-63. Mr. James filed
a motion for a New Trial and/or Judgment of Acquittal, which the
Court rejected. See ROA 71 and 73.

Before sentencing Mr. James filed his affidavit of truth with
attached Exhibits. Appendix 0001. On May 31st, 2005 Mr. James
requested that his affidavit be a part of the record as mitigating
evidence. A sentencing hearing was held on May 26th and May 31st,
2005. On May 31st, 2005, the Court sentenced Mr. James to two
hundred and eleven (211) months of imprisonment; One hundred and

-4-

fifty one (151) months on Count I and III, to be served concurrently and sixty (60) months on Count II to be served consecutively to Counts I and II. Sentencing Transcript 104. On June 9th, 2005, Mr. James file a pro-se Motion to Correct Unlawful Sentencing. ROA 128. The Court docketed it's judgment in a criminal case on June 20th, 2005. ROA 130. On July 12th, 2005, the Court denied Mr. James' motion to correct unlawful sentencing. ROA 140. Mr. James' Notice of Appeal was filed on July 14th, 2005. ROA 137. The Court filed an Amended Judgment in a criminal case on July 22nd, 2005. ROA 143. In the Amended Judgment, the Court again imposed a sentence of two hundred and fifty one (151) months on Counts I and III, to be served concurrently and sixty (60) months on Count II to run consecutively to Counts I and II. Id.

Mr. James also filed various pro-se motions on September 3rd, 2004 to include:

1.  "Motion to address the issue of Entrapment." Appendix 0192

2.  "Motion to address perjury statements pursuant to 18 U.S.C. 1623(a). Appendix 0197

3.  "Motion for acquittal due to prosecutal suborning perjury." Appendix 0203

4.  Motion to have defendant's tape expert examine all audio and video recording played at trial. Appendix 0206

5.  Motion for acquittal due to government violation of defendant's substantial rights. Appendix 0206

6.  Motion to amend defendant's motion for acquittal due to government violation of defendant's substantial rights.

All of these motions were denied on May 31st, 2005. See May 31st Sentencing Transcript.

-5-

### STATEMENT OF FACTS

1. **EVENTS PRIOR TO MR. JAMES ARREST AND THE ARREST**

   **A. PRIOR TO THE ARREST**

   Prior to this case, Mr. James had no prior convictions. Sentencing Transcript 78, 85: 22-23. At the time of his arrest Mr. James was a student in the electrical engineering program at the University of Illinois-Chicago, with one semester left. Sentencing Transcript 8, 58, 86, 91. Mr. James previously served in the National Guard from 1989 to 1998, and was honorably discharged. Sentencing Transcript 86, 91

   Agent Dick testified that Mr. James was targeted for an investigation involving counterfeit currency based on a tip from a confidential informant named Allen Dubon. Trial Transcript 35, 37. Allen Dubon was rejected by the DEA to become an informant. Trial Transcript 215-216, 419. At that time, Dubon had a pending state drug case for possession of 125 grams of powder cocaine. Trial Transcript 196. It was stipulated that Dubon faced a sentence of 9 to 40 years if convicted for this criminal offense. Trial Transcript 512-513. Dubon's criminal case was adopted by U.S. Attorney's office in June 2002 and dismissed. Trial Transcript 198, 227-228. The government also paid Dubon over $15,000 for his work as a confidential informant. Trial Transcript 487.

   The Secret Service were charged on February 8th, 2002 to investigate Mr. James for:

1.  Primary case type- Manufacturing counterfeit
    currency.

2.  Secondary case types- a) Dealing in
                               counterfeit currency.

                            b) Use of emerging
                               technology. Appendix
                               0045

All matters dealing solely with counterfeiting.

The FBI instructed Dubon to set up a meeting with Mr.
James. Trial Transcript.[109] On March 21st, 2002, Secret Service
Agents Dick and Newburg and FBI Agent Podesta setup,
monitored and recorded a conversation between Dubon and Mr.
James. Trial Transcript 38.

Agent Depodesta instructed Dubon prior to the meeting
and equipped him with a concealed recording device. Trial
Transcript 111-112. Dubon was acting undercover during this
meeting as an agent of the U.S. Government. Trial Transcript 41.
The Court allowed the government to introduce a tape
recording* and transcript of this conversation after
providing a limiting instruction about the use of the
transcript, and the tape was played in open court. Trial
Transcript 44-49.

On March 24th, 2002 Agent Depodesta again met with
Dubon. Trial Transcript 113. Depodesta testified that he
dialed Mr. James' phone number, gave the phone to Dubon,
and started a recording device. Trial Transcripts 115. The
government prepared a transcript of the recording, and the

_____

*Copies of the disks containing the March 21st and March
24th, 2002 recordings are found in the envelope labelled
"Volume 1 of 3" that are included with the Court file.

Court allowed the government to introduce the recording and
the transcript "as an aid to understanding the tape". Trial
Transcript 116.

Agent Depodesta testified that he first met the criminal
informant in November of 2001. Trial Transcript 196. And
that the criminal informant first told him about Mr. James
about two weeks after they met. Trial Transcript 199, 213.
Agent Depodesta also testified that the first time he
participated in law enforcement activities involving Mr.
James was on March 21st, 2002. Trial Transcript 109. And it
was on this day (March 21st, 2002) he, himself, "instructed"
the criminal informant to "engage" Mr. James in "drug
communication". Trial Transcript 248.

B.    **THE ARREST**

February through mid-March 2002 the criminal informant
acting through the instruction of agent Depodesta called Mr.
James on numerous occasions in which he asked Mr. James to
provide him with counterfeit money and Mr. James would not
cooperate with him to provide him with the money. Trial
Transcript 220. These conversations were not recorded. Trial
Transcript 109, 223-225. It was during one of these
conversations that Mr. James agreed to provide the criminal
informant with the counterfiet money after the criminal
informant threatened Mr. James with bodily harm. Appendix
0143, paragraph 2. The March 21st, 2002 meeting between
Dubon and Mr. James was set up to discuss how Mr. James was

-8-

going to give the criminal informant the counterfeit money. On March 21st, 2002 Mr. James told the criminal informant that the counterfeit money was not ready. Appendix 0078, paragraph 13.

Acting on behalf of agent Depodesta for the criminal informant to "engage" Mr. James in drug communication, the criminal informant setup a plan to use the counterfeit money to purchase cocaine from his own supplier and for the criminal informant to set the whole thing to appear that it was Mr. James who was responsible for doing so. Appendix 0086, paragraph 9.

Mr. James was successful in delaying the delivery of the counterfeit money to Dubon. On March 24th, 2002, three days later, agent Depodesta again met with Dubon. Trial Transcript 113. Depodesta testified that he dialed Mr. James' phone number, gave the phone to Dubon, and started a recording device. Trial Transcript 115. It was during this conversation Mr. James agreed that he would provide Dubon with the counterfeit money the next day (March 25th, 2002). Mr. Dubon instructed Mr. James to make the counterfeit money look like $300,000. Appendix 0117, paragraph 1.

Dubon arrived at the site of the meeting around 11am. Trial Transcript 60. The government placed a transmitter and a recording device on Mr. Dubon. Trial Transcript 56.*

---

*Agent Tackett, the only testifying agent present in the car with the transmitter, testified that he could not "really hear what was being said". Trial Transcript 96.

-9-

The government used the same recording device that was used on March 21st, 2002. Trial Transcript 81, 173. The device itself records the information. Trial Transcript 76. The government activated the recording device prior to its placement on Dubon. Trial Transcript 57, 80, 173.

The government offered testimony that Mr. James arrived some time later. Dubon entered Mr. James' car and they moved to a different parking lot and exited the vehicle. Trial Transcript 62. They opened the trunk to a Gold Nissan and agent Dick testified that they discussed counterfeit money in the trunk. Trial Transcript 62. Agent Depodesta could not identify the type of car this was from his vantage point. Trial Transcript 178-179.

They returned to their own cars, left the parking lot again, and drove around for approximately ten minutes. Trial Transcript 62-63, 237, 360-361. During this ten minute period, they were not under surveilance by the government and it was not known where they went. Trial Transcript 63, 180, 236-237. Dubon eventually returned to his original parking place at McDonald's. Trial Transcript 63. Mr. James returned shortly thereafter, and they both pulled into a neighboring Jewel parking lot. Trial Transcript 63.

At this point, agent Depodesta told Dubon to take the fake cocaine over to Mr. James' car. Trial Transcript 183. The agents testified that Dubon walked with a black bag to a car driven by Mr. James, and dropped the bag inside the

-10-

car after leaning inside the window. Trial Transcript 64,
185. The agents could not see Mr. James at that point.
Trial Transcript 83. No one saw Mr. James touch the fake
cocaine. Trial Transcript 90, 232.

Dubon then began to walk away from the car, and federal
agents, in plain clothes and unmarked cars, immediately
converged and informed Mr. James that he was under arrest.
Mr. James "complied and he was arrested". Trial Transcript
65, 86. With his weapon drawn (along with at least seven
other officers), agent Newburg ordered Mr. James to a prown
position outside the vehicle and began to handcuff him. At
this point, agent Newburg testified that he asked Mr. James
if he had a weapon, and that Mr. James then replied that he
had a weapon inside the car. Trial Transcript 309, 450.
Agent Locus testified that he found a gun in the car after
lifting a floor mat. Trial Transcript 441-442, 456.* No one
was in the car at that time. Trial Transcript 91.
Nonetheless, agent Locus removed the gun and "made it
safe". Trial Transcript 70. He did not rub the gun. Trial
Transcript 454. After the gun was handled, it was replaced
on top of the floor mat and then agents took pictures of
it. Trial Transcript 70, 443.

After Mr. James was handcuffed, agent Depodesta
testified that he saw a black bag that contained fake
cocaine in Mr. James car. Trial Transcript 236. Agent

---

*The floor mats were not mentioned at a prior Suppression
Hearing. See June 17th, 2002 Hearing at 16.

-11-

McCabe also testified that he retrieved a black bag from a tan or champagne colored Nissan that contained counterfeit currency. Trial Transcript 420-421. He testified that not all of the counterfeit currency was two-sided, and that a total of $87,430 in counterfeit money was retrieved. Trial Transcript 422, 426.

2.  **POST-ARREST INTERROGATION AND INVESTIGATION AND EVIDENTIARY MOTION AT TRIAL**

   A.  **POST-ARREST INTERROGATION AND INVESTIGATION**

   Mr. James was brought to the Chicago field office of the Secret Service, and agent Mckenna testified that he "Mirandized" Mr. James. Trial Transcript 266, 270. Agent Mckenna questioned Mr. James for about an hour. Trial Transcript 273. The questions asked by agent Mckenna delt only with counterfeitting matters. Agent Mckenna testified that he never questioned Mr. James about any cocaine. Suppression Hearing Transcript 43, Appendix 0150. Agent Newburg testified that the Secret Service does not have jurisdiction over drugs, Suppression Hearing Transcript 79, Appendix 0152 and that he was assigned to investigate counterfeit money. id at 79 and 0152. During the interrogation agent Mckenna discussed with Mr. James the little fish/big fish theory. Trial Transcript 295-296. It was suggested to Mr. James by agent Mckenna that if he cooperated with him, Mr. James could work his case off. Suppression Hearing Transcript 50, 51. Subsequently, according to agent Mckenna, Mr. James agreed to give a

-12-

written statement. Trial Transcript 273, 296. The statement was published at Trial Transcript 275-277.

Agent Mckenna also testified that Mr. James admitted he had a handgun for personal protection, although a gun was not mentioned in Mr. James' written statement. Trial Transcript 278. Agent Mckenna also prepared a report on the day of Mr. James' arrest that did not reference any statements concerning the gun. Trial Transcript 278. Instead, Mckenna added a reference to the gun one to three days later to the middle of his prior report. Trial Transcript 278-280, 297, See also ROA 71 (attaching the original and amended reports). Agent Mckenna testified that Mr. James admitted counterfeiting during his interrogation but did not include such a statement in Mr. James' written statement. Trial Transcript 282.*²

The FBI performed a number of tests for fingerprints on the gun it confiscated, but did not find Mr. James' fingerprints on the gun. Trial Transcript 91, 391-396.*³

B.  **EVIDENTIARY MOTION AT TRIAL**

Prior to trial, Mr. James filed a motion to produce tapes and the recorder that was used to make the March 25th, 2002 tape. Appendix 0213 and 0215. The government opposed this motion. See ROA 39 at 7-8. The government stated in the opposition to Mr. James' motion that:

*²Mr. James filed a motion to suppress this statement, which the Court denied on June 24th, 2002. See ROA 48. See also June 17th and June 24th, 2002 Transcript.

*³The government did not provide an ink card for Allen Dubon to it's fingerprint examiner. Trial Transcript 402.

"The "tape recorder" is actually a digital recorder which burns recorded conversations directly onto a CD ROM. When the conversations are recorded onto the CD ROM, they are automatically earased from the digital recorder, and the CD ROM itself becomes the evidence."

The Government in their motion continued to claim that:

"The recorder "failed" at the time of the March 25th, 2002 transaction at issue because it was not turned on. The agents involved in the case were testing the equipment prior to the transaction. In testing the equipment, they were turning it on and off. After testing the equipment, they left if off by mistake."

During trial, agent Depodesta testified that he "activated" the recording device. Trial Transcript 57. He also testified that the device was working properly after he placed it on the criminal informant. Trial Transcript 172. The prosecutor, Mr. Collins stated that "the device was practically impossible to manipulate". Trial Transcript 135. Agent Depodesta, after Mr. James was arrested on March 25th, 2002, retrieved and deactivated the recording device. Trial Transcript 188. Appendix 0161, paragraph 3. The Court intially agreed that the recording device was an "intergral part" of this case and indicated that the recording device should be produced. Trial Transcript 102, 119. The government indicated it would comply. Trial Transcript 127. On the second day of trial, the prosecuting attorneys, joined by U.S. Attorney Patrick Fitzgerald, reiterated their objections to producing the recording device, and threatened a mandamus appeal. Trial Transcript 130-136. Mr. James' counsel pointed out that they have the

-14-

fundamental right to examine evidence that is going to be
used against Mr. James, that the government knew this was
an issue, and that the government should have raised
their objection with the Seventh Circuit before the
middle of the trial. Trial Transcript 134, 139. In
response, the District Court repeatedly urged Mr. James
to enter into a stipulation concerning the non-disclosure
of the recording device. See, e.g., Trial transcript 133,
137, 139, 153. Following the Court's repeated
admonishments, the parties entered into a stipulation
that read:

> "It is stipulated between the parties that the
> recording and transmitting device used on March
> 25th, 2002 in this case was not malfunctioning on
> that day. The device was capable of recording and
> transmitting and the device was capable of being
> turned on and off by the Governments' agents and
> the informant involved in the case. It is further
> stipulated that the Government has declined to
> produce the recording transmitting device for
> viewing by this Jury pursuant to a privilege which
> the Court has deemed valid."* Trial Transcript 513

The Government also filed a motion to Admit Testimony
Concerning Defendant's Uncharged Drug Trafficking. ROA 52
at 13-14. The Court intially rejected this motion because
such evidence would be improper and prejudicial. Trial
Transcript 120-121; See Trial Transcript 151 (stating
that "evidence of other drug transaction... is more
prejudicical than probative" but that the government
could offer testimony to show "the agent's state of
mind"). The government renewed this motion at trial, and

---

*The Court also approved a matching Jury instruction
regarding the Court's finding of validity. See ROA 65 at 11

-15-

sought to elicit testimony of uncharged drug trafficking
to show the government agents' "personal knowledge". Trial
Transcript 118. Mr. James' counsel objected. Trial
Transcript 118-123, 134. The Court reversed it's earlier
decision and allowed the government to introduce
testimony concerning defendant's uncharged drug
trafficking "because the overall investigation needs to be
understood". Trial Transcript 124. Specifically, the Court
allowed agent Depodesta to testify that Dubon previously
sold Mr. James 1 kilogram of cocaine on two occasions,
98 pounds of marijuana on another date, and that the
marijuana deal involved counterfeit currency. Trial
Transcript 202. During closing arguments, the government
repeatedly argued that Mr. James was an experienced drug
dealer. Trial Transcript 592, 613, 615, 622. The
government also argued that:

> "You heard about heroin, you heard about
> marijuana, and in this case, which is the case
> before you, cocaine, the trifecta of drugs....
> all three of them." Trial Transcript 622.

-16-

3.    **TESTIMONY AND EVIDENCE AT TRIAL**

    A.    **TRIAL TRANSCRIPT**

        FBI agent Frank DePosesta testified at trial the he first met the criminal informant (Allen Dubon) in November of 2002. Trial Transcript 196. And that the criminal informant first told him about Mr. James about two weeks after they met. Trial Transcript 199, 213. Agent DePodesta also testified that the first time he participated in any law enforcement activity involving Mr. James was on March 21, 2002. Trial Transcript 109. And that he Advised the criminal informant to contacted Mr. James. Trial Transcript 221. Agent DePodesta went on to testified that the crinial informant had gone to Mr. James and tried to contact Mr. James on numerous occasions, and that Mr. James would not cooperate with him. Trial Transcript 220.  When Mr. James would not cooperate with the criminal informant, agent depodest testified that he "instructed" the criminal informant to "engage Mr. James in drug communications." Trial Transcript 248.

        Q.    "Did you instruct the CI (criminal informant) to contact Mr. James, or did you instructed him to engage Mr. James in grug communications?"

        A.    "Both."

    B.    **AUDIO RECORDINGS**

        The "drug communications" agent DePodesta "Instructed" the criminal informant to engage Mr. James in" were recorded on March 21, 2002, and on March 24, 2002,  of which  the  prosecutors

-17-

played 'altered' versions of both recorded conversations at
trial for the Jury.

On page 109 of the trial transcript, agent Depodesta
testified that:

> "The criminal informant had made a couple of calls to
> Mr. James to set up the meeting between the criminal
> informant and Mr. James on March 21st, 2002 at the
> direction of the FBI."

This contradicts the Government's stipulation that stated the
criminal informant had called Mr. James sixty two times between
February 8th, 2002 and March 21st, 2002.

### B1. THE MARCH 21ST, 2002 RECORDED CONVERSATION

The March 21st, 2002 recorded conversation between
Mr. James and the criminal informant was played for the
Jury as the "negotiation" between the criminal informant
and Mr. James, where Mr. James was to purchase cocaine
from the criminal informant's source using counterfeit
money. A close analyst of the conversation shows this
not to be the case.

The first thing the criminal informant said to Mr.
James in the March 21st, 2002 recording was:

> "Well, like I say, I got the guy set-up."

The criminal informant continued to say to Mr. James:

> "We show him (the guy the informant set-up) the
> money, some money, fake money, I memtion to him
> between seven and ten (seven and ten kg's of
> cocaine)." Appendix 0006, paragraph 15

> "I don't know exactly his (the guy the informant
> set-up) house, he's not gonna tell me exactly where
> it is, cause I could rob him myself."

> "At the corner of Narragansett and Diversey in the
> parking lot we can do that (rob the guy the criminal

-18-

informant setup) in the parking lot." Appendix 0083, paragraph 2

On the March 21st, 2002 recording the informant said:

"'I' want to do this guy too. (Rob the guy in the parking lot). Appendix 0085, last line, 0086 first line

The criminal informant continued to tell Mr. James that he would arrange his planned robbery in the parking lot at Narragansett and Diversey to:

"Do like you (Mr. James) fuck 'us' up." Appendix 0086

The 'us' that the criminal informant spoke about included himself and the guy he setup to rob in the parking lot of Narragansett and Diversey.

## B2. INFUSSION OF A DRUG CRIME

On the same March 21st, 2002 audio recording speaking about the drugs the informant wanted to rob from the guy he setup in the parking lot of Narragansett and Diversey, the criminal informant said to Mr. James:

"It would be better, how we gonna split it, or what?" Appendix 0076, last line

"Cause 'I' wanna do it like 'I' tell you, ten grand ($10,000)."

"I'm gonna sell you each one (the cocaine the informant was planning to rob) ten."

"You make ten, I make ten, because I don't got that much people to sell to, you know what I mean." Appendix 0077, paragraph 1

"I wanna make the money and get the fuck out of here." Appendix 0082, paragraph 13

"Alright, you help sell them?" Appendix 0079, paragraph 10

"Alright man, don't fuck me up man." Appendix 0085, paragraph 14

-19-

The criminal informant gave Mr. James instruction on
how to arrange the counterfeit money in the March 21st,
2002 recorded conversation.

> "Stack them (the counterfeit money) up and put
> real money on top, at least one twenty or some
> shit like that and make it seems real."
> Appendix 0080, paragraph 8

### B3. THE MARCH 24TH, 2002 RECORDED PHONE CONVERSATION

In this recorded conversation the criminal informant
said to Mr. James:

> "I talk to the guy (the same guy he said on
> March 21st, 2002 that he setup to rob in the
> parking lot) already."

> "He had ten (the same ten kg's of cocaine the
> criminal informant said on March 21st, 2002 he
> wanted to rob in the parking lot of Narragansett
> and Diversey) for us, he then added another
> five." Appendix 0114, paragraph 9

> "Just make sure for tomorrow, just make sure that
> they (speaking of the counterfeit money) look
> like three ($300,000)." Appendix 0117, paragraph 2

### C. MR. JAMES* HAND WRITTEN STATEMENT

In the Suppression Hearing agent Mckenna made clear that he
did not question Mr. James in relation to cocaine. Counsel
asked agent Mckenna:

> "Did you question him regarding the question of
> cocaine."

Agent McKenna replied:

> "No maam."

> "I told him that the purpose of my interview was
> to find out where the counterfeit came from, or
> who gave him the counterfeit, or how it was
> manufactured." page 43 Suppression Hearing
> transcript. Suppression Hearing Transcript 43,
> 16-22

After agent Mckenna promised Mr. James that Mr. James would

not go to jail if Mr. James would cooperate with him so the secret service could find out where the counterfeit came from, or who gave him the counterfeit, or how it was manufactured (See Section 1), Mr. James then gave him a written statement.

Mr. James wrote in his hand written statement that he went to give the criminal informant the counterfeit money in the parking lot of Narragansett and Diversey. The criminal informant was to give the counterfeit money to the guy the informant setup to rob 15 kg's of cocaine from by paying for the cocaine with the counterfeit money.

> "We (the criminal informant and Mr. James) were to make an exchange for 15 kg's of cocaine for the counterfeit money."

## 4.   COMPLAINT AFFIDAVIT

In paragraph 4 of agent Depodesta's complaint affidavit, agent Depodesta wrote:

> "In March 2002, a cooperating individual (CI) provided the FBI with information about an individual known to the CI as "James". The CI explained that James asked if the CI would be willing to arrange a narcotic transaction in which James would pay for powder cocaine with counterfeit money." Appendix 0051 at 4

On August 28th, 2004 Mr. James submitted his sworn affidavit of truth to the clerk of the court and served a copy to the Government. At sentencing Mr. James asked the court to make his affidavit of truth a part of the record.

In an FBI report of the criminal informant interview with the prosecutors, with both prosecutors present, the criminal informant told them that:

> "On several occasions James suggest that he could provide the source with counterfeit money that the source could use to rip off

-21-

drugs from a dealer, then the source could
sell the drugs for cash to pay off his debt."

"It was at that time, in November of 2001,
that the source walked into the offices of the
FBI in Chicago and asked to speak with agents."
Appendix 0143, paragraph 2

## 5.   PROSECUTOR'S PREPARED STATEMENT

After the criminal informant told the prosecutors that he

walked into the offices of the FBI in Chicago and asked to speak

with agents in November of 2001 because of Mr. James suggestion, the

prosecutors, Mr. Hays and Mr. Collins prepared a statement for the

criminal informant for him to read before the grand jury. In their

prepared statement the prosecutors wrote:

a.  "On March 16th, 2002, James called me (the criminal
informant) and we agreed that he (James) would
purchase one kilo of cocaine from my source for
$20,000 in counterfeit currency and he would give
me $10,000 in real currency."

b.  "On March 21st, 2002, we agreed that James would
purchase 10 kilos of cocaine from my source for
$200,000 in counterfeit money."

c.  "On March 22nd, 2002, James called me and asked
whether he could buy 20 kilograms from my source.
I told him I will have to see whether my source had
20 kilograms available."

d.  "On March 24th, 2002, James and I agreed that he
will purchase 15 kilograms from my source. He told
me he would pay me $20,000 in real currency for
arranging that transaction."

e.  "On March 25th, 2002, James and I met in McDonald's
parking lot (at Narregansett and Diversey) to
further discuss the conduct of that transaction."
Appendix 0058

This contradicts the interview the criminal informant had with

the prosecutors. See Appendix 0136-0143

-22-

CASE NO.   08cv1416

ATTACHMENT NO.

EXHIBIT

TAB (DESCRIPTION)   Con't'd from Pg 23

**6.    GRAND JURY TESTIMONY**

During the criminal informant's Grand Jury Testimony he testified that:

    Q.    Allen, did you meet with me yesterday and give me a statement regarding the circumstances surrounding the investigation of Donville James? Appendix, Exhibit "Informant's Grand Jury Statement"

    A.    Yes.

    Q.    And did you meet with me again today before we came in here?

    A.    Yes.

    Q.    And did I give you a statement that reflected what you told me the day before?

    A.    Yes.

    Q.    And did you read the statement carefully?

    A.    Yes.

    Q.    And is everything in that statement true and correct and based on what you told me?

    A.    Yes. Appendix 0060-0063

The criminal informant then proceeded to read the prosecutor's prepared statement before the Grand Jury as his testimony of what occured in this case.

**7.    SUPPRESSION OF EVIDENCE**

**A.    MARCH 25TH, 2002 AUDIO RECORDING EQUIPMENT**

In responding to Mr. James' motion to produce and examine the "failed" tape recorder, the government disclosed for the first time that the agent(s) did not turn on the equipment; That in testing "they" were turning the equipment on and off and "they" left it off by mistake.... The government in their

-23-

response to Mr. James' motion claimed that there was no
mechanical failure of the recording device. During trial
however, the prosecutor told the Jury in their opening
statement that the:

"recording device failed or malfunctioned."
Trial Transcript page 20, line 20-21

The agent testified at trial that the recorder was
activated. Trial Transcript, page 57, line 11

The prosecutor, Mr. Collins, said that:

"the device was practically impossible to
manipulate". Trial Transcript page 135

Agent Depodesta further testified that the:

"device was working when he placed it on the
CI." Trial Transcript page 172

And after the arrest:

"The device was working properly." Trial
Transcript page 188

The recorded disc containing the conversation between
Mr. James and the criminal informant on March 25th, 2002 was
listed in the "Disposition of Evidence, Contraband, and
Personal Property" list dated 6/4/02 at 3:57 compiled by the
case agent Daniel Dick. The March 25th, 2002 criminal
informant recorded body wire conversation with Mr. James is
listed as:

"One (1) compact disc, containing a recording of
the body wire place on the criminal informant by
the Federal Bureau of Investigation on 3/25/02,
has been inventoried on SSF 1544 with serial
number 201-2002-CE-000442." Appendix 0163,
paragraph 4

The same March 25th, 2002 recorded compact disc was also

-24-

inventoried and listed in a "certified inventory of evidence"
listed as:

> "The below listed item was recovered from Agent
> Depodesta of the Federal Bureau of Investigation
> on 3/25/02."

> "Marked for identification: DD 3/25/02 (SW Daniel
> Dick)."

> "Compact disc approximately 41 minutes in length,
> compact disc is contained in a jewel case."

> "Serial number 201-2002-CE-000442." See Affidavit
> of Truth, and Appendix 0165

The same serial number as listed in the "Disposition,
Contraband, and Personal Property" list.

The inventory of the March 25th, 2002 recording was done
by Agent Daniel A. Dick, witnessed by Agent Micheal J. Newberg
and supervised by Agent Glen R. Westlund on March 25th 2002,
the same day Mr. James was arrested. Appendix 0165

## B.   MARCH 218T, 2002 RECORDED WIRED CONVERSATION

During the trial, agents testified that the same equipment
that was used to record the March 25th, 2002 audio recording
was the same equipment they used to record all recorded
conversations in Mr. Jame's case. This piece of equipment the
government claimed recorded the conversations into to memory
to the device, then burned them onto a compact disc and the
original content is automatically erased from the memory of
the device. Trial transcript 81, 173

The original copy of the March 21st, 2002 recorded
conversation was logged into evidence on a "certified

-25-

inventory of evidence" list with serial number 201-2002-CE-000446. Appendix 0171

**C. MARCH 24, 2002 RECORDED PHONE CONVERSATION**

The original copy of the March 24th 2002 recorded conversation was logged into evidence on a "certified inventory of evidence" list with serial number 201-2002-CE-000443. Appendix 0164

**8. ALTERATION OF THE MARCH 21ST, 2002 TRANSCRIPT**

On the March 21st, 2002 recorded conversation the criminal informant said to Mr. James:

1. "It would be better how we gonna split it (the cocaine from the robbery), or what. Cause "I" wanna do it like I tell you. Ten grand 'I gonna sell you each one ten'. You make ten, I make ten. But I do not got that much people to sell it, you know?" Appendix 0076, last line and 0077, paragraph 1

2. "Yeah, both of them are gonna do like you you know, you fuck 'us' up". Appendix 0086, paragraph 9

In the version of the transcript that the prosecutor provided to the Jury these phases were changed to"

1. "Okay. But, it'd be better then- How we gonna split it, or what? Cause I wanna do like I tell you, you know, ten grand. 'I wanna tell you each one you sell', you make ten, I make ten. But, I don't got that much people to sell it, you know?" Apendix 0094, paragraph 2

2. "Yeah, but, both of them are gonna do like, you, you know, with the." Appendix 0107, paragraph 3

-26-

Phrase number one was altered to changed the meaning of what was actually taking place. Where the criminal informant is the one trying to sell the drugs he were planning to rob from the guy he set up in the parking lot at Narregansett and Diversey by paying them with the counterfeit money he told Mr. James to make seems like $300,000 in real money.

Phrase number two, were the informant said "do like you fuck us up" was edited out completely, even though the recording was clear and unambiguous.

### SUMMARY OF THE ARGUMENT

1. The government's case relied upon the conversations set up and involving its confidential informant, Allen Dubon, that the government recorded or tried to record. As the Court observed, "part and parcel of the government's case is the uae of [the Informant]." Trial transcript 96-98. Although the Government injected informant's activities, and his undercover recordings, into its case in chief, it refused to disclise the core evidence that it used to convict Mr. James - the recording device. The Court upheld this refusal in violation of the plain requirement of Rule 16 and despote the government's failure to demanstrate any valid reason to withold the device.

2. Furthermore, without legal basis, the District Court allowed Agent DePodesta to testify that Dubon (the informant) told him he and James had engaged in threeipisodes of prior drug trafficking.

-27-

This statement was hearsay, testimonial and not admisable. The government chose not to call Mr. Dubon (or to grant him immunity) and, thus, his alleged statements were not subject to confrontation. The government then exacerbated thes errors by making repeated references to this predudicial testimony during its closing argument.

3.   Everyone seems to be ignoring the contents of the recorded conversations that were played at Mr. James' trial. The government took extraordinary steps at trial to make sure the Jury did not get the full understanding of what was taking place on the recorded conversations. The Court instructed that the tapes are the evidence amd that the transcripts are to guide the Jury. Trial Transcript 44-49

The government disclosed a set of transcripts that were identical to the content on the recordings they had intended to use at trial. When it became clear that Mr. James would proceed to trial, the government came up with a second sets of transcripts that they would eventualy give to the Jury. In the second sets of transcripts the government intentionally manipulated key parts of the transcripts that would have made it clear to the Jury that Mr. James did not enter into any deal to purchase cocaine from the criminal informant's source. See section 8.

The government exploited Mr. James' Jury. Knowing full well that human being understad  and remember better when they read than when they listen, the government manipulated and edited out parts of the March 21, 2002 transcript that were devistating to their case, even though the tape was clear and unambiguous.

-28-

The criminal informant on the March 21st, 2002 recorded conversation that was played for the Jury said to Mr. James:

> "Well like I say I got the..... I got the guy setup. We show him the money, some money, fake money.... We can do the, we can do the ten or the seven. I mentioned to him between seven and ten (kgs of cocaine)." Appendix 0076, paragraph 15

> "I don't know exactly his house he's not gonna tell me exacly where it is cause I could rob him myself you know what I'm saying? He lives, around 3....3...2 blocks away from the brickyard and three house you know close to the corner.... at Narragansett and Diversey, in the parking lot, we can do that (rob the guy) in the parking lot. He he told me we we can go by the parking lot." Appendix 0083, paragraph 2

This indeed proves that this is a robbery attempt setup by the criminal informant through the "instruction" of the FBI.

The criminal informant continued to say:

> "I wanna do this one (rob the guy he setup)." Appendix, last and 0086

And he would fix his planned robbery to:

> "Do like 'you' (Mr. James) fuck 'us' (the informant and the guy he setup) up. Appendix, paragraph 8

To further entrap Mr. James into more criminal activities the criminal informant said on the March 21st, 2002 tape recorded conversation, speaking about the cocaine he was planning to rob:

> "It would be better. How we gonna split it or what?" Appendix 0076, paragraph 20

> "Make sure I go inside with the kilos and get my share cause I don't wanna leave without my share you know, I wanna make the money and get the fuck otta here." Appendix 0082, paragraph 13

> "Alright, you help sell them." Appendix 0079, paragraph 10

> "Cause I wanna do it like I tell you. Ten grand I gonna sell you each one (the cocaine he was planning to rob) ten ($10,000). You make ten, I make ten. But I do not got that much people to sell it. You know." Appendix 0077, paragraph 1

-29-

"Alright man, don't fuck me up, man." Appendix 0085 paragraph 13

The March 24th, 2002 recorded conversation that was played for the jury showed that the contents of the conversation were about the continuation of the same conversation of the March 21st, 2002 recorded conversation of the criminal informant's plan to rob cocaine from the guy he setup by paying them with the counterfeit money he instructed Mr. James to make appear to look like $300,000.

The criminal informant said on the March 24th, 2002 recorded conversation:

> "Hey, uh I talk to the guy already, he is on his way back. He said fifteen would be okay...., I tell him twenty five... he said if you guys are police, cause I be changing the number and stuff." Appendix 0114, paragraph 6

> "But just uh, just make sure for tomorrow (March 25th, 2002), just make sure the (counterfeit money) look like three ($300,000)." Appendix 0117, paragraph 1

> "It (the bag with the counterfeit money) look like three ($300,000), because the total comes out to three, but it looks like three, right?"Appendix 0116 paragraph 5

These two recorded conversations between Mr. James and the criminal informant on March 21st and March 24th, 2002 are the hard evidence in the prosecutions case. However, these two tapes showed that at the "instruction" of the FBI the criminal informant entered into preliminary discussions regarding the criminal informant's plan to rob cocaine from his own suppliers with the aide of Mr. James. All an elaborate hoax to entrap Mr. James into criminal activities. And also, these two tapes proved that Mr. James never asked or entered into any negotiations to purchase cocaine from the criminal informants source. Actually, the tapes showed that the criminal informant was the one who was offering to sell the drugs he was planning to rob.

-30-

When a defendant has been active in negotiating a drug transaction and has actually taken physical steps to obtain possession of the drug, the attempted offense is complete. Since the two tapes proved that Mr. James never entered into any negotiations to purchase cocaine, Mr. James cannot have violated the statute of attempt. The evidence is insufficient to prove Mr. James guilty beyond a reasonable doubt for attempt to possess with intent to distribute cocaine. U.S. v. Cea, cite as 914 F.2d 881 (7th Cir 1990).

4.   The prosecutor responded to Mr. James' motion to examine the "tape recorder which failed" by stating the motion should be denied due to the fact that "the tape recorder" is actually a digital recorder which burns recorded conversations directly onto a CD rom. When the conversations are recorded onto the CD rom, they are automatically erased from the digital recorder, and the CD rom itself becomes the evidence." Never mind that this is a violation of subsection (1) and (2) of section 2517, and section 2518 of Chapter 119, agent Depodesta testified under oath that all "audio recorded conversations were recorded in the memory of the recording device." And the contents of the recorded conversations were then later transferred over to a CD or a cassette, and the original content then "erased" from the "memory of the recording device."

This procedure of collecting recorded evidence allows for all sorts of editing and tampering and violates sections 2518 of Chapter 119 United States Code. According to agent Depodesta's testimony at trial all the recorded evidence in Mr. James's case was done following this procedure. Trial Transcript 81,173.

-31-

To satisify the "in relation to" prong of 924(C), the
Government introduced testimony at trial through FBI Agent Depodesta
that on March 25th, 2002 Mr. James stated to the criminal informant:

"I don't have to use my gun then, right?"

Without this alleged statement there is no other relationship
between the gun and the drugs and the "in relation to" prong of
924(C), thus, it couldn't have been satisfied.

Counsel correctly pointed out in Mr. James's main brief that a
"41 minute blank tape was logged for the March 25th, 2002 encounter"
with the criminal informant.

This further goes to show that the recording device was not
"left off" by "mistake" because something ran for "41 minutes". The
Government refused to disclose the core evidence- the original
recorded conversation(s) and the recording device- that it used to
convict Mr. James, which violates Mr. James's Due Process Right to a
fair trial.

The evidence that Mr. James possessed a firearm during or in
relation to a crime, was insufficient to support a conviction beyond
a reasonable doubt where the testimony of law enforcement agents and
fingerprint examiner was contrary to human experience and was
unworthy of belief.


5.    To obtain a conviction for 18 U.S.C. 472 the Government must
show that:

    1.    The defendant possessed counterfeit obligations.

    2.    He or she knew they were forged.

    3.    He or she passed or possessed them with the intent to

-32-

defraud.

The criminal informant was acting as an agent for the Government. He specifically instructed Mr. James to:

> "Stack them (counterfeit money) up and put real money on top, at least one twenty or some shit like that and make it seems real." Appendix 0080, paragraph 7

> "We show him the money, some money, fake A money..." Appendix 0076, paragraph 15

> "Just make sure for tomorrow, just make sure that they look like three ($300,000)." Appendix 0117, paragraph 1

The criminal informant asked for counterfeit money; the criminal informant knew the money he asked for was counterfeit money. Mr. James never concealed the fact that the currency was counterfeit, as it was made to the criminal informant's specific request for counterfeit money. The informant expected nothing of value, and he gave nothing of value. The Government failed to prove all of the elements, where it failed to prove that Mr. James intended to defraud anyone.

6.    The contents of the March 21st and March 24th, 2002 recorded conversations showed that Mr. James was entrapped in a drug crime. The District Court erred in denying Mr. James' motion to address the issue of entrapment, where Mr. James brought the facts to the Court's attention that he was entrapped in a drug crime by the criminal informant and agent Depodesta of the FBI.

7.    The District Court further erred in denying Mr. James's motion to address perjured testimony pursuant to 18 U.S.C. 1623(a), where "the trial judge failed to make an independent finding establishing

-33-

perjury".

8.    There would not have been either an indictment against Mr.
James or a trial for narcotics and gun charges if the prosecutors
did not suborned perjury. The prosecutors created a chain of
causation with their perjured prepared statement which resulted in
the conviction of Mr. James due only to the denial of Mr. James's
right to a fair trial, where the prosecutors intentionally altered,
manipulated, and suppressed key material evidence in the case.

    The District Court erred in denying Mr. James's "motion for
acquittal due to prosecutor suborning perjury". Mr. James was
deprived of liberty without Due Process of Law.

9.    The District Court also erred in denying Mr. James's "motion
for acquittal due to government violation of defendant's substantial
rights". Where Mr. James presented evidence to the judge that the
March 25th, 2002 body wire recorded conversation between the
criminal informant and Mr. James was recorded and were 41 minutes in
length, inventoried, witnessed, and supervised by secret service
agents.

10.   It is a violation of 2518, 2517 subsection (1) and (2) to
record the contents of all recorded conversations from Mr. James's
case in the "memory" of a recording device. Then "transfer" the
contents from the "memory" of the recording device over to a "CD"
or a "cassette". Then "erase" the "original" recording from the

-34-

"memory" of the recording device.

Title 18 U.S.C. 2518 specifically states:

> "The contents of any wire, oral, or
> electronic communication must be recorded
> on tape, or wire, or comparable device
> (like a CD). The recording shall be done in
> such a way as to protect against editing or
> other alterations. The original recordings
> shall not be destroyed, and in any event
> shall be kept for ten years."

According to the testimony of Agent DeBodesta and the

governments response to Mr. James' motion to Examine The Failed

Tape Recorder, the process set out by 2518 U.S.C. was not followed

and the integrity of the evidence and testimony of the agents are

not trust worthy. Mr. James' substantial right to Due Process to a

Fair Trial was violated.

11.  The jury found Mr. James guilty of violating 846, attempt. No

special verdict on the exact amount of substance Mr. James was

responsible for was returned by the Jury.

The Jury's instructions for Count One was that the "defendant

is charged with attempting to possess with intent to distribute over

5 kilograms of powder cocaine." ROA 65. A factual finding of the

actual amount of drugs reasonably foreseeable to Mr. James was not

made by the Jury. No finding of actual amount was sought and none

was rendered as to the amount of drugs involved in Mr. James' case.

Such a finding is now required in order to establish which

Subsection of 21 U.S.C. 841 applies to Mr. James to establish the

minimum and maximum sentence. Further, the finding is even required

to determine the base level for a drug crime under the United States

Sentencing Guidelines. The Jury made no factual determination

-35-

on the actual amount of drugs involved in Mr. James' case and Blakely and
Booker does not allow a judge to make such a finding. The actual amount of drugs
must be charge in the indictment and established beyand a reasonable doubt to the
jury's satisfaction. The District Judge improperly find that Mr. James' case
involved 15 kilograms of cocain.

12.  Legal Imposibility, Legal Incapability, and Sentencing
Entrapment are all matters of law. The content of the March 21st,
and March 24th, 2002 tape recorder - which are the real evidence in
this case - showed all three elements of law suggested by Mr. James
dominated his case. The evidence showed that Mr. James had not
requested to
the day he was arrested. So Mr. James could not have entered into
any active negotiation about a drug transaction that he never did
enter. And further, since Mr. James never entered into any
negotiation to purchase cocaine from the informant source or the
informant himself, it is Legally Impossible and Legally Incapable
for Mr. James to have violated the attempt statute, 21 U.S.C. 846.

On the Sentencing Entrapment issue, the criminal informant,
through the "instruction" of the FBI Agents, approached Mr. James
for counterfeit currency. Mr. James initially refused the criminal
informant's request. After sixty calls made by the criminal
informant to Mr. James, with threats of bodily harm to Mr. James,
Mr. James agreed to provide the criminal informant with some of the
counterfeit money.

On March 21st, 2002 FBI Agent Depodesta "instructed" the
criminal informant to "engage" Mr. James in "drug communication".

-36-

This day, March 21st, 2002 was the "first time" agent Depodesta "participated in any law enforcement activity involving Mr. James. And again it was agent Depodesta who "instructed" the criminal informant to "engage" Mr. James in "drug communication". The FBI was never charged with the responsibility to investigate Mr. James at all. The United States Secret Service were the only federal agency charged to investigate Mr. James, and only on counterfeit matters.

Mr. James was not looking to purchase cocaine from no one with counterfeit money. Agent Depodesta instruction to the criminal informant to lure Mr. James in a fictitious planned robbery was a ploy to ensnare Mr. James farther into criminal activities.

## ARGUMENT

I.  MR. JAMES IS ENTITLED TO A NEW TRIAL

A.  THE GOVERNMENT WAS OBLIGATED TO PRODUCE THE RECORDING DEVICE

Mr. James filed a Motion to Produce Recording Device. FED. R. CRIM. P. 16 states that "[u]pon a defendant's request, the government must permit the defendant to inspect...tangible objects...or copies or portions of any of these items, if the item is within the government's possession, custody, or control and" (i) the item is material to preparing the defense; or (ii) the government intends to use the item in its case-in-chief at trial." These requirements were clearly met here.
                     the case showed
First, it is undisputed that the government possessed the recording device. During the first day of trial, the government even agreed to produce it after the Court ordered the government to do so. Tr. 127.

Second, ~~it is clear that~~ the government used the
*relevance from the recording* recording device during its case-in-chief. The same

recording device was employed by the government on March

21st and March 25th. Tr. 81, 173. It is well settled, and

sensible, that materials used during the government's

case-in-chief include documents or objects that will be

marked as exhibits and offered into evidence, "plus

documents [and things] which will be relied on or referred

to in any way by any witness called by the government

during its case in chief." U.S. v. Countryside Farms, 428

F. Supp. 1150, 1154 (D. Utah 1977); see also U.S. v. Yee,

129 F.R.D. 629, 635 (N.D. Ohio 1990) (agreeing that

Countryside provides a "sensible interpretation" of Rule

16's disclosure requirements); 5 ILL. CRIM. PRAC. & PRO.

§ 9:15 (citing Countryside Farms). Similarly, if a

recording of a defendant's conversation is discoverable,

then any device or machine used for this recording also is

discoverable. See U.S. v. Rosenberg, 299 F. Supp. 1241,

1246 (S.D.N.Y. 1969) (cited in Wright and Miller, Fed.

Prac. & Pro. § 254, at n.7)).

Additionally, the recording device was material to Mr.

James' defense. The Rule 16 materiality standard is not a

heavy burden. See, e.g., U.S. v. Tanner, 279 F. Supp. 457,

470 (N.D. Ill. 1967) ("The standard for materiality for

discovery under [Rule 16] should not be significantly more

stringent than the scope of discovery allowed for

depositions and interrogatories under the civil rules.")

(citations omitted); U.S. v. Lloyd, 992 F.2d 348, 352
(D.C. Cir. 1993) (remanding for determination of whether
documents were material); U.S. v. Liquid Sugars, Inc., 158
F.R.D. 466, 471 (E.D. Ca. 1994) ("if the government plans
to use the results of scientific tests as evidence, data
and reports which directly underlie those results are
generally important to the understanding of the
evidence."). Documents and objects are material if they
could significantly help in uncovering admissible evidence,
aid witness preparation, corroborate testimony, or assist
impeachment or rebuttal. Lloyd, 992 F.2d at 351. This
materiality is evident here. It is beyond dispute that the
recording device, the output of which was the cornerstone
of the government's arguments against Mr. James at trial,
would have served these helpful purposes. Among other
things, it would have allowed Mr. James to properly prepare
for and make informed decisions regarding trial and to
evalute questions concerning the use of and data contained
in the device. In sum, review of the recording device would
have served the stated purposes of Rule 16, which are to
"contribute[] to the fair and efficient administration of
criminal justice" and to "promote broader discovery." FED.
R. CRIM. P. 16 advisory committee's note B (1975).

When faced with the government's refusal at trial, the
Court initially stated that it was in favor of showing the
device to the jury. Tr. 102. The Court's initial instincts
were correct - after all, Rule 16 required its production,

-39-

and the government had shared the device with known
criminals like its informant  Allen Dubon. Although the
government agreed to produce the device at one point during
trial, see Tr. 127, on the second day of trial, it changed
its tune. U.S. Attorney Patrick Fitzgerald appeared on
behalf of the government, refused to show the device to the
Court, defense counsel or jury, and argued that its
production would reveal "ongoing techinques that are used
in drug investigations." Tr. 132. The government made no
showing that the production of the actual device would have
harmed the government's ability to conceal recording
devices on individuals. Mr. James' counsel pointed out that
they have the fundamental right to examine evidence that is
going to be used against Mr. James, that the government
knew this was an issue, and that the government should have
raised with the Seventh Circuit before the middle of trial.
Tr. 134, 139. The Court admonished the government that this
presented an appellate issue and "could result in
reversal." Tr. 137. The government persisted in its
objection.

Faced with the government's objection and refusal to
turn over the recording device, and with the Court's
repeated admonishments to do so, the parties entered into a
stipulation. The full stipulation read:

> It is stipulated between the parties that the
> recording and transmitting device used on
> March 25th, 2002 in this case was not
> malfunctioning on that day. The device was
> capable of recording and transmitting and the
> device was capable of being turned on and off

by the Government agents and the informant
involved in this case. It is further stipulated
that the Government has declined to produce the
recording transmitting device for viewing by
this jury pursuant to a privilege which the
Court has deemed valid.

Tr. 513. There is no legal basis that supports the Court's
determination that this "privilege" was valid.

Clearly, the government wanted to shroud this key
evidence from view. U.S. Attorney Fitzgerald even made an
appearance to convince the Court to reverse its decision
requiring production of the device. Having made the tatical
decision to withhold the device, however, the government is
required to show that production of the device would harm
the government. The government failed to do so, and is
responsible for the consequences of its non-disclosure. The
law and applicable rules require the government to produce
evidence that they use during the case in chief, and
evidence that is material to the defense. The government
refused to do so, and the Court allowed this abuse of Rule
16. This decision was an abuse of discretion and entitles
Mr. James to a new trial. See, e.g., U.S. v. Isa, 413 F.2d
244, 249 (7th Cir. 1969) (court's denial of defendant's
[Rule 16] motion for production of two tape recordings or
conversations between defendant and internal revenue agent
made without defendant's knowledge was reversible error).

II.      THE COURT ERRED IN ALLOWING HEARSAY TESTIMONY BY
         GOVERNMENT AGENTS THAT THE INFORMANT TOLD THEM ABOUT
         OTHER DRUG DEALS INVOLVING MR. JAMES

Prior to the trial, the government filed a motion

-41-

seeking to admit evidence of "uncharged drug trafficking"
by Mr. James under FED. R. EVID. 404(b). ROA 52 at 13. The
Court initially rejected the government's motion, and
observed that any such evidence would be prejudicial to
Mr. James. Tr. 120-121. The Court said: "I would like to
avoid the other drug deals, if there were any, because I
think that Mr. James isn't being tried for those. And,
obviously, I can issue instructions, but it gets kind of
tough, particularly if it is close, if some juror believe,
well. He is constantly engaged in drug dealing, we know
that now, so I am not going to worry about this." Tr. 122.
The Court subsequently reversed its decision and allowed
this testimony because "the overall investigation needs to
be understood." Tr. 124. Because the government decided not
to call Dubon, the Court allowed this testimony to come in
through Agent DePodesta based on statements allegedly made
by Dubon to him. See Tr. 156.

At trial, Agent DePodesta testified that Dubon
previously sold 1 kg of cocaine on two occasions and 98
pounds of marijuana on another occasion to Mr. James. Tr.
202. DePodesta further testified that Dubon was afraid for
his life due to a fall-out regarding counterfeit money from
the marijuana deal. Tr. 203* In its closing, the government
highlighted this inadmissable testimony:

*The Court also allowed government agents to testify on
repeated occasions that Dubon's information led to arrest of
five other individuals and to the recovery of 34 kgs of
cocaine. Tr. 199-200, 493-495.

> Allen Dubon is a drug dealer who had a very
> comfortable drug dealing - series of very
> comfortable drug dealing conversations with
> the defendant. And the only reason that could
> happen... was because the defendant and Allen
> Dubon has a drug relationship. You heard
> about heroin, you heard about marijuana, and in
> this case, which is the case before you,
> cocaine, the trifecta of drugs... all three of
> them. And these talked about it. Allen Dubon is
> a drug dealer. Donville James is a drug dealer.

Tr. 615. The government further argued that Mr. James was
an "experienced, cautious drug dealer," and made further
reference to alleged other drug deals. Tr. 592, 613,
621-622. This was the very same impermissible and unduly
prejudicial propensity argument that the court worried
would unfairly prejudice the jury. Allowance of this
testimony and argument was an abuse of discretion. See
U.S. v. Owens, 424 F.3d 649, 656 (7th Cir. 2005)
(reversing conviction because district court abused
discretion in allowing testimony regarding alleged
prior robbery).

### 1. Agent DePodesta's Testimony Was Inadmissible Hearsay

The government admitted that any testimony by its agent
concerning what Dubon said to him was hearsay. Tr. 481.
Disregarding this admission, and the risks of the jury
using this testimony to prove the truth of the matter
asserted (i.e, that Mr. James was a drug dealer), the
government proceeded to use this testimony for this
impermissible purpose anyway.

It is well settled law that a government agent cannot

-43-

disclose, through hearsay testimony, the substance of his
or her conversations with an informant in order to
"establish the course of the police investigation." U.S. v.
J. Williams, 133 F.3d 1048, 1051 (7th Cir. 1998) (out of
court identification by informant was inadmissible hearsay
and plain and reversible error). An "officer's testimony
must be limited to the fact that he spoke to an informant
without disclosing the substance of that conversation." Id.
at 1052. No matter how compelling the government may think
its background story, it is still required to tell this
story through admissible evidence. "To allow testimonial
repetition of a declarant's out-of-court charge that the
defendant would engage or was engaged in specific
criminality would seem to create too great a risk that
these dangers [of unfair prejudice and misleading the jury]
will actualize. That risk cannot be justified simply to set
forth the background of the investigation." U.S. v.
Mancillas, 580 F.2d 1301, 1310 (7th Cir. 1978) (error to
allow government agent's hearsay testimony about informant
tip, but finding not reversible due to defense tactics);
see U.S. v. Brown, 767 F.2d 1078, 1084 (4th Cir. 1985)
(reversing conviction because court improperly allowed
government agent to give hearsay testimony that informant
told him that defendant had stolen shrimp from Navy
warehouse). The government insisted, and the Court allowed,
such prejudicial hearsay testimony to explain the
background of the government's investigation. Tr. 124. The

government used it for much more - to try and prove that Mr. James was an "experienced " drug dealer involved in the "trifecta" of drugs. This was clear error.

## 2.  This Hearsay Testimony Violated Mr. James' Confrontation Clause Rights

In Crawford v. Washington, the U.S. Supreme Court held that the Sixth Amendment bars that admission of out-of-court testimonial statements unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination. 541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004). Testimonial statements include "pre-trial statements that the declarants would reasonably expect to be used prosecutorially" and "statements that were made under circumstances that would led an objective witness reasonably to believe that the statement would be available for use at later trial." Id. at 1364. Here, Dubon provided his alleged statement to the FBI so that they could investigate and prosecute Mr. James, and as a means for Dubon to try and make his own criminal problems disappear.

not only anticipated that his statement could be used to prosecute Mr. James - he intended it to be used for that purpose. Because Dubon's alleged statement to Agent DePodesta fits either of these catagories, it was testimonial and not admissible. This Court should review de novo this adverse evidentiary ruling that impacted Mr. James' Sixth Amendment rights to confront his accuser.

The Seventh Circuit has warned against the "potential

-45-

for abuse when [government agents] testify to the
out-of-court statements of a [non-testifying] confidential
informant." U.S. v. Silva, 380 F.3d 1018, 1020 (7th Cir.
2004) (reversing conviction; citing confrontation clause
issues). In addition to being hearsay, courts have
concluded that the use of such testimony unfairly limits
the defendants' constitutional rights to confront and
cross-examine the witnesses against him. See U.S. v.
Cromer, 389 F.3d 662, 674-75 (6th Cir. 2004) (reversing
conviction due to government's use of hearsay statements by
confidential informant). They have done so because it is
clear that such statements are testimonial and that
"[s]tatements 'made to the authorities who will use them in
investigating and prosecuting a crime'...are precisely the
sort of accusatory statements the Confrontation Clause was
designed to address." Id.

Here, the Court allowed the government to make such
criminal accusations through a "clean witness," Agent
DePodesta, which allowed the government to not immunize
Dubon and keep him off the witness stand. Mr. James'
counsel objected to this ruling. Tr. 118-123, 134. The
allowance of this "anonymous accusations of crime without
any opportunity for cross-examination [made] a mockery of
th Confrontation Clause." Id. at 675. The government again
chose, and the Court allowed, this improper course of
action, which was reversible error.

-46-

### 3.  This Hearsay Testimony and Argument Violated Fed. R. Evid. 403 And 404

FED. R. EVID. 404(b) forbids the use of evidence of a
defendant's history of alleged illegal acts to demonstrate
that he is a person of bad character and likely therefore
to have committed the crime of which he is accused in the
present case. FED. R. EVID. 403 also admonishes that
relevant evidence "may be excluded if its probative value
is substantially outweighed by the danger of unfair
prejudice, confusion of the issues, or misleading the
jury." Challenges to the admission of evidence based on
these rules is reviewed under an abuse of discretion
standard.

Notwithstanding these clear rules, the government
requested, and the Court allowed, testimony concerning
unrelated crimes that allegedly involved Mr. James. The
government exacerbated this problem by making repeated,
prejudicial reference to this testimony in closing
argument. Despite the fact that Mr. James had no prior
convictions, and that no charges were even filed relating
to the alleged other crimes, the government pounced on this
testimony to argue that Mr. James was an experienced drug
dealer. Tr. 592, 615, 622. The government made these other
alleged crimes a focus point of their rebuttal and argued
that Mr. James was mixed up with the "trifecta" of drugs.
Tr. 622. This testimony and argument was purportedly
admitted only as background explanation, and was not to be

-47-

used, and was not admissible, to prove that Mr. James was a drug dealer. This testimony and argument was used to convince the jury in a weak case with hard to hear tapes that Mr. James was a drug dealer, and that he had a propensity to commit crime. It was clearly used for the truth of the matter asserted and in an attempt to bolster the reliability of Mr. James' written post-arrest statement. Such a purpose (and inference) is forbidden by Rules 403 and 404. The use and allowance of this propensity evidence and prejudicial argument requires reversal. See U.S. v. Beasley, 809 F.2d 1273, 1277-1281 (7th Cir. 1987) (reversing seven counts of conviction based on Rules 403 and 404 due to improper admission of other drug purchases); J. Williams, 133 F.3d at 1052 (allowing agent's testimony about informant's tip was more prejudicial than probative and reversible error; noting that jury may believe the testimony without any guarantee that it represents the truth); U.S. v. L. Williams, 739 F.2d 297, 300 (7th Cir. 1984) (reversing conviction for Rule 404 violations; "Whenever the prosecution improperly introduces evidence relating to defendant's bad character, there is always danger that evidence will cause the defendant undue prejudice."); U.S. v. Hernandez, 750 F.2d 1256, 1257-1258 (5th Cir. 1985) (reversing conviction for Rules 403 and 404 violations; DEA agent testified that he was informed that defendant was a known cocaine trafficker by other

-48-

government agency); 10 McCormick on Evidence § 249 (5th ed. 1999) ("[Officers] should not... be allowed to relate historical aspects of the case [through] inadmissible hearsay. Such statements are sometimes erroneously admitted under the argument that the officers are entitled to give the information upon which they acted. The need for this evidence is slight, and the likelihood of misuse great.")

A verdict is only as fair as the evidence on which it is based. Considering that Mr. James and the jury were deprived of the opportunity to review the recording device, and were subjected to prejudicial references to improperly used hearsay concerning alleged other crimes, the verdict lacks reliability and the trial was unfair. For the reasons set forth herein, Mr. James' sentence should be vacated, and he should be granted a new, and fair, trial.

## III. INSUFFICIENCY OF THE EVIDENCE TO PROVE COUNT ONE

Whether Mr. James' case should be remanded for dismissal of count-one of the indictment due to insufficiency of the evidence to prove Mr. James guilty beyond a reasonable doubt for attempt to posses with intent to distribute cocaine. U.S. v. Cea, cite as 914 F.2d 881 (7th Cir. 1990).

Mr. James was found guilty of attempt a violation of 21 U.S.C. 846. This charge requires proof that Mr. James acted with specific intent to commit the underlying offense, and in addition took a substantial step toward its completion. U.S. v. Rovetuso, 768 F.2d

-49-

809, 821 (7th Cir. 1985), cert. denied, 476 U.S. 1106, 106 S.Ct.
1957, 90 L.Ed.2d 360 (1986). The government failed to prove either
prerequisite beyond a reasonable doubt.

### 1.  Specific Intent

When a defendant has been active in negotiating a drug
transaction and has actually taken physical steps to obtain
possession of the drug, the attempt offense is complete.
U.S. v. Williams, 704 F.2d 315, 321 (6th Cir.), cert.
denied, 464 U.S. 991, 104 S.Ct. 481, 78 L.Ed.2d 679 (1983);
U.S. v. Cafaro, 480 F.Supp. 511, 515 (S.D.N.Y. 1979). See
U.S. v. Cea, cite as 914 F.2d 821 (7th Cir. 1990); U.S. v.
Barnes, 230 F.3d 311, 314 (7th Cir. 2000). There was
absolutely no negotiation between the government criminal
informant and Mr. James for Mr. James to purchase any
amount of cocaine from the criminal informant's source on
March 25th, 2002. The governments' own evidence - the March
21st and March 24th, 2002 recorded conversations, showed
that Mr. James did not enter into any negotiations with the
criminal informant to purchase cocaine from the criminal
informant's source. In fact, the governments' own evidence
showed that the government informant and FBI agents
originated, created, instigated, incited, and attempted to
lure Mr. James in a drug crime. See copies of disc that are
with court file "volume 1 of 3".

The evidence showed that the criminal informant
approached Mr. James and asked Mr. James to provide him

-50-

with counterfeit money. Tr. 220. It is clear from the
testimony aduced at trial that FBI Agent DePodesta
"instructed" the criminal informant to "engage" Mr. James
in drug communication. Tr. 248. The drug communication that
the criminal informant "engaged Mr. James in" was a plan
originated by the governments' agents for the criminal
informant to rob cocaine from the criminal informants'
source and for the criminal informant to arrange his
planned robbery to appear like it was Mr. James who ("fuck
us up") was the one responsible for the robbery. Appendix
0083 and 0086.

The content of the conversations on the March 21st and
March 24th, 2002 recorded conversations that were played
for the jury were preliminary discussions - initiated by
the criminal informant, regarding the criminal informants'
plan to rob cocaine from his own suppliers by paying them
with the counterfeit money the criminal informant asked Mr.
James to provide him with. In U.S. v. Cea, the Seventh
Circuit focused on the fact that Cea was active in
endeavoring to complete "the transaction," U.S. v. Cea,
cite as 914 F.2d 881 (7th Cir. 1990). In the instant case,
there were no active negotiations to complete "the
transaction," because Mr. James never entered into any
agreement with the criminal informant for Mr. James to
purchase cocaine.

2.   **Substantial Step**

The record before the Court must be very sufficient in

-51-

nature to establish that defendant engaged in conduct
constituting a "substantial step" towards the commission of
a crime. U.S. v. Extrada, cite as 256 F.3d 466 (7th Cir.
2001). To support a finding to establish that defendant
engaged in: conduct constituting a "substantial step"
toward the commission of a crime, the Court must focus on
what acts the defendant took to complete a substantive
crime. U.S. v. Barnes, 230 F.3d 311, 314 (7th Cir. 2000).
It is legally impossible and legally incapable for Mr.
James to have taken a substantial step to possess cocaine
when the evidence clearly showed that the criminal
informant only "engage" Mr. James in preliminary discussion
for Mr. James to assist him in his plan to rob cocaine from
his own supplier.

The evidence is insufficient to prove that Mr. James
acted with specific intent and in addition took a
substantial step to commit the underlying offense,
possession with intent to distribute. The government failed
to prove other prerequiste beyond a reasonable doubt. U.S.
v. Cea, cite as 914 F.2d 881 (7th Cir. 1990). Mr. James'
case should be remanded to the District Court with
instruction to dismiss count I.

IV.  **THE GOVERNMENT FAILED TO PROVE THE "IN RELATION TO" OF 924(c)**

Whether Mr. James' case should be remanded for dismissal of
count two because the government failed to prove the "in
relation to" requirement of 924(c). U.S. v. Taylor, 31 F.3d 459

(7th Cir. 1994).

## 1.  "In Relation To" Prong

The "in relation to" requirement of 924(c) requires the government to prove that the firearm facilitated or had the potential of facilitating the drug trafficking offense. U.S. v. Manillas, 183 F.3d 707 (7th Cir. 1999). A conviction under the "in relation to" prong of 924(c) is inappropriate if the firearms presence is coincidental or entirely unrelated to the crime. U.S. v. Statt, 245 F.3d 890, 906 (7th Cir. 2001); See also U.S. v. Adkins, 247 F.3d 444, 452 (7th Cir. 2001) (merely possessing weapon not enough).

The District Court abused its discretion in denying Mr. James' Motion for Acquittal Due to Government Violation of Defendant's Substantial Rights and Mr. James' amended Motion for Acquittal Due To Government Violation Of Defendant's Substantial Rights. In order to try and satisfy the "in relation to" prong of 924(c), the government introduced hearsay testimony at trial through FBI Agent DePodesta that on March 25th, 2002 Mr. James stated to the criminal informant:

> "I don't have to use my guy then, right?"
> See Tr. DePodesta testimony.

Without this alleged statement there is no other relationship between the gun charge and the drug charge, and the "in relation to" prong of 924(c) couldn't have been satisfied.

-53-

Other than FBI Agent DePodesta's testimony there is no
other evidence to show that Mr. James made the alleged
statement. At the time Mr. James made the alledged
statement the criminal informant was wearing a recording
device placed on him by Agent DePodesta. Tr. 172. There
were significant amounts of testimony at trial about the
recorded disc that was made by the criminal informant the
day Mr. James made the alleged statement. Agent Tackett,
the only testifying agent present in the car with the
transmitter, testified that he could not "really hear what
was being said." Tr. 96. Yet, Agent DePodesta testified
that he heard Mr. James make the alleged statement.

Mr. James, in his Affidavit Of Truth, showed the
District Court evidence that the disc containing the
alleged statement was recorded on March 25th, 2002, was 41
minutes in length was inventoried by the Secret Service as
evidence in SSF (Secret Service File) 1544, with serial
number 201-2002-CE-000442, and that the government failed
to disclose the disc to Mr. James as required under Brady
v. Maryland and FED. R. CRIM. pg. 16. See Appendix
0033-0035.

2.   "Use"

Section 924(c)(1)'s language indicates that Congress
intended "use" in the active sense of "to avail oneself
of." Smith v. U.S., 508 U.S. ___ (1993). This reading
receives further support from 924(c)'s context within the
statutory scheme, and neither the sections amendment

-54-

history nor Smith, Supra, at _____, is to the contrary.
Thus, to sustain a conviction under the "use" prong of
section 924(c)(1), the government must show that the
defendant actively employed the firearm "during" and "in
relation to" the predicate crime. Under this reading, "use"
includes the acts of brandishing, displaying, bartering,
striking with, and firing or attempting to fire, a firearm,
as well as the making of a reference to a firearm in a
defendant's possession. It does not include mere placement
of a firearm for protection at or near the site of a drug
crime or its proceeds or paraphernalia, nor the nearby
concealment of a gun to be at the ready for an imminent
confrontation.

The statement alledgely made by Mr. James ("I don't
have to use my gun then, right") would be making a
reference to a firearm allegedly in Mr. James' possession,
and would satisfy the criteria to sustain a conviction
under Smith. Agent Mckeena testified that during his
interview with Mr. James, Mr. James told him that he had
the gun for personal protection. Tr. 278. This alleged
admission of possessing a gun is containted nowhere in Mr.
James' handwritten and signed statement, even though Agent
McKenna testified that Mr. James' handwritten statement
was consistent with what he had originally written and with
what Mr. James told him. The alleged admission of
possessing a gun is contained nowhere in Agent Mckenna's
first report. Tr. 278. According to Agent Mckenna, he

amended his report a few days after the original report.
Agent Mckenna did not suggest that the report was amended
or supplimented. Instead, he placed the alleged admission
to the gun in the middle of his original report and left
the report to appear that it is not a suppliment or amended
report at all, but a report prepared all at the same time.
Tr. 278-280, 297. See also ROA 71 (attacking the original
and amended reports). If Mr. James however did mention to
Agent Mckenna that he had the gun for personal protection,
this statement would show that Mr. James did not violate
the "use" prong as required in Smith.

The evidence of Mr. James possessing a firearm during
or in relation to a crime, was insufficient to support a
conviction beyond a reasonable doubt where the testimony of
law enforcement agents was contrary to human experience and
was unworthy of belief. See Tr. 70, 309, 441-442, 443, 450,
454, and 456.

The government could not, and can not prove beyond a
reasonable doubt the "in relation to" prong of 924(c). U.S.
v. Taylor, 31 F.3d 459 (7th Cir. 1994).

Mr. James' case should be remanded with instruction for
the District Court to dismiss count two of the indictment.

V.    THE GOVERNMENT FAILED TO PROVE MR. JAMES INTENDED TO DEFRAUD ANYONE

Whether Mr. James' case should be remanded for dismissal of
count three because the government failed to prove all of the
elements where it failed to prove that Mr. James intended to
defraud anyone. U.S. v. Beck, 615 F.2d 441 (7th Cir. 1980).

A person who, with intent to defraud, passes or attempts to pass counterfeit obligations, commits the crime of counterfeiting. 18 U.S.C. 472. To obtain a conviction, the government must show that: 1)The defendant possessed counterfeit obligations; 2)He or she knew they were forged; 3)He or she passed or possessed them with the intent to defraud. U.S. v. Bolin, 35 F.3d 306, 309 (7th Cir. 1994).

The mere passing of counterfeit money, without the intent to defraud, does not violate Section 472. U.S. v. Snow, 670, F.2d 749, 753 (7th Cir. 1982); U.S. v. Tucker, 820 F.2d 234, 236 (7th Cir. 1987). In the instant case the evidence showed that the criminal informant approached Mr. James and asked Mr. James for counterfeit money. Agent DePodesta testified that:

> "The criminal informant had gone to Mr. James and tried to contact Mr. James on numerous occassions, and Mr. James would not cooperate with him to give him money."
> Tr. 220

Speaking of the counterfeit money the criminal informant asked Mr. James to provide him with, the criminal informant instructed Mr. James to:

> "Stack them up and put real money on top, at least one twenty or some shit like that and make it seems real." Appendix 0080, paragraph 7.

> "We show him the money, some money, fake money..." Appendix 0076, paragraph 15.

> "Just make sure for tomorrow, just make that they (the counterfeit money) look like three ($300,000)." Appendix 0117, paragraph 1.

It is clear that the criminal informant asked for counterfeit money; The criminal informant knew the money he asked for was counterfeit; Mr. James never concealed the fact that the currency was

-57-

counterfeit, as it was made to the criminal informant's specific request for counterfeit money. The informant expected nothing of value, and he gave nothing of value.

Mr. James' case should be remanded for dismissal of count three because the government failed to prove all of the elements. Where it failed to prove that Mr. James intended to defraud anyone. U.S. v. Beck, 615 F.2d 441 (7th Cir 1980).

## VI.    MR. JAMES WAS ENTRAPPED INTO CRIMINAL ACTIVITIES

The District Court erred in denying Mr. James' motion to address the issue of entrapment where Mr. James brought the facts to the court's attention that he was entrapped in a drug crime by the criminal informant and Agent DePodesta of the FBI. Sherman v. U.S., 356 US 369, 2L.ed 848, S.Ct. 819.

Mr. James was entrapped into a drug crime and the District Court erred in denying Mr. James' motion to address the issue of entrapment. Mr. James' case was originally investigated by the FBI according to FBI Agent DePodesta from at least "November 2001." Tr. 194, 204, and 213. FBI Agent Sodetz contacted the Secret Service on "February 8th, 2002." The Secret Service was charged to investigate Mr. James for:

1. Primary case type- Manufacturing United States Currency, 735.041.

2. Secondary case type- Dealing in United States Currency, 735.021.

3. Use of Emerging Technology, 848.930.

All three case types dealing with countefeiting matters only, which are all out of the investigative jurisdiction of the FBI.

-58-

FBI Agent DePodesta testified that the "first time he took part in any law enforcement activities involving Mr. James was on March 21st, 2002" (Tr. 109), which is forty two days after the FBI gave the case to the United States Secret Service. Agent DePodesta testified that he "instructed the CI (criminal informant) to contact Mr. James" (Tr. 221), and that "he (informant) had gone to Mr. James on - had tried to contact Mr. James on numerous occassions and Mr. James would not cooperate with him to provide him with money." Tr. 220. Agent DePodesta then testified that he "instructed the criminal informant to engage Mr. James in drug communication." The U.S. Attorney, Mr. Collins, asked Agent DePodesta at trial:

> "Did you instruct the criminal informant just to contact Mr. James, or did you instruct him to engage Mr. James in drug communication?"

Agent DePodesta's response was:

> "Both." Tr. 248.

Agent DePodesta instructed the criminal informant to engage Mr. James in drug communication without probable cause to do so. The FBI, whom originally investigated Mr. James from at least "November 2001", found no evidence that Mr. James was involved in any illegal drug activities. In the criminal informant's interview with the prosecutor, he told them that:

> "On several occassions Mr. James suggested to the source (informant) that he could supply the source with counterfeit money, that the source could use and buy drugs from a dealer, than the source could sell the drugs for cash to pay off his debt." Appendix 0143, Paragraph 2.

This statement was made in the presence of FBI Agent Sodetz, who was

the criminal informant's primary handler. The presence of Agent Sodetz in the criminal informant's interview with the prosecutor was to make sure the criminal informant told the prosecutors the same story he told to the FBI.

In the criminal informant's interview with the prosecutor, he did not mention to them that Mr. James wanted to purchase cocaine with counterfeit money. He only mentioned to them that Mr. James suggested that he could supply the counterfeit money.

On March 21st, 2002, his first time taking part in any law enforcing activities partaining to Mr. James (Tr. 109), Agent DePodesta instructed the criminal informant to "engage Mr. James in drug communication." Tr. 248. This was forty two days after the case was no longer in his agency's jurisdiction, was an egregous instigation of a more serious crime not charged to the FBI, and was outside the business of the investigation charged to the Secret Service. The March 21st and 24th, 2002 tapes showed that the criminal informant followed Agent DePodesta's instruction to "engage Mr. James in drug communication" by entering into a preliminary discussion with Mr. James for Mr. James to assist the criminal informant to "rob" cocaine from a guy the criminal informant "setup" in the "parking lot at Naragansett and Deversey" in Chicago, by paying for the cocaine with counterfeit money. Appendix 0083, paragraph 2. The Criminal informant would then arrange his planned robbery to appear to the "guy" he was planning to "rob" like it was Mr. James who "fuck" them "up" (Mr. James who was responsible for the robbery). Appendix 0086, paragraph 9.

To fully create a drug crime and to pull Mr. James even deeper

-60-

into criminal activities, the criminal informant said to Mr. James:

> "Alright you help sell them" (the planned
> stolen cocaine). Appendix 0079, paragraph
> 10.

> "It would be better, how we gonna split
> (the stolen cocaine) or what? Cause I
> wanna do it like I tell you. Ten grand I
> gonna sell you each one (the same stolen
> cocaine) ten ($10,000). You make ten, I
> make ten." Appendix 0076, last paragraph,
> and 0077, paragraph 1.

As is shown here, it is the criminal informant who is the one

offering to sell his planned stolen cocaine and not some source as

the criminal informant claimed. See Grand Jury Testimony, Appendix

0063-0064.

The government criminal informant was not acting as a decoy to

discover evidence of a committed crime, but was acting in the manor

to ensnare Mr. James into greater offenses. Mr. Justice Frankfurtner

in his opinion in Sherman v. U.S., 356 US 369, 2L.ed 848, S.Ct. 819

stated: "... the underlying reason for the defense of entrapment, no

matter what the defendant's past record and present inclintation to

criminality, or the depth to which he was sunk in the estimation of

society, certain police conduct to ensnare him into further crime is

not to be tolerated by an advanced society."

In U.S. v. Mathues, 22 F.2d 979 (D.C.E.D. Pa. 1927), '...where

a government agent, ... having charge of investigation and obtaining

evidence concerning an unlawful business, ... offers himself as a

participator in a different offense not connected with the business

under investigation... but a crime to which he must be a party to,

and, under the evidence, there has been no intention on the part of

the entrapped to commit such an offense until he was lured into it,

-61-

the policy of the law will not permit prosecution based on such
entrapment to be carried on."

The view that is held in the Seventh Circuit is "so that when
an officer induces a person who has had no intention of committing
a crime, to violate the law, the courts will not lend their aid in
punishment of persons thus lured into committing crime." O'Brien V.
U.S., 51 F.2d 674 (7th Cir. 1931).

"The violation of the Principles of Justice by the entrapment
of the unwary into crime should be dealt with by the court no matter
by whom or at what stage of the proceeding the facts are brought to
its attention...," Sherman at 858. The facts set forth violate the
Principle of Justice. The criminal informant and Agent DePodesta
entrapped Mr. James into crimes Mr. James would not have attempted
to commit on his own. Crimes to which Mr. James was convicted of. In
U.S. v. Cotts, 14 F.3d 300 N.2 (7th Cir. 1994), the court states:
"Our inclination,... is not to subject isolated government conduct
to a special brand of scrutiny when it's effect is felt at
sentencing... so long as it does not rise to the level of true
entrapment..."

The governments' criminal informant's actions and the actions
of FBI Agent DePodesta rises to the level of true entrapment in Mr.
James' case. The District Court erred in denying Mr. James' Motion
to Address the Issue of Entrapment, where Mr. James brought the
facts to the court's attention that he was entrapped in a drug crime
by the criminal informant and Agent DePodesta of the FBI. Sherman v.
U.S., 356 US 369, 2L.ed 848, S.Ct. 819.

Mr. James' case should be remanded to the District Court with

instruction, to dimiss the indictment due to the government

violation of the Principle of Justice by entrapping Mr. James into

criminal activities.

## VII. THE DISTRICT COURT FAILED TO ADDRESS THE SUBORNATION OF PERJURY

The District Court erred in denying Mr. James' Motion for

Acquittal Due To Prosecutor Suborning Perjury. Mr. James was

deprived of liberty without due process of law. Mooney v. Holohan,

294 U.S. 103, 112-113, 55 S.Ct. 340, 341-42, 79 L.Ed 791 (1935);

U.S. v. Agurs, 427 U.S. 97, 103, and n.8, 96 S.Ct. 2392, 2397, and

n.8, 49 L.Ed 342 (1976)(citing cases). Also see Robb v. Connolly,

111 U.S. 624, 637.

During the interview with prosecutors Mr. Hays and Mr. Collins,

the criminal informant mentioned to them that Mr. James had only:

> "On several occasions 'James' suggested
> that he could provide the source with
> countefeit money, that the source could use
> and buy drugs from a dealer, and the source
> could sell the drugs for cash to pay off
> his debt." Appendix 0143, paragraph 2. See
> pages 0136-0144 for the entire interview.

After the interview with the criminal informant, the prosecutors

prepared a statement for the criminal informant to read before the

Grand Jury in their attempt to seek an indictment against Mr. James.

In their prepared statement, Ms. Hays and Mr. Collins wrote:

1. "On March 16th, 2002, James called me
   (the criminal informant) and we agreed that
   he would purchase one kilo of cocaine from
   my source for $20,000 in counterfeit
   currency and he would give me $10,000 in
   real currency."

2. "On March 21st, 2002, we agreed that James
   would purchase 10 kilos of cocaine from my
   source for $200,000 in counterfeit money."

-63-

3.   "On March 22nd, 2002, James called me and asked whether he could buy 20 kilograms from my source. I told him I will have to see whether my source had 20 kilograms available."

4.   "On March 24th, 2002, James and I agreed that he will purchase 15 kilograms from my source. He told me he would pay me $20,000 in real currency for arranging that transaction."

5.   "On March 25th, 2002, James and I met in McDonald's parking lot to further discuss the conduct of that transaction."

6.   "He also said to me something to the effect of, 'I won't have to use my gun then, right?'"

It is clear from the criminal informant's interview with the prosecutors that the criminal informant did not mention anything to the effect of what the prosecutors wrote in their prepared statement that the criminal informant read before the Grand Jury.

The government was in possession of the March 21st and 24th, 2002 recorded conversations that showed that the criminal informant only engaged Mr. James in preliminary discussions to rob cocaine from his own source. And that Mr. James had no agreement with the criminal informant to purchase cocaine in March of 2002. The prosecutors had prior knowledge that they were providing the criminal informant with perjured statements to read before the Grand Jury. The perjured statements formed the basis for the Grand Jury's investigation, and were meant to influence the decision of the Grand Jury to return an indictment against Mr. James on narcotics and gun charges.

There would not have been either an indictment against Mr. James or a trial for narcotics and gun charges if the prosecutors

did not suborned perjury. The prosecutors created a chain of
causation with their perjured prepared statement, which resulted in
the conviction of Mr. James of narcotics and gun charges due only to
the denial of Mr. James' right to a fair trial, where the
prosecutors altered, manipulated, and suppressed key evidence in the
case, which included:

1.  The March 25th, 2002 informants' recorded
    body wired conversation with Mr. James.

2.  The original March 24, 2002 recorded phone
    conversation with Mr. James.

3.  The original March 21st, 2002 informant
    recorded body wired conversation with Mr.
    James.

4.  The original March 25th, 2002 video
    recording of the event of Mr. James being
    arrested on March 25th, 2002.

The prosecutors, Ms. Hays and Mr. Collins contrived a
conviction on narcotics and gun charges through the pretense of a
trial which in truth was used as a means to deprive Mr. James of his
liberty through a deliberate deception of the Grand Jury, Court, and
Trial Jury by the presentation of testimony known to be false.

Mr. James was deprived of liberty without Due Process of Law.
In Mooney V. Holohan, 294 U.S. 103, 112-113, 55 S.Ct. 340, 341-42,
79 L.ed. 791 (1935)("a prosecutors knowing use of perjured testimony
violates the Fourteenth Amendment.") See also U.S. v. Agurs, 427
U.S. 97, 103, and n.8, 96 S.Ct. 2392, 2397, and n.8, 49 L.ed 342
(1976)(citing cases). The Supreme Court in Mooney v. Holohan,
quoting Robb v. Connolly, 111 U.S. 624, 637, states ("upon the state
courts, equally with the Courts of the Union, rest the obligation to
guard and enforce every right secured by the Constitution"). The

-65-

Supreme Court in Pyle v. Kansas, states: "Allegations sufficiently charged a deprivation of rights guaranteed by the Federal Constitution,... if proven, would entitle the petitioner to be released from his present custody." Id. at 215, 216, 63, S.Ct. 117.81 L.Ed 214 (1995).

The District Court erred in denying Mr. James' pro-se Motion for Acquittal Due To Prosecutors Suborning Perjury. The District Court failed to address the elements of Mr. James' perjury allegations as the Supreme Court suggested in Dominquez. Mr. James' case should be remanded to the District Court with instruction to dismiss the indictment.

## VIII.    THE TRIAL JUDGE FAILED TO MAKE AN INDEPENDENT FINDING ESTABLISHING PERJURY

The District Court erred in denying Mr. James' Motion to Address Perjured Statement pursuant to 18 U.S.C. 1623(a). Where "the trial judge failed to make an independent finding establishing perjury." Dunnigan, 507 at 93. 113 S.Ct. 1117. U.S. v. Dominquez, 992 F.2d 678, 685 (7th Cir. 1993) Cert. denied ____U.S.____, 114 S.Ct. 250, 126 L.Ed 203(1994).

Mr. James was indicted by a Federal Grand Jury based on intentional false and misleading statements. The District Court erred in denying Mr. James' Motion to Address Perjury Statements. The criminal informant read a statement before the Grand Jury which was prepared for him by the prosecutors. Reading from this prepared statement, the criminal informant testified that:

> 1.    "On March 16th, 2001, James called me and we agreed that he would purchase 1 kilo of cocaine from my source for $20,000 in

> counterfeit currency and he would give me
> $10,000 in real currency." Appendix
> 0061-0062.

Mr. James did not know the criminal informant in March of 2001.

> "On March 16th, 2002, James...
> telephonically contacted the source
> (criminal informant) and they discussed a
> 1 kilogram cocaine transaction..." Appendix
> 0047, paragraph 2.

Phone records showed that Mr. James did not call the criminal

informant on March 16th, 2002. Appendix 0068-0070. One of the "69"

calls the criminal informant made to Mr. James between February 8th,

2002 and March 21st, 2002 was not made on March 16th, 2002. Appendix

0065-0066. The criminal informant and Mr. James did not speak to

each other on March 16th, 2002. It would be impossible for Mr. James

to have initiated a drug crime on March 16th, 2002, for which he was

later convicted of, if he did not speak to the criminal informant on

that date.

> 2.   "On March 21st, 2002, we agree that James
> would purchase 10 kilograms of cocaine from
> my source for $200,000 in counterfeit
> money." Appendix 0062, paragraph 2.

The context of the recorded conversation on March 21st, 2002 showed

that Mr. James did not enter into any agreement with the criminal

informant on March 21st, 2002 to buy drugs from anyone. The tape

showed that the criminal informant only entered into preliminary

discussions with Mr. James for the criminal informant to "rob" 7 to

10 kilograms of cocaine from a guy the criminal informant "setup" to

"rob" at the "parking lot at the corner of Naragansett and

Deversey." (Section 3, A-B)

> 3.   "On March 22nd, 2002, James called me and

-67-

asked whether he could buy 20 kilograms
from my source." Appendix 0062, paragraph 2

The tapes also showed that the criminal informant is the one who
rasied the amount of cocaine he was planning to rob from the guy he
setup in the parking lot. Section 3, B3 last paragraph.

4.   "On March 24th, 2002, James and I agreed
that he will purchase 15 kilograms from my
source for $300,000 in counterfeit money."
Appendix 0062, paragraph 3

Again the tapes showed that Mr. James had no agreement with the
criminal informant on March 24th, 2002 to buy cocaine from anyone.
The March 24th, 2002 recorded conversation showed that the criminal
informant increased the amount of cocaine he wanted to rob from the
guy he setup to 15 kilograms. The tapes showed that the conversation
between Mr. James and the criminal informant on March 24th, 2002 was
a continuation of the March 21st, 2002 preliminary discussion for
the criminal informant to "rob" cocaine from his own source. Section
3, A and B.

5.   "He (James) told me that he would pay me
$20,000 in real currency for arranging that
(the 15 kilograms) transaction." Appendix
0062, paragraph 3

This statement is the most egregous statement that was falsely made
to mislead the Grand Jury. The criminal informant in his interview
with the prosecutors never mentioned any of the above statement to
them. Appendix 0136-0143. The contents of the March 21st, and March
24th, 2002 recorded conversations showed that these statements are
completely false.

These statements were the principal focus of the Grand Jury's
inquiry and consitute the basis of their investigation. The false

-68-

and misleading statements made before the Grand Jury postuled the informant's deceit. The informant's false and misleading statements were intended to, and resulted in, influencing the judgement of the Grand Jury to return an indictment against Mr. James on narcotic and gun violations.

In Dunnigan, the Court held: "A person committed perjury when he gives false testimony concerning a material matter with the willful intent to provide false testimony." Dunnigan, 507, at 90, 92, 133 S.Ct. 1116; ("... and based on perjury, the trial judge must make an independent finding establishing perjury") Id. 507 at 93. 113 S.Ct. 1117.

The Supreme Court has noted that, in this context, "it is preferable for a District Court to address each element of an alleged perjury in a seperate and clear finding." U.S. v. Dominquez, 992 F. 2d 678, 685 (7th Cir. 1993) cert. denied ___ U.S. ___, 114 S.Ct. 250, 126 L.Ed.2d 203(1994). The criminal informant's intentional false and misleading statements before the Grand Jury clearly violated 1623(a) United States Code, "false swearing statute," and was a declaration under oath, U.S. v. Sherman, 150 F.3d 310 (3rd Cir. 1999); U.S. v. Gellene, 182 F.3d 578(7th Cir. 1998). This Circuit has held "as long as... testimony had a material tendency to influence or was capable of influencing it was material." Grant, 119 F.3d at 539. Gaudin, at 508, 115 S.Ct. at 2313.

Mr. James was indicted by the Grand Jury based on the criminal informants intentional false and misrepresentation of material facts. The District Court erred in denying Mr. James' Motion to

Address Perjured Statement, where the trial judge failed to make an independent finding establishing perjury. Dunnigan, 507 at 93.113 S.Ct. 1117. U.S. v. Dominquez, 992 F.2d 678, 685(7th Cir. 1993) cert. denied ____U.S.____, 114 S.Ct. 250, 126 L.Ed 203 (1994).

Mr. James' case should be remanded to the District Court with instructions to dismiss Count One and Count Two of the indictment due to perjured statements made before the Grand Jury.

## IX.   MR. JAMES" RIGHT TO A FAIR TRIAL WAS SUBSTANTIALLY VIOLATED

The District Court erred in denying Mr. James' pro-se Motion For Acquittal Due To Government's Violation of Defendant's Substantial Rights. Where Mr. James presentend evidence to the judge that the March 25th, 2002 body wire recording made by the criminal informant was recorded and was 41 minutes in length, inventoried, witnessed, and supervised by Secret Service Agents. This March 25th, 2002 body wire recording was intentionally suppressed by the government which violates Mr. James' substantial rights. Pyle v. Kansas, at 215, 216, 63, S.Ct. 117. 87 L.Ed. 214(1995).

In Mr. James' original motion, Mr. James brought the Courts attention to his sworn Affidavit of Truth, Appendix 0001, the Disposition of Evidence, Contraband and Personal Property List, Appendix 0163, and Certified Inventory of Evidence List, Appendix 0165, This labeled the March 25th, 2002 recording with the same serial number, FBI Agent DePodesta report labeled, FBI form FD-302 investigation on 3/25/2002, March 25th, 2002. Appendix 0159 paragraph 1 and 0161, paragraph 3. This all contradicts the prosecutor's claim that the agents did not turn on the equipment; that in testing "they" were turning the equipment on and off and

-70-

"they" left it off by mistake....

The government willfully suppressed the March 25th, 2002 body wire recording made by the criminal informant. The recorded conversation contains exculpartory material that woud have shown that Mr. James did not make nor did not have any agreement with the criminal informant to buy 15 kilograms of cocaine on March 25th, 2002 using $300,000 in counterfeit money.

Mr. James' Due Process Right to a Fair Trial was susbtantially violated by the government suppression of the March 25th, 2002 informant body wire recorded conversation, which is "a deprovation of Mr. James' Rights guaranteed by the Federal Constitution." Pyle v. Kansas, at 215, 216, 63, S.Ct. 117. 87 L.Ed 214(1995).

The District Court erred in denying Mr. James' pro-se Motion For Acquittal Due to Government Violation of Defendant's Substantial Rights." Mr. James' case should be remanded to the District Court with instructions to dismiss the indictment with prejudice due to government violation of Mr. James' substantial rights guaranteed by the Federal Constitution.

## X. MR. JAMES DUE PROCESS RIGHT WAS VIOLATED

Whether Mr. James' case should be remanded for dismissal of indictment due to the government violation of Mr. James' Due Process Right to at Fair Trial. Where the government admitted to destroying exculpatory material. Namely, the original recordings of all recordings in Mr. James' case:

1.  The March 25th, 2002 informant body wire recorded conversation.

2.  The March 25th, 2002 video recorded conversation.

-71-

3.    The March 24th, 2002 recorded phone
      conversation.

4.    The March 21st, 2002 informant body wire
      recorded conversation.

All in violation of 18 U.S.C. 2518, and 18 U.S.C. (1) and (2).

Chapter 119, Title 18, Section 2518 governs the procedure in
which oral communications are intercepted and recorded. Section 2518
makes it illegal for any person or persons to intercept a wire,
oral, or electronic communication. Any person or persons who seeks
to intercept a wire, oral, or electronic communication must get
authorization by a judge upon a showing in writing of oath or
affirmation.

However, Section 2511(2)(c) makes it permissable for one party
to a conversation to give consent to intercept a wire, oral, or
electronic communication. A criminal informant cooperating with the
Federal Bureau of Investigation must give consent by signing an
FD-472 form that allows the FBI to record his phone conversations.
The criminal informant must also sign an FD-473 form that allows the
FBI to place a body wire on this body.

In the instant case, the criminal informant gave no such
written consent to the FBI to record neither his phone calls with
Mr. James nor for the FBI to place a body wire on his body in order
for him to record his conversations with Mr. James. The FBI did not
have investigative jurisdiction in the counterfeit matter charged to
the Secret Service to investigate relating to Mr. James.

During the trial proceedings, FBI Agent DePodesta testified
that all "audio recorded conversations were recorded in the memory
of the recording device." Agent DePodesta then testified that the

-72-

contents of the recorded conversations were then later transferred over to a CD or a cassette, and the original content then "erased" from the "memory of the recording device." See Tr. Agent DePodesta's Testimony.

Under Title 18 U.S.C. 2518, "the contents of any wire, oral, or comparable device." "The recording shall be done in such a way as to protect against editing or other alterations." "The original recordings shall not be destroyed, and in any event shall be kept for ten years." Duplicate recordings may be made for use or disclosure, but only to the provisions of Subsection (1) and (2) of Section 2517 of Chapter 119 for investigation.

The government showed that they did not follow the proper procedure set forth by 18 U.S.C. 2518 for gathering electronic communications. They wrote in their response to Mr. James' request for the tapes and recorded that "the tape recorder" is actually a digital recorder which burns recorded conversations directly onto a CD ROM. When the conversations are recorded onto the CD ROM, the are automatically erased from the digital recorder. See ROA 39 at 7-8. This is a straight violation of 18 U.S.C. 2518. The statutes only allow to record directly to a "wire", "tape", or "comparable device" (like a CD ROM). It does not allow recording in the digital memory of any device that could be easily tampered with upon the transfer over to a "comparable device" like a CD ROM, as was done in this case.

Agents of the federal law enforcement agencies are quite aware of the procedures of 18 U.S.C. 2518 and would not gather recorded evidence in the manner described by Agent DePodesta and the

-73-

prosecutors. In fact, all the recordings in this case were done using equipment prescribed by 18 U.S.C. 2518. The "original" copies are locked away in Secret Service file 1544 with serial number listed in the "Certified Inventory of Evidence" list. The copies that were played at trial and disclosed as discoveries were all egregiously manipulated to suit the government's case. Mr. James made a timely request for discovery material. The government violated 18 U.S.C. 2518 and 2517, Subsection (1) and (2) of Chapter 119 for investigation and failed in their responsibility to disclose under Rule 16, FED. R. CRIM. P and Brady.

The government violation of 18 U.S.C. 2518 in allegedly destroying the original recordings violated Mr. James' Substantial Rights to Due Process to a Fair Trial. Mr. James' case should be remanded to the District Court with instructions to dismiss the indictment with prejudice.

## XI. MR. JAMES' RIGHT TO BE SENTENCED ONLY ON FACTS PROVEN TO THE JURY'S SATISFACTION WAS VIOLATED

The Court erred at sentencing in denying Mr. James' pro-se motion of "Defendant's Motion For Various Relief Based Upon <u>Blakely v. Washington</u>." The Court made improper factual findings contrary to U.S. v. Booker, 200 WL 50108.

The government charged and Mr. James was convicted of violating 21 U.S.C. 846, attempt. Section 21 U.S.C. 846 reads as follows:

> "Any person whom attempts or conspires to commit any offense defined in this Subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

The indictment failed to allege that possession with intent to

-74-

distribute cocaine is "in violation of 21 U.S.C. 841(a) and 21
U.S.C. 841(b) (the amount of the prohibited drugs and the range of
penalty) "which was the object of the attempt." An indictment must
contain an allegation of every fact which is legally essential to
the punishment to be inflicted. 21 U.S.C. 841(a) and 21 U.S.C.
841(b) must be charged in an indictment. Apprendi v. New Jersey, 530
U.S. 466, 147 L.Ed. 2d 435, 120 S.Ct. 2343(2000).

The Jury's instructions for Count One were that the "defendant
is charged with attempting to possess with intent to distribute over
five kilograms of powder cocaine." ROA 65. A factual finding of the
actual amount of drugs reasonably foreseeable to Mr. James was not
made by the Jury. No finding was sought and none was rendered as to
the actual amount of drugs involved in Mr. James' case. Such a
finding is now required in order to establish which Subsection of 21
U.S.C. 841 applies to Mr. James, to establish the minimum and
maximum sentence. Further, the finding is even required to determine
the base level for a drug crime under the United States Sentencing
Guideline. The Jury made no determination on the actualy amount of
drugs involved in Mr. James' case and Blakely and Booker does not
allow a judge to make that finding.

In U.S. v. Nance, the Seventh Circuit held that "the threshold
(500 grams and 5 kilograms) must be charged in the indictment and
established beyond a reasonable doubt to the Jury's satisfaction."
U.S. v. Nance, 236 F.3d 820, 824-25 (7th Cir. 2000).

The judge improperly found that Mr. James' case involved 15
kilograms of cocaine. What is certain is that the Jury found Mr.
James guilty of violating 846, attempt. Without a special verdict

-75-

form establishing the exact 5 kg's, or any other amount. Based on the Supreme Court ruling in Booker it is a violation of Mr. James' Constitutional Rights to have any person(s) other than the Jury to decide how much drugs Mr. James was convicted for attempting to purchase, if any at all.

With the verdict the way it was rendered by the Jury for violating 846, attempt, Mr. James can only be sentenced at a level 12 based on the sentencing guidelines, or since the guidelines are no longer mandatory, the judge should have sentenced Mr. James anywhere from zero to twenty years, but not to exceed the time Mr. James would get if he was sentenced by the guidelines at a level twelve due to the "Due Process Rule of the Supreme Court's Ex Post Facto Clause Jurisprudence."

The Ex Post Facto Clause is binding in this case. Mr. James was arrested when the sentencing guidelines were by law, mandatory upon all federal judges. The Supreme Court in Booker announced the rule that the Sixth Amendment Jury/proof requirements apply to the Federal Guidelines. Booker, 200 WL 50108 at 11. The relevant statutory maximum in the instant case is the sentencing guideline range. So therefore, within the statutory range of zero to twenty years. Mr. James' sentence must not exceed the high end of a level 12 of the Sentencing Guidelines. A base level 12 is the level for the least amount of drugs punishable by the Sentencing Guidelines. And it is the default level that applies when there is no legal determination of the factual issue of how much drugs apply in a defendant's case. See U.S. v. Shamblin, (S.D.W. Va. 2004), interpreted by the Fourth Circuit Court of Appeals in U.S. v.

-76-

Kinter, 235 F.3d 192 (4th Cir. 2000), to limit his sentence to the statutory maximum under 21 U.S.C. 841(b)(1)(c). Today, in light of the United States Supreme Court's recent decision in Blakely v. Washington, 2004 WL 1402697 (June 24th, 2004) "I find that there are further limits on his sentencing range. Based on only those sentencing factors that Shamblin admitted during his pleas, I find that his sentencing range under the guideline is 6 to 12 months."

A guilty verdict with no legal determination of the amount of drugs is the same as a guilty plea with no legal determination of the amount of drugs. Based on the discussion reached by the different courts in Shambling and Blakely, which was upheld by the Supreme Court in Booker, Mr. James should not be sentenced for more than 12 months for Count One of the indictment.

## XII. MR. JAMES SHOULD HAVE BEEN SENTENCED IN ACCORDANCE WITH HIS "SENTENCING MEMORANDUM"

The District Court erred in denying Mr. James' pro-se "Sentencing Memorandum" when it:

> A. Failed to consider the legal impossibility and the legal incapability of Mr. James' case.
>
> B. Failed to depart downward due to sentencing entrapment.

## A. Legal Impossibility and Legal Incapability

As Mr. James argued in Section I of this brief, to be guilty of attempt he must have acted with specific intent to commit the underlying offense, which is possession with intent to distribute cocaine, 21 U.S.C. 841(a), and in addition took a substantial step toward it's completion,

-77-

U.S. v. Rovetuso. When a defendant has been active in negotiating a drug transaction and has actually taken physical steps to obtain possession of the drugs, the attempt offense is complete, U.S. v. Williams.

The evidence presented by the government actually showed that the informant with the "instruction" of FBI Agents set up a plan for the informant to "rob" cocaine from his own source with the help of Mr. James, which was all a hoax to entrap Mr. James in a drug crime. Again, listening to the March 21st, 2002 recorded conversation the criminal informant is heard telling Mr. James:

> "Well like I say, I got the... I got the guy setup... we show him the money, some money, fake money..."

He continued to say to Mr. James:

> "I don't know exactly his house. He's not gonna tell me exactly where it is cause I could rob him myself, you know what I'm saying? He lives, around 3...3...2 blocks away from the brickyard and three houses away you know close to the corner... at Naraganett and Diversey, in the parking lot, we can do that (rob the guy) in the parking lot. He he he told me we we we can go by the parking lot."

This clearly and unequivocally showed that what took place in the parking lot at "Naragansett and Diversey" where Mr. James was arrested was a robbery attempt that was set up by the informant through the "instruction" of the FBI, where the criminal informant would purchase drugs with the counterfeit money he asked Mr. James to provide him with.

-78-

The informant even went as far as saying he would fix the robbery attempt to:

> "Do like you (Mr. James) fuck 'us' (the informant and the guy the informant supposedly had setup in the parking lot) up."

On the same tape recording the informant even went as far as telling Mr. James that if Mr. James would help him "sell" the cocaine after his planned robbery attempt 'he' would 'sell' each kilogram of cocaine for $10,000. The informant said:

> "Alright, you help sell them."

> "Cause I (informant) wanna do it like I tell you. Ten grand ($10,000) I gonna 'sell' you each one (the cocaine from the robbery attempt) ten. You (Mr. James) make ten, I make ten. But I do not got that much people to sell it, you know."

> "I wanna make the money and get the fuck out of here."

This piece of evidence showed that Mr. James did not make a request to the criminal informant to purchase cocaine from the criminal informants source. In fact, it showed that it was the criminal informant himself who is offering to sell the cocaine from his planned robbery.

Hence, it is legally impossible and legally incapable for Mr. James to have acted with specific intent to violate 21 U.S.C. 841(a), the underlying offense.

## B.   Sentencing Entrapment

This same piece of evidence also showed that Mr. James was not only entrapped into criminal activities, but it

-79-

also showed that the criminal informant, through the instruction of the FBI, sought to dig Mr. James even deeper into criminal activities.

First, the criminal informant asked Mr. James to provide him with counterfeit money. Then he moved to setup a drug crime where he told Mr. James that he would arrange the plan to appear as if it was Mr. James who was responsible for robbing some guy the informant setup by paying him with counterfeit money for the cocaine. This is what the criminal informant means when he told Mr. James that the robbery was going too

"Do like you fuck us up."

And to dig Mr. James even deeper into criminal activities, on the same March 21st, 2002 tape recording he told Mr. James that:

> "It would be better. How we gonna split it (the cocaine he allegedly was planning to rob) or what? Cause 'I' wanna do it like I tell you. Ten grand 'I' gonna 'sell' you each one ten. You make ten, 'I' make ten."

> "I wanna make the money and get the fuck out of here."

This is not only true entrapment, but it is also sentencing entrapment. Sentencing entrapment may be legally relied upon to depart downward under the sentencing guideline, U.S.S.G. Section 1B1.1 et Seq., 18 U.S.C. A.App. U.S. V. Staufer, cite as 38 F.3d 1103 (9th Cir. 1994). Pursuant to the ruling in Staufer and application note 13, U.S.S.G. 2D1.1, the court should have granted Mr. James a

-80-

downward departure due to sentencing entrapment for Count One of the Jury verdict.

In all, the District Court should have sentenced Mr. James according to Mr. James' pro-se "Sentencing Memorandum."

### CONCLUSION

For the reasons set forth in this brief, the Defendant-Appellant Donville James respectfully requests that this Court reverse his conviction and remand this matter for a new trial. Alternatively, Mr. James' requests that the Court vacate his sentence, and remand this case to the District Court for resentencing with instructions to apply the guidelines for sentencing entrapment, place Mr. James in a guideline range equivalent with no greater than a base offense level 12, and for such further relief as this Court deems just and proper.

Respectfully Submitted,

_____
Date

Donville James, Appellant
#14388-424
FCI Greenville
P.O. Box 5000, Unit H-2B
Greenville, Illinois 62246

-81-

## Rule 30(d) Certificate of Compliance

I, Donville James, Appellant, certify that the Appendix contains all materials required by Circuit Rule 30(a) and Circuit Rule 30(b).

Respectfully Submitted,

Donville James, Appellant.
#14388-424
FCI Greenville
P.O. Box 5000, Unit H-2B
Greenville, Illinois 62246

Date

## SHORT APPENDIX WITH ADDITIONAL MATERIALS

A.  9/10/02  Jury Verdict. ROA 61-63

B.  6/20/05  Judgment in a Criminal Case. ROA 130

C.  7/20/05  Amended Judgment in a Criminal Case. ROA 143

D.  5/31/05  Sentencing Hearing Transcript. R. 148-6, pp.104-105.

E.  4/11/02  Grand Jury Indictment. ROA 18.

F.         Jury Instructions (excerpt). ROA 65.

G.         Trial Transcript (excerpt) R. 113; pp 102, 119-124, 151, 513.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**F I L E D**

SEP 1 0 2002

WAYNE R. ANDERSEN
U. S. DISTRICT COURT JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 02 CR 278 |
| | ) | |
| DONVILLE JAMES | ) | Judge Wayne R. Andersen |

**DOCKETED**

SEP 1 3 2002

### VERDICT—COUNT ONE

We, the jury, find the Defendant, DONVILLE JAMES:

GUILTY of Count One of the indictment.

_Nichole C. Hare_
FOREPERSON

_Mary Mc Ginnis_

_Georgie E. Reyopoulos_

_Victor Santos_

_James F. Bock_

_Bobby A. ___

_Jeff _____

_Karen Jacobsen_

_Linda M. Horner_

_Susan Orlald_

_Irene McCallen_

_Bill Hill_

_9/10/02_
Date

EXHIBIT
A

61

34

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

SEP 10 2002

UNITED STATES OF AMERICA      )
                              )
              v.              )   No.  02 CR 278
                              )
DONVILLE JAMES                )   Judge Wayne R. Andersen

**WAYNE R. ANDERSEN**
**U.S. DISTRICT COURT JUDGE**

**DOCKETED**

SEP 13 2002

## VERDICT—COUNT TWO

We, the jury, find the Defendant, DONVILLE JAMES:

GUILTY of Count Two of the indictment.

_____
FOREPERSON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____
      9/10/02
_____
          Date

67

31

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

# FILED

SEP 1 0 2002

**WAYNE R. ANDERSEN**
**U.S. DISTRICT COURT JUDGE**

UNITED STATES OF AMERICA )
)
v. )   No.   02 CR 278
)
DONVILLE JAMES )   Judge Wayne R. Andersen

*DOCKETED*
SEP 1 3 2002

## VERDICT—COUNT THREE

We, the jury, find the Defendant, DONVILLE JAMES:

GUILTY of Count Three of the indictment.

_____
FOREPERSON

Mary Mc Ginnis

Georgia C. Regopoulos

_____

_____

_____

_____

Linda M. Herner

Susan Orlando

_____

_____

9/10/02
Date

63

38

(Rev. 03/05)

## United States District Court
## Northern District of Illinois

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | **Case Number: 02–CR–278–1** |
| | ) | **Judge: Wayne R. Andersen** |
| DONVILLE JAMES | ) | |

DOCKETED
JUN 2 0 2005

Gary Sternberg, Defendant's Attorney
Monika Bickert, AUSA

### JUDGMENT IN A CRIMINAL CASE
(For Offenses Committed On or After November 1, 1987)

**THERE WAS A:**

jury verdict of guilty as to count(s) ONE (1) - THREE (3) of the INDICTMENT.

## THE DEFENDANT IS CONVICTED OF THE OFFENSES(S) OF:

| Title & Section | Description of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 21:846 | Attempted possession with intent to distribute cocaine | 03/25/2002 | ONE (1) |
| 18:924(C)(1)(a)(1) | Possession of a firearm in relation to a drug trafficking crime | 03/25/2002 | TWO (2) |
| 18:472 | Possession of a counterfeit obligations of the United States | 03/25/2002 | THREE (3) |

The defendant is sentenced as provided in the following pages of this judgment.

**EXHIBIT**

**B**

130

JAMES, DONVILLE
2 CR 278-1

## IMPRISONMENT

IT IS THE JUDGMENT OF THIS COURT THAT:

the defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total uninterrupted term of ONE HUNDRED FIFTY-ONE (151) MONTHS.

As to Counts ONE (1) and THREE (3), the defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of ONE HUNDRED FIFTY-ONE (151) MONTHS to run concurrent to each other. As to Count TWO (2), the defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of SIXTY (60) MONTHS, to run consecutive to counts one and three.

The Court recommends to the Bureau of Prisons:

A facility that is closest to his family.

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for the periods specified for each count of conviction.

The defendant is sentenced on all count(s) of conviction, namely, COUNT (1) ONE to a period of FIVE (5) years of Supervised Release. THREE (3) years each as to counts two and three, said periods to run concurrent to count one.

The defendant shall report to the probation office in the district to which the defendant is released within seventy-two hours of release from the custody of the Bureau of Prisons. In addition, see the attached page(s) defining the mandatory, standard and discretionary conditions of supervised release that apply in this case.

The defendant shall report immediately to the probation office in the district in which the defendant is to be supervised, but no later than seventy-two hours after sentencing. In addition, see the attached page(s) defining the mandatory, standard and discretionary conditions of probation that apply in this case.

JAMES, DONVILLE
2 CR 278-1

# MANDATORY CONDITIONS OF SUPERVISED RELEASE
## (as set forth in 18 U.S.C. § 3583 and U.S.S.G. § 5D1.3)

1) For any offense, the defendant shall not commit another federal, state or local crime;

2) for any offense, the defendant shall not unlawfully possess a controlled substance;

3) for offenses committed on or after September 13, 1994, the defendant shall refrain from any unlawful use of a controlled substance and submit to one drug test within fifteen days of release from imprisonment and at least two periodic drug tests thereafter for use of a controlled substance as determined by the court:

4) for a domestic violence crime committed on or after September 13, 1994, as defined in 18 U.S.C. § 3561(b) by a defendant convicted of such an offense for the first time, the defendant shall attend a rehabilitation program in accordance with 18 U.S.C. § 3583(d);

5) for a defendant classified as a sex offender pursuant to 18 U.S.C. § 4042(c)(4), the defendant shall comply with the reporting and registration requirements set forth in 18 U.S.C. § 3583(d);

6) the defendant shall cooperate in the collection of a DNA sample from the defendant if the collection of such a sample is authorized pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000 and the Justice for All Act of 2004; and

7) The defendant shall pay any balance on the special assessment, restitution and/or fine imposed against the defendant.

# STANDARD CONDITIONS OF SUPERVISED RELEASE

1) For any felony or other offense, the defendant shall not possess a firearm, ammunition, or destructive device as defined in 18 U.S.C. § 921;

2) the defendant shall not leave the judicial district without the permission of the court or probation officer (travel outside the continental United States requires court authorization);

3) the defendant shall report to the probation officer as directed by the court or the probation officer and shall submit a truthful and complete written report within the first five days of each month;

4) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

5) the defendant shall provide to the probation officer access to any requested financial information including, but not limited to, tax returns, bank statements, credit card statements, credit applications, etc.;

6) the defendant shall support his or her dependents and meet other family responsibilities;

7) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

8) the defendant shall notify the probation officer ten (10) days prior to any change in residence or employment;

9) the defendant shall refrain from excessive use of alcohol;

10) the defendant shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician, and shall submit to periodic urinalysis tests as requested by the probation officer to determine the use of any controlled substance;

11) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

12) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

JAMES, DONVILLE
2 CR 278-1

13)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;

14)  the defendant shall notify the probation officer within seventy-two (72) hours of being arrested or questioned by a law enforcement officer;

15)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

16)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement; and

17)  if this judgment imposes a special assessment, restitution or a fine, it shall be a condition of probation or supervised release that the defendant pay any such special assessment, restitution or fine in accordance with the court's order set forth in the Criminal Monetary Penalties sheet of this judgment.

## DISCRETIONARY CONDITIONS OF SUPERVISED RELEASE

The defendant shall also comply with the following additional conditions of supervised release:

Other conditions imposed by the court:

As a special condition of supervised release, upon completion of the defendant's term of imprisonment, he is to be surrendered to a duly-authorized official for deportation in accordance with the established procedures provided by the Immigration and Naturalization Act. As a further condition of supervised release, if ordered deported, the defendant shall remain outside the United States during that time. If not deported, the defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and random drug tests thereafter, conducted by the U.S. Probation Office, not to exceed 104 tests per year. The defendant shall not possess a firearm of destructive device.

JAMES, DONVILLE
2 CR 278-1

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the "Schedule of Payments." Unless waived, the defendant shall pay interest on any restitution and/or fine of more than $2,500, unless the restitution and/or fine is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f). The payment options may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

| Total Assessment(s) | Total Fine | Restitution | Mandatory Costs of Prosecution |
|---|---|---|---|
| $300.00 | Fine Waived | $ | $ |

The defendant shall notify the United States Attorney's Office having jurisdiction over the defendant within thirty days of any change of name, residence or mailing address until all special assessments, restitution, fines, and costs imposed by this judgment are fully paid.

Based on the defendant's inability to pay, the costs of incarceration are waived.

## SCHEDULE OF PAYMENTS

- Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest, (7) penalties, and (8) costs, including cost of prosecution and court costs. If this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment.

- All criminal monetary penalty payments, except those payments made through the Bureau of Prisons' Inmate financial Responsibility Program, are to be by money order or certified check payable to the Clerk of the Court, U.S. District Court, unless otherwise directed by the Court.

- Unless waived, the defendant shall pay interest on any fine and/or restitution of more than $2,500, unless the same is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f). Payment options included herein may be subject to penalties of default and delinquency pursuant to 18 U.S.C. § 3612(g).

- Pursuant to 18 U.S.C. §§ 3613(b) and ©) and 3664(m), restitution and/or fine obligations extend for twenty years after release from imprisonment, or from the date of entry of judgment if not sentenced to a period of imprisonment.

Payment of the total criminal monetary penalties shall be due as follows:

        In full:

        Due immediately.


Pursuant to 18 U.S.C. § 3664(k) the defendant must notify the court of any material changes in the defendant's economic circumstances. Upon such notice, the court may adjust the installment payment schedule.

Pursuant to 18 U.S.C. § 3664(n), if a person is obligated to provide restitution, or pay a fine, received substantial resources from any source, including inheritance, settlement, or other judgment, during a period of incarceration, such person shall be required to apply the value of such resources to any restitution or fine still owed.


The defendant is immediately remanded to the custody of the United States Marshal.

JAMES, DONVILLE
2 CR 278-1

## RETURN OF SERVICE

I have executed this judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____

at _____.


By:_____.
                        (Signature)

Name (Print)_____

Title (Print)_____

JAMES, DONVILLE
2 CR 278-1

Date of Imposition of Judgment/Sentencing: May 31, 2005

WAYNE R. ANDERSEN
UNITED STATES DISTRICT JUDGE

Dated at Chicago, Illinois this _13_ day of June, 2005

245C (Rev. 03/035)

# United States District Court
## Northern District of Illinois

UNITED STATES OF AMERICA )
                           )
         v.               )
                           )
DONVILLE JAMES           )

**DOCKETED**

**JUL 2 2 2005**

Case Number: 02-CR-278-1
Judge: Wayne R. Andersen

Gary Sternberg, Defendant's Attorney
Monika Bickert, AUSA

## AMENDED JUDGMENT IN A CRIMINAL CASE
### (For Offenses Committed On or After November 1, 1987)

Date of Original Judgment:    May 31, 2005

Reason for Amendment:    Correction of Sentence for Clerical Mistake (Fed. R. Crim. P. 36)

**THERE WAS A:**

jury verdict of guilty as to counts ONE (1) - THREE (3) of the INDICTMENT.

**THE DEFENDANT IS CONVICTED OF THE OFFENSES(S) OF:**

| Title & Section | Description of Offense | Date Offense Concluded | Count Number(s) |
| --- | --- | --- | --- |
| 21:846 | Attempted possession with intent to distribute cocaine | 03/25/2002 | ONE (1) |
| 18:924(c)(1)(a)(1) | Possession of a firearm in relation to a drug trafficking crime | 03/25/2002 | TWO (2) |
| 18:472 | Possession of a counterfeit obligations of the United States | 03/25/2002 | THREE (3) |

The defendant is sentenced as provided in the following pages of this judgment. The Sentence is imposed pursuant to the Sentencing Reform Act of 1984. Other than the amendments or modifications stated in this judgment, the judgment entered May 31, 2005 is to stand (see attachment)



EXHIBIT

C

143



**JAMES, DONVILLE**
**2 CR 278-1**

Page 2 of 5

# IMPRISONMENT

## IT IS THE JUDGMENT OF THIS COURT THAT:

the defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total uninterrupted term of **TWO HUNDRED ELEVEN (211) MONTHS.**

As to Count ONE (1) and THREE (3), the defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total uninterrupted term of **ONE HUNDRED FIFTY-ONE MONTHS** on each count to run concurrent to each other.   As to Count TWO (2), the defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total uninterrupted term of **SIXTY (60) MONTHS** to run consecutive to counts one and three.

The Court recommends to the Bureau of Prisons:

A facility that is closest to his family.

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for the periods specified for each count of conviction.

The defendant is sentenced on all count(s) of conviction, namely, Count ONE (1) to a period of FIVE (5) years of Supervised Release.  Three (3) years each as to counts two and three, said periods to run concurrent to count one.

The defendant shall report to the probation office in the district to which the defendant is released within seventy-two hours of release from the custody of the Bureau of Prisons.  In addition, see the attached page(s) defining the mandatory, standard and discretionary conditions of supervised release that apply in this case.

The defendant is immediately remanded to the custody of the United States Marshal.

JAMES, DONVILLE
2 CR 278-1

## RETURN OF SERVICE

I have executed this judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____

at _____.


By:_____
                    (Signature)


Name (Print)_____

Title (Print)_____

Date of Imposition of Judgment/Sentencing: July 15, 2005

WAYNE R. ANDERSEN
UNITED STATES DISTRICT JUDGE

Dated at Chicago, Illinois this ___ day of July, 2005

47

**CLERK'S FILE COPY**

**FILED**

1    IN THE UNITED STATES DISTRICT COURT  J.N
2         NORTHERN DISTRICT OF ILLINOIS         SEP 2 2 2005
               EASTERN DIVISION

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

3   UNITED STATES OF AMERICA,        )
                                     )
4              Plaintiff,            )    No. 02 CR 278
                                     )
5              vs.                   )    Chicago, Illinois
                                     )    May 31, 2005
6   DONVILLE JAMES,                  )    1:30 o'clock p.m.
                    **05 - 3070**
7              Defendant.            )

8        TRANSCRIPT OF PROCEEDINGS - SENTENCING
         BEFORE THE HONORABLE WAYNE R. ANDERSEN
9                     VOLUME 2

10  For the Government:        HON. PATRICK FITZGERALD
                               United States Attorney, by
11                             MR. AMARJETTE BHACHU
                               Assistant United States Attorney
12                             (219 South Dearborn Street
                               Chicago, Illinois 60604)
13

14  For the Defendant:        MR. GARY STERNBERG
                               (2635 North Kedzie Avenue
15                             Chicago, Illinois 60647)

16

17          U.S.C.A.—7th Circuit          **DOCKETED**
18              **FILED**
                                          SEP 2 3 2005
              SEP 2 9 2005  DW
19
              GINO J. AGNELLO
20                 CLERK
              DOC. #_____

21                                        ┌─────────────────┐
                                          │    **EXHIBIT**      │
22                                        │                 │
                                          │        D        │
23  Court Reporter:        ROSEMARY SCARPELLI
                           219 South Dearborn Street
24                         Room 1412
                           Chicago, Illinois 60604
25                         (312)435-5815

**CLERK'S FILE COPY**

148-6

1        And having said that, let me read a sentence into

2   the record.   Let me advise you that after the sentence is

3   entered on the docket, you have from ten days to file a

4   notice of appeal.   You and Mr. Sternberg make some

5   interesting legal issues, so, Mr. Sternberg, when we sign the

6   judgment, we will call you so that you can file a notice of

7   appeal.   You probably will have a different attorney on the

8   appeal, if you choose to have an attorney.   But I think if

9   you ask Mr. Sternberg to file the notice, he will do that.

10  And I don't want there to be any delay in that, so we will

11  notify you when that takes place.

12        And, by the way, if you don't have the money to

13  afford an appeal, you can ask for leave to appeal informa

14  pauperis, which is to say have the filing fees waived.

15        But here -- here will be my sentence:   Pursuant to

16  the Sentencing Reform Act of 1984, it is the judgment of the

17  Court that the defendant Donville James is hereby committed

18  to the custody of the Bureau of Prisons to be imprisoned for

19  a term of 151 months on Counts One and Three, such terms to

20  run concurrent, that is, they run at the same time.

21        On Count Two, the gun charge, defendant is to be

22  imprisoned for a term of 60 months to run consecutive to

23  Counts One and Three.

24        Upon release from prison, the defendant shall be

25  placed on supervised release for a term of five years.   This

1   term consists of terms of five years on Counts One, terms of

2   three years on each of Counts Two and Three, all to run

3   concurrently.

4         Within 72 hours of release he shall report in person

5   to the Probation office to the district to which he is

6   released.

7         While on supervised release, he shall not commit

8   another federal, state or local crime.  Shall comply with the

9   standard conditions that have been adoptd by the Court and

10  also shall, as a special condition of supervised release,

11  upon completion of his term of imprisonment he is to be

12  surrendered to a duly-authorized official for deportation, if

13  that is what the law then requires, in accordance with the

14  established procedures of the appropriate federal agency.

15        As a further condition, if ordered deported, he

16  shall remain outside U.S. during the time he is ordered

17  deported.

18        If not deported, he shall refrain from any unlawful

19  use of a controlled substance.  He shall submit to drug tests

20  as ordered by the Probation Department.  He shall not process

21  firearm or destructive device.

22        That will be the sentence of the Court.  And I want

23  to thank you the members of your family as well as you

24  personally for the personal courtesies you have thrown

25  throughout -- shown throughout this understandably difficult

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

**APR 1 1 2002**

UNITED STATES OF AMERICA )

vs.

DONVILLE JAMES

**DOCKETED**
**APR 1 2 2002**

)
)
)
)
)
)
)

No. 02 CR 0278 MAGISTRATE JUDGE ARLANDER KEYS
                    UNITED STATES DISTRICT COURT
Violations: Title 21, United
States Code, Section 846;
Title 18, United                **JUDGE ANDERSEN**
States Code, Sections
924(c)(1)(A)(i) and 472.

**MAGISTRATE SIDNEY I. SCHENKIER**

### COUNT ONE

The SPECIAL FEBRUARY 2002-2 GRAND JURY charges:

On or about March 25, 2002, at Chicago, in the Northern
District of Illinois, Eastern Division,

DONVILLE JAMES,

defendant herein, did knowingly attempt to possess with intent to
distribute a controlled substance, namely powder cocaine in
excess of five kilograms, a Schedule II Narcotic Drug Controlled
Substance;

In violation of Title 21, United States Code, Section 846.

**EXHIBIT**

E

18

## COUNT TWO

The SPECIAL FEBRUARY 2002-2 GRAND JURY further charges:

On or about March 25, 2002, at Chicago, in the Northern District of Illinois, Eastern Division,

### DONVILLE JAMES,

defendant herein, carried and possessed a firearm, namely a loaded Smith and Wesson nine millimeter semi-automatic pistol, during and in relation to and in furtherance of a drug trafficking crime for which he may be prosecuted in a court of the United States, namely attempted possession with intent to distribute a controlled substance, namely powder cocaine in excess of five kilograms, in violation of Title 21, United States Code, Section 846, as more fully set forth in Count One of this indictment;

In violation of Title 18, United States Code, Section 924(c)(1)(A)(i).

## **COUNT THREE**

The SPECIAL FEBRUARY 2002-2 GRAND JURY further charges:

In or about March 2002, at Chicago, in the Northern District of Illinois, Eastern Division,

DONVILLE JAMES,

defendant herein, with intent to defraud, did keep in his possession and conceal falsely made, forged, and counterfeited obligations of the United States, namely Federal Reserve notes, totaling $87,430, in denominations of $20, $50, and $100;

In violation of Title 18, United States Code, Section 472.

## FORFEITURE ALLEGATION

The SPECIAL FEBRUARY 2002-2 GRAND JURY charges:

1. The allegations of Count Three of this Indictment are realleged and incorporated by reference as if fully restated herein for the purpose of alleging that certain property is subject to forfeiture to the United States, pursuant to the provisions of Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 492.

2. As a result of the offenses alleged in Count Three of this Indictment,

### DONVILLE JAMES

defendant herein, shall forfeit to the United States, pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 492:

(a) all counterfeit coins or obligations or other securities of the United States or any foreign government, or any articles, devices, and other things made, possessed, or used in commission of said violation;

(b) any material or apparatus used or fitted or intended to be used, in the making of such counterfeits, articles, devices, or things, found in the possession of any person without authority from the Secretary of the Treasury or other proper officer.

4. The interests of the defendant subject to forfeiture to the United States include, but are not limited to, the following:

(a) Approximately $92,000 in counterfeit United States currency in varying denominations including $20, $50, and $100 notes;

(b) Xerox Workcenter M940, serial number PTO 092780;

(c) Compaq C31000, serial number 5GOADGZHJB8;

(d) Dell CPU Tower Dimensions XPS D300, serial number BG6DD, Model MMP;

(e) Quartet 12 Inch Paper Cutter Model 9112;

All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 492.

A TRUE BILL

_Richard Z Deuter_

FOREPERSON

_Patrick J. Fitzgerald, by DRG_
UNITED STATES ATTORNEY

SEP 2002

WAYNE R. ANDERSEN
U. S. DISTRICT COURT JUDGE

USAV. Donville Jame

JURY INSTRUCTIONS

Members of the jury, you have seen and heard all the evidence and the arguments of the attorneys.  Now I will instruct you on the law.

You have two duties as a jury.  Your first duty is to decide the facts from the evidence in the case.  This is your job, and yours alone.

Your second duty is to apply the law that I give you to the facts.  You must follow these instructions, even if you disagree with them.  Each of the instructions is important, and you must follow all of them.

Perform these duties fairly and impartially.  Do not allow sympathy, prejudice, fear, or public opinion to influence you.

Nothing I say now, and nothing I said or did during the trial, is meant to indicate any opinion on my part about what the facts are or about what your verdict should be.

**DOCKETED**

SEP 1 3 2002



EXHIBIT

F

The indictment in this case is the formal method of accusing the defendant of an offense and placing the defendant on trial. It is not evidence against the defendant and does not create any inference of guilt.

The defendant is charged in Count One with attempting to possess with intent to distribute over five kilograms of powder cocaine. The defendant is charged in Count Two with carrying and possessing a firearm during and in relation to a drug trafficking crime. The defendant is charged in Count Three with possessing and concealing falsely made, forged, and counterfeited United States currency. The defendant has entered a plea of not guilty to these charges.

The government has declined to disclose the recording and transmitting devices used on March 25, 2002 in this case, pursuant to a privilege which the Court deemed valid.  You may draw whatever inferences you find reasonable from the absence of the evidence regarding the nature of any conversations alleged to have occurred.

CLERK'S FILE COPY

1

DOCKETED
OCT - 2 2004

1    IN THE UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3  UNITED STATES OF AMERICA,          )

4            Plaintiff,    F I L E D  )  No. 02 CR 278

5            vs.                OCT 0 8 2004  )  Chicago, Illinois
                                                September 5, 2002
6  DONVILLE JAMES,           )              1:00 o'clock p.m.

7            Defendant.    MICHAEL W. DOBBINS
                           CLERK, U.S. DISTRICT COURT  05-3070

8         TRANSCRIPT OF PROCEEDINGS - TRIAL
     BEFORE THE HONORABLE WAYNE R. ANDERSEN
9               and a jury
                 VOLUME 1
10

11  For the Government:     HON. PATRICK FITZGERALD
                            United States Attorney, by
12                          MR. PATRICK COLLINS
                            MS. VALARIE HAYS
13                          Assistant United States Attorneys
                            219 South Dearborn Street
14                          Chicago, Illinois 60604

15  For the Defendant:      ANITA RIVKIN-CAROTHERS & ASSOCIATES, by
                            MS. ANITA RIVKIN-CAROTHERS
16                          33 North LaSalle Street, Suite 3300
                            Chicago, Illinois 60602
17                               and
                            MS. JOAN A. HILL McCLAIN
18                          33 North LaSalle Street, Suite 3300
                            P.O. Box 7701
19                          Chicago, Illinois 60680
                                 and
20                          MS. MABLE TAYLOR
                            Three First National Plaza
21                          70 West Madison Street, Suite 1400
                            Chicago, Illinois 60602
22

23  Court Reporter:         ROSEMARY SCARPELLI
                            219 South Dearborn Street
24                          Room 1412
                            Chicago, Illinois 60604
25                          (312)435-5815

U.S.C.A. - 7th Circuit
F I L E D
AUG 0 4 2005  SK
GINO J. AGNELLO
CLERK

EXHIBIT
G

CLERK'S FILE COPY

113-1

1          THE COURT:  I do think, as I indicated earlier, she

2    has backed off a lonk way from an actual forensic examination

3    of it.  I do think that if her position is, if she wants to

4    be able to argue this device -- this agent knew how to turn

5    on this device, it was in his hands.

6          MS. McCLAIN:  He is trained.

7          THE COURT:  And I wasn't there, but I didn't do it.

8    And I think, therefore, it casts a doubt on the credibility

9    of other things.  She can make an argument.

10          MR. COLLINS:  Judge, we are not saying she shouldn't

11   be able to make that argument.

12          THE COURT:  Right.  I know.

13          MR. COLLINS:  We are asking this device not be

14   brought into the courtroom and put into the courtroom.  It is

15   descriptive.  We just are asking that.  We will give her

16   whatever stipulation.  We are not trying to prevent her from

17   whatever she wants to argue.

18          THE COURT:  Well, you can offer her a stipulation

19   and you guys can talk after we recess --

20          MR. COLLINS:  And we will show her.

21          THE COURT:  -- about the -- what she would like.

22   Maybe you can get a stipulation that says exactly what you

23   would like.  And if you accept it, then we don't have a

24   problem.  Obviously, it is a factor in this case and I am

25   tilting in favor of letting her show that to the jury.

1  we are not there yet and maybe we will have to actually think

2  about this overnight -- is that, obviously, this cooperating

3  witness was an integral part of the investigation and the

4  case we have seen. Miss Hays referred to him right off the

5  bat in her opening statement. Just as the mechanical devices

6  are and -- and the whole set-up.

7          And it seems to me that insofar as the jury is going

8  to be called upon to judge the efficacy and credibility of

9  everything the Government did, they should be able to say --

10  they -- you should be able to ask him, or Mr. Collins should

11  be able to say, "On what basis have you chosen to use this

12  particular cooperating witness? And were you aware of the

13  fact that there were all these bad things about him?"

14          Now, what Mr. Collins is saying is he -- they didn't

15  choose him with respect to Mr. James just because he was a

16  bad guy that wanted to get out of jail, but he was a bad guy

17  who wanted to get out of jail with a track record with Mr.

18  James, so they thought that would make him more successful

19  with Mr. James.

20          So if the theory of getting in the testimony about

21  the cooperating witness' negative traits is based on the

22  notion that they chose to use him because of those traits and

23  in spite of those traits, then, perhaps, the offsetting

24  characterstics, as experienced with Mr. James, would

25  certainly be equally relevant.

DePodesta - direct

1        Now, I have previously ruled, for those who aren't
2   aware of it, that those things shouldn't be admissible,
3   unless the defendant opens the door to them, because I don't
4   want the jury out there thinking, well, I am not sure if Mr.
5   James did this, but he sure did three of these four things
6   and so let's find him guilty.  I want to avoid that
7   prejudice, if possible.

8        But that is -- that is certainly a road we can go
9   down if the defendant himself chooses to challenge the wisdom
10  of the Government's reliability -- or reliance upon this
11  particular cooperating witness, if in fact part of the reason
12  they chose him was his past relationship with Mr. James.  And
13  that we could determine by some evidence taken at side bar
14  out of the presence of the jury.  But I am going to guess
15  that Mr. Collins has it right, that that is why they -- why
16  they picked this particular guy instead of some of the other
17  nefarious characters that find their way into Government
18  employment.

19       MS. McCLAIN:  Question, your Honor, for
20  clarification.

21       THE COURT:  Sure.

22       MS. McCLAIN:  It is my understanding what the
23  Government wanted to do, in addition to what the Court has
24  just stated --

25       THE COURT:  Right.

DePodesta - direct

1      MS. McCLAIN:   -- is that the -- they wanted to go

2   into the specific language that is in the recording on the

3   24th --

4      MR. COLLINS:   No.

5      MS. McCLAIN:   -- which says that -- where my client

6   says, "Like we did before."

7      MR. COLLINS:   No.

8      MS. McCLAIN:   And that the agent should be able to

9   interpret what "like we did before" meant.

10      THE COURT:   I have already -- I have already granted

11   the motion in limine that you made with respect to that and

12   said they can't go behind that.   It is there.

13      MS. McCLAIN:   Right.

14      THE COURT:   But they can't discuss that or try to

15   prove the validity of that, unless -- because I think it

16   would be prejudicial to the defendant, unless the defendant

17   himself chooses to open the door to that kind of testimony.

18   And -- and what Mr. Collins has picked up on in the last 36

19   minutes is the possibility that if the theory under which you

20   want to cross-examine Agent DePodesta and others is the jury

21   is entitled to know why it was that the Government was

22   relying upon this nefarious confidential witness, then --

23   then to be fair to the Government they are going to have to

24   show the valuable stuff he could offer, not just the bad

25   aspects of his past.   And part of the valuable stuff he

1   offers is a track record they claim -- I don't know -- with

2   Mr. James.

3          And so that is -- that is what Mr. Collins is

4   saying.  So I guess his position is, A, let's not go into the

5   deals -- we know pretty much on the record now, I guess, or

6   there has been testimony that he was a cooperating witness,

7   that is to say, he has made some kind of a deal with the

8   Government.  That is known.  If you want to go beyond that

9   through these witnesses, then he should be able to take it a

10  step further and explain the whole understanding they have

11  with respect to why they used this witness.

12         And they have a point.  I mean I haven't weighed all

13  that.  I would like to avoid the other drug deals, if there

14  were any, because I think that Mr. James isn't being tried

15  for those.  And, obviously, I can issue instructions, but it

16  gets kind of tough, particularly if it is close, if some

17  juror believes, well, he is constantly engaged in drug

18  dealing, we know that now, so I am not going to worry about

19  this.  It is tough for him.  And yet I understand Mr.

20  Collins' position.

21         MR. COLLINS:  Judge, just to address Miss McClain's

22  issue, we do not intend to go to Mr. DePodesta and try to get

23  him to interpret the transcripts on the 21st and 24th.  We

24  are done with those.  He will -- we are not asking him to

25  interpret.  He was not physically present at the meeting,

DePodesta - direct

1    although he heard, obviously, what was going on.

2            All I am asking -- all I am indicating is that if

3    they want to cross any FBI agent or Secret Service agent

4    about defendant -- I am sorry, Mr. Dubon's criminal history

5    and his baggage and his statements and all the rest --

6            THE COURT:  And his deal with the Government.

7            MR. COLLINS:  -- and his deal with the Government,

8    we should be able to give the other side, as your Honor has

9    just indicated.  The simple way to handle all this is to get

10   Mr. Dubon on the stand in their case and they can go to town

11   and -- but if they want to do it in our case, we should be

12   able to complete the picture.  And we really should, Judge.

13   We think it is hearsay to begin with by them starting it.

14   But if they start it, we should be able to complete the

15   picture.

16           MS. McCLAIN:  Your Honor, the only problem is how do

17   we establish the reliability and credibility of the informant

18   and the information he is providing or his motive and bias

19   for providing such information without being allowed to go

20   into --

21           THE COURT:  Well -- okay, wait, wait.  Here is --

22   here is the answer to that, at least at this stage:  And I am

23   talking because I would like everybody to be thinking about

24   these things so that ultimately when I rule, I will be able

25   to do my best.  And that is his -- his reliabilty and

1   credibility isn't an issue.  That is the Government's

2   position.  He is not going to be called as a witness.  Mr.

3   James' credibility might be an issue because he is on the

4   tape.  And the -- the witnesses who said that they saw the

5   money and saw the gun and saw the fake drugs, that is an

6   issue because they are witnesses in this case, but they are

7   not calling this confidential witness.  They are not asking

8   anybody to believe a word he says.  That is what their

9   closing argument is going to be, probably even if you call

10  him.  And so they -- that is -- they think they have enough

11  evidence, apart from any testimony he might give, to persuade

12  the jury to convict your client.  And -- and so they haven't

13  put his credibility at issue.  That is, I think, what their

14  position is.

15          Nevertheless, because the overall investigation

16  needs to be understood, I would -- I have said to you in the

17  hall I would let that information come in even through their

18  witnesses, but then, it seems to me, if what you are really

19  doing is attacking the state of mind and trying to understand

20  why these, as Miss Carothers said, phenomenally trained FBI

21  and Secret Service agents chose to use this nefarious

22  character, it would not be fair to not let them complete the

23  picture by saying, "We know he was really bad, but he had

24  these transactions with the defendant and that made us --

25  that led us to believe that he would be a good person to work

CLERK'S FILE COPY

1       IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

DOCKETED
OCT v 2 2004

3   UNITED STATES OF AMERICA,        )
                                     )
4              Plaintiff             )        No. 02 CR 278
                                     )
5          vs.                       )        Chicago, Illinois
                                     )        September 6, 2002
6   DONVILLE JAMES,                  )        8:45 o'clock a.m.
                                     )
7              Defendant             )

FILED
OCT 0 8 2004
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

8          TRANSCRIPT OF PROCEEDINGS - TRIAL
        BEFORE THE HONORABLE WAYNE R. ANDERSEN
9                  and a jury
                   VOLUME 2
10
                                          05-3070

     For the Government:    HON. PATRICK J. FITZGERALD
11                          United States Attorney, by
                            MR. PATRICK COLLINS
12                          MS. VALARIE HAYS
                            Assistant United States Attorneys
13                          (219 South Dearborn Street
                            Chicago, Illinois 60604)
14

15   For the Defendant:     ANITA RIVKIN-CAROTHERS & ASSOCIATES, by
                            MS. ANITA RIVKIN-CAROTHERS
16                          (33 North LaSalle Street, Suite 3300
                            Chicago, Illinois 60602)
17                               and
                            MS. JOAN A. HILL McCLAIN
18                          33 North LaSalle Street, Suite 3300
                            P.O. Box 7701
19                          Chicago, Illinois 60680
                                 and
20                          MS. MABLE TAYLOR
                            Three First National Plaza
21                          70 West Madison Street, Suite 1400
                            Chicago, Illinois 60602
22

23   Court Reporter:        ROSEMARY SCARPELLI
                            219 South Dearborn Street
24                          Room 1412
                            Chicago, Illinois 60604
25                          (312)435-5815

U.S.C.A. – 7th Circuit
FILED
AUG 0 4 2005 SK
GINO J. AGNELLO
CLERK

CLERK'S FILE COPY

113-2

1    think the Government should be allowed to show, yes, one of

2    the reasons we picked this particular guy was we knew that he

3    knew how Mr. James operated because he told us he had been

4    involved in four other deals with him, or whatever it was

5    that was said.

6          So before we charge through this door, I think it is

7    very important for the defendant to know what the Court's

8    thinking is so that you can make an election as to whether or

9    not you want to go through that door at all.

10         Now, having said all that, we know that there still

11   remains the option, as Mr. Collins pointed out, of calling

12   the cooperating witness who I assume is still available --

13   you have kept track of him --

14         MR. COLLINS:  Yes.

15         THE COURT:  -- and questioning him about his

16   credibility.  I think the rules are clear that you can

17   impeach him, even though you have called him.  And -- and I

18   think under those circumstances I probably would rule that

19   evidence of other drug transactions between him and Mr.

20   James, unless you open it up through something else, is more

21   prejudicial than probative.  But if you are trying to in

22   effect attack the witness' reliance upon this, the

23   Government's agents' reliance on this, then I think the jury

24   is entitled to know all the things that were in their mind

25   when they chose to work with this individual.

● CLERK'S FILE COPY

1           IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS                  DOCKETED
2                    EASTERN DIVISION
                                                            OCT ¥ 2 2004
3   UNITED STATES OF AMERICA,        )

4              Plaintiff,   FILED          No. 02 CR 278

5          vs.          OCT ¥ 8, 2004      Chicago, Illinois
                                           September 9, 2002
6   DONVILLE JAMES,       MICHAEL W. DOBBINS    9:15 o'clock a.m.

7              Defendant.   CLERK, U.S. DISTRICT COURT   05-3070

8            TRANSCRIPT OF PROCEEDINGS - TRIAL
        BEFORE THE HONORABLE WAYNE R. ANDERSEN
9                    and a jury
                      VOLUME 3
10

    For the Government:        HON. PATRICK J. FITZGERALD
11                             United States Attorney, by
                               MR. PATRICK COLLINS
12                             MS. VALARIE HAYS
                               Assistant United States Attorneys
13                             (219 South Dearborn Street
                               Chicago, Illinois 60604)
14

15  For the Defendant:         ANITA RIVKIN-CAROTHERS & ASSOCIATES, by
                               MS. ANITA RIVKIN-CAROTHERS
16                             (33 North LaSalle Street, Suite 3300
                               Chicago, Illinois 60602)
17  U.S.C.A. – 7th Circuit               and
         FILED                 MS. JOAN A. HILL McCLAIN
18                             33 North LaSalle Street, Suite 3300
     AUG 0 4 2005 SK           P.O. Box 7701
19                             Chicago, Illinois 60680
    GINO J. AGNELLO                    and
20        CLERK                MS. MABLE TAYLOR
                               Three First National Plaza
21                             70 West Madison Street, Suite 1400
                               Chicago, Illinois 60602
22

23  Court Reporter:            ROSEMARY SCARPELLI
                               219 South Dearborn Street
24                             Room 1412
                               Chicago, Illinois 60604
25                             (312)435-5815

CLERK'S FILE COPY

1    convicted of those charges."

2              So stipulated?

3              MS. HAYS:  So stipulated.

4              MS. TAYLOR:  The defendant Donville James by his

5    attorneys Anita Rivkin Carothers, Joan A. Hill McClain and

6    Mabel Taylor and the United States by Assistant United States

7    Attorneys Valarie Hays and Patrick Collins hereby agree and

8    stipulate as follows:  It is stipulated between the parties

9    that the recording and transmitting device used by the

10   Government on March 25th, 2002 in this case was not

11   malfunctioning on that day.  The device was capable of

12   recording and transmitting and the device was capable of

13   being turned on and off by the Government agents and

14   informant involved in the case.

15             If it is further stipulated that the Government has

16   declined to produce the recording transmitting device for

17   viewing by this jury pursuant to privilege which the Court

18   has deemed valid."

19             So stipulated?

20             MS. HAYS:  So stipulated.

21             MS. TAYLOR:  Thank you, your Honor.

22             THE COURT:  Thank you.  Will the Government plan to

23   put on any rebuttal or additional evidence, do you think?

24             MS. HAYS:  No, nothing.

25             THE COURT:  If you want to -- you said there might

# CERTIFICATE OF SERVICE

I, _____ hereby certify that I have served a true
and correct copy of the following:



Which is deemed filed at the time it was delivered to prison authorities for
forwarding, **Houston v. Lack**, 101 L.Ed.2d 245 (1988), upon the defendant/
defendants and or his attorney/attorneys of record, by placing same in a
sealed, postage prepaid envelope addressed to:




and deposited same in the United States Mail at the Federal Correctional
Institution at Greenville, Illinois.

I declare, under penalty of perjury (Title 28 U.S.C. §1746), that the
foregoing is true and correct.




Dated this _____day of _____, 20____.


                                    _____

                                         **FCI Greenville**
                                    Federal Correctional Institution

## ATTORNEY AT LAW

November 10, 2002
Mrs. Anita R. Carothers,

Dear Counsel,
      Attached you will find a Motion to Supplement the New Trial and/or Judgement of Acquittal.

      As you can see, I'm very concerned about my life, what direction my life is headed in towards the future. Reflecting on the events that took place before trial and after has made me realize the mistakes, and information that played an important part in determining outcome of my innocents or guilt, which led me to investigate, research and put this motion together to expound on the points you briefly touched upon, and to show the court why the entrapment should have been my defense from the onset.

      Mrs. Carothers, it's common knowledge that once you've experienced something and given an opportunity to look back you'll detect and recognize the pros and cons, which explains how I have identified these problems: (1) Failure to expose the case in its entirety prohibited me from putting on my defense to display how this case was initiated. (2) Not calling the witness to cross examine him stopped him from being accountable for his statements. (3) Not allowing me to take the stand also prevented certain details from surfacing. (4) Accepting the "New set of transcribed transcripts" from the tapes without review prior to trial to compare the authenticity was another grave error. (5) Exposing how the C.I. lured me into both crimes by persistently pursuing me after constant rejection of being involved numerous times sets precedence to show I wanted no part of the action. (6) Conflicting statements during the suppression hearing and trial by agent McKenna where he denied his promise to release my girl friend if I cooperated and worked my case off. At trial he changed the story by admitting he promised to drop the charges under oath, which would result in perjury.

      Mrs. Carothers, I am aware you know the law, and rules of the game that several brothers are being engulfed and swept away in. Under your guidance in pursuit of my freedom, I'm in jeopardy of losing my life unless I'm granted a new trial to establish the issues mentioned above. At this point I'm undecided on the avenue I should travel in quest of obtaining a new trial, sentencing entrapment departure, or acquittal.

      I'm consulting with you on this matter because I need your legal experience in devising a strategy to undue the harm that has happen and/or obtain damage control.

      Under the circumstances do you think it would be a wise move to file for Ineffective Assistance of Counsel? If so would you either direct me or put one together and mail it to me so I can file it Pro Se. I'm only trying to save my life.

By:  Donville James